31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

UNITED STATES OF AMERICA,  .  Case No. 1:15-CR-012
                          .
        Plaintiff,   .  Cincinnati, Ohio
                          .  Friday, March 6, 2015
      - v -        .  10:30 A.M. Hearing
                          .
CHRISTOPHER LEE CORNELL,  .  ***REDACTED VERSION***
                          .
        Defendant.   .  **Motion to Show Cause - (cont'd**
..........................  **from Thursday, March 5, 2015)**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE

APPEARANCES:
For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                     BY:  Timothy S. Mangan, Esq. (AUSA)
                     221 East Fourth Street
                     Suite 400
                     Cincinnati, Ohio  45202

For the Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
                     BY:  Richard Smith-Monahan, Esq.
                     251 E. 5th Street, Suite 350
                     Cincinnati, Ohio  45202

For Fox 19-WXIX TV,
et al.,:              MICHAEL K. ALLEN & ASSOCIATES
                     BY:  Michael K. Allen, Esq.
                     810 Sycamore Street, Fourth Floor
                     Cincinnati, Ohio  45202

                     FROST BROWN TODD
                     BY:  Susan Grogan Faller, Esq.
                     3300 Great American Tower
                     301 East Fourth Street
                     Cincinnati, Ohio  45202

Also Present:        Kara Killen (FPD Investigator)
                     Kevin Roach, News Director, Fox 19
                     Many interested persons

32

```
Law Clerk:             Laurie J. Nicholson, Esq.

Courtroom Clerk:       Mary C. Brown

Court Reporter:        Mary Ann Ranz
                       810 Potter Stewart U.S. Courthouse
                       100 East Fifth Street
                       Cincinnati, Ohio  45202

                           *   *   *
```

**REDACTED VERSION**

33

1          P R O C E E D I N G S     (10:30 A.M.)

2          THE CLERK:  Please be seated.

3      Case Number CR-1-15-12:  *United States of America versus*

4  *Christopher L. Cornell*.

5          THE COURT:  Good morning, everyone.  I apologize for

6  the delay.  There were some procedural matters that we needed

7  to sort out before we begin.  Those matters, I believe, are

8  resolved, and so we are ready to begin.

9      There are two matters before the Court today.  Defense

10  Counsel's motion for an Order to Show Cause why three entities

11  should not be found in contempt of this Court's previous Order

12  directed to Tricia Macke, a WXIX Fox news reporter, also to

13  WXIX Fox News Channel, and the Boone County Jail.

14      Also is the issue of whether or not this Court should

15  enjoin Channel WXIX from broadcasting an interview conducted

16  by Ms. Macke with the defendant in this case, Christopher

17  Cornell.

18      I think it might be wise to start with the issue of

19  contempt.  This would be a criminal contempt matter controlled

20  by Title 18, United States Code, Section 401, and a Court of

21  the United States should have power to punish by fine or

22  imprisonment, at its discretion, contempt of its authority as

23  to -- the applicable subsection is disobedience or resistance

24  -- to its lawful order.

25      Federal Rule of Criminal Procedure 42 provides the manner

34

1  in which the Court should proceed.

2      Initially, if the Court finds that one or more persons

3  have committed criminal contempt, that may be punished after

4  prosecution on notice.  The Court must give the person or

5  entity notice in open court, in an order to show cause, and

6  that notice must:

7      State the time and place of a trial;

8      Allow the defendant reasonable time to prepare a defense;

9  and

10     State the essential facts -- the essential facts

11 constituting the charged criminal contempt.

12     The Court would also have the authority to appoint a

13 prosecutor.

14     The persons or entities charged with criminal content --

15 contempt are entitled to a trial -- entitled to a jury trial.

16     So, the matter for today's hearing is whether or not the

17 Court has sufficient information to justify going forward with

18 a criminal contempt prosecution against one or more of the

19 entities mentioned in the motion for an order to show cause.

20     I would say that in the event that I find sufficient

21 information, I would file a formal notice and the matter would

22 be referred to the Clerk's Office for random assignment to

23 another judge.  So that is my opening statement.

24     And, Mr. Allen, for the record, perhaps you would like to

25 introduce the other counsel at your table.

35

1          MR. ALLEN:  Yes, Your Honor.

2      This is Susan Grogan Faller representing the parties in

3  this action:  Channel 19 and Ms. Macke.

4          THE COURT:  So you are co-counsel?

5          MR. ALLEN:  Yes, ma'am.

6          THE COURT:  All right.

7      Mr. Smith-Monahan, it's your motion, if you would like to

8  proceed.

9          MR. SMITH-MONAHAN:  Yes, Your Honor.

10     I don't know how the Court's intending to proceed.  I know

11 we've at least two witnesses that were brought forth for

12 today's hearing for purposes of making this hearing.

13     I know there is a representative from the Boone County

14 Jail, and I believe Ms. Tricia Macke was also going to be

15 required to appear.

16     I made argument last night on the record before the Court,

17 which I would construe probably is an opening-type statement

18 of what we believe the facts are at this point.

19     I don't know if the Court would desire to rehear that kind

20 of opening statement before we proceed today, or if you feel

21 last night's presentation was sufficient to lay out the issues

22 that we see in this case.

23         THE COURT:  I think that last night's presentation

24 was adequate.

25     Just to further lay the groundwork for today's hearing,

36

1   this Court entered an Order on January the 16th.  Magistrate

2   Judge Bowman entered that Order in behalf of the Court in

3   which she said that co-defense counsel orally requested an

4   Order from the Court directing the detention facility holding

5   the defendant not to permit outside contact by anyone with the

6   defendant without her express approval.

7       Judge Bowman went on then in her Order to say:

8       "Having considered the request, the Court hereby grants

9   the request and orders that no one be permitted to visit or

10  otherwise contact the defendant without the express approval

11  of Mr. Cornell's attorney."

12      That is the Order that was placed upon the record and is

13  available to the public on the Court's PACER program.

14      So with that as the basis, Mr. Smith-Monahan, you may call

15  witnesses.

16      Mr. Allen correctly pointed out last night that the

17  information the Court had was by way of hearsay, and so

18  first-person testimony today would be very helpful.

19          MR. SMITH-MONAHAN:  Yes, Your Honor.

20      And I don't know if the opposing counsel had any intention

21  of making an opening statement, but with the Court's

22  representation, we'd rest on what we indicated last night.

23  Perhaps if they do intend to make an opening statement, give

24  me a brief chance to rebut any new allegations that were made

25  before we start.

37

1          THE COURT:  Ms. Faller?  Mr. Allen?

2          MS. FALLER:  Your Honor, would we have a separate

3    opportunity to make an opening statement with respect to the

4    prior restraint as opposed to right now?

5          THE COURT:  Yes.  I think I'd like to manage the

6    criminal contempt portion of the -- the issues and then

7    address prior restraint separately.

8          MS. FALLER:  Your Honor, I, just for the record, want

9    to point out that I and my law firm was not involved in this

10   prior to the interview in question.  However, Fox 19 and

11   Tricia Macke proceeded in utmost good faith.  They were aware

12   of the Order, but without waiving any privilege, the fact is

13   they -- the fact is that they did have advice of counsel in

14   proceeding, were proceeding in good faith, did not believe

15   that this Order pertained to them or prevented them from

16   responding to the contact that was initiated by the defendant.

17     I believe that the defendant did tell them that this was

18   agreeable to his attorney at one point in time; however, the

19   attorney also left a voicemail that this was not agreeable.

20   So I'm not contending that they thought it was agreeable at

21   the time; however, because the Order says that the request was

22   for an order directing the detention facility and because they

23   were not -- they did not contact him initially, he contacted

24   them, he called them.  And the three phone calls that were

25   involved in the interview, although certainly they gave him

38

1    the number, they responded to his calls, they accepted his

2    calls, but they were proceeding in utmost good faith, and I

3    think that there is insufficient reason or evidence to go

4    further with respect to contempt of court concerning Tricia

5    Macke or Fox 19.

6              THE COURT:  Okay.  Mr. Smith-Monahan?

7              MR. SMITH-MONAHAN:  I have nothing further to add by

8    way of opening statement, Your Honor.

9              THE COURT:  Okay.  And although it's my understanding

10   that Assistant United States Attorney Mr. Mangan is on the

11   sidelines for this hearing, I suppose we should put it on the

12   record that you are not going to actively participate as best

13   we know?

14             MR. MANGAN:  That's correct, Your Honor.  We're

15   taking no position.

16             THE COURT:  Thank you.

17       All right.  Mr. Smith-Monahan, please call your first

18   witness.

19             MR. SMITH-MONAHAN:  Yes, Your Honor.

20       I'd first like to move to separate any witnesses that may

21   testify today.  I don't know if the opposing counsel intends

22   to call any witnesses separately or not.

23             MS. FALLER:  Yes, Your Honor.

24       I might call Tricia Macke and Kevin Roach and Robin

25   Tyndall.

39

1          THE COURT:  Ms. Faller, I assume Mr. Roach is your

2    corporate representative?

3          MS. FALLER:  He is.

4          THE COURT:  Please identify Robin Tyndall.

5          MS. FALLER:  Robin Tyndall is the producer involved.

6          THE COURT:  So she is a witness, not a corporate rep?

7          MS. FALLER:  Yes.

8          THE COURT:  So she should be precluded from the

9    courtroom until needed.

10      So if you would please stand up and head for the door,

11   we'll show you where the witness waiting room is, if she is in

12   the courtroom.

13      (Ms. Tyndall exits the courtroom.)

14          MS. FALLER:  And Tricia Macke as well, is that

15   correct?

16          THE COURT:  She is a party, I assume.

17          MS. FALLER:  A party, Your Honor?

18          THE COURT:  Well, in the sense that she is one of the

19   individuals who may need to respond to supported charges of

20   contempt of court.  So I would think she should be permitted

21   to stay.  I will hear argument to the contrary.

22      Mr. Smith-Monahan?

23          MR. SMITH-MONAHAN:  This is in regard to Ms. Macke,

24   Your Honor, is that correct?

25          THE COURT:  Yes, her presence in the courtroom.

40

1          MR. SMITH-MONAHAN:  I'm going to call her first, so

2    that may resolve that -- that issue anyway.

3          THE COURT:  Okay.  And then we have a representative

4    from the Boone County Jail.  Since that entity or that person

5    may be a subject of a further proceeding --

6          MR. SMITH-MONAHAN:  I don't know if he's here in a

7    representative capacity of the jail or whether he's here as a

8    witness.  If he's the designated representative for that

9    party, I believe the Court's correct, he could remain.

10          THE COURT:  For the record, would you tell me who you

11    are and what is your status in this matter?

12          LIEUTENANT MAYDAK:  I am Jason Maydak from the Boone

13    County Jail.  I'm here as a witness at the request of the

14    Marshal Service.

15          THE COURT:  And you represent the Boone County Jail,

16    correct?

17          LIEUTENANT MAYDAK:  I'm not here to take that stance,

18    no.

19          THE COURT:  Do you have any counsel here?

20          LIEUTENANT MAYDAK:  No.

21          THE COURT:  Okay.  Well, Mr. Smith-Monahan?

22          MR. SMITH-MONAHAN:  I think under those

23    circumstances, perhaps he should be separated, Your Honor.

24          THE COURT:  All right.  Lieutenant, we're going to

25    ask you to step out and wait in the waiting room, the witness

TRICIA MACKE - DIRECT

41

1   waiting room.

2        (Lieutenant Maydak exiting the courtroom.)

3            THE COURT:  Okay.  And, Mr. Smith-Monahan, if you

4   will call your first witness.

5            MR. SMITH-MONAHAN:  Yes, Your Honor.  We would call

6   Tricia Macke.

7            THE CLERK:  Please raise your right hand.

8         (Duly sworn by the Clerk.)

9                          TRICIA MACKE

10  a witness herein, having previously been sworn, testified as

11  follows:

12                      DIRECT EXAMINATION

13  BY MR. SMITH-MONAHAN:

14  Q.  Good morning, Ms. Macke.

15  A.  Good morning.

16  Q.  I am Richard Smith-Monahan.  I represent the defendant in

17  this matter.

18  A.  Uh-huh.

19  Q.  Would you please state your name, full name, and spell

20  your last name for the court reporter?

21  A.  It's Tricia Macke, M-A-C-K-E.

22  Q.  And how are you employed?

23  A.  I'm a news anchor for Fox 19 Television.

24  Q.  And how long have you been employed -- so employed?

25  A.  Almost 22 years.

1    Q.  And are you familiar with the case that's currently

2    pending in the District Court, United States District Court,

3    *United States versus*, it's titled, *Christopher Lee Cornell*?

4    A.  Yes.

5    Q.  Okay.  Were you aware of an Order --

6        Were you aware whether there was an Order issued on

7    January 16th, 2015, related to contact with the defendant in

8    this case?

9    A.  I found out about it on Thursday morning.  Prior to that I

10   did not know.  Yesterday morning.

11   Q.  Okay.  And by "Thursday morning," can you specify do you

12   know what date that was?  Yesterday, Thursday?

13   A.  Yeah, yesterday, whatever the date.  I don't even know.

14   6th?  7th?

15   Q.  And how did you find out about it?

16   A.  Through a voicemail you left on my phone.

17   Q.  And as a result of that voicemail did you make inquiry

18   into what the contents of that Order were?

19   A.  Yes.

20   Q.  And did you find out what the contents of that Order were?

21   A.  I think -- it was a conversation with our lawyer and we

22   were trying to find out the -- 'cause --

23       MS. FALLER:  Objection.

24       Please do not disclose the contents of any conversation

25   with the lawyer.

REDACTED VERSION

1  A.  I did not have your Court Order -- or the Court Order in

2  hand, ever.  I've never seen it.

3  Q.  All right.  And without telling me the content of the

4  conversation, you've indicated you did discuss the matter with

5  corporate counsel?

6  A.  Yes.

7  Q.  Was it your considering that corporate counsel reviewed

8  that Order?

9       MS. FALLER:  Objection.  I don't think she would know

10 that, other than the content of the conversation.

11      THE COURT:  Sustained.

12 Q.  All right.  So without having read the Order, you're

13 indicating you're aware basically of what the Order said?

14 A.  I'm only aware of what your voicemail said, which I still

15 have.

16 Q.  Okay.  Let's take a step back.  Regarding the defendant in

17 this case, did you make the decision at some point to attempt

18 to interview him?

19 A.  He called the news room.  He called us initially.

20 Q.  Okay.  When did that occur?

21 A.  That was Wednesday evening during Ten O'clock News.

22 Q.  And how did you find out about that?

23 A.  I was on set anchoring the news and our executive producer

24 pulled me off the set to tell me that he had called and

25 requested an interview.  And also he gave her the name and

44

1   number of his attorney, and she asked me at that point if I

2   could put a call into his attorney.  At that time I did put a

3   call into the attorney.  Karen Savir, I believe.

4   Q.  Slow you down.  I asked you when that was and I think you

5   said Wednesday.

6   A.  Wednesday night during the Ten O'clock News, about 10:45.

7   Q.  When did you put in this call to the attorney?

8   A.  About 10:40.  Within minutes.

9   Q.  Wednesday night?

10  A.  Uh-huh.

11  Q.  And who was that attorney you called?

12  A.  Karen Savir.

13  Q.  And did you speak with Ms. Savir?

14  A.  Left a voicemail message.  Her voicemail said she was on

15  vacation.

16  Q.  Okay.  And did her voicemail refer you to do anything if

17  you needed to reach someone from our office?

18  A.  I can't remember what her voicemail said, but I did leave

19  a message.

20  Q.  Okay.  At some point did you reach out to the Boone County

21  Jail to attempt to contact the defendant --

22  A.  Yes.

23  Q.  -- in this case?

24      And when did that occur?

25  A.  Immediately after I called his attorney.

1  Q.  So this is 10:45-ish on Wednesday night?

2  A.  Approximately, yeah.

3  Q.  I don't know --

4      This is two days ago, Wednesday, correct?

5  A.  Correct.

6  Q.  Okay.  And tell me about that communication with the jail.

7  A.  I talked to the individual that answered the phone.  It's

8  a female.  Again, I was right in the middle of anchoring a

9  newscast and trying to make phone calls and trying to get on

10 before the next commercial break, so I wasn't taking down who

11 I was speaking to at the Boone County Jail.  It was a female.

12 They told me that there was no one there to authorize an

13 interview or to get him on the phone, or whatever it was,

14 because I asked -- I said I was returning a call.  They said

15 to call back in the morning.  "Who should I talk to?"  They

16 gave me a name of someone to talk to, and that was pretty much

17 it.

18 Q.  I'm sorry?

19 A.  That was pretty much it.

20 Q.  Okay.  And did you have any further communication with the

21 jail that evening?

22 A.  I called them twice, I believe.  I think the second -- I

23 think I hung up and then I called back and said -- asked if

24 they're granting interviews, or something to that extent, I

25 believe.  It was something like, you know, "Will he be able to

1  do an interview?"  Or "Is there anyone else that" -- I did ask

2  them was there anyone else besides the lieutenant that was

3  going to be on in the morning that could okay the interview

4  that night and she said, "No, you'd have to call in the

5  morning," so that's what I did.

6  Q.  So if I'm understanding you correctly, no one told you

7  whether you could or could not interview the defendant on

8  Wednesday night?

9  A.  Correct.  They said there was no one there that evening,

10 that I had to talk to their boss, and that person would be in

11 on Thursday morning at 8 o'clock.

12 Q.  Okay.  So did you then call the jail on Thursday morning?

13 A.  Yes.

14 Q.  And at what time did you do that?

15 A.  I was trying to go over that.  It was around 10:30 --

16 Q.  Okay.

17 A.  -- in the morning.

18 Q.  Would that have been before or after the voicemail you

19 indicated you received from me?

20 A.  I think it was initially before.  I called them before and

21 then I listened to your voicemail.

22 Q.  Okay.  Do you know what time that voicemail was left?

23 A.  It's on my phone.  I mean, the stamp would be on my phone.

24        MR. SMITH-MONAHAN:  Your Honor, may I permit this

25 witness to view her phone, if that would help to refresh her

 1    recollection?

 2          THE COURT:  Yes, you may.

 3          THE WITNESS:  Can I get it out of my bag?

 4          MR. SMITH-MONAHAN:  May she get it?

 5          THE COURT:  Yes, you can step down and retrieve it.

 6      (Witness complying.)

