# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 1:15CR012 |
| CHRISTOPHER CORNELL, | : | Senior Judge Beckwith |
| Defendant, | : | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO AMEND ORDER OF DETENTION AND MOTION TO ENFORCE THE NO-CONTACT ORDER ISSUED BY THE MAGISTRATE JUDGE ON JANUARY 16, 2015**

Now comes Defendant Christopher Cornell and hereby submits this response in opposition to the Government's motion to amend the order of detention. The government is seeking to restrict Mr. Cornell's telephone access at the Boone County Jail where he is being detained. Currently, and consistent with the dictates of the Constitution, Mr. Cornell may place monitored and recorded phone calls just like any other inmate at the jail. Importantly, the phone limitations that the Government purportedly seeks to impose through an order of this Court have already been rejected by the Boone County Jail as logistically impossible, a fact of which the Government is fully aware. Therefore, it appears that the Government is in effect seeking a blanket restriction on his telephone access at the jail, which would amount to a violation of his First, Fifth, and Sixth Amendment rights to the United States Constitution. Mr. Cornell thus opposes the Government's motion.

Additionally, Mr. Cornell moves this Court to modify the No-Contact Order issued by Magistrate Judge Bowman on January 16, 2015, by amending the Order to resolve any ambiguity that remains.

## Procedural History and Factual Circumstances

The Government's motion for phone restrictions comes less than one week after the media broadcasted a telephonic interview with Christopher Cornell. Prior to the local broadcast, which has now been covered by national media outlets, Mr. Cornell's defense counsel motioned this Court to enjoin the local news station from airing the interview, arguing that the interview was obtained in violation of Magistrate Judge Bowman's No-Contact Order entered on January 16, 2015. (Doc. #22). This Court heard evidence and argument during two show-cause proceedings that took place on March 5 and March 6, 2015.

Notably, the Government sat silent during these proceedings, expressing no concerns about national security, taking no action to protect national security, and taking no position on whether the Court should issue an injunction prohibiting the media from publicly broadcasting Mr. Cornell's hour-long interview. (Tr. 38). The news station contacted the FBI following their interview of Mr. Cornell to inform them and seek comment on the fact that Mr. Cornell had provided in-depth statements pertaining to the investigation and prosecution of the case. (Tr. 139). While it certainly could have, the Government did not seek to review the reporter's recorded interview prior to the show-cause hearings to determine whether the airing of the interview would compromise the parties' right to a fair trial or compromise national security. In fact, at no point either prior to or during the proceedings did the Government raise any concerns regarding a risk, or a potential risk, to national security resulting from the dissemination of Mr. Cornell's opinions and statements, or from any other behavior Mr. Cornell might engage in while in custody at the local jail.

The facts elicited at the show-cause proceedings on March 5 and 6, 2015 were as follows: On January 16, 2015, Magistrate Judge Bowman issued a No-Contact Order precluding the

detention facility housing Mr. Cornell from permitting any outside contact with Mr. Cornell without the express authorization of undersigned counsel. (Doc. #10). On March 4, 2015, Mr. Cornell used a telephone at the Boone County Jail to call a local news station. (Tr. 43). He spoke with the executive producer of the station, stated his desire to share his story, and provided his attorney's name and number for the station to contact regarding the interview. (Tr. 100). Mr. Cornell was not interviewed during his initial call to the station, but was told that his attorney would be contacted. (Tr. 48, 101). At 10:45 p.m. that night, a reporter left a message on the undersigned's voicemail stating that Mr. Cornell had contacted the station to provide an interview, and she sought counsel's position on setting up a meeting with Mr. Cornell. (Tr. 44).

The following morning, at 8:07 a.m. on March 5, 2015, the news station was notified by the Federal Public Defender's Office that the interview was not authorized by Mr. Cornell's attorneys and that initiating further contact with Mr. Cornell would be a violation of a No-Contact Order that was issued by the Court. (Tr. 57-58). The reporter contacted her station's corporate counsel and conferred with her superiors in a privileged phone conference. (Tr. 72, 102). The news station decided to disregard the attorneys' prohibition on the interview and directed the reporter to contact the Boone County Jail to set up the interview. (Tr. 118). The reporter contacted the jail and discussed arrangements for the interview at least five times before the interview took place. (Tr. 45-46, 59-67). The officials at the Boone County Jail worked to facilitate the interview by passing along the reporter's cell phone number to Mr. Cornell and arranging with the reporter a time and place for the interview to take place. (Tr. 81-83). Despite the No-Contact Order, the jail did not contact undersigned counsel to determine whether she was authorizing the jail to facilitate media communication with Mr. Cornell or whether she was authorizing the reporter to set up an interview with her client. (Tr. 81). And facilitate they did:

