**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:15-CR-00012-SSB |
| | : | |
| Plaintiff, | : | Judge BECKWITH |
| | : | |
| v. | : | |
| | ` : | |
| CHRISTOPHER LEE CORNELL, | : | |
| | : | |
| Defendant. | : | |

**SENTENCING MEMORANDUM OF CHRISTOPHER LEE CORNELL**

Up to January 2016 I was scratching stuff on the walls, printing pictures and putting them on my walls and wrote things on my cell door. I felt like I had nothing to lose, my life was over and I would have no chance at court as people kept telling me it's a 98% conviction rating. So I became scared and angry. I never meant any of that stuff. I want to say sorry about those things too. It wasn't until recently that I decided to finally stop all the nonsense and stop living this life. I don't want any more of this. I don't want any more trouble. I don't want any more attention. I don't want to feel the way I do any more or have my family go through this. I don't want to spend my life inside of a prison. I want my life back. I want to be happy and to live my life in peace with loved ones doing good and productive things. I can hardly eat and sleep because of all of this. I even contemplated suicide. I would do anything to avoid going to prison or have any more of my time taken away. Time is life and I already lost a year of my life. Please forgive me and allow me to have a second chance.

- Chris Cornell, February 15, 2016, Boone County Jail (Ex. A, Cornell Letters).

Is it possible to de-radicalize someone? Yes, according to German terror expert, Daniel Koehler, who recently testified at the sentencing hearings of six convicted Minnesota terror defendants. According to Koehler, the most important ingredient is a "willing defendant." (Ex. B., CBS Minnesota Article). He also believes that throwing young people accused of terror plots in prison for long periods of time could create a larger threat because there are no de-radicalization programs in U.S. prisons. (*Id.*). Koehler's testimony, in part, persuaded U.S. District Court Judge Michael Davis, to craft sentences for each defendant

specifically tailored to their individual case. (Ex. C, AP article). Those who went to trial and expressed no remorse received 30 years in prison. (*Id.*). The leader received 35 years. (*Id.*). Three of the four defendants who did not cooperate, but pleaded guilty received 10 years. (*Id.*). The fourth received 15 years. (*Id.*).

While the Minnesota case is different from Chris Cornell's case, in that the defendants were intending to travel abroad to kill for ISIS rather than a domestic plot within the United States, the lesson from that case is that harsh sentences for young terror recruits are not always the answer.

It has been shown time and time again that extremely long sentences do not deter people from committing crimes. (Ex. D, Nat. Institute of Justice Article). "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." (*Id.*). Furthermore, "prisons may exacerbate recidivism," rather than rehabilitate defendants. (*Id.*). Thus, an extremely long prison sentence serves only two purposes of sentencing: punishment and protection of the public from further crimes by the defendant during the time of incarceration. "Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime." (*Id.*).

This sentencing memorandum is intended to assist this honorable Court in handing down a fair and just sentence that satisfies the purposes of sentencing as set forth in 18 U.S.C. § 3553 (a). The Government's suggested 30-year sentence will do nothing but punish. It will not deter. It will not rehabilitate. It will not protect the public upon Chris'

release if he is warehoused in a high-security prison for 30 years without any mental health counseling, education, or hope for a future.[1]

Chris is now 22 years old. He has spent the last two years of his life in prison, much of which has been in solitary confinement. He was in segregated housing at the Boone County Jail, but unfortunately was still exposed to certain inmates and guards who made fun of him and inmates who encouraged some of his bad behavior. He has been in solitary confinement on the death row of USP Terre Haute since March 2016. As a result of his good behavior and acceptance of responsibility via a plea agreement, the Government removed the SAMs restrictions on July 11, 2016.

During the last two years, Chris has gone through dramatic changes in personality, mindset, and worldview. He went from lashing out in anger, to withdrawn and suicidal, to hopeful for his future. Even though he has not been provided with intensive mental health counseling, he has had access to extremely qualified and caring mental health professionals – Drs. Scott Bresler and Chris Marett – who have spent hours evaluating him for competency and mitigation. His time in solitary confinement has provided him with the ability to reflect on his actions outside of the pressures and ridicule of other inmates. It has allowed him to reconnect with the peaceful aspects of Islam and reject the radical Islamic propaganda that he found on the internet. Most importantly, his family has stood behind him and provided as much support as they know how to provide. These last two years have given Chris time to mature. And he has matured.

A 30-year sentence is much too long. This Court should not throw away a troubled young man who lost his way through reading ISIS propaganda online. Chris Cornell is

---

[1] As this Court knows, the length of the prison sentence affects a defendant's BOP security level.

fixable. He has the potential of living a productive and law-abiding life if given a chance. As will be set forth in this sentencing memorandum, a sentence much lower than 30 years is sufficient, but not greater than necessary under the unique circumstances of this case.

## I. Nature and Circumstances of the Offense:

Chris Cornell was a lonely, depressed, 20-year old kid with the mind of a teenager, who was self-radicalized by reading ISIS propaganda and conspiracy theories on the internet. Chris lived a fantasy life behind a computer screen. As he told the informant during one of their early meetings, "I like messing with Kafir[2] on-line and on Twitter. I like messaging with them and messing with them a lot (chuckling)." (Oct. 17, 2014 meeting with informant).

The question is, would Chris have actually come up with a plan to harm others if he did not have the in-person encouragement of another like-minded individual? It just so happens that in this case, the like-minded individual turned out to be an FBI informant who was working off a terrorism case of his own and who was also getting paid. There is no question that he was highly-motivated to help the FBI build a terrorism case to avoid punishment and for monetary gain.

Importantly, it is critical for this Court to understand that Chris is often prone to fantastical exaggeration when he speaks, particularly when he is trying to impress someone else. While this tendency can lead to harmless boasting like his suggestion that he was beating college-aged wrestlers when he was in middle school, in the context of this case, there exist many exaggerated statements from Chris that sound frightening when read or heard in isolation.

---

[2] Kafir is an Arabic term meaning "disbeliever."

For instance, Chris makes statements to the informant that he would be planning an attack even if the informant was not involved. Thus, the Government contends that Chris would have done his crime with or without the informant. However, Chris' statement about acting alone regardless of the informant's involvement is not supported by his history of living his entire life on the computer and regurgitating the propaganda of others. In reality, Chris was bragging to the informant—trying to impress his only friend—when making many of his boastful statements, including his statement about acting alone without the assistance and encouragement of the informant.