 7  A.  It was turned off.  It's going to take a minute.

 8  Q.  Take your time.  Just when you've been able to ascertain

 9  the information, look up and then I'll know.

10  A.  Sure.

11      (Witness reviewing her cell phone messages.)

12          THE COURT:  While we have a brief hiatus --

13      You just continue, Ms. Macke.

14      -- I want to be sure that everyone in this courtroom is

15  well aware that no recordings can be made of today's

16  proceedings.  No photographs may be taken.  And if you have a

17  cell phone with you, turn it off, or at least turn the sound

18  off.

19  A.  Okay.  Hang on.  I've got a lot of kids.  I've got a lot

20  of phone calls on here.

21      (Witness continues to review her cell phone messages.)

22  A.  I believe your call was at 8:07 A.M.

23  Q.  And, just for the record, have you had the opportunity now

24  to take a look at your cell phone?

25  A.  Yeah.  Yes, I'm looking at it.

REDACTED VERSION

48

1   Q.  And the information you're providing is based on having

2   reviewed the information in your cell phone?

3   A.  Right.

4   Q.  Now, the cell phone that you're holding, that has a cell

5   phone number that goes along with that phone, is that correct?

6   A.  Right.  But yours came up No Caller ID.

7   Q.  I'm sorry.  Your phone --

8   A.  Yeah.

9   Q.  -- has a telephone number you can call and reach that

10  phone, correct?

11  A.  Yes.

12  Q.  I don't want you to say the number.

13      The number to that cell phone, is that the number you left

14  on Ms. Savir's voicemail the night before --

15  A.  Yes.

16  Q.  -- the call to try to reach you?

17  A.  Uh-huh.

18  Q.  Okay.  What was your purpose in calling Ms. Savir on

19  Wednesday evening at approximately 10:45?

20  A.  Robin, our executive producer, again came out to me on set

21  and said that "Chris Cornell called and wanted to do an

22  interview and that he left the name of his attorney and the

23  phone number with us."  And I said to Robin, "You want me" --

24  and she said, "I need you to call her attorney to get this

25  interview."  And I called.  But you have to realize this was

 1  -- I was in the middle of doing a newscast, so everything is

 2  done unbelievably quickly and a lot of times without question:

 3      "Put a call in."

 4      "Okay."

 5      I'm trying to get out before the next commercial break.

 6  Q.  So the question was your purpose in making that call.  And

 7  your purpose was to reach Mr. Cornell's attorney because he

 8  had left that name and number --

 9  A.  Yes.

10  Q.  -- is that correct?

11  A.  Uh-huh.

12  Q.  And you did not reach the attorney at that time?

13  A.  Correct.

14  Q.  You've indicated now that you received a voicemail from me

15  at 8:07 Thursday morning, correct?

16  A.  Right.  But I wasn't awake at 8:07.

17  Q.  I'm sorry.  Came to your phone --

18  A.  Right.

19  Q.  -- at 8:07?

20      And you've indicated the next time you checked your

21  voicemail that morning would have been what time?

22  A.  I think around 10:30, something like that.

23  Q.  And prior to checking your voicemail to see if you had

24  gotten a return call from counsel, you're indicating you

25  contacted Boone County Jail again, correct?

50

1  A.  There were so many phone calls that I made on Thursday

2  morning and -- I'm trying in good faith to put all of these

3  together on who I called when, 'cause I was on the phone

4  multiple times with my station, with Robin, at home, with

5  Boone County, so I don't know the order in which I made all

6  these phone calls, to be honest with you.

7  Q.  So your answer is you don't know if you called Boone

8  County Jail before you heard my message?

9  A.  I think I did, but I'm not positive.

10 Q.  Had you heard my message, would you have called the Boone

11 County Jail having heard it?

12        MS. FALLER:  Objection, Your Honor.  That's

13 speculation.

14        THE COURT:  Sustained.

15 Q.  All right.  Let's talk about after hearing my phone

16 message, did that notify you of my office's intention on

17 whether you should interview our client or not?

18 A.  It notified me to tell my station and the lawyer.

19 Q.  Pardon?  I just didn't hear your response.

20 A.  I said, it notified me to get somebody else involved, and

21 that's why I called our bosses at the station.

22 Q.  My question was, did it notify you of what our office

23 wished in terms of contacting our client?

24        MR. ALLEN:  Judge, I'm going to object.  I think

25 she's asked and answered it a couple of times.

REDACTED VERSION

```
 1              THE COURT:  Overruled.
 2   Q.  Okay.
 3   A.  I'm sorry?
 4              THE COURT:  You should answer the question.
 5   A.  Can you repeat the question that you wanted?
 6   Q.  Did the voicemail that you listened to --
 7   A.  Uh-huh.
 8   Q.  -- notify you of what our office wishes -- what our
 9   office's wishes were related to you interviewing our client?
10   A.  Yes.
11   Q.  And what was your understanding of what that expression
12   was?
13   A.  Not to do an interview.  You were not going to grant it.
14   Q.  Okay.  And I think you've already referenced this, but did
15   that voicemail reference this Court Order?
16   A.  No.  All it said -- there was no number, but it said that
17   a judge --
18       I can play it for you, if that helps.  So --
19              MR. SMITH-MONAHAN:  I would have no objection.
20   A.  -- so I don't misquote.
21              MR. SMITH-MONAHAN:  It's a voicemail.  I'm not
22   offering --
23              THE WITNESS:  I don't want to misquote it.
24              THE COURT:  That's fine.  Go ahead and play it.
25              THE WITNESS:  Hang on.  I think this is the one, so
```

REDACTED VERSION

 1    if it's not, I'm going to stop it real quick.

 2            MR. SMITH-MONAHAN:  I don't know, Your Honor, if I

 3    may just interject just briefly --

 4            THE WITNESS:  (Phone begins playing)  "Tricia

 5    Macke" --

 6            MR. SMITH-MONAHAN:  Can we stop this?  Is there an

 7    ability to stop it?

 8        I don't know if I've disclosed anything confidential about

 9    my co-counsel in that voicemail that perhaps may not be for

10    public consumption.  I'm just --

11        Perhaps more of a factor that would be irrelevant to this

12    hearing.  I'm not exactly sure what I said on the

13    circumstances on why I was responding as opposed to Ms. Savir.

14    I'm trying not to bring public facts here relevant, to the

15    extent that be the case.

16            THE COURT:  Well --

17            MR. SMITH-MONAHAN:  Is that making sense?  I don't

18    know, perhaps if we could have the Court listen to it *in*

19    *camera* first, and then if there's nothing confidential on

20    there --

21        Am I making sense?

22            THE COURT:  You are.

23            MR. SMITH-MONAHAN:  I can address it at sidebar, if

24    you'd rather.

25            MS. FALLER:  I would just say that she got -- she

53

1  acknowledges that she got a voicemail that mentioned an Order.

2  And it seems to me that we're taking an undue amount of time

3  on the issue.

4          MR. SMITH-MONAHAN:  I simply don't remember what I

5  said about why I was getting back instead of Ms. Savir, and I

6  didn't want to make anything on a public record about personal

7  matters related to her.  That was my only reason for asking

8  that.  I don't know what I said on there.  So if they've

9  listened to it recently and know that I didn't -- I didn't

10 disclose any kind of personal information, then I'm not

11 concerned.  But if there's some information, I would ask the

12 Court to listen to it before it becomes a public recording.

13         THE COURT:  I can listen to it *in camera*.  Or perhaps

14 we could --

15         MR. SMITH-MONAHAN:  You want to address it at sidebar

16 and I can --

17         THE COURT:  Yes.

18         MR. SMITH-MONAHAN:  Okay.

19 SIDEBAR CONFERENCE:

20                    **THIS PORTION IS UNDER SEAL**

21

22

23

24

25

1

2

3                 THIS PORTION IS UNDER SEAL

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED VERSION

1

2

3                    THIS PORTION IS UNDER SEAL

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED VERSION

1

2

3                   THIS PORTION IS UNDER SEAL

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED VERSION

**THIS PORTION IS UNDER SEAL**

7   CONCLUSION OF SIDEBAR CONFERENCE

8         THE COURT:  Well, when we were briefly interrupted

9   you were about to play the voicemail message from

10  Mr. Smith-Monahan to you, and if you would please do that now

11  in open court.

12         THE WITNESS:  Okay.  Just hang on; timed out.

13    (Message commenced being played.)

14     "Yes.  Hi.  This is a message for Tricia Macke.  This

15    is Richard Smith-Monahan.  I'm an attorney in the Federal

16    Public Defender's Office.  I'm advised by Karen Savir of

17    our office that you left a voicemail for her regarding

18    our client and prospective interview.  I'm co-counsel on

19    the case and Ms. Savir is unavailable, so I'm returning

20    your call.  We're not -- our office, as counsel, are not

21    going to authorize any form of interview him -- interview

22    of him at this point.  We do appreciate your phone call

23    making that request.  So we would request that you conduct

24    no interview of him at all at this time.  I would remind

25    you, as I'm sure you're aware, there's a Court Order from

1    our federal judge that he not be interviewed by the media

2    without permission of counsel.  We're not granting that

3    permission.  Okay?  Thank you again for the call.  If you

4    have further questions, you can reach me at my office

5    later today.  My phone number is 513-929-4834.  Again, my

6    name is Richard Smith-Monahan.  Thank you."

7    Q.  Thank you.

8       Now, Ms. Macke, you've indicated you did listen to that

9    message?

10   A.  Yes.

11   Q.  And you heard the entirety of the message?

12   A.  Yes.

13   Q.  Did you have any difficulty understanding it because of

14   your circumstances?

15   A.  No, thank you.  I'm fine.

16   Q.  Now, after hearing that message did you have further --

17   let's --

18       You've indicated you had a phone conversation with the

19   Butler County Jail that morning, correct?

20   A.  Yes.

21   Q.  And I believe your final answer was you were not sure if

22   it was before or after you actually heard that voicemail,

23   correct?

24   A.  Yeah.  I was trying to --

25       You want me to look at my times --

REDACTED VERSION

```
 1   Q.   (Nods head affirmatively.)

 2   A.   -- to give you an idea of that on what call I made when?

 3        Okay.  My time stamp says that yours came in at 8:07.  But

 4   again, I don't know what time I actually listened to it.

 5        I put a call into the Boone County Jail at 9:55 A.M.

 6        Called the executive producer after that.

 7        Called the executive producer again.

 8        I called Fox 19 multiple times.

 9        Talked to Jason Scott, another executive producer at our

10   station.

11   Q.   Let me stop you for one moment.

12   A.   Uh-huh.

13   Q.   You mentioned two calls to your executive producer --

14   A.   Uh-huh.

15   Q.   -- shortly after the 9:58 phone call to the Butler County

16   -- I'm sorry, the Boone County Jail?

17   A.   Yeah, uh-huh.

18   Q.   Without telling me the substance and detail of those

19   conversations, would the purpose of either of those calls been

20   to discuss that I advised you not to interview our client?

21   A.   Was it to advise what?  I'm sorry.

22   Q.   That I advised you not to interview our client.

23   A.   Yes.

24   Q.   Okay.  So at the point that you're calling that executive

25   producer at least, you've heard my voicemail and been informed
```

REDACTED VERSION

1  that we were advising you not to interview our client?

2  A.  I believe so.

3  Q.  Now, let's talk about your first phone call with the Boone

4  County Jail, which I believe you indicated occurred at 9:58,

5  your first call on Thursday to the Boone County Jail.  All

6  right?

7  A.  Okay.

8  Q.  What transpired during that phone call?

9  A.  I asked -- I had the direct number.  Lieutenant Maydak

10  answered the phone and I said who I was.  And he was --

11  Q.  You said a name.  Can you give us an estimate as to how

12  you, for the court reporter, how you would spell that name,

13  the person you talked to?

14  A.  M-A-Y-D-A-K.

15  Q.  I'm sorry.  Go ahead.

16  A.  Okay.  Which is the person they told me to call that

17  evening, the night prior.  So I called, he answered the phone,

18  told him who I was.  It was as if he was expecting my call,

19  because I don't even think I came out and said his name, Chris

20  Cornell's name.

21  Q.  By "him," you're referring to the defendant?

22  A.  Uh-huh.  And I said I was calling him back to get an

23  interview.  I wanted to see if we --

24      And I don't know if this is before or after I listened to

25  your voicemail, this initial conversation I had with

1   Lieutenant Maydak, just to point that out, 'cause this is the

2   initial -- when I talked to him the very first time.

3   Q.  Understood.

4   A.  And I stated I wanted to do an interview.  He said, "The

5   jailer doesn't allow any kind of face-to-face interviews, but

6   you could come over and visit him as a visitor and just -- and

7   talk to him."  And I said, "With a camera?"  And he said, "No,

8   just as a visitor."

9       And I said, "Okay.  What about a phone interview?"  And he

10   said, "I would imagine that he would allow that."

11       And I said, "Well" --

12       I think I referred to Chris Cornell as "he."  I never said

13   his name.

14       -- "he called us.  Can I give you a phone number for him

15   to call us?  Because if I'm going to record the phone

16   conversation, it has to be a specific phone number into our

17   news room;" you know, it would have the capabilities of

18   recording a phone call conversation.  And I gave him that

19   phone number.

20       Oh, I should take that back.  Hang on.  I didn't have the

21   phone number on the initial phone call with Lieutenant Maydak

22   because I didn't know it.  I said, "I'm gonna have to give you

23   a call after I talk to someone at Fox 19 to get the phone

24   number for the Voicer Bay," and he said, "Okay, I'll give you

25   a call back."  We hung up.

1  Q.  Okay.  That's fine.

2  A.  Okay.

3  Q.  Did the lieutenant at that point indicate to you anything

4  about there being a Court Order --

5  A.  No.

6  Q.  -- prohibiting an interview of the defendant?

7  A.  No.

8  Q.  He did not?

9  A.  No.

10  Q.  All right.  Why did you choose not to go out and meet with

11  the defendant given that conversation?

12  A.  He said the jailer would not allow any kind of interview.

13  Q.  I thought you said you could have a personal visit but not

14  cameras.

15  A.  Oh, but I'm in the line of business of television, so a

16  face-to-face interview does me no good.  If I can't record it

17  or have a camera there, I have no means of just being a

18  visitor and talking.  It would be senseless for my job.

19  Q.  Okay.  So after this phone call, when was the next time

20  you contacted the Boone County Jail again?

21  A.  I believe it was after a call or two from my station.

22  Q.  Okay.  Call or two from your station.

23  A.  Where I called the station and talked to I believe -- our

24  lawyers were present at that time, I believe.

25  Q.  Okay.  And so back to the question.  When was the time

TRICIA/MACKE - DIRECT

63

1    that you next called the Boone County Jail?

2    A.  I can look at -- I can give you an approximate.

3    Q.  If refreshing your -- if looking at your phone would help

4    refresh your recollection --

5    A.  So I was starting to make phone calls like at 10:30 in the

6    morning, within the half hour, to be honest with you.  This

7    was all a flurry of phone calls.  As any reporter will tell

8    you, you're making the phone calls fast and furious to try to

9    get it, plus I had all my five kids home from school that day,

10   so getting this (snapping fingers) out as quickly as I can.

11   Q.  So you've indicated the first phone call is at 9:58.  Are

12   you testifying today that you believe the second phone call

13   was in 30 minutes of 9:58?

14   A.  Right -- yeah.

15   Q.  Would it help to refresh your recollection to look at your

16   phone?

17   A.  Yeah.  But when I have multiple calls, all of them aren't

18   in here.  You know, which -- it says you have three calls; it

19   doesn't have all the time stamps of the multiple calls.

20   Q.  Would it help to refresh your recollection at all to look

21   and see when that second call --

22   A.  If it helps you, I will.

23   Q.  I'll let you take a moment to look --

24   A.  Okay.

25   Q.  -- and see if that helps.

64

1    A.  Okay.

2        (Witness reviewing her phone messages.)

3    A.  And again, I don't know what time you left yours, but

4    yours was stamped at 8:07.  Okay?

5        And then the Boone County Jail was at 9:58.  That was my

6    call to them, and it says it lasted four minutes.

7    Q.  I'm looking for --

8        You've indicated there was a second call for the Boone

9    County Jail.  We're trying to identify that time.

10            MR. SMITH-MONAHAN:  May I get some more water while

11   she's --

12   A.  10:21.

13   Q.  10:21?

14   A.  Uh-huh.  10:20.  Because the first time --

15       I think the first time I kind of, so to speak, butt-dialed

16   them, I didn't mean to call them; I meant to call the station;

17   so I hung up on that one.  So I called them and it lasted 83

18   -- or 53 seconds.

19   Q.  So if we could just --

20       What time do you believe that was you actually --

21   A.  10:20.

22   Q.  10:20?

23   A.  Uh-huh.

24   Q.  Let's talk about that phone call.  Do you recall that

25   phone call?

1  A.  Yes.

2  Q.  Can you please explain to the Court what happened during

3  that call?

4  A.  I called and Lieutenant Maydak answered the phone again,

5  and I told him that I had a phone number for him to pass along

6  to Chris Cornell and if he would call that number.  And he

7  said -- we discussed what time he would call.  I said, "I'm

8  not at the station right now to do the interview.  I'd have to

9  have a little bit of time to get ready to get over there."

10  And I said, "What time's" -- to get over the station to record

11  it because this phone isn't for recording purposes.

12      I said, "What time is good for you" to Lieutenant Murdak

13  [verbatim], and he said, "Well, we go to lunch between 11 and

14  12, so how about sometime after that?"  I said, "1 o'clock

15  would work well for me.  That would give me enough time to get

16  over to the station."  And that was pretty much the

17  conversation.

18  Q.  Okay.  In this phone call, you indicated you gave the

19  lieutenant your phone number, correct?

20  A.  To the Fox 19 Voicer -- yeah -- Bay.

21  Q.  To the best you can specifically remember, what did you

22  ask the lieutenant to do with that phone number?

23  A.  Pass this number on.  "Can you give Chris Cornell this

24  phone number to call me to do the interview?"

25  Q.  Okay.  So you're asking the lieutenant to give the number,

PROCTOR/MACKE - DIRECT

66

1  to request the defendant to call you at that number --

2  A.  Yes.

3  Q.  -- correct?

4     All right.  And to best of your knowledge, by this point

5  you had in fact heard my voicemail, correct?