3

When Mr. Cornell did not call the reporter at the time designated by the jail for the interview, the jail lieutenant went so far as to knock on Mr. Cornell's cell door to see if he was going to call the reporter back to give the interview: "I called to our Control Room operator and asked her to call into his cell and see if he was still willing to make that phone call." (Tr. 83). Shortly after this, Mr. Cornell called the station and provided three recorded 20-minute segments. (Tr. 67).

When the lieutenant was asked at the hearing why he did not mention the Court Order prohibiting outside contact with Mr. Cornell to the reporter, he stated that since undersigned counsel had authorized the jail to provide Mr. Cornell with access to a telephone, as far as he was concerned, the Court Order was "no good." (Tr. 80).[1] Notably for the purposes of the Government's motion, the testimony at the show-cause hearing showed that undersigned counsel had attempted to limit Mr. Cornell's calls to his attorney and his family and was told, in no uncertain terms, that limitations on outgoing calls could not be made:

Q: Initially when you got the Court Order, was [Mr. Cornell] permitted to make any phone calls at all? When you first got the court order with the defendant?

A: Mr. Cornell was not allowed to make phone calls at all.

Q: Not even to his attorney?

A: Correct.

Q: Not to his family?

A: Correct.

Q: And I think your initial conversations with Ms. Savir were related to that problem, correct?

A: Correct.

---

[1] In fact, on January 29, 2015, during the discussion between defense counsel and the jail regarding telephone access, after being told that Mr. Cornell's outgoing calls could not be limited to his attorneys and family only, undersigned counsel communicated to the lieutenant that while she would go ahead and permit Mr. Cornell to use the phone, the Court Order was still in place and designed to restrict unauthorized individuals from making contact with Mr. Cornell without counsel's permission. The lieutenant confirmed that the jail's file reflected that the only individuals authorized to make contact with Mr. Cornell were the members of his defense team, his parents, and his brother.

Q: I believe your response was if we're going to let him use the phone to call his attorney and call his family, the jail can't limit who else he might call. Correct?

A: Correct.

Q: So, there was no specific request that he be able to call the media, correct?

A. Correct.

Q: The request was he needs to be able to call his attorney and he needs to be able to talk to his family, correct?

A: That was the initial request.

Q: Okay. And that's not an unreasonable request for a defendant, correct?

A: Correct.

Q: But there was no in-between choice at that point; in other words, you couldn't just allow him to call those individuals but limit other contacts, so it was either he gets to call everybody or gets to call nobody?

A: Correct.

Q: That was the response?

A: Correct. And she was fully aware of that. (Tr. 87-88).

After the presentation of evidence at the show-cause hearing, this Court noted that the No-Contact Order "tends to become ambiguous" and concluded that there was not enough evidence to proceed with an Order to Show Cause as to why the reporter, the news outlet, and the Boone County Jail should not be held in contempt. (Tr. 162). Since Mr. Cornell initiated the contact with the news station in the first place, the Court ruled that the reporter's subsequent contact with the jail to arrange the interview was the functional equivalent of returning Mr. Cornell's phone call and not a willful, intentional violation of the No-Contact Order. (Tr. 160).

The Government now moves this Court to amend the Order of Detention to limit the individuals or entities that Mr. Cornell may contact telephonically. For the reasons stated below, Mr. Cornell objects to the Government's motion to the extent that it seeks and may result in a

blanket phone restriction. Additionally, Mr. Cornell moves the court to modify and re-affirm the No-Contact Order issued by Magistrate Judge Bowman on January 16, 2015.

## LEGAL ANALYSIS

Assuming that the lieutenant at the Boone County Jail testified truthfully at the show-cause hearing on March 6, 2015, the phone restrictions that the Government now seeks cannot be accommodated by the jail. In effect, then, the Government appears to be asking this Court to impose a blanket restriction on telephone use. Mr. Cornell objects to such a blanket restriction as violative of his First, Fifth and Sixth Amendment rights.