Chris also told the informant that the informant was the first person who believed in Jihad that he actually met in person. He told him he never did anything like this before. He said, "Like, this is the first time that I ever met with anybody off the internet too and you know to discuss, this kind of like, ideas and stuff. Although I did kinda post some stuff on the internet you know. . . . Twitter and all this stuff about like Khalifa, and you know, so and so, you know, but I don't really talk about it much, it's kinda just between myself you know." (Oct. 17, 2015 meeting with informant).

Chris explained that he wanted to travel to Syria or Afghanistan, but did not have the money or the ability to do so. He told the informant, "I see now that I met up with a brother that's actually interested ya know, in Jihad here ya know . . . like it started, like it's amazing how it happened ya know, like . . . I didn't think I was gonna meet anyone over here ya know . . . [UI] . . . well ya know next day ya know. . . . maybe, maybe this is exactly what I was supposed to be at . . . . who knows but this is what I feel though, this is just me ya know . . . it's not like ya know Allah said ya know, he came to me and said . . . you need to be here . . . this is what I see . . . this is . . .  what I've been seeing ya know . . . it's, it's just amazing how like what all went about." (Oct. 18, 2014 meeting with informant).

It is common knowledge that the mere presence of another like-minded individual can embolden someone toward conduct he might not have undertaken alone. In fact, it was the informant who actually reached out to Chris via Twitter. In the discovery provided to the defense, the informant told agents he "set up a Twitter account and started communicating with individuals who are pro-ISIS." During a conversation about how they met, Chris recalled the informant reaching out to him:

> **Chris**:    I can't remember where I met you at, ya know, [UI] you on twitter somewhere I think you might have been, I was looking, trying to look and see . . . first time . . .
>
> **Informant**: yeah, I think twitter, twitter was our first I think . . .
>
> **Chris**:    and ah . . . I don't know how I came across you, I think you might have messaged me, I message you or something
>
> **Informant**: oh ok.
>
> **Chris**:    I think you might have messaged me, cause I wrote something about ah . . . I remember it was . . . brother's ah . . . I said something about ya know Jihad is not simply there ya know, um . . . brothers and [UI] Kufar and ya know . . . [UI] . . . ya know, Jihad here ya know, I think that might have been the first third of it and you messaged me or something.

(Oct. 18, 2014 meeting with informant).

The discovery provided to the defense states that "During an operational meeting on 9/11/2014, the [informant] told handling Agents about a kik message exchange he/she had with an individual using kik account "RaheelMahrusUbaydah" (Unbaydah) whose profile picture is of a jihadi carrying a black flag." The "CHS Reporting Document," states that on 8/29/14, Chris told the informant they should "wage jihad under their own orders." However, the discovery includes screen shots/photos of conversations between the informant and Chris dating back to 8/25/14. It is clear from these screen shots that there are parts of the initial communication between Chris and the informant missing and the

informant is the one who brings up the fact that the informant has "been in contact with the brothers in Shaam/Iraq to communicate with the Amir's or ppl in charge about if they prefer that we make hijrah[3] or to strike locally, still haven't got a firm answer." According to the discovery, the investigation was opened on 9/12/14. Thus, the informant and Cornell were communicating for 17 days before the informant contacted the FBI about Cornell and before any of their communications were documented/recorded.

It was clear that Chris was having no luck getting approval to wage an attack in the United States from anyone connected with ISIS. During an electronic messaging conversation, the informant wrote to Chris:

> Asalamu alaykum akhi, I hope you are well. I spoke to a brother about our conversation to seek advice, and he spoke with an Amir, long story short, u were right and I was wrong. The Amir wanted to know how well I trust you and I told them I trust u completely and that you are for real, so he said if that's the case there is no reason to delay once we are ready, inshallah I'm with u 100%.

Chris responded:

> Alaikum salam my dear brother. I am doing well. Great to hear! Finally we get back some answer. I knew it . . . And I am ready and with you 100 % too!

To be sure, Chris has affirmatively accepted responsibility for his actions and counsel is not arguing that he was entrapped. The fire was already burning. Chris had already self-radicalized. But there is a mitigating argument that the informant's actions did add fuel to the fire. The actions of the informant do not excuse Chris' conduct, but they do provide useful context for this Court in attempting to understand Chris' conduct and why he felt emboldened to come up with a violent plan.

---

[3] Migration for the Cause of Allah.

The informant took time to befriend Chris. Chris told Dr. Bresler that he believed the informant to be an "honest person who cared about me and what I had to say. . . He gave me books, gave me advice, and understood. I did have feelings for him, like I got your back, I would die next to you. . . . I looked at him like a brother. He was a caring, honest person who cared about me, what I had to say." (Bresler Report at 10, filed under Seal). Thus it is easy to understand why Chris was so devastated to find out that the person he looked at like a brother was an FBI informant. No question Chris was hurt.

The informant in this case was older than Chris. He told Chris he was married and had children. He was a born Muslim and seemed to Chris to be very knowledgeable about religion and politics. He became like a mentor to Chris. The informant suggested and even provided Chris with books and gave him guidance on Islam. Throughout the hours of electronic messaging and in-person meetings with the informant, Chris confided in him about his problems with his family, with work, and even his interest a girl. During one kik electronic messaging communication, Chris wrote:

> **Chris**:   Okay, so last night I was getting ready for work . . . I had this thought on my mind that I would really like a wife and so I asked Allah that night . . . what do you know I went off to work and see this beautiful sister that looked to be my age who was Somali that was with her mother and brother who also appeared my age or younger. She was a very beautiful sister, Akhi, she dressed modest (not like a moderate) and was perfect as I could picture I would like to see myself with a sister. I wanted to approach but had so many thoughts on my mind like usual . . . not only was I in the middle of work but thoughts like, "how can I support a family if I can barely support myself . . . how do I approach and ask for marriage and so on." . . . It's funny how I can never be nervous or shy around anyone and can speak to many of people and any of people but when I come in a situation like this I am shy as can be. Ha, ha. I think it's amazing that Allah again listened and gave me what I asked for but feel ashamed I didn't follow through. So akhi . . . . I was wondering if you can lend some advice or help? In'Sha'Allah I get another opportunity like that.
>
> **Informant**: I'm very sorry for the delay akhi just been dealing with some things. Mashallah may Allah make it easy for you. This is very good. Do you

recognize them? Any chance you may run into them or even the brother again at masjid or in the area? I think you should approach the brother and make it easier to get in touch with her after befriending her brother so that way he and the family will already know you're a good person with good character rather than just a random guy approaching in public.