6  A.  Yes.

7  Q.  Now, after that phone call, did you have a subsequent

8  occasion to call the Boone County Jail?

9  A.  Yes.

10 Q.  Okay.  And when would that have been?

11 A.  About 1:07.

12 Q.  Okay.  At that point in time when you called the Boone

13 County Jail had you received any call from the defendant?

14 A.  No.

15 Q.  Okay.  So let's talk about that phone call.

16    Can you explain to the Court who you called and what

17 happened in that phone call?

18 A.  I was at Fox 19 at the time and I called at 1:07.  Called

19 to talk to Lieutenant Murdak -- Maydak -- I'm sorry, Maydak.

20 -- to see if the phone call -- to see if the phone call was

21 going to happen.  And he said, "Hang on.  Let me see."  And he

22 put me on hold, came back over on the phone couple seconds

23 later and said yes, he, Chris Cornell, was going to give me a

24 call.

25 Q.  Okay.

PROCTOR/MACKE - DIRECT

67

1   A.  It was pretty quick.

2   Q.  Pardon me?

3   A.  It was a pretty quick phone call.

4   Q.  All right.  What happened after that in relation to the

5   defendant?

6   A.  And then I received a collect call from the Boone County

7   Jail from Chris Cornell.

8   Q.  And do you know what time that occurred?

9   A.  Probably eleven after?  I'm not sure.

10  Q.  I'm sorry?

11  A.  1:11, 1:09, something like that.  Within minutes.

12  Q.  Okay.  And at that point did you talk to the defendant on

13  the phone?

14  A.  Yes.

15  Q.  And how long did that conversation last?

16  A.  There were three 20-minute conversations.

17  Q.  All right.  And why did it occur in three 20-minute

18  conversations?

19  A.  The way that the phone he -- it keeps cutting you off

20  after 20 minutes.  When I initially got on the phone with

21  Mr. Cornell, I asked him how long we would have and he said

22  20 minutes.  And then you get a recording in your ear that

23  says this is going to cut off in two minutes and then you get

24  a one-minute warning, and then Mr. Cornell called me back

25  after the first 20 minutes, then he called me back after the

68

```
 1   second.
 2   Q.  Okay.  So by your approximation of him understanding you,
 3   this interview lasted a total of approximately 60 minutes?
 4   A.  Yes.
 5   Q.  I'm not going to ask you any of the content of what the
 6   defendant said to you during that phone call.  I do want to
 7   ask you, however, whether during the course of that phone call
 8   you asked him questions?
 9   A.  I did.
10   Q.  Did you ask him a number of questions over the course of
11   that hour?
12   A.  I did.
13   Q.  And you're a reporter I think you said for some 22-plus
14   years, correct?
15   A.  Yes.
16   Q.  So I assume you're very experienced at requesting or
17   conducting interviews with individuals, correct?
18   A.  Yes.
19   Q.  And would you say you conducted that interview in a
20   fashion similar to the way you interviewed other individuals
21   in the past?
22   A.  Hundreds, yes.
23   Q.  Okay.  And what is -- again, without discussing the
24   contents of what he said, what was the point of your
25   questioning him at that point from your perspective?
```

A.   The point for -- was to find out what he intended to do,

and what --

Q.   Intended to do with what?

A.   With what he was charged with.  The three counts that he

was charged with.

Q.   So in terms of how he intended to defend himself, is that

what you meant?  I'm not trying to put words in your mouth.

A.   No, it's -- it's -- every reporter, I mean, wants a good

story.  Somebody wants to talk.  This man is a -- you know,

he's a federal prisoner; he wants to talk.  Yeah, I'll talk to

him.  "What do want to talk about?"

Q.   What was your point there?  You said you wanted to find

out what he wanted to do.  I'm trying to get you to elaborate

on that point.

A.   What he intended to do in the United States.  I think that

it's kind of like a hard question to sum up, because a lot of

time when you go into an interview, you don't know what you're

gonna get.  I was going to be lucky if I got him to tell me

his name.  You don't know going in what you're going to get

until you get in there.  Just like when you're questioning

somebody, a witness, you don't know what you're going to get.

So you start off with your questions.  You know, he's never

going to answer questions, the meat, that I really want to get

to where I would ask him, you know, "Did you really intend to

blow up the Capitol?"

1  Q.  Did you ask him that question?

2  A.  Yes.

3  Q.  Did you ask him what he intended to do with his defense at

4  trial?

5  A.  No.

6  Q.  Did you ask him about specific details regarding what he

7  did or didn't do related to these charges?

8  A.  Yes.

9  Q.  And would you characterize your discussion with him as a

10  give-and-take with you asking questions and him responding, or

11  was it more you ask him a single question and he went on a

12  20-minute narrative?

13  A.  It was definitely a conversation.

14  Q.  All right.  Was this interview recorded?

15  A.  Yes.

16  Q.  And what is the current status of that recording?  Is it

17  in the possession of your station?

18  A.  Yes, I would imagine.

19  Q.  Has it at this point been released beyond the possession

20  of your station?

21  A.  There was one sound bite aired at 6:30 last night during

22  the newscast.

23  Q.  Just one sound bite from that recording?

24  A.  I believe so.

25  Q.  Was that during your show or --

 1  A.  I was --

 2      It normally is, but I was busy writing a story, so I

 3  didn't anchor the 6:30.  I only came out and fronted one sound

 4  bite.

 5  Q.  After receiving the voicemail that I left for you

 6  yesterday, did you make any attempt to contact me or my

 7  office?

 8  A.  I did not.

 9  Q.  To your knowledge, did anyone from your station make any

10  attempt to contact me or my office?

11  A.  I do not know that.

12  Q.  Did you have concerns personally in going forward and

13  interviewing him, given that I had indicated that you should

14  not and given that I had indicated that there -- I believe

15  there was an Order prohibiting that contact?

16  A.  I had conversations with my lawyer.

17  Q.  Did you have concerns?

18          MR. ALLEN:  Judge, I object.  I don't know that

19  that's relevant.  I don't --

20      I think it is probably protected.

21          THE COURT:  It's probably --

22          MR. ALLEN:  Protected.

23          THE COURT:  Overruled.

24  A.  Yes.

25  Q.  What were your concerns?  And I don't want to know what

REDACTED VERSION

TRICIA/MACKE - DIRECT

72

1    your conversations with your attorney were.  What were your

2    concerns?

3            MS. FALLER:  Objection.  Is he asking for her concern

4    before she contacted the lawyer and therefore she contacted

5    the lawyer?  Or is he asking if she had had a concern after

6    she got finished talking to the lawyer?  Because I think that

7    makes a difference and I don't think the question's clear.

8            THE COURT:  Mr. Smith-Monahan, if you would rephrase

9    your question to perhaps more carefully pinpoint the time

10   frame of your question.

11   Q.  I'm trying not to discuss what you and your attorney

12   talked about.

13   A.  Uh-huh.

14   Q.  That's privileged.

15       Did you have concerns on your own separate and apart from

16   what the attorney told you?

17   A.  Before or after talking to him?

18   Q.  Well, let's start with before.

19   A.  Yes.

20   Q.  And what were those concerns?

21   A.  You told me based upon your voicemail that I wasn't

22   allowed to do it.  That was my concern.  I didn't know -- I

23   mean, I didn't know the outcome.

24   Q.  Okay.  After having had the conversation with your

25   attorney, did you have independent concerns based on -- not

1    based on your conversation with the attorney but based on your

2    experience as a reporter about interviewing my client?

3    A.  No.

4    Q.  Okay.  All right.

5         There was a hearing in this matter on or about

6    January 16th, 2015, which is the date of this Order we've been

7    referencing.  Were you present in court at that hearing?

8    A.  No.

9    Q.  Was someone from your station present in court?

10   A.  I have no idea.

11   Q.  Did you as a reporter review the online docket --

12   A.  No.

13   Q.  -- of this case?

14   A.  I did not.

15   Q.  If a court hearing is going to happen related to this

16   matter, how do you find out about it?  I'm assuming you're

17   kept abreast of this case.

18   A.  No, not really.  I'm not.  There're a million cases, so

19   the only -- you know, and I don't have a lot of say-so as to

20   what we're putting on the air.  So, you know, it's not --

21   that's not something I do.

22   Q.  So a hearing occurring in this case would not be something

23   brought to your attention --

24   A.  It would not.

25   Q.  -- at your station?

REDACTED VERSION

74

```
 1   A.  No.
 2           MR. SMITH-MONAHAN:  Okay.  Your Honor, I would like
 3   to take one moment to consult with my investigator who is on
 4   the other side of the berm.  May I do that?
 5           THE COURT:  You may.
 6      (Mr. Smith-Monahan and Ms. Killen confer privately.)
 7           MR. SMITH-MONAHAN:  May I take one moment to consult
 8   with my client as well?
 9           THE COURT:  Yes, you may.
10      (Mr. Smith-Monahan and the defendant confer privately.)
11           MR. SMITH-MONAHAN:  Your Honor, I have no further
12   questions of this witness.
13           THE COURT:  Ms. Faller?  Mr. Allen?
14           MS. FALLER:  I have no question.
15           THE COURT:  Thank you.  You may step down.
16      (Witness excused.)
17           THE COURT:  Mr. Smith-Monahan, call your next
18   witness, please.
19           MS. FALLER:  She may either stay or go as she
20   chooses?
21           THE COURT:  She may.
22           MS. FALLER:  Or wait.  Do you need her again for the
23   second part?  I don't need her again for the second part of
24   this hearing.
25           THE COURT:  Mr. Smith-Monahan --
```

1      MR. SMITH-MONAHAN:  I couldn't hear.

2      THE COURT:  -- do you have any position with regard

3 to whether Ms. Macke needs to remain for the second part of

4 the hearing on the subject of a restraining order to prevent

5 the publication of this audiotape?

6      MR. SMITH-MONAHAN:  I would not intend to present her

7 as a witness further at that portion of the hearing.  So if

8 she desires to leave now, I don't believe we have a reason to

9 have her stay.

10      THE COURT:  All right.  So, Ms. Faller, you will not

11 need her present so she may be excused?

12      MS. FALLER:  Yes.  She may stay or leave as she

13 chooses, as far as I'm concerned.

14      THE COURT:  All right.  Your decision, Ms. Macke.

15      MR. SMITH-MONAHAN:  I would call the Boone County

16 Lieutenant, Your Honor.

17      THE CLERK:  Please raise your right hand.

18      (Duly sworn by the Clerk.)

19      THE CLERK:  Please be seated.

20                    LIEUTENANT JASON MAYDAK

21 a witness herein, having previously been sworn, testified as

22 follows:

23                    DIRECT EXAMINATION

24 BY MR. SMITH-MONAHAN:

25 Q.  Good morning.

1   A.  Good morning.

2   Q.  I'm Richard Smith-Monahan.  I represent the defendant in

3   this matter.

4      Would you please state your name, full name, and spell

5   your last name for the court reporter?

6   A.  Jason Maydak, M-A-Y-D-A-K.

7   Q.  Okay.  And how are you employed?

8   A.  I'm employed by the Boone County Jail.

9   Q.  And what is your position there?

10   A.  Lieutenant.

11   Q.  Okay.  And how long have you been employed at the Boone

12   County Jail?

13   A.  Eighteen years.

14   Q.  Eighteen years.

15      Okay.  And how long have you been a lieutenant at the

16   Boone County Jail?

17   A.  Approximately eight.

18   Q.  Eight.

19      Okay.  Are you familiar with the individual known in this

20   case as Christopher Lee Cornell?

21   A.  Yes.

22   Q.  Okay.  And have you seen him at the jail?

23   A.  Yes.

24   Q.  Are you familiar that he's housed at the Boone County

25   Jail?

77

1   A.  Yes.

2   Q.  And were you made aware --

3       Is he a state inmate, a federal inmate?  What is your

4   understanding of his status at the jail?

5   A.  A federal inmate.

6   Q.  Okay.  Have you yourself had contact with the United

7   States Marshals Service related to the defendant?

8   A.  Yes.

9   Q.  Okay.  And did the United States Marshal Service make you

10  aware of an Order from the Federal Court related to outside

11  contact with the defendant?

12  A.  Yes.

13  Q.  And what was your understanding of that Order?

14  A.  The Order was initially to have no contact with anyone

15  outside with the -- unless his attorney approved it.

16  Q.  Along about Wednesday of this week did you receive a phone

17  call -- well, you may not have.

18      Were you aware of whether a reporter called the jail

19  requesting to interview the defendant?

20  A.  Yes.

21  Q.  Okay.  How did you become aware of that information first?

22  A.  My shift supervisor from second shift on Wednesday made me

23  aware of it.

24  Q.  And, to your knowledge, do you know when that phone call

25  came in from the reporter?

JASON MAYDAK - DIRECT

78

```
 1  A.  No.
 2  Q.  So you found out about it from a second shift supervisor?
 3  A.  Correct.
 4  Q.  When did you find out about it?
 5  A.  Sometime Wednesday evening.
 6  Q.  Sometime Wednesday evening.
 7      Were you working that evening?
 8  A.  No.
 9  Q.  Did you then receive a phone call from that reporter?
10  A.  On Thursday, yes.
11  Q.  Okay.  Do you know the name of that reporter?
12  A.  Tricia Macke.  That's who she said she was.
13  Q.  Okay.  And do you recall what time you received the phone
14  call from her?
15  A.  Exactly, no, but it was in the A.M.  Maybe 9 o'clock.
16  Generally in that time frame.
17  Q.  Sure.  And do you know how many phone calls you received
18  from her that morning?
19  A.  At least two, maybe more.
20  Q.  Okay.  Let's see if we can first talk of -- on that first
21  conversation.
22  A.  Okay.
23  Q.  Can you recall what kind of inquiry she was making of you?
24  A.  She was requesting to have an interview with Mr. Cornell.
25  Q.  And what did you tell her when she made that request?
```

79

1   A.  I told her no, that it would not be permitted.

2   Q.  Did you tell her why that would not be permitted?

3   A.  She asked me why, and I just told her it was the jailer's

4   policy that no face-to-face interviews could be done within

5   our facility, and that's for any inmate, just not a federal

6   inmate.  So --

7   Q.  Did you mention to her this Order that you had spoke to

8   the marshals about?

9   A.  No.

10  Q.  You did not?  Okay.

11      So how did that phone call resolve?  What decision was

12  made during that phone call, if any?

13  A.  As I said, as a result of that phone call, shortly after

14  Mr. Cornell was asked if he was willing make a phone call to

15  her for an interview.

16  Q.  So let me take one step back.  You've indicated that

17  during that first phone call you told the reporter no, that

18  they couldn't cut come and visit with him?

19  A.  As a face-to-face interview, yes.

20  Q.  Was there a discussion with the reporter at that point

21  about a phone conversation occurring?

22  A.  Yes.  I told her the only way that she would be able to

23  speak with him was if the inmate was to call her.

24  Q.  Okay.  So what was her response to that?

25  A.  Maybe just an "Okay" or -- I mean, she may have questioned

1   as to why and that's when I just told her that was the

2   jailer's policy.

3   Q.  Is there a reason you didn't mention the Order?

4   A.  I, at that point in time, I believe that the Order -- and

5   I'm not sure how to word this.  I don't want to say Order was

6   no good, but the Order said that he could have contact with

7   people on the outside at her -- with her permission, the

8   attorney.

9        I had spoken with the attorney, and we may have exchanged

10  some emails back and forth, that -- explaining that once he

11  had a phone in his cell, he was more than welcome to call

12  anybody that he wanted to call.  She understood that.  Because

13  at first she wanted him to just to be able to call his

14  parents, and I explained our procedure with our phones:  If

15  there's a phone in his cell, we can't limit who he calls.  If

16  he has a phone, he can call anyone.  I explained that to her.

17  She understood that and she said it's okay.

18  Q.  All right.  Was there any conversation with the attorney

19  about the press interviewing him?

20  A.  I don't really recall the press specifically.  You know, I

21  talk to a lot of attorneys; I talk to a lot of agencies.  I

22  don't remember the exact specifics of that phone call.  But I

23  did point out to her that if she had -- if the inmate had

24  access to a telephone, that he would be able to call anybody,

25  and she was okay with that.

1   Q.  And was there any express authorization by the attorney

2   for the press to talk to him.  "Any express," meaning "I'm

3   specifically authorizing the media to talk to him."

4   A.  No.

5   Q.  All right.  During this first phone conversation did the

6   reporter, Ms. Macke, give you a phone number to give to Mister

7   -- or to the defendant in this matter?

8   A.  Yes.

9   Q.  She did?

10  A.  Yes.

11  Q.  During the first phone call?

12  A.  I'm sorry.  Maybe that was not the first phone call.

13  Q.  Okay.  And after the first phone call did you --

14      I think you've indicated you did have a conversation with

15  the defendant?

16  A.  I personally did not.  My day shift supervisor was -- I

17  asked him to go ask Mr. Cornell if he was willing to make a

18  phone call to Tricia Macke and the shift supervisor reported

19  back to me that yes, he did want to, or that he would make the

20  phone call.

21  Q.  And then at some point did you receive a second phone call

22  from the reporter?

23  A.  Yes.

24  Q.  Do you recall when that was?

25  A.  Within an hour or two later of the initial call.

1  Q.  What, to the best of your recollection, what transpired in

2  that phone call?

3  A.  I informed her that he did say he was willing to talk to

4  her, and therefore she provided me with a phone number for him

5  to call and a time for him to call.

6  Q.  Okay.  So it was during that second phone call you were

7  given a number?

8  A.  Second -- I know it was not the first phone call.

9  Q.  Okay.  Did you communicate that phone number to the

10  defendant?

11  A.  I communicated it to my shift supervisor.

12  Q.  Okay.  And what did you direct the shift supervisor to do

13  with that phone number?

14  A.  Provide the number to the inmate.

15  Q.  Okay.  Did you personally at any point read the Court's

16  Order regarding outside contact?

17  A.  Yes, initially when it was first submitted.

18  Q.  After the second phone call from the reporter, Ms. Macke,

19  do you recall if you received any additional phone calls from

20  her?

21  A.  Yes, I did.

22  Q.  And to the best of your recollection when did that occur?

23  A.  It was around 1 o'clock, because that was the time that he

24  was supposed to call.