**I. A Blanket Restriction on Phone Access Violates Cornell's Constitutional Rights.**

As a pre-trial detainee, Mr. Cornell has a First Amendment right to communicate with family and friends and a sub-right to reasonable use of a telephone for that purpose. Washington v. Reno, 35 F.3d 1093 (6th Cir. 1994). Additionally, any restrictions that prevent Mr. Cornell from contacting his attorney may violate his Sixth Amendment right to counsel. Tucker v. Randall, 948 F.2d 388, 390-91 (7th Cir. 1991)(possible violation of 6th Amendment to deny a pretrial detainee telephone access for four days, if no other contact with the attorney was allowed); Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989)(prisoner's challenges to limits on the time and number of phone calls were sufficient to state an arguable claim for violation of their right to counsel).

However, Mr. Cornell does not have a right to unfettered telephone use at the jail. Instead, his right to use the phone is subject to "rational limitations in the face of legitimate security interests of the penal institution." Washington v. Reno, 35 F.3d at 1100. Generally, the exact nature of the telephone service provided to inmates is to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions. Id.

In order to determine whether any set of "limitations" on telephone access at the jail is "rational," the government must prove either that the regulation is "reasonably related to legitimate penological interests" or "that the regulation furthers an important or substantial governmental interest unrelated to the suppression of expression and that the limitation on First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved." Washington, 35 F.3d at 1100.[2]

Courts apply a four-part test for determining whether a limitation is rational:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.... A second factor relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates.... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order.... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

Turner v. Safley, 482 U.S. 78, 89-90 (1987).

The Government has not attempted to analyze this four-part test, let alone meet it. On the contrary, it has put before the Court a motion that is at once over-broad and under-inclusive and has provided only hypothetical scenarios as justification for its motion.

The Government asserts that restriction of Mr. Cornell's access is necessary to protect national security because he might contact someone in Isis, or he might incite others to act. Based as it is on hypotheticals and theoretical risks, not actual facts, the Government's motion is

---

[2] The Sixth Circuit has not determined whether rational-basis or intermediate-scrutiny should apply to a court's assessment of the constitutionality of prison-imposed restrictions on phone access. Iswed v. Caruso, 573 Fed.Appx. 485, 489 (6th Cir. 2014)(noting same, recognizing that Washington cited both Turner v. Safley, 482 U.S. 78, 89 (1987) (applying rational basis to restrictions regarding inmate-inmate communications) and Procunier v. Martinez, 416 U.S. 396, 413 (1974)(applying intermediate scrutiny to prison regulations authorizing mail censorship, determining that they must be "generally necessary" to protect one or more legitimate governmental interests) and declining to decide the issue)). Mr. Cornell submits that a blanket restriction on his phone usage passes neither level of scrutiny.

7

over-broad to the extent it seeks to prevent Mr. Cornell from any phone access, thus failing to satisfy the Turner factor regarding reasonableness and whether such a blanket restriction allows Mr. Cornell alternative means to exercise his rights. There is simply no support either in the law or the facts for such a sweeping curtailment of Mr. Cornell's First and Sixth Amendment rights. And the motion is under-inclusive, in that it focuses solely on telephonic communications, thus failing to satisfy the Turner factor of providing a rational connection between the restriction sought and the "legitimate government interest" asserted here. If there were an actual—not merely hypothetical—risk that Mr. Cornell might communicate with ISIS or incite others to act, the Government would instead move to restrict all forms of communication. In short, the Government's fears are not just unreasonable; they are irrational.

Not only has the Government not satisfied the Turner factors, the Government's own actions belie its asserted fears. Whatever security concerns the Government has now, it should have had the moment Mr. Cornell was detained. But the Government did not seek to impose restrictions upon his detention, and, of most relevance, the Government apparently had no concerns about any national security implications related to allowing Mr. Cornell's interview to be broadcast for the world to hear. If there were any basis for the Government's concern regarding security that it now puts before the Court, the Court's thorough proceedings on March 5 and 6 provided ample opportunity for the Government to voice both its concern and the bases for it. Instead, and quite to the contrary, the Government was not concerned about national security when the defense sought to enjoin the media from broadcasting Mr. Cornell's interview. The Government did not even seek to review the interview before deciding to sit on the sidelines at the hours-long hearings on March 5th and 6th, 2015, and took no position on whether what it now seems to perceive is a "call to arms" interview should have been aired to the public.