In giving Chris advice on handling what he perceived as discrimination against Muslims at his job, the informant stated:

> You know what it is like, they, they're trying to get a response out of you so they can say, oh look, that's what we're talking about. . . . So, once you snap, and say you know, you cut them out, or you do something else. They're all like that. That's exactly what it is. . . . but you know what, if they're not, if they're discriminating against you, I mean, there's ways to follow up with that. Just flip it on them, just say you know, tell them, I have this problem and you can file a complaint with the labor department you know. . . Don't let them, you know, bait you into something. . . . whenever you have a problem like that make sure you document it . . . Even if it's write a letter to the higher up supervisor or whoever it is. . . Cause by the time if you take it to the labor department, if they fire you, you can sue them for it. Once they see you are doing those steps, I'm almost 90 percent positive they won't like bother you anymore. . . .Akhi, [UI] don't get me wrong, I'm not saying don't stand up for yourself, but at some point, we kinda have to learn to deal with it, cause they'll wanna just push you and push you, and oh, well, he quit on his own. They're not gonna talk about all the harassment they did to get you to that point, you know?

(Oct. 17, 2014 meeting with informant). In helping Chris deal with the fact that his parents do not support or understand his practice of Islam, the informant advised:

> Even if you can't really convince them, just, you know deal with them as nice as you can, you know. . . . just cause at the end of the day, they're still your parents, you know? . . . Especially your mother, you know? She has far more [UI] on you than anybody in this world. She tells you, you know, you look funny with that beard, just let her. You know, just say I love you mother. . . . Cause that's character, you know? . . . After every hardship comes ease. You know, it's just a test, everything in this life, just be patient . . . I mean your parents they can be giving you the hardest time in the world, but that could be you know just so that one day they open up their eyes and come to their senses, you know, so be patient with them, especially your mom, you know. She carried you for nine months.

(Oct. 17, 2014 meeting with informant). Chris was also very eager to learn Islam from his new friend/mentor. At one point Chris said:

**Chris**: I got books explaining simple like the basics of you know how to pray, how to speak Arabic, but, I'm not doing well with the . . .

**Informant**: Is there something you need help with, like for example, do you . . .

**Chris**: Um, pretty much like established prayer, right uhm Arabic, you know, because I have been having trouble with that. I have been pretty much on my own throughtout this whole time, you know.

**Informant**: Yeah, no, no, no, I agree with you. You may not be comfortable you know, to Skype you know. . . . My point, when you do get to that point. When you do get comfortable, or even, if you have any questions. I am not a scholar, but there are a lot of things I, I may be able to help you. . . . Even during [UI] Salat in prayers, you can pray in English.

**Chris**: That's what I have been trying to do. I have the book with me and I sometimes you know read from that. I've been also trying. I can't get no help from these brothers online. These coconuts you know. I've been trying to go to this website.

**Informant**: Nnno, nnno, when it comes to that, sorry to interrupt you, but I wouldn't study Al-Qaeda from them . . . Al-Qaeda is one of the most important things to study in Islam, outside you know the fundamentals, the praying, and the you know . . . Al-Qaeda is like the Creed.

(Oct. 17, 2014 meeting with informant).

It is also very important for this Court to consider Chris' youth and maturity level at the time of the offense. Chris was 20 years old when he met the informant. He also had a very unstable childhood. Dr. Bresler will testify at the sentencing hearing that Chris' brain is quite late in developing and his maturity level at the time of the offense was like that of a teenager. His immaturity in combination with his mental issues, the instability of his home life while growing up, and his desire to impress the informant -- his only friend besides his

brother and his cat—played a key role in his terrible decision to commit these criminal acts.

Lastly, the infeasibility of this plan must be examined, especially in light of Dr. Bresler's opinion that Chris suffers from Schizotypal Personality Disorder. (Bresler Report at 22, Filed Under Seal). According to Dr. Bresler, Chris evidences personality features and traits such as "cognitive distortions and eccentric behavior," "odd beliefs and expressed 'magical thinking' that was inconsistent with cultural norms." (*Id.*) Dr. Bresler also noted that "there is some evidence to indicate that Chris has a propensity to distort reality, possibly to psychotic proportions." (*Id.* at 20). With this mental diagnosis in mind, we must examine the plan that is at issue in this case.

Chris has never handled or shot a gun. Rather he read about guns online. His brother informed counsel that he invited him to the shooting range shortly before this incident and Chris did not want to go. Certainly a person who has never shot a gun is capable of hurting people, but Chris' plan was not to simply spray a bunch of bullets at a crowd of people. Chris told the informant that the two of them would be able to enter the front door of the Capitol Building during the State of the Union Address and that Chris would take aim at the president while he gave his speech. He planned to wear a turban, black camouflage and sandals. During their last planning meeting, he abandoned the idea of using pipe bombs. He told the informant, "like I said before, I don't think we're working with explosives, I think it's a terrible idea first, maybe later, ya know, with this first operation, I want this to be, I want this to be right, ya know, I don't wanna be stopped simply with this one . . . (Jan. 13, 2015 meeting with informant). Chris now contends this is because he really had no idea how or desire to make them.

Chris had never been to Washington, D.C. In fact, he had only been outside of Ohio a couple of times in his life for wrestling competitions. Although he pulled up some online photos of the Capitol, he told the informant that they would have to do some reconnaissance once they got to D.C. since they would have 6 days to do so. While he looked online for a hotel, he had not booked or decided on a hotel. The informant was also very insistent that Chris make a video message explaining why they committed the attack. The informant told Chris he already made his video. After much prodding, the informant asked Chris if he still wanted to make the video. Chris responded, "I'll probably just get to D.C. I guess, and then . . . I guess I'm just gonna wait till I get to the D.C. area." (Jan. 13, 2015 meeting with informant).