25  Q.  Okay.  I want to make sure we've made clear for the

1 record.  Did this all occur, these phone calls I've

2 referenced, did they all occur on Thursday?

3 A.  Yes.

4 Q.  And that was yesterday --

5 A.  Correct.

6 Q.  -- correct?

7     Okay.  And so around 1 o'clock you receive a phone call

8 from the reporter again.  Can you explain what transpired

9 during that phone call?

10 A.  Something along the lines of could you let him know that

11 she's waiting and that he hasn't called yet.

12 Q.  Okay.  Did you have any communication with the defendant

13 after receiving that phone call?

14 A.  I personally did not, no.

15 Q.  Okay.  What did you do after you received that phone call?

16 A.  I called to our Control Room operator and asked her to

17 call into his cell and see if he was still willing to make

18 that phone call.

19 Q.  "His" meaning the defendant?

20 A.  Yes.

21 Q.  And did that happen?

22 A.  Yes.

23 Q.  And what was communicated back to you?

24 A.  "Okay."

25 Q.  Were you aware of whether the defendant actually did make

JASON NAYDAK - DIRECT

84

1  this phone call?

2  A.  No, I was not.

3  Q.  Okay.  So you had no part in -- in no actual hands-on part

4  with that part of the process?

5  A.  Correct.

6  Q.  Who would have been the person that did, if you know?

7  A.  It who would have been the person --

8  Q.  Who facilitated him to get the phone and make the phone

9  call?

10  A.  Himself.

11  Q.  So --

12  A.  No, someone from the jail.

13  Q.  Obviously, I can't --

14     A person can't walk around a jail and do what they want.

15  Who would have been the guard or individual that facilitated

16  him getting to a phone and making the phone call?

17  A.  He has a phone inside his cell.

18  Q.  In his cell?

19  A.  He actually has a portable phone that sits right outside

20  his cell that he has full access to.

21  Q.  So no one has to hand it to him in order to --

22  A.  No, unless it's moved from that location at some point.

23  That -- I don't know if it was actually sitting in front of

24  his food pass at that particular moment or not.

25  Q.  Fair enough.

1    Did you have any further contact with the reporter after

2  that 1 o'clock or so phone call?

3  A.  No.

4  Q.  Did you have any communication with the U.S. Marshals

5  Service on Wednesday or Thursday about communication with

6  Mr. Cornell, meaning the past two days from today, Wednesday

7  or Thursday of this week?

8  A.  I had communications last night with one of the U.S.

9  Marshals.

10 Q.  Last night?

11 A.  Yes.

12 Q.  Before or during the time the reporter was calling, did

13 you have communication with the marshals regarding the

14 defendant?

15 A.  No.

16    MR. SMITH-MONAHAN:  Okay.  Your Honor, may I take a

17 moment similarly and check with my investigator and my client?

18    THE COURT:  Yes, you may.

19    (Mr. Smith-Monahan confers with Ms. Killen and later the

20 defendant privately.)

21    MR. SMITH-MONAHAN:  A few more questions, Your Honor,

22 if I may.

23 BY MR. SMITH-MONAHAN:

24 Q.  Why did you choose to facilitate this reporter being able

25 to interview the defendant?

1    A.  Basically, it's not a policy, but inmates have the right

2    to speak to the media at our facility if they choose to do so.

3    Q.  Can any member of the public just call and ask to speak

4    with an inmate and you would facilitate it?

5    A.  It is common.

6    Q.  Pardon?

7    A.  It is common at our facility.  It is normal practice for

8    that to happen.  That's part of our compliance with

9    Immigration standards and Department of Corrections standards

10   to relay messages and not prevent them from communicating with

11   people.

12   Q.  Did you have concerns, given the Court's Order,

13   facilitating this interview?

14   A.  At that point I believe that the phone privilege and who

15   he communicated with was approved by his attorney,

16   Mr. Cornell's attorney.  We had a conversation about him being

17   able to call anyone, including the media, and she okayed his

18   access to a telephone.

19   Q.  Let me take a step back now.  Are you saying this attorney

20   okayed him talking to the media?  I think that was --

21   A.  She okayed him to have a telephone.  When that discussion

22   took place, I informed her that he could -- at that point

23   would be able to call anyone he chooses and she said that's

24   okay for him to have a telephone.

25   Q.  Let me walk through that.  I think if I'm --

1      Initially, when you got the Court Order, was she

2  [verbatim] permitted to make any phone calls at all?  When you

3  first got the Court Order with the defendant?

4  A.  Mr. Cornell was not allowed to make phone calls at all.

5  Q.  Not even to his attorney?

6  A.  Correct.

7  Q.  Not to his family?

8  A.  Correct.

9  Q.  And you understand that obviously that would be a problem

10  if a defendant can't talk to his attorney, right?

11  A.  Yes.

12  Q.  And I think your initial conversations with Ms. Savir were

13  related to that problem, correct?

14  A.  Correct.

15  Q.  So what you informed her was we can't pick and choose who

16  he calls if we let him use a phone, correct?

17  A.  Correct.

18  Q.  So --

19  A.  Well, hold on.  Please repeat that.

20  Q.  Yeah, sure.

21      I believe your response was if we're going to let him use

22  the phone to call his attorney and call his family, the jail

23  can't limit who else he might call.  Correct?

24  A.  Correct.

25  Q.  So there was no specific request from the defense that he

REDACTED VERSION

88

1  be able to call the media, correct?

2  A.  Correct.

3  Q.  The request was he needs to be able to call his attorney

4  and he needs to be able to talk to his family, correct?

5  A.  That was the initial request.

6  Q.  Okay.  And that's not an unreasonable request for a

7  defendant, correct?

8  A.  Correct.

9  Q.  But there was no in-between choice at that point; in other

10  words, you couldn't just allow him to call those individuals

11  but limit other contacts, so it was either he gets to call

12  everybody or gets to call nobody?

13  A.  Correct.

14  Q.  That was the response?

15  A.  Correct.  And she was fully aware of that.

16       MR. SMITH-MONAHAN:  May I take a moment to consult

17  with my client?

18       THE COURT:  You may.

19    (Mr. Smith-Monahan and the defendant confer privately.)

20       MR. SMITH-MONAHAN:  May I take one moment again on

21  the other side of the berm?

22       THE COURT:  Yes.

23    (Mr. Smith-Monahan and Ms. Killen confer privately.)

24       MR. SMITH-MONAHAN:  I have no further questions.

25                    CROSS-EXAMINATION

LT. JASON MAYDAK - CROSS

89

BY MS. FALLER:

Q.  I have just a couple of questions for further

clarification --

A.  Okay.

Q.  -- if possible.

    In the first conversation that you had with Tricia Macke,

do you recall whether there was any discussion one way or the

other about whether she could come to the jail to visit the

gentleman?

A.  I believe there was and that's what I denied initially,

was her to visit the facility and do an interview with the

inmate.

Q.  And when you say that, was there any discussion or

understanding of whether or not she would have cameras if she

came to visit?  You know, a television camera for a television

interview?

A.  I -- I don't know exactly what was talked about, but I

believe I did mention that there would be the -- there's no

audio- or video recording devices permitted in our facility.

Q.  Yes.  Thank you.

    But she couldn't have come to visit even without any

devices is what you're saying, is that correct?

A.  She could come in and have a non-contact visit at a

visitation area.

Q.  And you said, I believe, there was a call at or about

```
 1    1 o'clock in the afternoon from Tricia Macke.  Do you recall

 2    her exact words during that call?

 3    A.  I don't recall the exact words, but she basically said,

 4    "Is he still going to make that phone call?  He hasn't called

 5    yet."  Something of that nature.  I don't know exactly what

 6    the verbiage used was.

 7              MS. FALLER:  I don't have any further questions,

 8    thanks.

 9              THE COURT:  Mr. Smith-Monahan, any follow-up?

10              MR. SMITH-MONAHAN:  No, Your Honor.

11              THE COURT:  All right.  Thank you, Lieutenant.  You

12    may step down.

13        (Witness excused.)

14              THE COURT:  Mr. Smith-Monahan, is there a reason for

15    Lieutenant to continue to be segregated?

16              MR. SMITH-MONAHAN:  No, Your Honor.

17              THE COURT:  All right.  You may remain, if you wish;

18    otherwise, you're excused.

19        (Lieutenant Maydak exiting the courtroom.)

20              THE COURT:  And if you'll call your next witness.

21              MR. SMITH-MONAHAN:  No further witnesses, Your Honor.

22              THE COURT:  All right.  Would you like to argue your

23    motion at this point, submit it?  File briefs?

24              MS. FALLER:  Your Honor, as you know I'm basically a

25    civil lawyer.  Is it appropriate at this point to argue that
```

ARGUMENT - SMITH-MONAHAN

91

1   we do not need to go forward with a defense because you're not

2   going to, with respect to my clients, you do not --

3           MR. SMITH-MONAHAN:  Your Honor, can I ask --

4       I'm having a hard time hearing you from behind.

5           THE COURT:  Okay.

6           MR. SMITH-MONAHAN:  If that's going to be a long

7   discussion, could we have her at the podium?

8           THE COURT:  Ms. Faller, if you could speak from the

9   lectern so everyone can hear you.  Okay.

10          MS. FALLER:  All I was asking -- and I'm sorry, I

11  didn't intend it to be long.

12      What I think -- what would be appropriate, if this was a

13  regular civil case, would be sort of a motion for directed

14  verdict that -- with respect to my client anyway -- you do not

15  feel that you have enough evidence to go forward in contempt

16  and, therefore, there's no need to put on any further defense.

17  I think that is the case, in that I would be able to -- to

18  make that argument.  But if the Court thinks that I'm wrong

19  and that you do have enough to go forward against my clients,

20  then I could put on additional witnesses.

21          THE COURT:  Well, let me hear what Mr. Smith-Monahan

22  has to say.

23          MR. SMITH-MONAHAN:  Okay.  So, acknowledging this

24  portion of the proceeding is related to contempt, I will

25  remind the Court our focus is this statement that was

92

1  obtained, we believe, in violation of the Court Order.  We

2  leave it to the Court's determination and discretion to find

3  which of the individuals or entities named may or may not be

4  in contempt as a result of the violation of that Order, but we

5  believe the violation of the Order in this case is clear.

6  That is based on the following:

7       This Order was issued January 16th, 2015.  It is a public

8  document on the docket of this court.

9       I did spend some time discussing with the reporter whether

10 or not she was personally aware of it.  I frankly think it's

11 irrelevant.  It's a public document, it's an Order of this

12 Court.  These are news agencies obviously following the

13 progress of this case.

14      I would start by saying I believe they knew or should have

15 known about the Order because it was a public record filed on

16 the docket and it was articulated by the magistrate in open

17 court in a room full of reporters.

18      Having said that, I believe this reporter at a minimum

19 became aware of the existence of this Order upon a voicemail

20 from me on Thursday, yesterday, at 8:07 in the morning.  She

21 didn't hear it until sometime a bit later, sometime after --

22 or sometime around 10 o'clock.  She was not entirely clear

23 whether she heard my voicemail before or after she called the

24 jail on Thursday morning, but, nonetheless, was certainly

25 aware of the voicemail by the time she was making arrangements

1 to try to interview our client at the Boone County Jail.

2     It is clear from her testimony she had discussions with

3 her superiors -- I forget the title they were given, but her

4 superiors about this matter. She discussed this matter with

5 her counsel. Clearly, the WXIX is aware at this point of the

6 existence of the Order. Whether or not they actually read it

7 or not -- I think it would have been foolish for them not to

8 at that point -- but, nonetheless, they're aware of the

9 existence of it.

10     I think the Order speaks for itself. It is "no one

11 permitted to visit or otherwise contact the defendant without

12 the express approval of Mr. Cornell's attorney."

13     It appears that the reporter began down the path of trying

14 to get permission from our office, but when that permission

15 was denied, instead of recontacting us for any further

16 discussion, just decided on her own to proceed to try to

17 interview our client.

18     I won't reiterate the facts that she indicated happened,

19 but she clearly took affirmative steps with the jail to make

20 sure that Mister -- or my client, the defendant, called her

21 for an interview. During the course of that interview, she

22 asked him numerous questions, I think it's very clear, over

23 the course of an hour about the circumstances of the case, the

24 circumstances of what he may or may not have done related to

25 the case.

94

1    This was precisely our concern that something like this

2    might happen with a 20-year-old, very impressionable young man

3    who's a defendant in this case.  This was exactly the point of

4    requesting this Order so that something like this did not

5    happen.

6    The Court stated in open court in a room full of reporters

7    that it was not to happen, issued a written Order that it was

8    not to happen, and from what I can tell that was intentionally

9    disregarded.  Whether this reporter did it of her own

10   volition, intentionally disregarded, or did it at on the

11   advice of her superiors at the station and/or at the advice of

12   her legal counsel, it was nonetheless intentionally regarded

13   -- I'm sorry, intentionally disregarded.

14   We did everything in our power, as I indicated to you last

15   night and from what you hear from the testimony, to avoid this

16   happening.  When we caught wind of the plot developing and

17   thought it had been alleviated, assumed they would follow our

18   direction that we're not giving express approval for you to

19   have contact with our client.  I communicated that, I believe,

20   very clearly in that voicemail more than one time and

21   referenced the Court Order.  So, short of seeking some

22   injunction at that point, which we didn't believe was

23   necessary given we communicated it to the station and they had

24   no further contact with us, we believed it wasn't going to

25   happen.

1    So, we would submit this is unfortunately an agency or a

2  business, a news station, acting with knowledge in direct

3  contradiction of this Court Order and a reporter individually

4  acting intentionally with direct knowledge in violation of an

5  Order of this Court.

6    Based on those circumstances, we ask the Court to -- I

7  believe the proper request at this point is to enter an order

8  requiring them to show cause, both the -- both the reporter,

9  who was Tricia Macke, and the television station WXIX, issue

10 an Order to show cause why they should not be held in

11 contempt.

12    The issue of the Boone County Jail, you know, frankly, I

13 would submit that to your discretion.  The issue of the Boone

14 County Jail disclosing this information does not directly

15 relate to our concerns going forward in this case, which are

16 that this information not be disclosed to the public or

17 disclosed to the government for use in prosecution given that

18 it was taken in violation of a Court Order.

19    I would estimate, as we discussed pre-trial, that there

20 may be a recording of this in the jail's log, which we're

21 going to ask ultimately, depending on your ruling, to suppress

22 that information, or order that that information not be

23 disseminated any further.  I will submit the issue on contempt

24 to the Boone County Jail and leave that to your discretion.

25         THE COURT:  Okay.  Ms. Faller, a response, or do you

ARGUMENT - FALLER

96

1    want to stand on your previous remarks?

2            MS. FALLER:  Thank you, Your Honor.

3        I think that the testimony is clear and uncontradicted

4    that this contact started with the defendant.  It was the

5    defendant who contacted the station and Tricia Macke then

6    proceeded.

7        I think her testimony was clear that she was conscientious

8    and acting in good faith at all points in time.  She did not

9    simply, quote, "decide on her own" that she was going to do

10   this.  She made proper inquiry.  She talked to counsel.  There

11   was no discussion of how many counsel, but she talked to

12   counsel.  It was not my office or me, but she did do that.

13   She talked to her superiors and she talked to the Butler

14   County Sheriff's Office and she got no indication whatsoever

15   that she could not proceed in the manner that she was doing.

16       At first I thought maybe there was some inconsistency

17   between the Officer Maydak's -- Deputy Maydak's recollection

18   of the conversation and Ms. Macke's, but I think that they

19   were actually very consistent:  That she couldn't come in with

20   a recording device and do a formal TV interview.  And Tricia

21   said, "In my business you would want to have it recorded for

22   use," but that that was permissible and possible.  She had no

23   indication from the deputy other than that.

24       The defendant not only called the station in the first

25   place, but when he was given the proper phone number, he

97

1    called repeatedly.  He called three times.  So at all points

2    in times I think Tricia Macke and the station acted in

3    complete good faith, that there was no intent to be in

4    contempt of court, there was no intent to violate the Court

5    Order.  And that not --

6         Leaving aside all the First Amendment arguments, even if

7    this were not a First Amendment case, there should be no order

8    to show cause why there's no contempt.

9         However, this is a First Amendment case, and I think that

10   any Show Cause Order under these circumstances would clearly

11   impinge the First Amendment.

12        I am planning to argue more about the First Amendment in

13   the second portion of the hearing.  I can do more now, but I'm

14   happy to leave that argument for later.

15             THE COURT:  Last word, Mr. Smith-Monahan?

16             MR. SMITH-MONAHAN:  Thank you, Your Honor.  I just

17   want to refer back to the words of the Order:  "No one" --

18   this is Judge Bowman's order of January 16, 2015, the final

19   sentence:  " ... no one be permitted to visit or otherwise

20   contact the defendant."

21        I don't believe that Order matters whether the defendant

22   had reached out first or not.  No one was permitted to

23   otherwise contact the defendant.

24        When the reporter called the jail repeatedly requesting

25   that the deputy get a message to my client, asking him to call

98

1  and providing him a phone number, that is undoubtedly and

2  indisputably otherwise contacting him.  I don't see any other

3  way to interpret what happened there.  So the question remains

4  why?  Opposing counsel suggested she had no reason to believe

5  she couldn't do it.  I told her she couldn't do it.  I told

6  her clearly and directly in reference to this Order.  If this

7  is good faith, why not give me a call back?  Why not have

8  counsel call me back?  Why not have a superior call me back?

9  There's a point to this Order and it's to prevent this exact

10  thing from happening.  What more can the Court do to prevent

11  this exact thing from happening?

12      I have nothing further.

13          THE COURT:  Ms. Faller, to the extent that you are

14  moving to truncate the proceedings and find in favor of your

15  clients, it's denied.

16    I do at this point think there's sufficient evidence in

17  the record to move forward with a notice of criminal contempt.

18  However, certainly I'll give you the opportunity to present

19  anything that you think would have a bearing on that question.

20    I do note that we've been going for an hour and a half,

21  perhaps two hours.  Before you call your witnesses, would you

22  like a break?

23          MS. FALLER:  I think that's a good idea, Your Honor.

24  Thank you.

25          THE COURT:  Okay.  And can I ask you for purposes of

1  scheduling how many witnesses you're anticipating calling?