If the choice is between no access to the phone—the *de facto* position of the Government given the inability of the jail to accommodate the undersigned's narrower request—and unfettered access to a phone, the circumstances presented in this case support Mr. Cornell's continued access to a phone. Notably, the Boone County Jail has voiced no security concerns with respect to their custody and control over Mr. Cornell. Indeed, the jail already has safeguards in place to prevent the use of telephones for harassment, fraud, incitement, or other illegal purposes, and phone calls at the jail are monitored and recorded at all times. Further, because of the high-profile nature of the case, Mr. Cornell has been placed in an isolation unit at the jail. He has no contact with anyone other than undersigned counsel. Solitary confinement units are "virtual incubators of psychosis—seeding illness in otherwise healthy inmates and exacerbating illness in those already suffering from mental infirmities." Ruiz v. Johnson, 154 F.Supp.2d 975 (S.D.Tex.2001). Mr. Cornell has been held in isolation for two months already. To isolate Mr. Cornell even further by restricting him from using the phone to call his defense team and family members would both compromise his ability to assist in the preparation of his defense and result in additional psychological harm. Segregated prisoners must have regular and meaningful human contact; telephone access is an essential component to this.[3]

## II. A Modification of the Magistrate Judge's Order is Necessary to Resolve Any Remaining Ambiguity.

The Magistrate Judge's No-Contact Order states, with certain exceptions not relevant here, "that no one be permitted to visit or otherwise contact the defendant without the express approval of Mr. Cornell's attorney." The lieutenant of the Boone County Jail has informed this Court that the Magistrate Judge's Order is no longer "good" because undersigned counsel

---

[3] The Boone County Jail permits one 30-minute visit on Tuesdays and one 15-minute visit on Saturdays. Therefore, absent telephone access, and assuming he receives the maximum amount of visits, Mr. Cornell would have only 45 minutes of conversation per week.

instructed the jail to permit Mr. Cornell use of a telephone in response to the jail's assertion that it could not accommodate the restrictions sought by counsel. Notwithstanding the lieutenant's misapprehension of the law, the Order is "good" until the Court withdraws it. But his refusal to acknowledge its force highlights the necessity for the Court to modify the Order to do away with any remaining ambiguities.

As was communicated to the Court and to the jail, the point of the Order is to prevent the jail from allowing the public unfettered access to Mr. Cornell. Such a restriction is necessary to protect Mr. Cornell's constitutional right to fair trial provided by the Fifth Amendment, and limitations to that restriction (*i.e.*, that he be allowed to contact his attorneys and family) are necessary to protect his First and Sixth Amendment rights. To that end, Mr. Cornell proposes that the No-Contact Order be modified to read as follows:

> Counsel for Defendant Christopher Lee Cornell has requested an order from the Court directing the detention facility holding the Defendant not to permit outside contact by anyone with the Defendant without her express approval. To protect the Defendant's First, Fifth and Sixth Amendment rights, the Court grants the request and orders the detention facility to restrict any member of the public from contacting the defendant without the express authorization of his attorneys. For the purposes of this Order, "contact" means any communication, outreach, or attempt at communication, whether written or verbal and whether initiated by the member of the public or made in response to a contact by the Defendant. Exempt from this Order are facility personnel, those individuals necessary for the normal operations of the facility, and those pre-approved individuals on a list provided to the detention facility by the Defendant's attorneys. The detention facility is ordered to keep the list of pre-approved individuals on file and readily accessible to employees of the detention facility.

## **Conclusion**

Wherefore, Mr. Cornell requests that the Court deny the government's Motion to restrict his phone access and grant his motion to modify the Magistrate Judge's No-Contact Order to resolve any remaining ambiguity therein.

Respectfully submitted,

*s/ Karen Savir*
Karen Savir (KY92002)
Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

Attorney for Defendant
Christopher Cornell

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing was served upon Tim Mangan, Assistant United States Attorney, and his co-counsel via Electronic Case Filing, on this 16th day of March 2015.

*s/ Karen Savir*
Karen Savir