A big question that comes out of a very unique case like this one is whether the informant, Chris' mentor, Chris' only friend, could have discouraged him from going down a violent path and instead engage in peaceful acts of resistance. Since Chris trusted the informant and listened to his advice on many issues, it is very plausible that the informant could have swayed Chris in a different, non-violent direction. At one point the day before they purchased the guns, Chris asked the informant if he maybe wanted to do something else:

| | |
|---|---|
| **Chris**: | so you're hundred percent sure, you know, are ready? And . . . |
| **Informant**: | I drove thirteen hours to get here, I'm as ready as it gets. |
| **Chris**: | I'm just making sure cause ah, you know. |
| **Informant**: | I know what you mean though . . . |
| **Chris**: | cause you know, cause I'm, I'm, we move forward ya know, I don't wanna make it ah cause, I don't know if you wanted to wait for ah ya know anything ah or |

|  | maybe have other plans, ya know maybe we could plan on going to ah ya know, meet up with some brothers ya know, from ah Sham, Pakistan or whatever, cause we could easily get in contact with them, cause its easy nowadays . . . . |
|---|---|
| **Informant**: | Yeah. |
| **Chris**: | Was thinkin maybe you could, have that mind or ya know . . . |
| **Informant**: | like go to Sham instead? |
| **Chris**: | Yeah, I'm just saying ya know, I was just making sure, you're hundred percent sure you wanna do this; I'm not trying to say we're gonna do this . . . |
| **Informant**: | Oh, oh, ok I got you, yeah that's what I thought you were saying. I got you, no no, I have other plans. |
| **Chris**: | cause what I was gonna say, cause what I was planning, if we wasn't gonna move forward with this, we could probably meet up woth some brothers, [UI] . . . cause I know how, I know how extremely dangerous it is, especially after the fact they found [UI] . . . in France [UI] . . . went to Syria, things are getting even more strict than before, when I was gonna go cause ah, stuff I'm, packing with me today is brand new, I originally bring that stuff with me, [UI] . . . some new camees, and ah ya know, new clothes and stuff like that, but um, that was back in, before the ah, caliphate was actually established and really wasn't on the news. |
| **Informant**: | Oh, ok. |
| **Chris**: | But ah, now they found out this girl went to, she went to Sham, I'm sure it's going to be more you know, even more strict, cause they were talkin about we need to be even more ah, secure on the borders and stuff . . . so |
| **Informant**: | Yeah. |
| **Chris**: | I was thinking maybe even that, or maybe ya know, um . . . I don't know if you heard about them brothers, I'm pretty sure that they're, that they're connected to the brothers, over in ah Islamic State, they call, what is it, Teriki Taliban or something like that. |

13

| | |
|---|---|
| **Informant**: | I keep hearing something about that yeah. |
| **Chris**: | Yeah, I'm pretty sure they're connected. |
| **Informant**: | a little confused [UI] . . . it's like something from actual Taliban. |
| **Chris**: | um hum, yeah I think from Pakistan, [UI] . . . Pakistan . . . but ah, that's what I had in mind, like if you don't wanna move forward with this, we could plan anything, because we're here right now, we could do whatever . . . . |
| **Informant**: | Yeah. |
| **Chris**: | Will move forward with this ya know, I'm all for it. |
| **Informant**: | Ok . . . yeah I'm good. |
| **Chris**: | Cause ya know I'm open for different [UI] . . . and everything. |

(Conversation with Informant on January 13, 2015.).

This ill-conceived plan was not a suicide mission. Chris had the fantastical belief that he and the informant would be able to escape and go into hiding. He discussed trying to figure out where they would live and how they would get food. In fact, in October 2014, Chris told the informant that his desire was to create an Islamic State right here in the United States, just the two of them. The informant replied, "Just to hold down land and establish a caliphate, I mean, we're two guys." Chris responded, "That's the thing, we need to establish it, but it's gonna be very, very difficult with two people." (Oct. 17, 2014 meeting with informant).

In the end, upon review of Chris' loose and ever-changing descriptions of his purported plot, it is clear that his ideas were not rationally possible or remotely realistic. Certainly, despite the infeasibility of his plan, Chris accepts that his words and actions have

consequences. Ultimately, he took a "substantial step" when purchasing firearms. However, as will be discussed below, this "substantial step" is much farther removed from the actual crime than many terrorism plots that receive the kind of prison time the Government is requesting in this case. This "substantial step" is the purchase of firearms in Cincinnati, Ohio on January 14, 2015, with a plan to drive to Washington, D.C., scope out the capital, and then carry out the planned attack 6 days later.

Thus, while Chris deserves attempt liability, it also true that the nature of his inchoate offense involved a plan that was less fully developed than a typical attempt offense. After all, for attempt liability, a defendant's conduct "must be more than remote preparation." *United States v. Mandujano*, 499 F.2d 370, 377 (5th Cir. 1974). To be clear, counsel is not suggesting Chris' actions do not qualify as a "substantial step." However, for sentencing purposes and consideration of the nature of his offense, it is relevant that Chris' acts were far closer to "remote preparation" than, for instance, a defendant who pushes the detonator on a fake bomb.

Counsel respectfully submits that actions that result in actual harm deserve greater punishment. Similarly, substantial steps and plans that involve a feasible and soon-to-occur present danger of actual harm deserve greater punishment than an unrealistic plan that involves 6 days of additional forthcoming development.

It is important to note that the defense spoke to the gun shop employee who sold Chris the firearms. He informed the defense that Chris initially failed the background check and he could not sell him the gun that day. He also informed the defense that the FBI did something to make him pass the background check. The Government disputes that the Chris failed the background check and that the check was simply delayed because he was

on a list of disqualified persons due to the open terror investigation.[4] However, the bottom line is that the gun store employee initially refused to sell Chris the firearms until after the background check came back clear. The gun store employee told Chris to give him a telephone number so he could reach him once the background check cleared. Chris went back to the car where the informant was waiting in order to figure out a telephone number to give to the gun store because he did not have a cell phone and did not want the gun store to call his parents' house. The informant helped him to create a Google number. When Chris went back into the store to provide the telephone number, he was informed that he could purchase the guns.

Finally, a close examination of the "Message to America" speech that the Government quotes in its Sentencing Memorandum was actually copied by Chris from other speeches that he found online. In his Feb. 15, 2016 letter, Chris wrote, "The speech was copied from other speeches with a couple words added in and switched around." (Ex. A., Feb. 15, 2016 Cornell Letter)(Ex. E, Message to America Sources). Through all the online posting, the phone call to the news, and the statements made to the informant, nothing that came from Chris was an original idea. Rather all of his hate speech was copied from radical Islamic propaganda that he found very easily on the internet.