2       MS. FALLER:  It would be at most two, Your Honor.

3       THE COURT:  Okay.  Well, I suppose in fairness to

4  everyone a 15-minute break till 12:15.

5       MS. FALLER:  Thank you, Your Honor.

6       THE COURT:  Okay.

7       THE CLERK:  All rise.

8    (11:58 A.M., a recess was taken.)

9                        *   *   *

10 BEFORE THE COURT:                    (12:20 P.M.)

11      THE CLERK:  Please be seated.

12      THE COURT:  Ms. Faller, if you'll call your first

13 witness.

14      MS. FALLER:  Thank you, Your Honor.  I would call

15 Robin Tyndall.  I believe she's outside the courtroom.

16      THE CLERK:  Please raise your right hand.

17    (Duly sworn by the Clerk.)

18      THE CLERK:  Please be seated.

19                        ROBIN TYNDALL

20 a witness herein, having previously been sworn, testified as

21 follows:

22                      DIRECT EXAMINATION

23 BY MS. FALLER:

24 Q.  Would you please state your name for the record?

25 A.  Robin Tyndall.

REDACTED VERSION

100

1    Q.  And by whom are you employed?

2    A.  WXIX Fox 19.

3    Q.  And what's your position?

4    A.  Executive Producer.

5    Q.  Do you mind if I called you Robin?

6    A.  Please.

7    Q.  Robin, to your knowledge, have you ever spoken with the

8    defendant in this case?

9    A.  I did, yes.

10   Q.  And could you tell me when and by what means?

11   A.  Wednesday night, a little after 10 o'clock P.M., he phoned

12   our news room.

13   Q.  Did you answer the call?

14   A.  I did.

15   Q.  And could you tell us everything you recall of the

16   conversation, please?

17   A.  Yes.  He called the news room collect.  I accepted the

18   charges.  He asked me first thing how does he get his story

19   out on television and I asked him who he was and what his

20   story was.  And he told me his Muslim name, which I didn't

21   recognize because all the coverage we had done was by the name

22   Chris Cornell.  So I asked him what he was accused of and he

23   told me that he was the man suspected of plotting to attack

24   the U.S. Capitol.  And I asked him to spell his name and he

25   did.  And then I asked him, "What do you want to do?"  And he

1  said that he wanted to get his story on television.  And I

2  asked him if his lawyer would allow him to talk and he said

3  yes, and then he proceeded to give me his lawyer's name and

4  her phone number and he spelled her name.

5  Q.  All right.  Do you recall anything else of the

6  conversation?

7  A.  No.  I just told him that we would reach out to his

8  attorney and we'd be in contact.

9  Q.  All right.  Did you in fact call his attorney?

10  A.  I contacted our anchor and she contacted the attorney's

11  office.

12        MR. SMITH-MONAHAN:  Can we get her slightly closer to

13  the microphone?  Her voice is soft.

14        THE COURT:  Yes.  If you could speak up and speak

15  directly in the microphone, that would help.

16  A.  Okay.

17  Q.  Would you repeat your answer?  Did you in fact call the

18  attorney whose name that he had given you?

19  A.  I did not.  I gave the attorney information to our anchor,

20  Tricia Macke.

21  Q.  Okay.  And did Tricia indicate whether or not she had

22  called the attorney, as far as you know?

23  A.  She did.  She called and left a message.

24  Q.  Okay.  Did you have occasion at any point in time to hear

25  that the attorney did not -- that some attorney did not

ROBIN TINDALL - DIRECT

102

1   approve of any kind of interview and referenced a Court Order?

2   A.  The next day.

3   Q.  Okay.  And did you --

4       I do not want to ask you about the content of any

5   conversation, but did you have occasion to discuss this with

6   counsel?

7   A.  I did.

8   Q.  And was this inside counsel or outside counsel for your

9   employer?

10  A.  Inside counsel.

11  Q.  Meaning an employee of Raycom, or "outside" meaning a law

12  firm that does work for Raycom?

13  A.  I'm actually not sure.

14  Q.  Okay.  And did you at any point in time ever think you

15  were in any way exhibiting contempt of the Court or the

16  Court's power?

17  A.  Of course not.

18  Q.  Did you think that the station was exhibiting contempt of

19  the Court or the Court's power and authority?

20  A.  No.

21  Q.  Did you intend at any point in time to violate any kind of

22  Court Order or cooperate in the violation of the Court Order?

23  A.  Never.

24          MS. FALLER:  And I at this point have no further

25  questions.

1          THE WITNESS:  Okay.

2          THE COURT:  Mr. Smith-Monahan?

3          MR. SMITH-MONAHAN:  Thank you, Your Honor.

4                      CROSS-EXAMINATION

5    BY MR. SMITH-MONAHAN:

6    Q.  Good afternoon, Ms. Tyndall.  My name is Richard

7    Smith-Monahan.  I represent the defendant in this matter.

8        What's your function as executive producer?

9    A.  I oversee the newscast, the content, the structure, the

10   assignment of crews.  Pretty much just oversee the Ten O'clock

11   News.

12   Q.  You are a --

13       Would it be correct to call you a supervisor?

14   A.  Yes.

15   Q.  You have discretion to decide what does and does not make

16   the news?

17   A.  I do.

18   Q.  Do you have discretion to decide what stories are pursued

19   or not pursued at your station?

20   A.  I do.

21   Q.  You would have the discretion in relation to the reporter,

22   Tricia Macke, in terms of what stories she chooses to

23   investigate or not in relation to the station?

24   A.  Yes.

25   Q.  Now you've indicated that you talked to the defendant on

104

1    Wednesday evening of this week, correct?

2    A.  Correct.

3    Q.  Was that your first contact with him?

4    A.  Yes.

5    Q.  Was that a cold call to you?  Had you any expectation of

6    receiving that call?

7    A.  No expectation whatsoever.

8    Q.  Now you've indicated that he gave you an attorney name and

9    number during this phone call, correct?

10   A.  Correct.

11   Q.  Do you know what attorney name he gave you?

12   A.  Karen Savir.

13   Q.  And were you -- did you have any understanding as to who

14   Karen Savir was other than his attorney?

15   A.  No, just knew she was -- that he had said that was his

16   attorney's name.

17   Q.  What familiarity did you have with the defendant's case

18   prior to this phone call?

19   A.  I mean, we've covered it; it's a big news story, so we've

20   done a lot of stories on it.

21   Q.  Had you ever attended a court hearing yourself related to

22   this matter?

23   A.  No.

24   Q.  Did you have reporters from your station that attended

25   court hearings related to this matter?

1  A.  Yes.

2  Q.  Do you know whether you would have had reporters attend

3  each of the court hearings that had occurred up to that date

4  in this matter?

5  A.  I would expect so, yes.

6  Q.  So if I indicated to you there was a hearing on or about

7  January 16, 2015, related to whether the defendant was going

8  to be released on bond, would you expect that a reporter from

9  your station would have been present at that hearing?

10        MS. FALLER:  Objection:  Speculation, unless she

11  recalls.

12        MR. SMITH-MONAHAN:  I couldn't hear all of the

13  objection.

14        MS. FALLER:  Speculation, unless she recalls

15  specifically.

16        THE COURT:  You may answer the question, if you know.

17  A.  I'm sorry.  What was the question again?

18  Q.  Try that again.

19  A.  Okay.

20  Q.  January 16th hearing of 2015 related to whether the

21  defendant was going to be released on bond.  Let me just start

22  with do you know specifically if you had a reporter present at

23  that hearing?

24  A.  I do not know for sure.

25  Q.  Okay.  Based on your experience as a supervisor, would you

REDACTED VERSION

1   have expected that you would request a reporter to be present

2   at that hearing?

3   A.  Yes.

4   Q.  Okay.  Do you have any reason to believe there was not a

5   reporter at that hearing, specifically?

6   A.  What day of the week was that?

7   Q.  January 16th, 2015.  What was your question?

8   A.  What day of the week is that?

9         MR. SMITH-MONAHAN:  May I refer to my calendar, Your

10  Honor, and I can --

11        THE COURT:  You may.

12      (Pause.)

13        THE COURT:  It was a Friday, if that helps.

14        MR. SMITH-MONAHAN:  Thank you, Judge.  My proficiency

15  is not good with my phone.

16  Q.  Okay.  A Friday?

17  A.  I don't work Fridays, so there's no way I would know.

18  Q.  All right.  So you were given the name Karen Savir along

19  with a phone number, correct, as far as the defendant's

20  attorney?

21  A.  Correct.

22  Q.  You took that information and you passed it on to your

23  reporter Tricia Macke, correct?

24  A.  Correct.

25  Q.  What did you tell her when you gave her that name and

REDACTED VERSION

```
 1    phone number?

 2    A.  I told her that Mr. Cornell called us and wanted to talk

 3    to us, wanted to tell us his side of the story, and told her

 4    he had supplied us with his name and number and that I had

 5    asked him if his attorney would allow him to talk, he said

 6    yes, and that I wanted her to call him -- I'm sorry, call her.

 7    Q.  Call the attorney?

 8    A.  Call the attorney, yes.

 9    Q.  And did you give Ms. Macke any further direction that

10    related to that conversation?

11    A.  I don't recall.

12    Q.  Okay.  Were you aware at that time of the Court Order

13    prohibiting outside contact with the defendant?

14    A.  No.

15    Q.  Okay.  Now, you are aware that Ms. Macke did in fact make

16    a phone call to that attorney's number, correct?

17    A.  Correct.

18    Q.  And did Ms. Macke advise you what she did when she called

19    that number?

20    A.  I believe she said that she left a message.

21    Q.  Okay.  And did you give her any further direction related

22    to having left a message and not talked to anyone?

23    A.  No, not that night.  No.

24    Q.  Did Ms. Macke subsequently inform you that she had

25    received a return phone call from an attorney related to this
```

1  defendant?

2  A.  The next day she told me that she had gotten a voicemail

3  message, yes.

4  Q.  Okay.  Did she tell you who that attorney was that called?

5  A.  She said that it wasn't a -- it wasn't Karen Savir, that

6  it was a man, she believed, in her office.

7  Q.  And did she tell you the content of that, or did you hear

8  the voicemail?

9  A.  I did not.

10  Q.  Okay.  Did Ms. Macke tell you the content of that

11  voicemail?

12  A.  I believe she paraphrased it, but I don't remember her

13  exact words.

14  Q.  Did she paraphrase to you that the attorney instructed

15  that the client was to not be interviewed?

16  A.  I think that she told me that the attorney said she

17  wouldn't -- she wouldn't authorize an interview.

18  Q.  The attorney would not authorize an interview, did I hear

19  correctly?

20  A.  Yes.

21  Q.  Did she also tell you that the attorney referenced a Court

22  Order prohibiting contact?

23  A.  Not that I recall.

24  Q.  So you don't believe Ms. Macke told you that information?

25  A.  She might have.  I don't recall.

REDACTED VERSION

ROBIN TYNDALL - CROSS

109

1  Q.  Would that be important information to you if there was a

2  Court Order prohibiting contact?

3  A.  Certainly.

4  Q.  All right.  But you don't recall her saying it?

5  A.  No.  I was actually in the drive-thru and doing -- taking

6  my daughter to school and juggling around 80 things so I

7  don't.

8  Q.  Is it your testimony you would think if she did tell you

9  that, that would be something that would stick with you

10  because it's important?

11  A.  If I heard it, yeah.

12  Q.  Okay.  When, as best you can recall, was this conversation

13  with Tricka -- I'm sorry -- Tricia Macke when she told you she

14  had received a voicemail from an attorney?  When did that

15  conversation occur?

16  A.  Thursday morning sometime in the 10 o'clock hour, I would

17  think.

18  Q.  Around 10 o'clock?  Okay.

19     So when she told you the attorney had disapproved of the

20  interview, what did you do with that information?

21  A.  I think we called my supervisor, Kevin Roach.

22  Q.  Okay.  And did you discuss that matter with him?

23  A.  Yes.

24  Q.  And what was the result of that conversation between you

25  and he?

1   A.  We decided to consult a legal counsel.

2   Q.  Now you're telling the Court you're not aware of the Court

3   Order at that point?

4        MS. FALLER:  Objection.  That's not what she said.

5        You're talking now about what she spoke to Kevin --

6        MR. SMITH-MONAHAN:  I'll clarify the question.

7   Q.  At this point in time you just finished talking with

8   Kevin, Kevin Roach, right?

9   A.  (Nods head affirmatively.)

10  Q.  At this point in time were you aware of the Court Order?

11  A.  The earliest I absolutely remember knowing about the Court

12  Order was when we were on the phone with our legal counsel.

13  Like I said, if Tricia mentioned it in her phone call to me, I

14  don't recall that part of the conversation.  But my earliest

15  recollection is when we were on the phone with the attorney.

16  Q.  So you don't recall knowing about the Court Order prior to

17  the phone call with the attorney, am I understanding you

18  correctly?

19  A.  Correct.

20  Q.  Why did you make the decision to call legal counsel if

21  you're not aware of a Court Order prohibiting outside contact?

22  A.  Because the attorney was saying we couldn't talk to the

23  guy who said he wanted to talk to us.

24  Q.  Okay.  So you had a conversation with yourself and

25  Mr. Roach and legal counsel, correct?

1    A.  Yeah.  There was a conference call with --

2    Q.  What is the name of this legal counsel?

3         MS. FALLER:  Objection.

4         THE COURT:  Overruled.

5    A.  I've only heard it referred to as Covington.  I don't know

6    the actual name.

7    Q.  I'm sorry?

8    A.  I've only heard it referred to as Covington.  I don't know

9    the actual name.

10   Q.  Is the attorney local --

11   A.  Our corporate attorney.

12   Q.  Is the attorney local here or is this an attorney from out

13   of state, do you know?

14   A.  I don't know.

15   Q.  Male or female?

16   A.  It was a man.

17   Q.  As a result of this conversation with the attorney, you

18   became aware of a Court Order related to this matter?

19   A.  Correct.

20   Q.  And this Court Order, you were informed, prohibited

21   outside contact with this defendant?

22   A.  Correct.

23        MS. FALLER:  Objection.  Are you asking a question?

24   Are you asking her what she --

25        That seemed to be a leading question.

112

```
 1      Do you have a question to ask her?

 2          MR. SMITH-MONAHAN:  I am cross-examining, so it is a

 3   leading question.

 4          MS. FALLER:  Well --

 5      (Laughter.)

 6          MS. FALLER:  Good point.  But my point is that you

 7   just stated what something --

 8      Are you asking her a question?

 9          THE COURT:  Overruled.  But I have a feeling you're

10   gonna have to restate it.

11          MR. SMITH-MONAHAN:  I have a feeling I am, too.  That

12   effectively got me off track, so give me a moment.

13   Q.  So -- I'll just step one step back and come back to it

14   again.

15      You were informed during this conversation that there was

16   a Court Order, correct?

17   A.  Correct.

18   Q.  And you became aware during this conversation that this

19   Court Order prohibited outside contact with the defendant,

20   correct?

21   A.  I'm sorry, what did you say?

22   Q.  You were informed or became aware in this conversation

23   that this Order prohibited outside contact with this

24   defendant?

25   A.  Actually, I'm remembering a little bit more clearly now.
```

REDACTED VERSION

 1   I had reached out to one of our other producers and asked her

 2   to pull documents, any documents from the case, and I think

 3   she may have brought it to our attention and that's when we

 4   called the attorney's office.

 5   Q.  Okay.  Let's step back.  Who was this other producer?

 6   What's her name?

 7   A.  Nicole Doll.

 8   Q.  And can you just spell the last name for the court

 9   reporter?

10   A.  D-O-L-L.

11   Q.  Nicole is the first name?

12   A.  Correct.

13   Q.  Is she your equivalent at the station, a person of equal

14   level?

15   A.  She's a producer.

16   Q.  So she's a supervisor above you?  I intend to simplify.

17   A.  She's actually below me.

18   Q.  Below you?

19   A.  Yes.

20   Q.  So you called her --

21      I want to figure out where in time this phone call

22   occurred.  Was this before you talked to Kevin Roach or after?

23   A.  I don't recall.

24   Q.  Okay.  Let's go back.  Before or after you talked to your

25   reporter Tricia Macke?

 1    A.  After.

 2    Q.  Okay.  So this is after you were notified by Ms. Macke

 3    that the attorney had said no?

 4    A.  Actually, wait.  Wait a second.  I take that back.  I

 5    contacted Nicole Doll first thing in the morning even before I

 6    talked to Tricia Macke and asked her to pull all the records

 7    on this case in the expectation that we would be able to talk

 8    to him.

 9    Q.  Okay.

10    A.  I apologize.

11    Q.  So we're going to need to readjust here.

12        So this individual, Nicole Doll, pulled records and

13    informed you that there was a Court Order related to outside

14    contact with the defendant.  Is that what you're saying?

15    A.  Correct.

16    Q.  And she told you that information before you talked to

17    Tricia Macke?

18    A.  She came -- I believe she came in during the call to the

19    attorney and said that she had a Court Order -- had found a

20    Court Order.

21    Q.  This is during your and Kevin Roach's call to the

22    attorney?

23    A.  Correct.  It was a conference call with other people.

24    Q.  I don't want to belabor it, but I want to make sure we

25    have the timeline.  You talked to Tricia, you --

1      The first thing you did that morning related to this was

2   call Nicole Doll and asked her to pull records related to the

3   case?

4   A.  Yes.  And I -- and I talked to my other executive

5   producer, Jason Scott, informed him that we might be able to

6   do this interview, asked him to have a photographer available.

7   I did everything I would normally do to try to get ready for a

8   story.

9   Q.  So when you informed Nicole Doll to do this, she's getting

10  records that the station would have accumulated related to

11  this case in its investigation.  Is that what she's doing

12  there?

13  A.  She's pulling past stories we've done; she's pulling court

14  records.

15  Q.  That's what I'm getting at.

16      These are records and reports that were in your station's

17  possession in its investigation of this case?

18  A.  Well, I think she had to pull them off of PACER.

19  Q.  Pull them off of PACER?

20  A.  Yes.

21  Q.  Do you know for a fact what she did when she got those

22  records?

23  A.  Well, she forwarded out several of the documents and then

24  she came in during our phone call with the corporate attorney

25  and said she had found a Court Order.