Chris created a character, with a different name, in a fantasy where this character was somebody in the world. But the character Chris created was not original—the script for this character was already written by the propaganda work of radical Islamists. Generally speaking, when someone plagiarizes their words and ideas, the words and ideas, no matter

---

[4] When defense counsel first spoke with the employee, he was not sure if the background check came back as a delay or a denial. The employee checked his notes and upon a follow-up conversation with counsel confirmed that the background check originally came back as a denial.

how terrible, are less a part of the core of who that person is as a human being. There is no doubt that Chris was self-radicalized and adopted beliefs inconsistent with his core underlying humanity. As stated throughout this memorandum, Chris is fixable.

## II. Chris' History and Characteristics, Including Ultimate Transformation After His Arrest:

At the sentencing hearing, Dr. Bresler will testify about Chris' turbulent and troubled childhood, his mental health issues, and will provide insight on his journey to self-radicalization. As Dr. Bresler states in his report:

> Chris was a young man, living at home, shut off from the outside world living in his room, friendless, deficient in social skills, working a dead-end job. He was desperate to feel like he was "somebody" and reached out through the Internet, projecting into cyberspace that he is a significant force in the world at large.

(Bresler Report at 23).

However, just as Chris' radicalization did not happen overnight, his path to de-radicalization did not happen overnight. There is no doubt that Chris did some stupid, self-sabotaging things during the year after his arrest. Chris' fear of looking like a friendless, loser with mental health issues continued after his arrest. This is how he explained the Fox 19 interview:

> During the Fox 19 interview I made things up and repeated stuff I heard before. I was nervous during the interview, hence the laughter. The reason why I really done the interview was because I read and seen things on the news about me said by my parents that I thought made me look like a loser[5] so I didn't talk to them for a few days and was mad at them and finally called Fox 19. . . I was again seeking attention and trying to impress people.

---

[5] Chris' father was quoted on national news outlets as saying, ""He's a big mama's boy, you know. His best friend is his kitty cat. There's no way he could have carried out any kind of terrorist plot," Cornell's father said. "He didn't even drive; he didn't have a car." http://www.cnn.com/2015/01/15/us/capitol-attack-plot/

(Ex. A, February 15, 2016 Cornell Letter).[6]

Chris' final self-destructive act where he posted his message to America and information about who he believed the informant to be on the internet landed him as a pretrial detainee on death row at USP Terre Haute under SAMs restrictions. Chris did this shortly after he returned from MCC Chicago where he was being evaluated for competency. It is important for this Court to know that during the time he was housed at MCC Chicago, he was either in solitary confinement or permitted to spend his rec time with one particular inmate – Adel Daoud.

Daoud is a young man who was also being evaluated for competency to stand trial in federal court for 2012 charges of attempting to detonate a fake bomb provided by the FBI outside a downtown Chicago bar.[7] Daoud had also been indicted on charges of soliciting the murder of the undercover FBI agent in the terrorism case and attacking a fellow inmate at the Metropolitan Correctional Center in May 2015. In August 2016, Daoud was found incompetent to stand trial. Despite the Government's stated concern about Chris' conduct, which caused them to place SAMs restrictions on him, Chris was permitted to spend one-on-one time with a person accused of actually pushing the detonator on a fake bomb with the intent to kill innocent civilians in a bar. Chris spoke at

---

[6] Chris was actually beaten up by a fellow inmate while he was being housed at the Boone County Jail. This inmate was a white supremacist who Chris thought wanted to be his friend. Chris recalled that the inmate was egging him on to call the news after he saw the news story about Chris being a mama's boy and having no other friends but his cat. The defense believes that this is one of the inmates who wrote to the Government with information about Chris seeking consideration for a case he had pending.

[7]      http://www.chicagotribune.com/news/local/breaking/ct-adel-daoud-competency-ruling-20160825-story.html
http://www.nytimes.com/2012/09/16/us/man-is-accused-of-jihadist-plot-to-bomb-chicago-bar.html

length with Daoud, who stated in court that the Federal District Court Judge is a member of a secret society of the Illuminati and a reptile overlord, and believed the judge, prosecutors, and his own lawyers were members of a secret society conspiring against him. (see footnote 6). Daoud had written a letter to the judge in which he contended that "Americans are mostly 'brainwashed,' and his case is therefore, 'quite literally me vs. The United States of America.'"[8] Daoud shared many of his ideas with Chris during their time together.

It simply defies belief that Chris was even permitted to spend time with such a person if the Government believed Chris to be so big a threat that SAMs restrictions were warranted. It was shortly after Chris returned from MCC Chicago that he posted his message to America and information about who he believed was the informant on the internet.

Once separated from outside influences, Chris finally took a step back to reflect on what he had done. His transformation has been significant and is demonstrated over numerous letters that he wrote from February 2016 to May 2016. (Ex. A, Cornell Letters). For much of this time, Chris was in solitary confinement at USP Terre Haute. When he arrived he did not have books, a radio, or a television. Although this was an extremely lonely and painful experience, Chris admits that it gave him a lot of time to think about what he did and he finally began having hope for the future.

It has not been an easy road. There were times when Chris was so depressed and despondent that he could not even converse with counsel without sobbing. There were times when Chris told counsel that he wanted to kill himself. But slowly, as he worked

---

[8]      http://chicago.suntimes.com/news/bombing-suspect-daoud-wants-foreign-jurors-suggests-judge-read-quran/

through his issues little by little, Chris came to the conclusion that while he does need religion/Islam in his life, he rejects the radical ideas that he used to regurgitate on his Twitter account and to the informant. In his February letter he wrote:

> Though this experience has been hard on me, but it has also been life changing because it has woken me up and got me back on the right track. I said some terrible things and made some really bad decisions but at the end of the day I am only a human being and I am not a perfect person but that is fine because I don't plan to be a perfect person. All that I can be is the best person I can and that's it. I will make mistakes, I will sin and I will say and do things I don't mean but I'll learn from those things just as I have now. I never wanted any of this. This way of life is not fun nor is it cool but it is stressful and humiliating. At the start of this all I thought it was fun and cool because of all the attention I was receiving but that was until reality set in.
> . . .
> I want to apologize to my family, my attorneys, the Muslim community and anyone else that may be involved. I am sorry for putting everyone through this and making things hard on you.