116

1  Q.  Okay.  All right.  So we're back to then the first you

2  believe you knew about the Court Order was during the phone

3  conversation with the lawyer?

4  A.  Correct.

5  Q.  Did she hand you the Order?

6  A.  I was on the phone call; I was not at work at that time.

7  Q.  You were not at your station at the time?

8  A.  Correct.

9  Q.  So she had this Order in hand at that point?

10  A.  I wasn't there; I don't know.

11  Q.  Okay.  Well, she was saying she had an Order, correct?

12  A.  Correct.

13  Q.  Was Kevin Roach in the room at the time?

14  A.  I don't know; I wasn't there.  I assume -- I assume Kevin

15  was in there.  I mean, it was a conference call.  I wasn't

16  hosting the conference call, I wasn't in the building, so I'm

17  not exactly sure.

18  Q.  All right.  So you're having a phone conversation with you

19  and Kevin Roach and an attorney --

20  A.  Yes.

21  Q.  -- right?

22  A.  Yes.

23  Q.  And you don't believe Kevin and the attorney are in the

24  same place; they're both on the phone?

25  A.  Correct.

1   Q.  And so this individual, Nicole Doll, comes in with

2   records.  So --

3   A.  She came --

4       I was on the phone.  She came in and said that she had

5   found a Court Order.

6   Q.  Came into where you were?

7   A.  Came into where Kevin was.

8   Q.  Okay.  So we're back to that.  So she's in the room with

9   Kevin Roach?

10  A.  Okay.

11  Q.  All right.  That's correct?

12  A.  Yes.

13  Q.  It's your testimony, not mine.

14  A.  Yes.  I'm just --

15  Q.  And she has these records that she's pulled at your

16  request?

17  A.  Correct.

18  Q.  All right.  Explain for the Court -- and I don't know if

19  we've flushed this out enough -- who is Kevin Roach within

20  this organization?

21  A.  Kevin Roach is the News Director.  He overseas the news

22  room.

23  Q.  Where does he fall in the hierarchy.  Is he your boss or

24  are you his boss?

25  A.  He's my boss.

1  Q.  He's your boss.  Okay.

2      How many people -- how high up is he in this company in

3  terms of authority?  Are there a lot of people above him or is

4  he kind of the top dog at WXIX?

5  A.  He is the top manager in the news room.  There's a new

6  general manager that will be starting who he reports to.

7  Q.  So he is below the general manager --

8  A.  Yes.

9  Q.  -- in the corporate structure?

10     So he participated in this phone call, and this is with

11  legal counsel and himself, where this Order has been found by

12  Nicole Doll, correct?

13  A.  Correct.

14  Q.  And at that point you're notified of this Order, and a

15  discussion ensues between the three or four of you related to

16  this Order, correct?

17  A.  Correct.

18  Q.  Now, I believe you testified that you concluded that it

19  was not going to be a problem for you to interview the

20  defendant or for your station to interview the defendant,

21  correct?

22  A.  Correct.

23  Q.  Was that based -- and I'm not asking you what anyone said

24  to you at this moment.

25     Was that based on this conversation between you, Kevin

ROBIN TINDALL - CROSS

119

1   Roach, and the attorney?

2   A.  Yes.

3   Q.  And, specifically, was that based on advice you received

4   from this attorney?

5   A.  Yes.

6         MR. SMITH-MONAHAN:  If I may, Your Honor, I believe

7   what we have here is testimony that was on direct examination

8   and now on cross that this organization is relying on advice

9   it received from its counsel, and that is a relevant issue to

10  who's at fault here today.

11      I'm going to submit to the Court by presenting this

12  evidence in this fashion that waives the attorney-client

13  privilege related to this matter and request to be able to

14  inquire as to what advice this attorney gave.  It's relevant

15  and I'm speculating perhaps they're going to try to hide

16  behind the fact the attorney advised them this was okay.

17      So I would at this point request a finding that the

18  attorney-client privilege is waived related to this issue and

19  permit me to ask questions related to what advice was given --

20        MS. FALLER:  Your Honor --

21        MR. SMITH-MONAHAN:  -- for the limited purpose of

22  determining intent and whose decision this was.

23        MS. FALLER:  Your Honor, of course, we do not agree

24  with that interpretation at all.  We did not either -- we did

25  not waive the privilege; no one discussed what the content of

120

1   the conversation was.

2       It's appropriate to reference that there was a

3   conversation.  There was no discussion of the content.  And I

4   specifically said in my opening that we were not waiving the

5   attorney-client privilege.

6       Moreover, what matters is what she can testify to and what

7   other witnesses can testify to.  And she can be examined as to

8   her intention, her state of mind, but she cannot be examined

9   as to the content of the attorney-client communication.

10          THE COURT:  Mr. Smith-Monahan?

11          MR. SMITH-MONAHAN:  I think the end point is going to

12  be if the closing argument here is, "Hey, they got advice from

13  an attorney and they relied on it so there's no bad faith,"

14  which the opposing counsel has repeatedly insisted it's an

15  issue that you must consider, I think I should be able to

16  probe into what that advice was.  If they're going to claim

17  good faith based on the advice of counsel, I think the Court

18  needs to hear what that advice was.  It goes directly to the

19  heart of this issue.

20          THE COURT:  I'm inclined to think that for the

21  purpose of today's hearing I can take this at face value

22  without detail.  However, if Ms. Macke, Channel 19, are going

23  to attempt to rely on advice of counsel in the long run at a

24  trial on the issue of criminal contempt of court, then

25  obviously that would waive the attorney-client privilege.

REDACTED VERSION

121

 1     So I think at this point it's somewhat premature.  I think

 2  there's enough in the record for the Court at this point to

 3  take that into consideration.  But details might not help us

 4  out today.

 5          MR. SMITH-MONAHAN:  Yes, Your Honor.  I'm going -- I

 6  want to ask one or two more questions at this point.  I don't

 7  believe it will violate the ruling you've just made.

 8  BY MR. SMITH-MONAHAN:

 9  Q.  So from being a participant in this conversation were you

10  able to tell whether --

11  A.  Which conversation?

12  Q.  I'm sorry.  I'm referring to the conversation between you

13  and Kevin Roach and the attorney related to the question of

14  whether to interview my client.

15     Were you able to ascertain from this conversation, without

16  telling me anything the attorney advised you, whether the

17  attorney was provided a copy of this Order?

18  A.  I don't know.

19  Q.  So the advice you received and later relied on, you don't

20  know if it was based on the attorney actually reading the

21  Order?

22  A.  I wasn't in the building.  I don't know what transpired

23  from the building.  Sorry.

24  Q.  That's fine.

25     As a result of this conversation, did you have a further

122

1    conversation with Tricia Macke?  And by "this conversation," I
2    mean the conversation with Kevin Roach and the attorney.
3    A.  Yeah, we were -- we talked about proceeding with the
4    interview.
5    Q.  Okay.  And just to be entirely clear for the record, at
6    the time of this conversation with the attorney and with Kevin
7    Roach when you found out about the existence of this Order,
8    the defendant had not at that point been interviewed by Tricia
9    Macke, correct?
10   A.  Correct.
11   Q.  Okay.  Now, you say you did have a further conversation
12   with Tricia Macke about this matter?
13   A.  Yes.  We discussed proceeding with the interview --
14   Q.  Okay.
15   A.  -- after our attorney conversation.
16   Q.  Did you inform her of your conclusion about whether it was
17   appropriate to interview the defendant?
18   A.  What do you mean?
19   Q.  Well, you reached a conclusion that you were going to go
20   forward with the interview of the defendant.  Did you inform
21   Tricia Macke of that decision?
22   A.  Tricia was on the call; I didn't need to inform her.
23   Q.  Okay.  I did not realize that.  So she was also a part of
24   this phone call with Kevin Roach and the attorney?
25   A.  I believe so.

1  Q.  Was there anyone else on this phone call, to your

2  knowledge?

3  A.  Jason Scott, the other executive producer.

4  Q.  Okay.  Anyone else?

5  A.  I don't know.  I'm not sure.

6          THE COURT:  Mr. Smith-Monahan, I would draw your

7  attention to the time.  Do we need to take a break at this

8  point?

9          MR. SMITH-MONAHAN:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. SMITH-MONAHAN:  Probably seven, eight minutes.

12          THE COURT:  Okay.  Let's make it ten.

13          MR. SMITH-MONAHAN:  That's fine.

14          THE COURT:  And we'll resume essentially at

15  1 o'clock.

16          THE CLERK:  All rise.

17      (At 12:46 P.M., a recess was taken.)

18                          *   *   *

19  BEFORE THE COURT:                    (1:02 P.M.)

20          THE CLERK:  Please be seated.

21          THE COURT:  Mr. Smith-Monahan, are you ready to

22  resume?

23          MR. SMITH-MONAHAN:  Yes, Your Honor.

24          THE COURT:  Please proceed.

25          MR. SMITH-MONAHAN:  Thank you.

REDACTED VERSION

```
 1   BY MR. SMITH-MONAHAN:
 2   Q.  Ms. Tyndall, when you became aware of this Court Order
 3   that we've been referencing, did you have a discussion with
 4   anyone at the station related to challenging the Order in
 5   court?
 6   A.  Not that I recall.
 7   Q.  Did you consider that yourself, the possibility of
 8   challenging the Order in court?
 9   A.  No, I don't -- I mean, no.
10   Q.  So the decision of the station was to proceed with
11   attempting to interview Mr. Cornell in spite of the Order,
12   correct?
13   A.  Based on our discussions with our attorney.
14           MR. SMITH-MONAHAN:  I have no further questions, Your
15   Honor.
16           THE COURT:  Ms. Faller?
17           MS. FALLER:  I have no further questions.
18           THE COURT:  Thank you, ma'am.  You may step down.
19       (Witness excused.)
20           THE COURT:  Preferences regarding the witness'
21   ability to remain in the courtroom?
22           MR. SMITH-MONAHAN:  I have no objection.  I do not
23   expect to recall her as a witness, so she may do as she
24   pleases at this point.
25           THE COURT:  Ms. Faller, I assume that's agreeable?
```

125

1      MS. FALLER:  That's the same, Your Honor, because I'm

2 assuming that this testimony will be taken into consideration

3 in the next phase of the hearing.

4      THE COURT:  Right.  Okay.

5   Your next witness, Ms. Faller?

6      MS. FALLER:  My next witness is Kevin Roach.

7      MR. SMITH-MONAHAN:  Your Honor, we have a separation

8 of witnesses and Mr. Roach just sat in and listened to the

9 last witness.

10      THE COURT:  He's the corporate rep.

11      MR. SMITH-MONAHAN:  I thought Tricia --

12   I misunderstood.  I thought we were designating Tricia

13 Macke as the individual.

14      MR. ALLEN:  Judge, I think you clearly designated the

15 corporate rep was permitted to stay in, was my recollection.

16      MS. FALLER:  That's correct.

17      THE COURT:  So noted, Mr. Smith-Monahan.

18      MR. SMITH-MONAHAN:  I apologize, Your Honor.

19      THE COURT:  Mr. Roach, if you'll approach and raise

20 your right hand to be sworn.

21    (Duly sworn by the Clerk.)

22      THE CLERK:  Please be seated.

23                        KEVIN ROACH

24 a witness herein, having previously been sworn, testified as

25 follows:

```
 1                    DIRECT EXAMINATION
 2   BY MS. FALLER:
 3   Q.  Would you state your name for the record, please?
 4   A.  Kevin Roach.
 5   Q.  And by whom are you employed?
 6   A.  Raycom Media, which owns WXIX TV.
 7   Q.  And what is your position?
 8   A.  News Director.
 9   Q.  I think you were here for prior testimony as to who would
10   be your superior at the station.
11       Do you have anything to add about just at the station?
12   A.  No.
13   Q.  And then who else do you report to?
14   A.  I have a corporate news boss.
15   Q.  And aside from the corporate news boss is there anyone
16   else up higher on the chain who is the boss in any manner?
17   A.  Of me, no.
18   Q.  Okay.  Now, when did you first hear that either there was
19   a Court Order regarding this current case or that the attorney
20   for the defendant did not wish for you to proceed -- for the
21   station to proceed with an interview of the defendant?
22   A.  It was midmorning.
23   Q.  Yesterday, is that correct?
24   A.  Yesterday.
25   Q.  Okay.  And what did you do at that point?
```

1  A.  I contacted our outside counsel, which is Covington &

2  Burling in Washington, D.C.

3  Q.  And do you recall when you learned that there was a Court

4  Order actually involved?

5  A.  Well, in prior testimony by Ms. Tyndall, when we did the

6  PACER search, we initially did not discover the Order in

7  question.  We later discovered it that morning.

8  Q.  And was that during the phone conversation?  Is that what

9  you're talking about?

10 A.  Yes.

11 Q.  Did Tricia Macke say anything to you about a Court Order

12 or did anyone say that Tricia Macke had said anything about a

13 Court Order?

14 A.  No.

15 Q.  Do you know whether or not the attorney saw the Court

16 Order?

17 A.  Yes.

18 Q.  And did he see the Court Order?

19 A.  He did.

20 Q.  Did you at any time --

21     Do you know whether at any time the attorney attempted to

22 contact the counsel for the defendant?

23 A.  Yes, he did, after the counsel had told me that he was

24 going to pursue a contempt hearing last night.

25 Q.  And what were you told was the result of that contact?

1    A.  The attorney for Covington & Burling told me that

2    Mr. Monahan said he didn't have time to talk to him.

3    Q.  Did you at any point in time believe you were exhibiting

4    contempt of the Court -- or the station or Tricia Macke was

5    exhibiting contempt of the Court?

6    A.  Absolutely not; that's why we contacted our attorney.

7    Q.  Did you intend at any point in time for yourself or the

8    station to violate any Court Order?

9    A.  Never would.

10   Q.  Did you understand the Boone County authorities to suggest

11   in any manner that Tricia, proceeding as she did, was

12   inappropriate, improper, or a violation of a Court Order?

13   A.  No, given the fact that the defendant told us that his

14   attorney was okay with it.

15   Q.  And was there anything said that Boone County interfered

16   in any way with Tricia proceeding the way she did?

17   A.  No, they didn't.

18          MS. FALLER:  I have no further questions at this

19   time.

20          THE COURT:  Mr. Smith-Monahan?

21          MR. SMITH-MONAHAN:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23   BY MR. SMITH-MONAHAN:

24   Q.  Good afternoon, Mr. Roach.

25   A.  How are you doing?

1  Q.  We've met.  I introduced myself previously.

2       All right.  So, when was the first you learned this week

3  about the possibility of interviewing the defendant?

4  A.  Ms. Tyndall called and informed me of the phone call from

5  the defendant late Wednesday night when he called the station.

6  Q.  Okay.  And can you basically explain for the Court what

7  happened during that conversation you had?

8  A.  She described to me the conversation that she had with him

9  and that we left a message for his attorney.

10 Q.  Okay.

11 A.  And that was it for the night.

12 Q.  Did she explain who had left a message for the defendant's

13 attorney?

14 A.  Yes.

15 Q.  And who did he say left that message?

16 A.  Tricia Macke.

17 Q.  Was there any information communicated back to you about

18 what was on the attorney's voicemail as far as not being in

19 the office at the time?

20 A.  No, not at that point.

21 Q.  Okay.  So when is the next time you had a conversation

22 related to this matter and the defendant?

23 A.  Some of the managers brought it to my attention that they

24 gathered all the documents from PACER, discovery was made

25 about this Court Order, and that's when I proceeded to call

1   Covington & Burling.

2   Q.  Now you've estimated that to be midmorning on Thursday,

3   correct?

4   A.  Correct.

5   Q.  All right.  Now, did you directly have a conversation with

6   Tricia Macke prior to the meeting with the attorney on

7   Thursday morning?

8   A.  No.

9   Q.  Did you have any conversation with her at all?

10  A.  Conference call with the attorneys.

11  Q.  Did you learn that Tricia Macke had been advised by

12  counsel that the interview was not authorized by counsel?

13  A.  We were --

14      You're referring to your voicemail?

15  Q.  Correct.

16  A.  I'm not sure at what point that came up, but it did come

17  up for the interview.

18  Q.  Okay.  So you were informed at some point that morning

19  that counsel had indicated no -- the interview was not

20  authorized, correct?

21  A.  That you had said he wasn't doing interviews despite what

22  his other defender -- defense attorney said.

23  Q.  Okay.  Did you hear the voicemail, by any chance?

24  A.  No.

25  Q.  Okay.  Did you get that information directly from Tricia

1   Macke or do you recall who told you that?

2   A.  I think it came up in the conference call.

3   Q.  Who said it?

4   A.  Who said it?

5   Q.  Who said it.

6   A.  We had so many phone calls that morning, let me think.  It

7   was probably Tricia.

8   Q.  Okay.  And did she also say in that conversation that the

9   attorney, myself, had referenced that there was a Court Order

10  prohibiting contact with the client?

11  A.  At that point we already had the Court Order.

12  Q.  But was that information communicated to you by Tricia

13  Macke that that had been referenced by me, if you recall?

14  A.  I think there was a reference made about it, yes.

15  Q.  So as of the point of this phone call with this attorney,

16  you were informed that the attorney, my office, was

17  disapproving of this interview, or alerted to the fact of the

18  Court Order -- and you had actually seen the Court Order,

19  correct?

20  A.  Correct, and consulted with the counsel on the

21  interpretation of the Court Order --

22  Q.  Okay.

23  A.  -- before the interview.

24          MR. SMITH-MONAHAN:  Your Honor, I realize your prior

25  ruling that I'm not permitted to inquire into the conversation

REDACTED VERSION

KEVIN ROACH - CROSS

132

 1   with the attorney.  I will say for the record at this point I

 2   would ask to do that but for the Court's ruling.  So adhering

 3   to the Court's ruling I will not, but I'm lodging my request

 4   that I would at this point do that.

 5              THE COURT:  So noted.

 6              MR. SMITH-MONAHAN:  Thank you.

 7   BY MR. SMITH-MONAHAN:

 8   Q.  And you said you actually read the Order that morning,

 9   correct?  Did I understand that right?

10   A.  Yes.

11   Q.  And it's your testimony today that is the first time --

12   that morning was the first time you were aware of this Court

13   Order?

14   A.  Correct.

15   Q.  Have you attended, prior to today and last night, any

16   court hearings related to the defendant?