(Ex. A, Feb. 15, 2016 Cornell Letter).

While the Government contends that Chris has no remorse, his letters to his family from USP Terre Haute suggest otherwise. In his first letter to his family after arriving as USP Terre Haute he wrote:

> Not going to lie this place is kind of scary, it reminds me of an old dark eerie prison you'd see in the movies. This place is terrible but at least the food is alright, we get ice cream and milk. There isn't anybody up here other than one person down the hall, I don't know who he is though, you can't hear anyone or anything in here because they run a loud fan all day. I don't mind it though, I'd rather not talk to anyone here anyways. I'm glad you found me, I knew you would, they told me you called, that made me smile. I can't call for 30 days but I think you can still visit me. . . . I don't have a TV or anything, others do, I was told I can't, I can see tv somewhat in other people's windows at night, ha. I have a window, you can't see much more than the prison across the road and inmates, at least its something.

(Ex. A, Chris Cornell Letter, March 29, 2016, USP Terre Haute). A few days later he wrote another letter to his family:

> I wish this all was a bad dream and I'd wake up in my bed at home to see Mikey laying next to me and John on his bed watching a movie, but this is all real. I hope they can soon see the change in me, understand me, give me the help I need and allow me to get a second chance. I'm not a terrorist, a criminal or a bad person, I'm just a kid who suffered from problems that made some bad decisions and stupid mistakes, because I made some mistakes it doesn't make me a bad person rather a human being, we all make mistakes, it go's to show none of us are perfect. Since all this crazy stuff started I have changed and grown up a lot and soon enough I believe it will show. Today, I am a new person with a new mind set, I'm no longer the person I used to be.

(Ex. A, Chris Cornell Letter, March 31, 2016, USP Terre Haute).

Chris spent his time in solitary confinement reflecting upon what he did and he explained to his family that he rejects the radical ideas he once believed:

> As you can see from my last letters, I done some searching, not only at Boone County the last month or so but I also did here, especially here, this place brung me closer to myself these past couple days, I done some searching to find myself and where I went wrong and what I am going to do to change it, I believe I found my answers, I found myself, the real me who I forgot, I promise that things from here on out will be different, you will only see and hear good and positive things from me and on top of that I'm, going to take a stand against the crap I was about before, it was stupid and wrong of me.
> . . .
>
> Those stupid terrorist and their ideologies are twisted, they are out killing innocent people and ruing families, they are brainwashing innocent mind of kids with hate filled propaganda, those terrorist don't care about anyone but themselves and are using those kids to carry out their delusional agenda, it is truly terrible, I'm not one of them nor do I support their messed up ideologies! They are sick people!

(Ex. A, Chris Cornell Letter, April 4, 2016, USP Terre Haute).

Chris usually tried to be strong for his family, but he really struggled to stay positive during his time in pretrial detention. He regularly suffered from panic/anxiety attacks, extreme stress, and depression. In April 2016 he wrote:

> Not sure how to say how I'm feeling, really down at the moment, I haven't ate all day, ☹, I been drinking coffee all day, so much on my mind, trying to take it to another place, I don't want to worry you guys

> but things haven't been as good as I'd sometimes make it sound, it tends to be like this most of the time, I had a really bad panic attack tonight, almost passed out, felt like I couldn't breathe and was having a heart attack, my whole body hurts, my eyes and head hurt too, crying as well, can't take it in here, its so much to handle for me, all of it, I hate this all, I hate being alone away from you guys and my home, I hate being seen as a "bad person," a "terrorist," tonight I pressed the emergency call button for help during my panic attack, when the C.O. got back here he asked me if it was me, I said "yes, I'm having a panic attack," he said, "no your not, don't press it again you ISIS mother fucker, you goat fucker." I told him, "I'm not with those terrorist, you don't know me, why would you say any of that to me," after that he left and I broke down in tears, my panic attack got worse.

(Ex. A, Chris Cornell Letter, April 27, 2016, USP Terre Haute). His depression would last for days:

> I'm sitting here crying now, my head hurts really bad, barely even slept at all, I just don't know what to do anymore, I need some kind of help, not this, I'm going to try to talk to the psych doctor right now, not sure if they'll even get her for me, I'm losing it dad, I don't know how much I can possibly take, I will do my best to stay strong, no more stupid stuff like that, please don't be mad at me, I am sorry . . .I am sorry for going on TV and the internet, I am sorry for scaring the informant, I mean it, I am really sorry . . .

(Ex. A, Chris Cornell Letter, April 29, 2016, USP Terre Haute).

Cornell continued to express his remorse in letters to his family throughout May:

> I don't know what to do or think at this point, all I can say is I screwed up big time and threw away my life, who knows whats going to happen and if I'll still have a life, I don't want to get out here an old man, my life would be pretty close to an end if I got 30 years . . . I don't think they'll give me a second chance, maybe but who knows, I'll do anything to change their minds, to get that chance, and have a life, who knows if they'll listen, I made it hard for that to happen with the stupid crap I did after my arrest, but hopefully they can . . . I know this is hurting you guys too, especially John, wish none of this happened and I never put you guys through this . . . .

(Ex. A, Chris Cornell Letter, May 17, 2016, USP Terre Haute). The letters quoted in and attached to this Sentencing Memorandum are only some of the letters that Chris wrote during his many months in solitary confinement. His letters to his family stopped around

June 2016 because he was permitted regular weekly visits with his family. Because the Government would intercept all of his mail, his letters took more than a week to get to his family. Therefore, he stopped writing to them since he knew he would be able to see them every week.

Chris is an American kid who converted to Islam and self-radicalized over time via the internet. It took him some time to unravel all of the propaganda that dominated his brain, especially when he was placed in a jail cell with someone like Adel Daoud. However, it would be hard to believe that someone who was not sincere would write so many letters expressing so much remorse and have so much insight on why he did what he did. It would be one thing if Chris only expressed remorse at his sentencing hearing. It is another that he expressed remorse month after month to his family.

### III. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

"Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007). Therefore, a review of the types of cases nationally that have warranted the 30-year sentence the Government is seeking is an important exercise in determining a sentence that is sufficient, but not greater than necessary.