17   A.  No.  I run the news run.

18   Q.  All right.

19   A.  I don't go out in the field.

20   Q.  Did you direct any of your reporters -- and I don't know

21   if you participate at this level -- but did you direct any of

22   your reporters to attend any court hearings related to this

23   defendant?

24   A.  Yes.

25   Q.  Who did you direct to attend court hearings related to

KEVIN ROACH - CROSS

133

 1 | this defendant?

 2 | A.  I leave those decisions to managers that are below me.

 3 | Q.  Okay.  But you gave direction for reporters to attend this

 4 | defendant's court hearing?

 5 | A.  Correct.

 6 | Q.  Did you give direction for reporters to attend this

 7 | defendant's bond hearing where the determination was made

 8 | whether he would be released from jail?

 9 | A.  Yes.

10 |         MR. SMITH-MONAHAN:  Your Honor, I've left my notes on

11 | my table.  May I retrieve them?

12 |         THE COURT:  Yes.

13 | Q.  Does January 16th, 2015 sound like a date that could have

14 | occurred, or do you remember?

15 | A.  We cover dozens of stories, so I don't have recollection

16 | of those kind of details.

17 | Q.  I understand.

18 | A.  And, again, I'm running a news room.

19 | Q.  Was a discussion had between you and anyone else at your

20 | station about challenging the Court's Order in court?

21 | A.  No.

22 | Q.  So was there discussion had about raising any form of

23 | objection and otherwise -- in writing or otherwise to this

24 | Court Order?

25 | A.  We sought counsel on interpretation of that Order.

REDACTED VERSION

KEVIN ROACH    CROSS

134

1    Q.  So that's a no?

2    A.  We sought advice from counsel on the interpretation of the

3    Order.

4    Q.  The question was, was there a discussion about objecting,

5    in writing or otherwise, to this Order of the Court?

6           MR. ALLEN:  Objection; it's asked and answered.

7           THE COURT:  Overruled.

8           THE WITNESS:  That's not part of my attorney-client

9    privilege?

10          MS. FALLER:  Well, I think he's not asking you about

11    any conversation with the attorney.  He's asking you aside

12    from any conversation with the attorney was there discussion

13    in the -- in the news room.

14       That's the way I understood the question.

15          MR. SMITH-MONAHAN:  I understand I can't ask about

16    attorney-client relations.  I asked if anybody in the station

17    and he had the conversation.

18    A.  Okay.  I'm sorry.  Ask it again then, please.

19    Q.  Sure.  Did you have a conversation at any point with

20    someone on your staff at the station related to potentially

21    objecting in writing or otherwise to this order from the

22    Court?

23    A.  No.

24    Q.  Did you yourself as the -- Program Director?  Is that the

25    right title?

 1   A.  No.

 2   Q.  I'm sorry.

 3   A.  News Director.

 4   Q.  News Director.

 5       Did you in your authority in that position consider that

 6   matter yourself:  Perhaps we should go to the Court and object

 7   to this ruling or raise the issue whether this ruling is

 8   appropriate?

 9   A.  I rely on people that do this for a living and, therefore,

10   that's why I called outside counsel.

11   Q.  So that's a no, you did not consider that?

12   A.  I rely on outside counsel.

13   Q.  So that's a no?

14   A.  I asked outside counsel for their interpretation of the

15   ruling.

16   Q.  My question was whether you considered that option

17   yourself as the boss in this news room.

18   A.  I wouldn't make that decision without outside counsel's --

19   Q.  I didn't ask your decision.

20   A.  -- consultation.

21   Q.  I asked whether you considered it.

22           MS. FALLER:  You're asking aside from any

23   conversation, and aside from thinking about what an attorney

24   might have said, did he independently consider it?  Because I

25   feel like there's a communication issue.  So I object to the

REDACTED VERSION

1    question as stated.

2           MR. SMITH-MONAHAN:  I don't know how to be any

3    clearer.  I'm asking if this man considered that option.

4           THE COURT:  Overruled.  You may answer the question.

5    A.  Okay.  What I'm trying to say is, my thought process is

6    that I need outside counsel's help in making a decision about

7    whether or not we go forward with this interview.

8    Q.  Is that a no or a yes to that question?

9    A.  The question being?

10   Q.  Did you consider in your own mind the option of coming

11   into court and challenging this Court's Order before acting?

12   A.  No.

13   Q.  You made a reference to an attorney at a law firm I guess

14   in D.C.  If you said the attorney's name -- I tried to catch

15   it but didn't.  Do you know that attorney's name?

16   A.  I gave it to you.

17   Q.  When?

18   A.  Yesterday I gave it to you.

19   Q.  For the record --

20   A.  Covington & Burling.

21   Q.  I can't testify.

22        For the record, if you don't know it -- I'm not trying --

23   this isn't a trick.

24        Just for the record can we indicate the attorney's name?

25   I can say a name.  Would you recognize it if I said it?

1   A.  Yes.

2   Q.  Was it Jeff Koffeff?

3   A.  Yes.

4   Q.  Okay.  And that's K-O-F-F-E-F-F?

5   A.  I'm not positive on the spelling.

6   Q.  Phonetically --

7   A.  Covington & Burling in Washington, D.C.

8   Q.  All right.  Now, is this the attorney you're referring to

9  that you had this conversation with in the morning related to

10  the propriety of going forward?

11  A.  Yes.

12  Q.  Now you testified earlier that that attorney contacted me,

13  correct?

14  A.  Yes.

15  Q.  And you testified earlier I said I didn't have time to

16  talk to him?

17  A.  That's what he told me.

18  Q.  Do you know what time that conversation occurred?

19  A.  It was --

20  Q.  Let me make it clear.  Do you know what time he talked to

21  me?

22  A.  He told me that was probably last night at 7:30 about, and

23  he said, "I just hung up with him and he said he doesn't have

24  time to talk to me."

25  Q.  And do you recall the first time you and I talked about

REDACTED VERSION

KEVIN ROACH - CROSS

138

1   this matter was, yesterday?

2   A.  Probably about seven.

3   Q.  And you indicated --

4   A.  7:00 P.M.

5   Q.  Okay.  And you had given me the attorney's office number,

6   correct?

7   A.  Yes.

8   Q.  And you gave me his cell number, correct?

9   A.  Yes.

10  Q.  And I informed you I attempted to reach him, correct?

11  A.  Well, I recall calling you back saying, "I just realized

12  how late it is; here's his cell phone number; he's probably

13  not in the office."

14  Q.  So this phone call from him to me you think was around

15  7:30, correct?

16  A.  Yes.

17  Q.  And we had an 8:15 appearance we had to be in court for,

18  correct?

19  A.  Yes.  Well, at that point I didn't know that there was an

20  8:15 court appearance.

21  Q.  And that turned out to be the 8:15 time we had to be here,

22  right?

23  A.  Turned out to be.

24  Q.  So this return by phone call happened 45 minutes before we

25  had to be in court, correct, if you're just doing the math?

KEVIN ROACH - CROSS

139

1   A.  Sure.

2   Q.  After the defendant was interviewed by Tricia Macke, did

3   someone from your office contact the FBI?

4   A.  Yes, they did.

5   Q.  What did they -- and I don't want you to testify as to the

6   content of anything my client said.  Okay?  But what did they

7   tell the FBI when they contacted them?  Who was that person

8   first?  Who contacted the FBI?

9   A.  I don't know who it was, but I was told that somebody

10  called the FBI to get a comment.

11  Q.  Was it at your direction that that person did that?

12  A.  No.

13  Q.  Whose direction would that have been?

14  A.  It was likely one of the managers that work for me.

15  Q.  And what was communicated to the FBI at that point?

16  A.  I don't know the details of the conversation.

17  Q.  No one informed you at any point about what happened

18  during that conversation?

19  A.  No.

20  Q.  Did you ask?

21  A.  No.

22  Q.  How did you find out about it?

23  A.  I found out late in the day.

24  Q.  Yesterday?

25  A.  Yes.  And what was said was, there was no comment.

REDACTED VERSION

CLOSING ARGUMENTS

140

1   Q.  From the FBI?

2   A.  That's what I was told.

3           MR. SMITH-MONAHAN:  May I take a moment, Your Honor,

4   with my investigator?

5           THE COURT:  You may.

6       (Mr. Smith-Monahan and Ms. Killen confer privately.)

7           MR. SMITH-MONAHAN:  I have no further questions at

8   this time.

9           MS. FALLER:  I have no further questions at this

10  time.

11          THE COURT:  Thank you, Mr. Roach.  You may step down.

12      (Witness excused.)

13          THE COURT:  Another witness, Ms. Faller?

14          MS. FALLER:  No, Your Honor.

15          THE COURT:  Thank you.

16      Mr. Smith-Monahan, anyone you would like to call by way of

17  rebuttal?

18          MR. SMITH-MONAHAN:  No, Your Honor.

19          THE COURT:  Okay.  Closing remarks?

20          MR. SMITH-MONAHAN:  I believe I have argued earlier

21  how clear we believe this Order is in terms of what was

22  prohibited.

23      I think we have knowledge within the WXIX station from top

24  to bottom about the contents of this Order prior to the

25  decision that was made to go ahead and proceed and interview

141

1    my client.

2         I think there's some significance here when you're looking

3    at the issue of contempt.  This station is aware of an Order

4    from this Court relying apparently on the representations of

5    counsel, which we cannot inquire into what those

6    representations were, but certainly they had the opportunity

7    to come into court and challenge the Order.  They have

8    counsel.  They have two attorneys here today.  They were able

9    to get an attorney here on about 45 minutes' notice last night

10   to represent them in court.

11        So when you're reflecting on good faith and those kinds of

12   issues, they certainly had plenty of access to counsel and are

13   aware of a Court Order that's all of two sentences long that

14   had been on the books since January 16th.  So they're asking

15   you to, you know, to, I presume, conclude this is good faith,

16   this is not intentional violation of an Order.

17        They certainly had within their disposal the option of

18   seeking clarification from the Court, seeking a revocation of

19   the Order from the Court, appealing the Order from the Court,

20   or somehow bringing the matter to the Court's attention before

21   merely proceeding in the face of a Court Order and explaining

22   their rationale on the back end.

23        There are two cases I wanted to bring to the Court's

24   attention in this regard.  One is a First Circuit case, *In the*

25   *Matter of Application to Adjudge the Providence Journal*

142

1   *Company and its Executive Director, Charles Hauser, in*

2   *Criminal Contempt.* It is 820 Fed.2d 1354, a 1987-case.

3       In that case -- and this is an *en banc* decision. I will

4   point out this was later reversed by the Supreme Court on

5   other grounds. But this is, nonetheless, the *en banc* First

6   Circuit holding, that it was significant the fact that the --

7   it was a publisher in that case who had been charged with

8   violating a court order, attempted to argue good faith but had

9   made no effort to try to address the matter in court prior to

10  acting, trying to address the propensity of the court order

11  or clarification of the court order before acting.

12      Similarly here, there is no reason this news organization

13  could not have done that. They had the Order in hand, they've

14  not conducted the interview, and they've been advised by

15  counsel directly and indisputably that the interview was not

16  authorized and that this Order prohibited it.

17      I would also point the Court to a case out of the Southern

18  District of Florida. The District Court decision *United*

19  *States versus Cable News Network, Incorporated*, 865 F. Supp.

20  -- that's F. S-u-p-p. -- 1549, a 1994-decision -- holds

21  similarly:

22      It is difficult for an organization to hide behind

23      good faith and advice of counsel when they have not sought

24      any form of appeal or redress in the court prior to

25      acting.

CLOSING ARGUMENTS

143

1       The Order is clear.  Their knowledge of the Order is

2   clear.  I suggested earlier I'm not sure knowledge -- how

3   relevant knowledge is.  It's on the public docket; it had been

4   for a month and a half at the time.  They chose to not adhere

5   to it.

6       Under those circumstances, we submit that there is a

7   sufficient amount of evidence before the Court today to

8   proceed on a Show Cause Order for contempt on the three listed

9   entities or individuals in our motion.

10      Thank you.

11          THE COURT:  Ms. Faller?

12          MS. FALLER:  Thank you, Your Honor.

13      Your Honor, I'm here to address whether or not the Court

14  should issue an Order to Show Cause why my clients, Tricia

15  Macke and Fox 19 as an entity, should not be held in contempt

16  of court.  And I think it is very clear under the facts and

17  the law that they should not be held in contempt of court in

18  this circumstance.

19      The meaning and validity of the Order are not cut-and-dry.

20  Obviously, reasonable minds can differ as to them, and also as

21  to the effect on Fox 19.

22      The Order says that what was requested by counsel for

23  defendant was an Order from the Court directing the detention

24  facility holding the defendant not to permit outside contact

25  by anyone with the defendant without her express approval.

REDACTED VERSION

1    First of all, we understand from the testimony here today

2    that she did give express approval to the Butler County

3    authorities.  But beyond that, the Order goes on to say:

4        "Having considered the request, the Court grants the

5        request and orders that no one will be permitted to visit

6        or otherwise contact the defendant without the express

7        approval of Mr. Cornell's attorney."

8    So among others, there's a reasonable understanding that

9    this is stating that the detention facility should not permit

10   this, not that this Order goes to the media in general.

11   Moreover, if the Order had gone to the media in general,

12   there would be sufficient First Amendment issues with the

13   Order.

14   And as to the possibility of appeal or redress, Fox 19 and

15   Tricia Macke were not parties to this case and would have no

16   ability to appeal, and from their testimony they saw no need

17   to address this Order in court in any way.

18   More importantly, I think their good faith -- Tricia

19   Macke's, Kevin Roach's, the executive producer -- there is no

20   indication that anyone thought that they were in any way

21   violating a court order or indicating contempt for the Court,

22   nor would they have done that if they had so thought.  They

23   proceeded in good faith to determine the best cause of action.

24   They took it.  Whether that was the right answer or the wrong

25   answer, there certainly was no contempt of court.  And there's

1  no evidence that should indicate that a Show Cause Order

2  should be issued.

3      Beyond that, Your Honor, if a Show Cause Order were

4  issued, that would clearly violate the First Amendment of the

5  Constitution and the Ohio Constitution as well.

6      The United States Supreme Court has many times indicated

7  how serious a prior restraint of speech is.  *Near against*

8  *Minnesota* talks about the chief purpose of the Constitution's

9  protection of freedom of the press is to prevent previous

10  restraints upon publication.

11      *Nebraska Press Association against Stuart* says that prior

12  restraints are the most serious and the least tolerable

13  infringement on First Amendment rights.

14      Any prior restraint on expression will be viewed by the

15  Supreme Court with a heavy presumption against constitutional

16  validity.  That's *Organization for a Better Austin*, quoting

17  *Carroll against President and Commissioners of Princess Anne*.

18      In order to overcome the clear law and to show that a

19  prior restraint could be tolerated, you must show that the

20  prior restraint is necessary to protect a state interest of

21  the highest order.  That's *Smith against Daily Mail*, 443 U.S.

22  97.

23      The Ohio Supreme Court has also been completely consistent

24  and emphatic in this regard.

25      So if this Order were to be interpreted to mean that the

146

1    Court was ordering the media not to broadcast anything without

2    the approval of Mr. Cornell's order -- I mean, Mr. Cornell's

3    attorney, that would be violative of the First Amendment and

4    the Ohio Constitution.

5        And the Ohio Supreme Court as well has said once true

6    information is disclosed in a public document opened to public

7    inspection, the press cannot be sanctioned for publishing it.

8        And it is our understanding -- I think it's even been

9    stated in court -- that as of now, this whole -- the series of

10   three calls is available in a tape recording or some manner of

11   document or some media that -- aside from what Fox 19 has.

12   And so it would -- it would be -- it would possibly come into

13   play in the trial anyway.  But in any event, it would not at

14   all be appropriate to issue any kind of an order that would

15   prevent Fox 19 from broadcasting this material.

16       Beyond that, right here in the Sixth Circuit there was a

17   case that I well remember almost 20 years ago.  It was -- it

18   started right here in the Southern District of Ohio in the

19   *Procter & Gamble against Bankers Trust* case.  And in that one,

20   Judge Feikens from Detroit came down --

21       I don't know, possibly because all the judges had Procter

22   & Gamble stock; I don't know.

23       -- but he came down and issued a prior restraint.  And the

24   Sixth Circuit was crystal clear that the publisher's planned

25   publication did not pose such a grave threat to critical

147

1  government interests or to a constitutional right as to

2  justify the district court's injunction.  And whether it was

3  emergency circumstances and a temporary injunction or anything

4  else, it was not justified.

5      Here, there's no issue of the location of ships at sea

6  during wartime or anything that even comes close to justifying

7  any kind of prior restraint.  So to issue an order finding the

8  media in contempt of court for violation of this Order could

9  never withstand constitutional scrutiny, and so I think that

10 has been successfully demonstrated that there should be no

11 Show Cause Order in this case.

12     Thank you, Your Honor.

13         THE COURT:  Mr. Smith-Monahan, last word.  It's your

14 motion.

15         MR. SMITH-MONAHAN:  Thank you, Your Honor.

16     We drifted over, I believe, into the question the Court

17 identified as the second issue, which is why I intentionally

18 not yet addressed that, the constitutional issue under the

19 First Amendment, as to whether you should order that the news

20 station not play this news story.  And as I understood the

21 Court, we were not there yet, so I will forgo all of the

22 conversation about prior restraint and what the law requires.

23 I'm prepared to discuss it and I can do that momentarily,

24 unless you want me to respond now.

25         THE COURT:  It's fine.  You can go ahead and do it

148

1    now.  We won't stand on formalities.

2         MR. SMITH-MONAHAN:  Counsel's -- opposing counsel's

3    suggested this is an order -- this Order from Judge Bowman is

4    an order not to broadcast.  Okay?  That is not the issue yet.

5        The Order is to not otherwise contact the defendant.  All

6    right?  This Order doesn't prohibit them from broadcasting

7    information.  They can go and legitimately investigate the

8    case all they want.  They can broadcast information.  They can

9    read the docket.  They can interview the government.  They can

10   talk to the agents.  They can get any lawful information about

11   the case and broadcast it.  This Order has nothing to do with

12   that.