On October 1, 2014, **Mohamed Mohamud** received a 30-year sentence after a **jury trial** for **attempting to detonate a fake bomb** provided by the FBI at a Christmas-tree lighting ceremony in downtown Portland. The Government asked for 40 years and the Judge sentenced him to 30 years. District Court Judge Garr King said Mohamud's youth

and remorse for his actions helped lower his sentence.[9] The judge said he believed "the actions of undercover FBI agents edged into 'imperfect entrapment,' the idea that though they didn't fully entrap Mohamud in a legal sense, their actions nonetheless encouraged him to commit wrongdoing." (*Id.*). However, the judge noted "Mohamud chose the location and timing of the bomb . . . **and when offered the choice to commit peaceful acts of resistance**, he instead told the undercover agents he wanted to 'become operational.'" (*Id.*)(emphasis added). Unlike Mohamud, Chris was much farther removed from his target and he was never offered the choice to commit peaceful acts of resistance by the informant. As discussed above, there is a good chance that Chris would have taken the informant – his mentor's—advice.

On September 14, 2012, **Amine El Khalifi** was sentenced to 30 years pursuant to a 25-30 year plea agreement for **attempting to detonate at the U.S. Capitol a fake bomb** strapped to his body which was provided by the FBI.[10] The 29-year-old expressed no remorse for his actions at the sentencing hearing and told the judge, "I just want to say that I love Allah. That's it."[11] Unlike Chris, El Khalifi pushed the detonator button and expressed no remorse.

On August 15, 2013, **Quazi Mohammed Rezwanul Ahsan Nafis** was sentenced to 30 years for **attempting to detonate a fake bomb** provided by the FBI outside the

---

[9]  http://www.foxnews.com/us/2014/10/01/mohamed-mohamud-to-be-sentenced-wednesday-for-plot-to-attack-christmas-tree.html
[10]  https://archives.fbi.gov/archives/washingtondc/press-releases/2012/virginia-man-sentenced-to-30-years-in-prison-for-plot-to-carry-out-suicide-bomb-attack-on-u.s.-capitol
[11]  http://www.nydailynews.com/news/national/amine-el-khalifi-sentenced-30-years-capitol-bomb-plot-article-1.1159847

Federal Reserve building.[12] Nafis pleaded guilty to attempting to use a weapon of mass destruction. He faced a maximum of life in prison, but the government acknowledged a 30-year sentence would be sufficient given the defendant's feeble attempt to cooperate after he was arrested. (*Id.*). Unlike Chris, Nafis actually pushed the detonator button.

**Shahawar Matin Siraj** was sentenced to 30 years on January 18, 2007 after a **jury trial** for **plotting to bomb** the Herald Square subway station in 2004.[13] He had turned down a plea deal offered by prosecutors under which he would have been sentenced to **10 years in prison**. (*Id.*). Unlike Chris, Siraj went to trial and did not accept responsibility for his actions. If he would have pleaded guilty, he would have received a much lower sentence.

A review of these cases demonstrates that defendants receive 30-year sentences when they go to trial and fail to accept responsibility and/or actually push the button in order to detonate a bomb they believe to be real. Conversely, defendants do not receive such high sentences when they plead guilty, accept responsibility, and particularly when plans are far removed from their actual target.

Recently, **Munir Abdulkader** received a 20-year prison sentence with a lifetime of supervised release from Judge Barrett for his plan which was **directed by an actual ISIS operative.** The plan was to abduct a specific local veteran, video-record his beheading, and then attack a Cincinnati-area police station.[14] Abdulkader was arrested in May 2015 by the FBI Joint Terrorism Task Force after a controlled purchase of an AK-47-

---

[12]     http://www.nydailynews.com/news/national/thwarted-nyc-fed-bomber-30-years-article-1.1422360
[13] http://www.nytimes.com/2007/01/09/nyregion/09plot.html
[14]     http://www.cincinnati.com/story/news/2016/11/23/west-chester-man-sentenced-terror-plots/94298896/

style rifle. At sentencing, the Government advised the court that **the 25-year sentence it was seeking took into account the defendant's cooperation with authorities**. Unlike Chris, Abdulkader was actually in direct contact with a higher-up in ISIS and his targets were in Cincinnati. Evidence at the sentencing hearing was that Abdulkader did reconnaissance on both local targets. His plan was much more feasible than Chris'.

On November 20, 2012, an 11.5 year sentence was imposed on 26-year-old **Douglas Wright**, the **leader** of four self-described anarchists who pleaded guilty for **trying to blow up a highway bridge between Cleveland and Akron using dummy explosives** provided by an undercover FBI agent.[15] The judge rejected the Government's request for 30-year sentences.[16] The judge's sentence was 15.5-22 years below the advisory Guideline range and was largely based on the informant's role. "In a memorandum issued after the sentencing hearings concluded, the court explained that it had opted to vary downward on the basis of the inert nature of the explosives, the CHS's role in facilitating the offense, and various individual characteristics of the defendants."[17] A demolition expert who testified for the defense said that even if genuine explosives had been used, the group had "grossly underestimated" the amount needed to topple, or even damage, the bridge. (Footnote 15). The expert stated that "The threat of any damage to the [bridge's concrete supports] was nonexistent and **unrealistic**." (*Id.*). Unlike Chris, the defendant again pushed the detonator button on a bomb. Like Chris, he was heavily influenced by an informant and his plan would not have realistically resulted in the destruction he intended.

---

[15]     http://www.usatoday.com/story/news/nation/2012/11/20/ohio-bridge-bomb-plot-three-sentenced/1717857/

[16]     http://www.ohio.com/news/local/more-details-from-bridge-bombing-plot-come-to-light-at-sentencing-hearing-1.347841

[17] http://www.opn.ca6.uscourts.gov/opinions.pdf/14a0057p-06.pdf

On August 30, 2005, 19-year-old **Imran Mandhai** was sentenced pursuant to a **guilty plea** to 14 years in prison for his role in a conspiracy to destroy electrical power stations or a National Guard Armory by means of fire and explosives. (Order, *United States v. Mandhai*, No. 02-60096-CR-DIMITROULEAS (S.D. Fl. Oct. 26, 2004, ECF No. 132). The court granted a downward departure from the advisory guideline range of 210-262 months in part because the terrorism enhancement created a guideline range that did not fit the crime, and criminal history category VI overrepresented the seriousness of defendant's criminal history. The case had been remanded for resentencing because the district judge's previously-stated reason for the downward departure was improper. However, the Eleventh Circuit held, "We agree with the district court, however, that the 12 level increase to Mandhai's offense level required by the terrorism enhancement prevents the penalty from fitting the crime, based on the facts of this record.[18] The totality of the circumstances in this record, along with other factors that might not have been brought to the Court's attention because he granted a downward departure, may be sufficient to remove the case from the Guidelines 'heartland.'" (*Id.*). The court went on to say, "Ours is a rule of law. We can and must keep our traditional democratic principles in place as we deal with terrorism and its threat. **On this record, a sentence range of 188 to 235 months is excessive for the crime Mandhai committed**." (*Id.*).