13       This Order addressed one discrete issue, and that was

14   otherwise contacting the defendant.  Do not otherwise contact

15   this defendant.  They read the Order.  I told them I believe

16   that's what the Order said and I specifically told them not to

17   contact my client and interview him.  It could not be any

18   clearer.

19       They have either violated the Court Order or they have not

20   violated the Court Order.  We submit they have violated the

21   Court Order.  We submit they did it with eyes wide open.

22       And the reason I brought up earlier the fact that they

23   chose not to challenge it, in those two cases I cited to you,

24   what they chose to do was to go forward in the face of the

25   order and try to excuse their conduct on the back end if it

149

1    was challenged.

2        So in the first instance we're really not concerned with a

3    prior restraint.  We're simply required with Don't Do This,

4    and they did it.  And the Order said don't do it; they did it

5    anyway.  They threw caution to the wind and decided we don't

6    think it applies, or whatever.  I don't know what the attorney

7    said, because we've not been able to explore that, but based

8    on whatever that attorney said, they decided to go forward.

9        They very well could have just asked the Court for

10   clarification of this point.  Again, this goes --

11       Where's the good faith?  Where's the good faith?  Their

12   extent of trying to contact counsel about it was for the

13   reporter to leave a message on my co-worker's voicemail at

14   10:45 at night.  I responded at the start of business hours

15   the very next day, 8:07, which is when that, consistent with

16   my recollection, is when I left a voicemail, expecting they

17   were not going to do it because of the Court Order and my

18   advice.

19       I didn't get a single other phone call from them.  My

20   office didn't either.  Where's the good faith in that?

21       Where's the good faith in the decision not to contact

22   counsel back?  Not to have a discussion on a rationale basis

23   with another attorney about the meaning of what's going on

24   here?

25       Where's the good faith in choosing just to go forward with

REDACTED VERSION

1    the interview, knowing the Order exists, without coming to the

2    Court for clarification?

3        Or if they disagree with it or they don't know what it

4    says or, as she says, reasonable minds can disagree, why not

5    err on the side of caution at that point?

6        If this issue of contempt boils down to good faith,

7    where's the good faith and the choices they could have made

8    but didn't?

9        So the first question for the Court is, Have they violated

10   the Court Order?  And, if so, the Court has the option of

11   holding them in contempt.

12       I believe the next question then is, What is the

13   appropriate remedy given that finding?  And I think you have a

14   world of options at your disposal at that point -- from jail

15   to fines.  And that's up to the Court, you know.  We're not --

16       As I told you last night, our point is a simple and

17   straightforward one.  I'm representing a client which everyone

18   in this room knows is charged with a very serious series of

19   crimes, who has significant liberties at stake in this case.

20   The importance of this matter and this Order was paramount.

21   Had they had a discussion with me at any point yesterday, they

22   would have realized that.

23       So when you come around to the question of the First

24   Amendment --

25       And I guess this goes to the remedy which we requested

151

1    yesterday and that is order that WXIX is prohibited from

2    playing the recording of my client.

3        -- when you come around to this question, I think first

4    you have to say this isn't just a pure First Amendment

5    question.  You're balancing the First Amendment against

6    constitutional rights of a defendant in a proceeding where

7    there is a Court Order addressed to this issue.  So it is not

8    just pure First Amendment.  You're balancing the station's

9    First Amendment rights with my client's Fifth Amendment right

10   to a fair trial under the Due Process Clause and his Sixth

11   Amendment right, as I referenced last night perhaps less

12   artfully, to a fair and impartial jury who is not tainted by

13   information obtained in violation of a Court Order.

14       So we submit first take those considerations into balance.

15   Sure, they have a First Amendment right to report stories.

16   They don't have a First Amendment right to disregard a Court

17   Order.  They don't have a First Amendment right to go

18   otherwise contact the defendant when the Court has ordered

19   that that not happen.

20       Finally, to really come down --

21       And if the Court is going to get down to the level of

22   analyzing this as a prior restraint, I believe that is the

23   theory of -- the First Amendment theory at issue --

24       I think opposing counsel has referenced it.

25       -- is this a prior restraint on the media?

152

1    I cite to *Forsyth County, George versus Nationalist*

2    *Movement*, 505 U.S. 123 at page 130; a 1992 Supreme Court

3    decision:

4        A prior restraint in order to be lawful must be:

5            Number one, content-neutral;

6            Number two, narrowly tailored to serve a significant

7        governmental interest; and

8            Number three, leave open alternatives for

9        communication.

10    Three-factor test from the Supreme Court to determine

11    whether a prior restraint on the media is lawful.

12    I think if you consider those three factors in relation to

13    this case, this is clearly a lawful prior restraint.

14    Number one, it was content-neutral.  This Order was merely

15    not to contact him.  It didn't limit what they could report.

16    It didn't limit anything about the content of what they

17    report.  The Order merely prohibited the media from otherwise

18    -- or anyone -- from otherwise contacting the defendant.  It

19    is clearly and indisputably a content-neutral Order.

20    Number two:  Is it narrowly tailored to serve a

21    significant government interest?  I would believe that

22    determination was made by Magistrate Judge Bowman.  There is a

23    narrow interest here that is protecting this defendant's

24    constitutional rights related to this trial.

25    I believe the Court is likely aware as to the

REDACTED VERSION

1    extraordinary media circus that has been surrounding this

2    case.  It seems to have been a bit of a race for ratings as to

3    who could get a story like this on the TV first.

4        Judge Bowman issued an Order which was narrowly tailored.

5    It prohibited outside contact with our client without getting

6    permission of his counsel.  It serves a distinct need.  It was

7    narrowly tailored.

8        And I think when you look at the third factor, which is

9    leave open alternatives for communication, it met that

10   standard as well.  If the media intended to try to interview

11   our client, the open alternative for communication was to

12   contact counsel and discuss this matter.

13       There was a voicemail left at 10:45 Wednesday night and a

14   response from me by voicemail and no further communication at

15   all.  I don't even think they availed themselves of the

16   options there to communicate about what they intended to do.

17       And I would also point out when you're considering this

18   prior restraint --

19       And I know I may have hounded on this point a bit.

20       -- but come back to the Court if you disagree with a prior

21   restraint.  Object, appeal, bring the matter before the Court

22   instead of choosing to just disobey it and see what happens.

23       So under these circumstances, Your Honor -- and, you know,

24   leave open alternatives for communication.  I wanted to point

25   out you don't have to go interview the defendant.  I will tell

154

1   you from representing my clients, I'm not sure I've ever had

2   the media interview one of my clients.  There's plenty of

3   other avenues for communication for the media to get

4   information about a case:  Research the docket; read the

5   indictment; contact the government.  The government has a

6   spokesperson who I believe will make statements about --

7   public statements about a case.

8       So we're not unduly limiting the media's access to the

9   information or their ability to report on this case.  What

10  we're doing is holding them to a standard of fairly reporting

11  on this case so that they don't infringe on important

12  constitutional rights of a young man charged with very serious

13  offenses.

14      So in sum, Your Honor, we ask, I guess looking now at our

15  twofold inquiry, first that you make a finding regarding the

16  three entities and/or individuals mentioned in our motion,

17  that they need to show -- an Order to Show Cause regarding

18  contempt.  However you choose to handle it from that in terms

19  of punishment or remedies is largely -- we're leaving up to

20  the discretion of the Court.  But the one question we ask you

21  to consider is not allowing this news media outlet to play

22  this unlawfully-obtained statement from our client.

23      Thank you.

24          THE COURT:  Ms. Faller, was there more that you

25  wanted to say on this particular aspect of the hearing?

CLOSING ARGUMENTS

155

1        MS. FALLER:  Just a few comments, Your Honor.

2      First of all, if this was any kind of a race for ratings,

3  I think that the media would have aggressively worked to

4  produce such a story during the ratings period rather than

5  waiting for the defendant.  The defendant just happened to

6  contact them the day before yesterday and they proceeded on

7  it.

8      But more importantly, I'm sort of glad that opposing

9  counsel brought up the three-part test, because this

10  circumstance does not by any stretch of the imagination meet

11  the three-part test necessary for a prior restraint.  And if

12  my clients were to be held in contempt of court or if the --

13  they would be enjoined from this broadcast, either one would

14  be a prior restraint on speech and would impinge on the First

15  Amendment and would be unconstitutional.

16      First of all, this is not content-neutral.  This is not a

17  rule or order that says no one can carry picket signs down the

18  middle of Vine Street and block traffic irrespective of what

19  the signs say.  That's content-neutral.

20      There's another problem being addressed:  The safety of

21  motorists and pedestrians, and that's content-neutral.  Here

22  it's content-specific.  It deals only with contact with,

23  interviews with, talking with a defendant in a criminal case.

24  So that's not content-neutral.  It wouldn't match with any

25  precedence about being content-neutral.

156

1    Second, this is not narrowly tailored to serve the goal of

2    an important government interest.  Every single -- if --

3    Every single jail or prison interview of a prisoner

4    involves a criminal case in which the prisoner has

5    constitutional rights.  So this rule would be completely

6    meaningless if any time you wanted to talk to a prisoner that

7    was considered -- it was considered acceptable to say "No, you

8    cannot," and that is narrowly tailored to serve the interests

9    of the prisoner's First -- I mean, constitutional rights.  The

10   rule would be meaningless if that were the interpretation.

11   What you need to have is a narrowly-tailored circumstance

12   where revealing, you know, certain portions of certain

13   documents would expose our troops to undue danger, or

14   revealing a certain aspect of classified information would,

15   again, subject persons to bodily harm.  That's narrowly

16   tailored.  You can't say you can't reveal any of it.  You have

17   to tailor it to the danger presented under the three-part

18   test.

19   This is not narrowly tailored.  This Order could be --

20   If that were acceptable, you could have in every single

21   criminal case that the defendant has constitutional rights and

22   so we're going to say, "To protect him, there should be no

23   publicity."  There's lots of alternative ways to deal with

24   pre-trial publicity.  There's voir dire, there's change of

25   venue, so on and so forth.  That does not pass constitutional

REDACTED VERSION

157

1    muster by any stretch.

2        And that kind of goes into the third --

3        The third point for a legal prior restraint is what

4    alternatives are there for communicating the same information?

5    So if you can't use the specific records, psychiatric records

6    or whatever, what would be the alternative to getting the

7    information out?

8        Here the information is the defendant's story that he

9    wants to tell, that he approached the media to tell.  And that

10   is completely different from his attorney's story or what you

11   can gather from looking at pleadings or something like that.

12       So this has failed the three-part test on all three.  You

13   only have to fail on one to be an illegal prior restraint.

14   But it has failed on all three, and there're countless

15   precedence which would suggest that.

16       So, once again, an Order -- an Order that would hold

17   either the individual Tricia Macke or the entity in contempt

18   of court would fail as unconstitutional and have serious First

19   Amendment ramifications.

20       Secondly, any prior restraint on the publication,

21   broadcast, would severely impinge on the First Amendment, so

22   neither could be proper in this circumstance.

23       Thank you, Your Honor.

24          THE COURT:  Since we've slightly wandered off the

25   formal give-and-take, Mr. Smith-Monahan, I would give you a

158

1 few last words.

2          MR. SMITH-MONAHAN:  I will keep it very brief.

3          THE COURT:  Okay.

4          MR. SMITH-MONAHAN:  I won't rehash those three

5 elements.  We submit they're clearly satisfied for a prior

6 restraint.

7    I think what I'd like to leave you with and remind you of

8 is I don't think you have to get to that point in this case.

9 I think you have an agency here that chose to willfully

10 disobey a Court's order.  The time to make that argument that

11 this was a prior restraint was before they disobeyed the

12 Order.  They had the means to do it; they had the counsel who

13 could be here in 45 minutes' notice; they could have done it.

14    I cited you that District Court case earlier from the

15 Southern District of Florida that was 865 F. Supp. 1549.  I

16 want to end with a quote from the judge in that case.

17          "People simply cannot have the luxury of knowing that

18           they have the right to contest the correctness of the

19           judge's order in deciding to willfully disobey it."

20    It is a little bit late for them to make that argument.

21 They made the choice to disobey an Order of this Court, and to

22 come in now and say it's a prior restraint is too late.

23    Thank you.

24          THE COURT:  A short recess is in order.

25    Just for my own information, Mr. Smith-Monahan, are other

1  breaks in the offing for your client as was the last one?

2  Or --

3        MR. SMITH-MONAHAN:  Let me --

4     May I check?

5        THE COURT:  Sure.

6     (Mr. Smith-Monahan and the defendant confer privately.)

7        MR. SMITH-MONAHAN:  We're fine.  We're within an

8  hour, Your Honor.

9        THE COURT:  All right.  2:15 we'll resume.

10        MR. SMITH-MONAHAN:  Yes, Your Honor.

11        THE COURT:  Okay.

12        THE CLERK:  All rise.

13     (At 1:55 P.M., a recess was taken.)

14                         *   *   *

15  BEFORE THE COURT:                    (2:12 P.M.)

16        THE COURT:  All right.  Folks, I've taken a few

17  minutes to review the cases cited by both sides, and it seems

18  to me that the Order that Judge Bowman issued, while she

19  intended, I'm sure, to make it perfectly clear and to tailor

20  it narrowly in the context of these facts, it does tend to

21  become ambiguous, and, as Ms. Faller points out, is not

22  actually constituting *per se* a prior restraint, certainly

23  ultimately has that effect.

24     There are cases that indicate where a media outlet

25  willfully and intentionally violates an Order and chooses not

160

1    to attempt to secure clarification or amendment or revocation

2    of an Order, that contempt may be a solution or an appropriate

3    process for the Court.  However, I think the record is clear

4    that this was not a willful, intentional violation of a Court

5    Order.

6        I'm inclined to believe that the Order, which says a

7    detention facility -- I'm going to just do a little

8    paraphrasing -- should not permit outside contact by anyone

9    with the defendant without her prior approval and no one

10   should be permitted to visit or otherwise contact the

11   defendant without the express approval of Mr. Cornell's

12   attorney.

13       In this case, the contact went from the defendant to an

14   outside media source, as opposed to the other way around.  And

15   while it could be argued, I suppose, that Ms. Macke contacted

16   the defendant and that was a violation of the Order, she was

17   in fact returning his phone call.  If the situation were

18   different, if Ms. Macke had been available at the time

19   Mr. Cornell made his first phone call and she had picked up

20   and there was a button on her phone to record, there would be

21   absolutely no question.

22       The happenstance is she was on the air at the time the

23   first call was received, and that the call could not be

24   recorded or taken at that time is pure happenstance.

25       The Supreme Court in *Nebraska Press Associate, et al.*

Decision of the Court

161

1   *versus Stuart, Judge, et al.*, which can be found at 427 U.S.

2   539 --

3       It's a 1976-case, so it's old law that's still good law.

4       -- talked about the confrontation between prior restraint

5   to protect one vital constitutional guarantee, or perhaps more

6   under the Fifth- and Sixth Amendments, and the explicit

7   command of another that the freedom to speak and publish shall

8   not be abridged.  And the Supreme Court said:

9           "We affirm the guarantees of freedom of expression

10          are not absolute under all circumstances, but the

11          barriers to prior restraint remain high and the

12          presumption against its use continues intact.  We hold

13          with respect to the order entered in this case prohibiting

14          reporting or commentary in this case" --

15      In that case it was on judicial proceedings held in

16  public.

17          -- "barriers have not been overcome.  To the extent

18          that the order restrained publication of such material, it

19          was clearly invalid.  And to the extent that it prohibited

20          publication based on information gained from other

21          sources, we conclude that the heavy burden imposed as a

22          condition to securing a prior restraint was not met."

23      And the judgment in that case of the Nebraska Supreme

24  Court was reversed.

25      So, having heard the information that Ms. Faller has

DECISION OF THE COURT

162

1  elicited and the testimony from the WXIX personnel, I conclude

2  that there is not enough evidence to proceed with an Order to

3  Show Cause why Ms. Macke, WXIX, and the jail should not be

4  held in contempt.

5      Having said that, to prohibit WXIX from publishing or

6  airing the interview would be a prior restraint.

7      An interesting situation overall where Mr. Cornell's right

8  to remain silent is in conflict with his right to speak as

9  well.

10     So, I will not issue any restraining order and I will not

11 pursue criminal contempt proceedings against the three named

12 entities in Mr. Cornell's attorney's motion.

13     Comments?  Questions?  Clarification?  I will incorporate

14 all of this in an Order that will be filed.

15         MR. ALLEN:  Nothing from the Channel 19 staff, Your

16 Honor.  I think it's very clear what you've ruled.

17         THE COURT:  Mr. Smith-Monahan?

18         MR. SMITH-MONAHAN:  Nothing further, Your Honor,

19 given the Court's ruling.

20         THE COURT:  All right.

21         MR. MANGAN:  Your Honor?

22         THE COURT:  Yes?

23         MR. MANGAN:  In light of your ruling, is there --

24     Would I be correct to say the government's at liberty to

25 subpoena a copy of this audio from either the reporters or the

REDACTED VERSION

163

1    jail?

2          THE COURT:  You are certainly free to do that, and --

3          MR. MANGAN:  Thank you.

4          THE COURT:  -- all parties have to deal with the case

5    as it exists.  So we'll be in recess.

6          THE CLERK:  All rise.            (2:27 P.M.)

7                        -   -   -

8                  PROCEEDINGS CONCLUDED

9                        -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

164

I N D E X

OVERVIEW OF THE HEARING                    Page 33

OPENING STATEMENTS, re:  Prior Restraint   Page 37

MOTION FOR SEPARATION OF WITNESSES         Page 38


W I T N E S S E S

                                    Direct   Cross

**TRICIA MACKE**                       41      --
**LT. JASON MAYDAK**                   75      88

**ARGUMENTS**
By Ms. Faller                      Page 90
By Mr. Smith-Monahan               Page 92
By Ms. Faller                      Page 96
By Mr. Smith-Monahan               Page 97

**ROBIN TYNDALL**                      99      103
**KEVIN ROACH**                       126     128

**CLOSING ARGUMENTS**
By Mr. Smith-Monahan               Page 140
By Ms. Faller                      Page 143
By Mr. Smith-Monahan               Page 147
By Ms. Faller                      Page 155
By Mr. Smith-Monahan               Page 158

**DECISION OF THE COURT**              Page 159


* * *

REDACTED VERSION

165

# C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


s/Mary Ann Ranz
Official Court Reporter