On November 1, 2012, **Rezwan Ferdaus** was sentenced, pursuant to a **guilty plea**, to 17 years for his participation in a plot to **use drones to blow up the Pentagon**. (Indictment, *United States v. Ferdaus*, No. 11CR10331, ¶1-2 (D.Mass. Sept. 29, 2011, ECF No. 6). When the undercover FBI agents told Ferdaus that "his first detonation device

---

[18] http://media.ca11.uscourts.gov/opinions/pub/files/200215933.pdf

succeeded in killing three U.S. soldiers and injuring four or five others in Iraq," he responded, "That was exactly what I wanted." (*Id.* at ¶5). As part of his plot, Ferdaus designed and constructed "detonation components for improvised explosive devices ('IEDs') using mobile phones." (*Id.* at ¶3). Across the course of his cooperation with the agents, whom he believed to be members of al Qaeda, Ferdaus supplied twelve phones that were wired to serve as detonation devices. (*Id.* at ¶4). Ferdaus actually travelled to Washington D.C. from Massachusetts to take photos and subsequently relayed all of the information he gleaned from his trip to D.C. to the undercover agents. (*Id.* at ¶7). Further, Ferdaus actually rented a storage space where he could "receive, store, and design his airplane attack vehicles." (*Id.* at ¶8). Ferdaus repeatedly requested supplies and funding from the agents, and inquired about remote control aircrafts form a supplier in Florida. (*Id.* at ¶8). After obtaining fake explosives from the undercover agents, Ferdaus placed some of them in the aircraft, and locked them inside his storage facility. (*Id.* at ¶9).

On December 14, 2009, **Ehsanul Islam Sadequee** was sentenced to 17 years for his extended involvement in a terrorist conspiracy that stretched through multiple countries with multiple known terrorists abroad, and where he traveled to Washington D.C. to create casing videos for violent attacks.[19] Both Sadequee and a co-defendant, **Syed Haris Ahmed** (13-year-sentence), went to trial and represented themselves. At Sadequee's sentencing hearing, he continued to justify his actions using the religion of Islam as the reasoning for his behavior. Sadequee repeatedly explained that he did not care what the sentence would be, and the law did not apply to him, because he lived by the code of Islam. He faced a statutory maximum of 60 years (the government only argued for

---

[19] https://www.justice.gov/opa/pr/atlanta-defendant-found-guilty-supporting-terrorists

twenty.) The court noted that he lacked remorse for his actions and sentenced him to 17 years, despite Sadequee's unwillingness to stand while the court read the sentence. (Sentencing Tr., *United States v. Sadequee*, No. 1:06-CR-147-WSD-2, 49-50 (N.D. Ga. Dec. 14, 2009, ECF No. 635).

On June 27, 2016, **Miguel Moran Diaz** was sentenced to <u>ten years</u> after pleading guilty to felony possession of a firearm. [20] Diaz planned to shoot citizens of Miami and transcribe "ISIS" into the bullets, so people would be aware of the motive of the attacks. (Sentencing Tr., *United States v. Diaz*, No. 15-20264-JAL, 18-19 (S.D. Fl. Sept. 22, 2015, ECF No. 34). He researched making bombs online and shared the information with an informant. (*Id.* at 19). He described himself as a "lone wolf for ISIS." (*Id.* at 21).

A 30-year sentence would create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. While it is true that there are no cases exactly like Chris Cornell's case, it is clear from examining the types of sentences handed down for other "domestic plotter" cases that a 30-year sentence is excessive. A sentence between 10-20 years is much more in line with the kinds of sentences that have been handed out nationally for cases in which a defendant plotter does not actually push the button on a bomb detonator and accepts responsibility rather than going to trial.

### IV. Conclusion:

There is no doubt that Chris Cornell did a terrible thing. However, locking this young man away in a high-security prison for 30-years is not the answer. Chris is fixable. He can

---

[20]     https://www.fbi.gov/contact-us/field-offices/miami/news/press-releases/miami-resident-and-isil-sympathizer-sentenced-to-10-years-in-prison-for-illegally-possessing-a-firearm

be saved. A shorter sentence with a long period of supervised release will provide punishment, protect the public, and afford adequate deterrence to criminal conduct. It will also give Chris an opportunity to be placed in a medium security prison that has more educational opportunities than a USP. Chris is finally at a place where he has some hope for his future. He told the informant on several occasions that he was thinking about going to school for nursing – a career focused on helping and caring for others. While such a career is no longer possible for him, it is possible for him to do something positive with his life. As Dr. Bresler wrote in his report,

> Chris has the ability to reinvent himself again, but this time as someone who is law-abiding, loving, and nurturing towards others. . . He will mature into an adult while imprisoned. . . he has the ability to make good choices and associate with other men who are truly repentant, desiring to return to the community with the hopes of making a positive contribution.

(Bresler Report at 23). Chris knows he must be punished for his crimes. However, he respectfully asks this honorable Court to consider a sentence considerably less than 30-years.

Respectfully submitted,

/s/ Candace C. Crouse
MARTIN S. PINALES (Ohio Bar No. 0024570)
CANDACE C. CROUSE (Ohio Bar No. 0072405)
Pinales, Stachler, Young, Burrell & Crouse Co., LPA
455 Delta Ave., Suite 105
Cincinnati, Ohio 45226
(513) 252-2750
(513) 252-2751
mpinales@pinalesstachler.com
ccrouse@pinalesstachler.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served via this Court's electronic filing system on all counsel of record on this 29th day of November, 2016.

/s/ Candace C. Crouse
CANDACE C. CROUSE (0072405)