1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


- - -


UNITED STATES OF AMERICA,    .  Case No. 1:15-CR-012
                             .
            Plaintiff,       .  Cincinnati, Ohio
                             .  Monday, April 18, 2016
      - v -                  .  9:00 A.M. Hearing
                             .
CHRISTOPHER LEE CORNELL,     .  **Excerpt of Competency Hearing**
                             .
            Defendant.       .  **TESTIMONY OF SCOTT BRESLER,**
...........................  **Ph.D.**

             EXCERPT OF TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE
APPEARANCES:
For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                      BY:  Timothy S. Mangan, Esq. (AUSA)
                      221 East Fourth Street
                      Suite 400
                      Cincinnati, Ohio  45202

                      UNITED STATES DEPARTMENT OF JUSTICE
                      BY:  Michael J. Dittoe, Esq.
                      National Security Division
                      950 Pennsylvania Avenue NW, Suite 1539
                      Washington, D.C.  20530

For the Defendant:    PINALES, STACHLER, YOUNG, BURRELL &
                      CROUSE:
                      BY:  Martin S. Pinales, Esq.
                      and  Candace C. Crouse, Esq.
                      and  Eric G. Eckes, Esq.
                      455 Delta Avenue, Suite 105
                      Cincinnati, Ohio  45226

Law Clerks:           Laurie J. Nicholson, Esq.
                      Patrick F. Smith, Esq.

Courtroom Clerk:      Mary C. Brown

Court Reporter:       Mary Ann Ranz
                      810 Potter Stewart U.S. Courthouse
                      100 East Fifth Street
                      Cincinnati, Ohio  45202

BRESLER - DIRECT

2

```
 1                    MONDAY, APRIL 18, 2016
 2                P R O C E E D I N G S        (9:14 A.M.)
 3         THE CLERK:  Please be seated.
 4      Case Number CR-1-15-12:  United States of America versus
 5    Christopher Cornell.
 6         THE COURT:  Good morning.
 7         MR. PINALES:  Good morning.
 8         MR. MANGAN:  Good morning.
 9         MR. DITTOE:  Good morning, Your Honor.
10         THE COURT:  I think perhaps Mr. Pinales had some
11    preliminary remarks that he wanted to make; is that correct?
12         MR. PINALES:  Yes, Your Honor, which I thought we
13    could explain through the witness, but I will -- I will
14    paraphrase, if the Court would like me to.
15      With the Court's permission, we're going to put on
16    Dr. Scott Bresler, our forensic psychologist who has been on
17    this case for some time.
18      He filed an initial report, and as of yesterday afternoon
19    when Chris came back to this area, saw him again, and has some
20    modifications and changes from his initial report, and I'd
21    like to have him explain that, with the Court's permission, of
22    course.
23         THE COURT:  Okay.  Mr. Mangan, Mr. Dittoe, anything
24    you'd like to put on the record as a matter of preliminary
25    remarks?
```

BRESLER - DIRECT

3

1    MR. MANGAN:  No, Your Honor.  I think we're ready to

2  proceed.

3    THE COURT:  Okay.  Mr. Pinales, call your first

4  witness.

5    MR. PINALES:  Dr. Scott Bresler.

6    THE CLERK:  Please raise your right hand.

7    (Witness duly sworn by the Clerk.)

8    THE CLERK:  Thank you.  Please be seated.

9                SCOTT BRESLER, Ph.D.

10  a witness herein, having previously been sworn, testified as

11  follows:

12                DIRECT EXAMINATION

13  BY MR. PINALES:

14  Q.  State your name; spell your last name, please.

15  A.  Scott Bresler, B-R-E-S-L-E-R.

16  Q.  Are you -- do you have any particular vocation?

17  A.  I do.

18  Q.  Tell us what that is.

19  A.  I am the Clinical Director in the Division of Forensic

20  Psychiatry at the University of Cincinnati and the Department

21  of Psychiatry and Behavioral Neuroscience.

22  Q.  Educationally, do you have a title?

23  A.  Psychologist.

24  Q.  Yes.

25  A.  I have a Ph.D.

4

1  Q.  That's what I was getting at.  So it's Doctor Bresler?

2  A.  Correct.

3  Q.  Dr. Bresler, referring to your CV, would you tell us your

4  education?

5  A.  I have a Ph.D. from Georgia State University.  This I

6  completed after doing a couple of bachelor degrees and a

7  couple of masters degrees.  And I have a post-doctoral

8  specialization in forensic psychology, neuropsychology and

9  geropsychology.

10  Q.  You said you were employed.  Can you give us your

11  employment history?

12  A.  I've been with the University of Cincinnati with the

13  College of Medicine, Department of Psychiatry and

14  Neuroscience, for about eight years now.  Prior to that, I was

15  at the University of Massachusetts School of Medicine where I

16  was the Associate Director of Forensic Services for the

17  commonwealth based at Bridgewater State Hospital.  And prior

18  to that I was at the University of Nebraska at Lincoln where I

19  had a clinical position there as well as an academic position

20  for approximately eight years.

21  Q.  You were tasked with doing a competency exam on Chris

22  Cornell?

23  A.  Correct.

24  Q.  Now, regarding that have you ever done competency

25  examinations in the past?

1   A.  Many times.

2   Q.  Can you give us a rough -- not --

3       I'm not asking for a specific, you know, number.

4   A.  Hundreds of times.

5   Q.  And of those have you actually testified?

6   A.  Yes.

7   Q.  And have you testified and been qualified as an expert?

8   A.  I have.

9   Q.  And has that been in state court?

10  A.  Multiple states and federal court.

11  Q.  Have you been employed to do competency reports by the

12  defense?

13  A.  I have.

14  Q.  By the government?

15  A.  I have.

16  Q.  And by the court?

17  A.  Yes.

18          MR. PINALES:  I would offer exhibit --

19      May I have the witness be shown Exhibit A, first of all,

20  before I offer it?  Thank you.

21  Q.  I've shown you what's been marked Defense Exhibit A for

22  identification purposes.  What is that?

23  A.  It's my curriculum vitae.

24  Q.  And does that reflect all of your publications and all of

25  your education?

6

```
 1   A.  Not all of my education, but what's relevant.  And I
 2   believe it's an updated CV with presentations and
 3   publications.  Thank you.
 4           MR. PINALES:  I'd like to offer Exhibit A.
 5           MR. MANGAN:  No objection.
 6           MR. PINALES:  Thank you.
 7           THE COURT:  It will be admitted.
 8       (Defendant's Exhibit A was admitted.)
 9   Q.  You know a person by the name of Chris Cornell?
10   A.  I do.
11   Q.  You see him here?
12   A.  I do.
13   Q.  When, why, and how did you come to know Chris Cornell?
14   A.  Initially, I came to know Christopher Cornell, although
15   not at -- with that name.  He was calling himself Raheel at
16   the time, Your Honor.
17       I was brought in with Karen Savir, who was the Public
18   Defender for the government at the time.  She brought me in to
19   work with her and to do a comprehensive evaluation of her
20   client.
21       When she pulled off the case, I was asked to stay on and
22   continue in that role by Mr. Pinales and Ms. Crouse and
23   Mr. Eckes, and I've maintained that position now and that
24   relationship with these defense counsel for approximately a
25   year.
```

BRESSLER - DIRECT

7

1    Q.  Did you work with any other professional in your

2    evaluation?

3    A.  I worked with a gentleman named Dr. Christopher Marett.

4    He assisted me.  At the time he was my forensic psychiatry

5    post-doc fellow, and he stayed in that position with the

6    permission of defense counsel.

7    Q.  And could you tell us what his qualifications are?

8    A.  He's a board-certified psychiatrist and forensic

9    psychiatrist.

10   Q.  Did you do a competency evaluation?

11   A.  I have.

12          MR. PINALES:  I'd like to have Exhibit B shown to the

13   witness.

14          THE WITNESS:  Thank you.

15   Q.  Placed before you is something marked Defendant's Exhibit

16   for identification purposes B.  Do you see that?

17   A.  I do.

18   Q.  And what is that?

19   A.  It is a comprehensive assessment of the defendant's

20   competence to stand trial, which I completed with a report

21   date of November the 4th, 2015.

22   Q.  Since that November date --

23          MR. PINALES:  First, I'd like to offer that into

24   evidence at this point.

25          MR. MANGAN:  No objection, Your Honor.

8

```
 1          MR. PINALES:  Thank you.
 2          THE COURT:  It will be admitted.
 3      (Defendant's Exhibit B was admitted.)
 4  Q.  Since that November date of last year, have you maintained
 5  contact with Chris Cornell?
 6  A.  I've met with him multiple times since then.
 7  Q.  When was the last time you saw him?
 8  A.  Yesterday.
 9  Q.  And since that November report have you studied additional
10  items that were not studied when that report was done?
11  A.  Yes.
12  Q.  Would you share with us what those were?
13  A.  There are volumes of transcripts, Your Honor, that I
14  looked at very carefully --
15      I finally made it through; it took me many, many hours to
16  do that.
17      -- transcripts between the defendant and the confidential
18  informant or the interactions that they were having, which, of
19  course, led to the allegations against him.  So that I've
20  seen.
21      I've also seen a number of letters between the defendant
22  and family members or the defendant and his defense counsel,
23  you.
24  Q.  In total, how many hours have you and Dr. Marett spent
25  with Chris Cornell?
```

1   A.   Forgive me.  I neglected one thing.

2   Q.   Oh.

3   A.   I also saw letters between a woman that I believe

4   Mr. Cornell had romantic interest in.  The letter was made to

5   her; it was supposed to be sent to her.  So I didn't -- I

6   neglected to say that; that's the additional piece.

7   Q.   And those are post your -- your report?

8   A.   Yes.

9   Q.   Did you talk to his family?  Did you interview his family?

10  A.   I spoke with his family prior to completing this report.

11  I have not spoken with them at any length since then.

12  Q.   And have -- as a result of the hours --

13       I started to ask how many hours, approximately, did you

14  spend with --

15  A.   Approximately up to this point, Your Honor, approximately

16  17 hours I've spent with him.

17  Q.   And that's contact with Chris one-on-one or two-on-one?

18  A.   One-on-one, two-on-one, and then I also accompanied you on

19  one or two occasions, if I'm not mistaken, to watch the

20  interactions between you, and also you called me at a couple

21  of crisis points.

22  Q.   We'll get to those.

23       Does Chris suffer from any mental disease or defect?

24  A.   I believe that he has a mental disorder at the present

25  time.

10

1  Q.  Do you have an opinion, to a reasonable degree of forensic

2  psychological certainty, as to whether Mr. Cornell is

3  presently suffering from any mental disease or defects?

4  A.  Yes.

5  Q.  What is that opinion?

6  A.  I believe that Mr. Cornell suffers from an adjustment

7  disorder with mixed anxiety and depression, and also I believe

8  that he has a personality disorder that is called Schizotypal

9  Personality Disorder.

10  Q.  Well, let's take these one at a time, and remember you're

11  talking to me, so bring it down, please.

12      What is this adjustment disorder?  What is that?

13  A.  It's a -- an extreme reaction to a set of -- of stressors,

14  which is another fancy way of saying significant amount of

15  inner stress that impacts upon an individual usually within a

16  three-month time frame and it impacts them at multiple levels,

17  and in his case he has marketed anxiety and also at times is

18  -- can be depressed to the point of being suicidal.

19  Q.  Have you seen him and discussed him being suicidal --

20  A.  Many times.

21  Q.  -- with him?

22  A.  Many times.

23  Q.  And when was the last time?

24  A.  Yesterday.

25  Q.  Did you learn yesterday that the Boone County Jail had

11

1  taken any special precautions?

2  A.  I did.

3  Q.  And how did you learn that and what precautions?

4  A.  Some of the correctional officers related to me before I

5  met with him that they had him on special precautions.  And

6  then I spoke with Mr. Cornell about that, and he told me that

7  prior to leaving the federal facility in Terra Haute, that he

8  expressed to them that he was feeling suicidal and depressed,

9  and apparently that information was passed on from the federal

10  facility, the federal lockup, to the Boone County Jail.

11  Q.  This depression, does that go to competency?

12  A.  It can.

13  Q.  How?

14  A.  Well, there've certainly been times when I've seen him

15  where he was so overwhelmed with depressing feelings and

16  crying, sometimes incessantly, that he didn't process

17  information very well, and so it certainly can.

18  Q.  Well, he's facing some serious charges; that would be

19  depressing to anyone.

20  A.  Of course.

21  Q.  Can you contrast that with specifically to Chris?

22  A.  Look, the adjustment, the diagnosis of adjustment disorder

23  is a -- is a somewhat common diagnosis.  He is certainly

24  facing a very significant amount of stress.  And there are

25  times where his experience of that stress appears to overwhelm

1  his limited coping capacities.  In addition to that, he has a

2  previous history of being diagnosed with depression during his

3  formative teenage years and was evaluated by other

4  professionals and given that diagnosis.  So it's a concern.

5  He has very limited coping capacities and coping resources.

6  Q.  Were you privy to those previous diagnoses?

7  A.  I was.

8  Q.  You mention schizotypal.  Talk to me.  What is that, in my

9  language?

10  A.  I call it schizotypal but some people call it schizotypal

11  [schizotipple, phonetic].  It's a pervasive disorder that

12  expressed itself interpersonally, Your Honor.

13     It's a disorder where the person often has somewhat odd

14  mannerisms; usually begins in early adulthood.  You'll have

15  people that can engage sometimes in magical thinking, may have

16  very odd beliefs.

17     His interpersonal speech, he never looks at you; he always

18  looks down at you.  And even at times where I ask him to look

19  at me so I can at least feel that he's paying attention, he'll

20  only briefly do so and then put his head back down.

21     Sometimes his speech is circumstantial.  It's not exactly

22  relevant to what you ask him.  Or he'll just go on and he'll

23  say lots of things but there's very little content in what

24  he's saying, like a poverty of content.  This seems to be

25  traits for him, like well-formed traits.  That's schizotypal.

13

```
 1   Q.  Does that mean he's schizophrenic?
 2   A.  No.
 3   Q.  You mentioned that this -- this disorder has certain
 4   traits.
 5   A.  Yes.
 6   Q.  Does he have odd beliefs or magical thinking?
 7   A.  He can have some odd beliefs and magical thinking.
 8   Q.  Have you observed that?
 9   A.  Well, I think the most -- yes, I have.  I think the most
10   recent expression of these beliefs --
11       And some might even consider them an idea, what they call
12   an idea of reference.
13       -- he had a brief, casual encounter with a woman in the --
14   in the Boone County Jail, if I'm not mistaken, and all of a
15   sudden that took extreme importance in his life.  He attached
16   great significance that this woman was now his girlfriend and
17   that they were meant to be together, and he was writing love
18   letters to her and even instructing her, Your Honor, on how
19   she should comport herself, her behavior, just based upon this
20   brief interaction.  So he attached an unusually significant
21   amount of importance to something that most others would have
22   seen as simply a casual encounter, casual social encounter.
23   Q.  Another trait is odd thinking and speech.  Does he possess
24   that?
25   A.  Yes.  I mentioned the speech, that he will sometimes speak
```

1   around issues and you'll have to redirect him.  And sometimes

2   he talks and talks and he's not really talking to what you're

3   asking him to talk about; he needs to be redirected.

4   Q.  What about paranoia or suspiciousness?

5   A.  I think he's had a lot of that, but it's hard to gauge

6   given the circumstances.  Of course, everything that he's

7   saying and on the phone to his family, the phone calls and the

8   letters, all of that's being monitored, so it's hard to tease

9   that apart.  But there were clearly times before he got into

10  this trouble where he began to withdraw from other people,

11  from peers, and spend more and more time isolated, which is

12  really a telltale sign of this personality disorder.  In fact,

13  this whole Raheel identity is something that he created with

14  many, many hours by himself on a computer in his -- in his

15  room at home.

16  Q.  Does he suffer from improper or constrictive --

17  A.  Affect, yes.

18  Q.  -- affect?

19  A.  Yes, he does.  He's very flat.  His affect is very flat.

20  He doesn't show -- his emotions are typically very, very flat,

21  and -- unless he hits a certain topic, and then he can become

22  very tearful, very upset, and he gathers himself back and it's

23  flat again.

24  Q.  Does he have a behavior or appearance that is odd,

25  eccentric, or peculiar, one of the other traits?

15

1  A.  Again, that one's hard to judge, because in the jail

2  initially -- I mean, I -- I saw him yesterday; it was the

3  first time he asked me to call him Chris.  But ever since I've

4  seen him, he's always been Raheel and had on a skullcap with

5  long hair, and so he's always looked different.

6      There are reports that I read that indicate that even

7  before he created this identity Raheel, that he dressed

8  differently from other peers with, like, dark clothes with a

9  black hoodie, or what have you.  But we see a lot of people

10 like that, so I'm not sure how bizarre that is, but certainly

11 different.  It would stand out from other kids.

12 Q.  One of the other traits is a lack of close friends.

13 A.  He has --

14 Q.  Did that possess -- is that --

15 A.  Very much so.

16 Q.  -- part of his --

17 A.  Very much so.

18 Q.  In what way?

19 A.  He's really an isolated person.  He doesn't have any -- I

20 mean, in his earlier years, he had one or two close friends

21 that shared a limited interest, limited interest that he had.

22 But he's not had any close friends for many years, Your Honor.

23     His closest friend that he professes to love dearly would

24 be his brother, and, of course, his mother and his father he

25 loves and they're close, and he has pets that he expresses

1    great fondness for.

2    Q.   Does he have excessive social anxiety?

3    A.   He has a lot of social anxiety.

4    Q.   And are these all traits of that mental defect?

5    A.   These are all traits of Schizotypal Personality Disorder.

6    Q.   Can people with all those traits and with that disorder

7    have psychotic episodes?

8    A.   They can.  I see them in the hospital quite a bit when

9    they've undergone a lot of stress, but I've not seen him be

10   transiently psychotic at all.

11   Q.   What about his intellectual capacity?

12   A.   He has a normal intelligence.

13   Q.   Now, you and I have been talking for the past, oh, 10 or

14   15 minutes; we've had a normal conversation.  Is that the type

15   of conversation that you've been able to have with Chris --

16   A.   No.

17   Q.   -- type of normality?

18   A.   No.

19   Q.   Why not?

20   A.   Because that's not how he relates.  He will sit, and

21   typically he will sit and wait for you to speak with him.

22   Often his answers are short and unelaborated.  But if he

23   becomes very anxious, he'll just take off and talk.  I mean

24   incessantly, at length, about something he's worried about or

25   troubled about and that was running through his mind over and

1   over again.  Usually, it's very depressing thoughts or anger

2   about how his -- he feels his family has been treated

3   unfairly.  But then he'll close back up again and it's like

4   pulling teeth to get him to give information.  So it goes back

5   and forth.

6   Q.  Well, over this past year that you've been involved with

7   Chris's life, have you seen changes in him over the past year?

8   A.  Yes.

9   Q.  What are they?

10  A.  Well, there've been times when I met with him where I

11  think he's been very focused and very conversant and he's able

12  to do okay.  And then there've been other times when he's

13  looked very depressed, cried almost non-stop, expressed very

14  dark, hopeless, dark ideas about his life, suicidal ideation,

15  embarrassed to admit it but says that, always followed by "I

16  would never do that to my parents, but I don't know if I can

17  continue much longer with this."  And then, of course,

18  yesterday was the first time that I met this man who called

19  himself Christopher Cornell and not Raheel.

20  Q.  What do you mean it's the first time you've met him?

21  A.  Well, it's not the first time I met him, but this persona

22  who I met with yesterday.  His persona that he described

23  yesterday was -- was different than the person that I've met

24  with the previous 14 and a half, 15 hours.

25  Q.  Did you have an opportunity to read Dr. Nieberding's

18

1    report?

2    A.  I did.

3    Q.  Dr. Nieberding was the psychologist that the government

4    asked to do a forensic exam?

5    A.  Yes.

6    Q.  And can you tell us do you agree with that, disagree with

7    it?

8    A.  I can't -- you know, I don't agree or disagree.  I mean, I

9    think that he and I saw some similar things, and I think that

10   Dr. Nieberding picked up on the anxiety issues and he

11   references it in his report.  I think Dr. Nieberding picked up

12   on some of the schizotypal traits, antisocial traits, and

13   referenced it in his report.

14       You know, Dr. Nieberding has to go on the information that

15   he has and the presentation that he has in front of him, and

16   that's what Dr. Nieberding saw, and I thought it was

17   well-written and I thought it was comprehensive.

18   Q.  And in Dr. Nieberding's report and in your observations

19   was there anything where Chris was putting up a guard not to

20   be looked at as if he had a mental issue?

21   A.  Yes.

22   Q.  Tell us about that.

23   A.  Well, in both of our testing that we did with Mr. Cornell,

24   Your Honor, he -- there -- there are, embedded into the test,

25   validity indices so that you can get a sense of what the

1   approach the person who takes the test is taking.  So

2   impression management, if you will.  Are they exaggerating

3   some things of the psychopathology of having memory illness

4   problems?  Or the opposite, are they faking good?  Are they

5   trying to look, you know, completely devoid of having issues?

6   And that's what we found; we found he was very invested in

7   looking healthy and looking good.

8   Q.  You mentioned a few times earlier about the isolation that

9   he had in his confinement.  Does that have any effect on his

10  competency, his mental state?

11  A.  It -- it very well could.  There've been times when he's

12  been placed in solitude and not had any significant contact

13  with others and then he's left to his own mind to come up with

14  ideas, and he doesn't seem to do particularly well under those

15  circumstances.

16  Q.  Well, he was -- he was originally in the Boone County

17  Jail; correct?

18  A.  I believe he was at --

19  Q.  In Butler County and then --

20  A.  Butler County.

21  Q.  -- local facilities?

22  A.  Local facilities.

23  Q.  And then when he saw Dr. Nieberding, he was in MCC

24  Chicago; correct?

25  A.  Yes.

SHESLER - DIRECT

20

1   Q.  And was he isolated there?

2   A.  I think he was isolated there.

3   Q.  Did he have any friends, any people to talk with, even

4   though he's under a SAMs order?

5   A.  Yes, he -- they would let them out.  I think he spoke

6   about letting him out to exercise.  And I think -- I don't

7   know if I'd call them friends, but certainly he had

8   acquaintances and people that he spoke with when they would

9   let them out or move them.

10  Q.  Do you know who that other person is and how that may have

11  influenced him?

12  A.  I know that he met with another young man who is facing

13  similar charges there.  The man's name is Adel Daoud.

14  Q.  And he was able to talk --

15      You've learned that he was able to talk to Chris?

16  A.  From what -- from what Chris tells me, yes.

17  Q.  And that he -- he was able to give his ideas to Chris?

18  A.  So he tells me.

19  Q.  Now, let's get to why we're here today.

20      There's a couple of prongs to competency to stand trial,

21  and the first is do you have an opinion, within reasonable

22  degree of forensic psychological certainty, as to whether

23  Christopher Cornell is able to understand the nature and

24  consequences of the proceedings against him?  Do you have an

25  opinion?

1   A.  Yes.

2   Q.  And what is that opinion?

3   A.  I think that for the most part he understands that.

4   Q.  Has your opinion changed over the year that you have

5   interviewed him and diagnosed him?

6   A.  It has.

7   Q.  And in what way?

8   A.  Well, there were times when I met with him where we

9   weren't getting anywhere because he was so depressed and

10  despondent and crying a lot.  He would get confused pretty

11  easily, have problems articulating his ideas and his

12  understanding of things.

13  Q.  And has that changed over the course of the almost

14  12 months?

15  A.  It's ebbed and flowed.  I -- I think now that he's -- for

16  the most part has a rational, factual understanding of the

17  charges against him and understands what their -- you know,

18  what the legal implications are, Your Honor.

19  Q.  Now, there's a second prong to competency, and I'm going

20  to ask whether you have an opinion, to a reasonable degree of

21  forensic psychological certainty, as to whether Christopher

22  Cornell is able to assist counsel in properly preparing a

23  defense?

24  A.  I do have an opinion to that effect.

25  Q.  Will you share that with us?

22

1   A.  It's a more complicated issue.  I feel now, based upon the

2   most recent evaluation I've done with him, Your Honor, that I

3   think he is competent to proceed with adjudication, but I'd

4   like to describe that competency more in my language than in

5   the Court's black or white, if -- if I may.

6       I think that that competency is somewhat marginal and I

7   have reasons to support that.

8   Q.  Well, first of all, what do you mean by "somewhat

9   marginal"?

10  A.  First of all, I think that things can change with him.

11  And so depending upon the circumstances of his confinement, he

12  can become again quite anxious, quite despondent, and it may

13  be very difficult for you and Ms. Crouse and Eric to work with

14  him.  And in fact, I've interviewed you, and you've even told

15  me that there are times you review something with him in great

16  detail and then show up at a later point in time and go back

17  over that and you feel like all two hours you did with him

18  were wasted, and I discussed that with you, and it's usually

19  at times when he's feeling very highly anxious, very hopeless

20  and very depressed.

21      So this element of being able to work collaboratively,

22  Your Honor, with his counsel I think is somewhat fluid.  Now I

23  believe he's okay.  But with humility, Your Honor, I would

24  strongly advise that he be reevaluated before this case moves

25  forward to either a guilt phase or to some agreement -- plea

23

1 agreement phase. I think I would strongly advise that he be

2 reevaluated, and I know that you've asked me if I would be

3 open to doing that. Certainly would do that for you as

4 defense.

5 Q. You've said he's competent marginally. You said he knows

6 what's going on in the courtroom and that he can assist

7 counsel.

8     Will he be able to help, or will there have to be some

9 special measures taken in Chris's ability to work with counsel

10 in preparation of the trial?

11 A. Well, first of all, in light of the fact that he's now

12 calling himself Christopher Cornell and he's spent a lot of

13 time kind of looking at things, I would anticipate that

14 there's going to be a need for defense counsel to meet with

15 him extensively.

16     If they are planning to use as a part of their defense

17 strategy, Your Honor, Mr. Cornell actually giving testimony, I

18 would think that that would need lots of preparation before he

19 would be able to, given his social anxiety and everything

20 else, lots of preparation by -- by defense for that. So those

21 would be two areas that I would be concerned about.

22 Q. Do you have an opinion as to whether or not he's faking,

23 he's malingering, any of that?

24 A. Well, like I mentioned, I think faking and what --

25     In what sense? I mean, I don't think he's faking mental

24

1   illness.  I think he's very invested, and I think

2   Dr. Nieberding picked up on this too.  He's very invested in

3   not appearing as though he's mentally ill, so I wouldn't say

4   that he's malingering in that regard.

5       Can I say with -- with any confidence that now that he

6   calls himself Christopher Cornell that this identity that he

7   created, Raheel, is no longer there?  I can't say that.  I'm

8   not able to discern whether that is or is not true.  But he

9   certainly talks in great detail about how Raheel came to be.

10  Q.  How did he come to be?  Tell me about that.

11  A.  It's a very -- it's a complicated picture.

12      I think what happened, Your Honor, is that he was feeling

13  a great sense of loss in trying to understand who he is and

14  what he wants to do, what we ordinarily see in teenagers.  But

15  instead of what most teenagers do, which is gravitate toward

16  peers, finding a special peer group either through sports or

17  religious affiliation, or what have you, he withdrew and

18  created this -- this identity over time and renamed himself

19  and converted to Islam.  But even in the Islamic group, he was

20  not -- he was not into a mainstream type of Islam.  He was

21  much more attracted to ISIS or Al-Qaeda or these types of

22  groups -- Hamas, Islamic Jihad, you know, these types of

23  groups -- and he formed this identity as a way to feel, I

24  feel --

25      And he says this, which is remarkable.

25

1      -- that he created these identities to -- to make him feel

2  as though his life made a difference and that he was somebody,

3  as opposed to being the son to a drug addicted ex-con, living

4  a marginal life, poor- to lower middle-class at best.  So he

5  created that identity.

6      And I think that he's had a lot of time to reflect as to

7  how his life as Raheel has not only had a bad impact for him

8  -- and he's certainly aware of that and what he's facing --

9  but also that it's hurt the people that he professes to love

10  most, which is -- and he's very protective of them -- his

11  mother and his father and his brother.

12          MR. PINALES:  One moment.

13      (Defense Counsel confer privately.)

14          MR. PINALES:  Nothing further.  Thank you.

15          THE COURT:  Mr. Mangan?

16                  CROSS-EXAMINATION

17  BY MR. MANGAN:

18  Q.  Dr. Bresler, I have just a few questions --

19  A.  Sure.

20  Q.  -- to try to clarify things a little bit.

21      So, first of all, you refer to Raheel as an identity or

22  persona.  You're not talking about multiple personalities?

23  A.  Oh, no, not at all.

24  Q.  And do you have any doubt that when he converted, that it

25  was sincere?

26

1  A.  I think he felt it was sincere, yes.

2  Q.  And based on your interviews with him and, you know, all

3  the rest of the data, he certainly studied that religion?

4  A.  Quite a bit.

5  Q.  And, in fact, in terms of his memory, he would quote the

6  Koran at times chapter and verse to you?

7  A.  He would, yes, to me, and even teach me what he believed

8  were the meanings of certain things -- chapter and verse, as

9  you say.

10  Q.  Okay.  And there were times, perhaps, in the early goings

11  of meeting with him that when he talked about the situation he

12  faced, he wanted to defend his religious beliefs in this case?

13  A.  Absolutely.

14  Q.  And as you talk to him now, those feelings seem to have

15  changed?

16  A.  So he says.

17  Q.  Okay.  But I wanted to be clear we're not talking about

18  multiple personalties?

19  A.  No.

20  Q.  Okay.  This is someone who underwent a conversion to

21  fairly extreme religious beliefs; correct?

22  A.  Yes.  I'm -- I'm a little hesitant to say "conversion,"

23  counselor.  I'm not sure.  I mean, he's self-radicalized, I

24  think is probably the best way to say it.

25  Q.  Fair enough.

1      Let me go back to just understanding the materials you've

2   reviewed since you issued your report in November.

3      How many times have you met with Chris Cornell since

4   November 4th, 2015?

5   A.  It's three or four.  I don't have it right directly in

6   front of me, but it's three or four times.  I think it's four.

7   Q.  All right.  Okay.  One was this weekend?

8   A.  Correct.

9   Q.  Do you recall when the others were?

10  A.  I think I met with him maybe about four weeks ago, and

11  then prior to that about four weeks ago, and prior to that

12  about four weeks.

13  Q.  Okay.

14  A.  I did not go to Terra Haute, so I've not seen him since he

15  got transferred.

16  Q.  So these were all when he was local?

17  A.  That's correct.

18  Q.  All right.  You mentioned some of the materials that you

19  reviewed, and I just wanted to make sure I understood what

20  you'd seen and what you hadn't seen.

21      You mentioned letters that were written by Mr. Cornell.

22  Did that include the letters he has written since he's been at

23  Terra Haute?

24  A.  There are some letters.  I don't know if you and I are on

25  the same page in terms of the actual -- but these letters were

28

```
 1   written approximately the end of March to the early part of

 2   April.

 3   Q.  Okay.  We may be talking about the same letters.

 4       In those letters, did you see indications that Mr. Cornell

 5   was eating well?

 6   A.  Yes.

 7   Q.  And that he was exercising?

 8   A.  Yes.

 9   Q.  And that he was sleeping better?

10   A.  These were things he wrote in the letter, yes.

11   Q.  And sometimes he repeats that multiple times?

12   A.  And sometimes he repeated that multiple times.

13   Q.  Okay.  Were you ever provided information regarding

14   material that Mr. Cornell posted online from the Boone County

15   Jail?

16   A.  Yes.

17   Q.  Okay.  And this would have been posted on a website back

18   in approximately January?

19   A.  Yes.

20   Q.  All right.

21   A.  Uh-huh.

22   Q.  And in connection with that, there were some materials

23   that were retrieved from Mr. Cornell's jail cell and then

24   provided to the defense.

25       Were you provided with any of those materials?
```

1  A.  I think I was, yes, sir.

2  Q.  So, for example, there was a document that showed an

3  analysis of the discovery in who Mr. Cornell believed the

4  confidential source was?

5  A.  Yes.

6  Q.  And you saw that analysis?

7  A.  Yes.

8  Q.  Did that have -- does that have any significance to the

9  opinion that you're providing today?

10  A.  Yes.

11  Q.  How so?

12  A.  I believe it bespeaks his competency to be able to

13  participate and help out in the provision for his defense.

14  Q.  Okay.  Because it clearly showed he could analyze the

15  discovery and put things together in an organized manner?

16  A.  It seemed to suggest that, yes.

17  Q.  All right.  Were you also provided a document from his

18  jail cell that showed a list of terrorism cases or incidents

19  over the past year?

20  A.  Yes.

21  Q.  And what did that show to you?

22  A.  That he's keeping track of these various types of

23  incidents, what happens to the people, and, you know, legally

24  what the ramifications are for these people.

25  Q.  And does that suggest competence to you as well?

1    A.   Yes.

2    Q.   You said you saw a letter to the woman -- to a woman that

3    he had encountered at Boone County?

4    A.   I did.  It's been a while, but I did.

5    Q.   Was it just one letter or multiple letters?

6    A.   I don't know.  I've read quite a few letters.  I thought

7    it was more than one, but I apologize, I don't remember.

8    Q.   Did you ever interview that woman?

9    A.   I did not.

10   Q.   All right.  And so is it fair to say you don't know what

11   her feelings are towards Mr. Cornell?

12   A.   I do not.

13   Q.   When you spoke with Mr. Cornell in the early going, did he

14   exhibit any shame or regret over what he was being charged

15   with?

16   A.   Not directly.  Any shame or regret typically was couched

17   within how all of this was having a terrible impact on his

18   family.

19   Q.   Okay.  But certainly not apologetic for what he was

20   planning?

21   A.   Not apologetic for what he is alleged to have planned.

22   Q.   Okay.  Now, you mentioned some comments about him wanting

23   to appear as not having a mental illness.

24   A.   Correct.

25   Q.   So let's talk about that a little bit.

1     In your report, you administered a number of diagnostic

2  tools, or forensic tools perhaps is a better term.

3  A.  Both.

4  Q.  Okay.  And in those there is a -- at least some of them

5  tried to discern whether someone is feigning or not?

6  A.  Correct.

7  Q.  And the conclusions that you saw from the test results

8  were that Mr. Cornell was not feigning?

9  A.  Not feigning that he was mentally ill or had major

10 problems with mental illness.

11 Q.  All right.

12 A.  In fact, just the opposite.

13 Q.  Okay.  And, in fact, a number of times when you would go

14 to talk to him, he would say, "Look, I'm not crazy; I'm not --

15 I'm not sick"?

16 A.  Right.

17 Q.  And, in fact, he tried to distinguish himself from other

18 cases where he knew someone was held to be, you know, not

19 guilty by reason of insanity or something like that; right?

20 A.  Right.  I mean, he -- he was -- from the get-go made it

21 very clear that he's -- nothing's wrong with him and under no

22 circumstances would he allow his defense team to even

23 entertain the possibility of an insanity defense.

24 Q.  And that's been consistent throughout?

25 A.  I think it's been consistent throughout.

32

1  Q.  You mentioned that you read the transcripts of discussions

2  with the confidential source before he was arrested?

3  A.  Yes.

4  Q.  In fact, during those conversations before he was

5  arrested, didn't he make a statement to the source that "We

6  want to explain why we're doing this because we don't want

7  people to think we're crazy"?

8  A.  I believe I recall him saying something to that effect.

9  Q.  Let me just ask you a little bit more about these tools

10  that you used.

11  A.  Sure.

12  Q.  You mentioned that you gave him a test this weekend?

13  A.  I did.

14  Q.  What was that?

15  A.  The evaluation of Competency to Stand Trial Revised.  It's

16  the same tool that Dr. Nieberding used and that we had used

17  one time previously.

18  Q.  What's the purpose of that tool?

19  A.  It's --

20     What I use it for?  It's -- it's what I would call an

21  aide-memoire.  It's a comprehensive set of questions to

22  evaluate the -- the knowledge of the defendant in regards to

23  court players, court proceedings, capacity to interact with

24  defense counsel; what happens if -- if problems emerge in that

25  relationship or disagreements emerge in that relationship, and

33

1   there's numbers that can be assigned, you get a score, but I

2   don't use it for that purpose.  I use it as a way to organize

3   my evaluation, Your Honor.

4   Q.  Well, it's designed to assess competency to stand trial?

5   A.  Yes.

6   Q.  And you administered it once on August 21st, 2015, and

7   this past weekend; is that correct?

8   A.  This past weekend, and let me just check that date.  I'm

9   not finding the exact date in here, but I -- that sounds

10  right.  I know it was sometime in late --

11  Q.  Sometime prior to your written report?

12  A.  Oh, absolutely.

13  Q.  And let's go back to the one that you gave the first time

14  you gave it to him.

15  A.  Okay.

16  Q.  At that time, you did go through the scoring mechanism;

17  correct?

18  A.  I don't remember if I did or didn't, but I typically don't

19  do that, so --

20      Do I reference it?  I have to take a close look.

21  Q.  Correct me if I'm wrong, the way the tool is designed,

22  that there are three different sections?

23  A.  Correct.

24  Q.  All right.  And a person who is -- typically folks who are

25  competent score below 60 on each section?

34

1    A.   That's how the tool -- that's what the tool is designed to

2    kind of predict.  But it's -- again, I mean "competency" is a

3    legal term, it's not a clinical term, and whether somebody is

4    or is not competent to proceed with adjudication is in the

5    hands of the trier of fact.  It's not something that, you

6    know, that experimental psychologists, you know, should be in

7    the position of trying to predict.  This certainly can assist

8    the Court, and that's why I use it.

9    Q.   And that's why I wanted to delve into what the tool is.

10   And if it would be helpful, you can turn to page 31 of your

11   prior report.

12   A.   Sure.

13   Q.   You wrote that "Most competent defendants score below 60

14   on all three sections," page 31.

15   A.   Yeah.  I'm getting it.  One second.

16   Q.   Sure.

17       (Witness reading.)

18   A.   Okay.  I'm with you.

19   Q.   Okay.  And based on the tool that you gave to Mr. Cornell

20   that time back in August, he did score below 60 --

21   A.   Yes.

22   Q.   -- on all six sections?

23   A.   Yes.

24   Q.   The conclusion you wrote, at least with respect to the

25   administration of the ECST, was that as to that testing

35

1   "Mr. Cornell evidenced an adequate overall level of rational

2   ability to consult with counsel."

3   A.  Yes, based on the tool.  Yes.

4   Q.  Okay.  And then you administered that same tool this past

5   weekend?

6   A.  I did.

7   Q.  But you didn't score it?

8   A.  I did not sit down and score it.  But it would be -- go

9   ahead.  I'm sorry.

10  Q.  Would it be consistent with the first time you

11  administered --

12  A.  I think it would be largely consistent.

13  Q.  Okay.  So the administrator of the ECST on both occasions

14  supported your conclusion today that he is able to assist

15  counsel?

16  A.  Yes.

17  Q.  Okay.  And then I just wanted to touch on one other tool.

18  You also gave Mr. Cornell a test called the MacCAT?

19  A.  Yes.

20  Q.  All right.  And is that also designed to assess

21  competency?

22  A.  It is.

23  Q.  And that was also given earlier in 2015?

24  A.  Yes.  Did not do it yesterday.

25  Q.  Prior to your written report?

36

1    A.  Correct.

2    Q.  And that's also designed for competency?

3    A.  Also designed to assess competence, trial competency.

4    Q.  And that has two sections, I believe?

5    A.  I think three, but go ahead.

6    Q.  Well, let's just kind of get to the results.

7    A.  Where are you?

8    Q.  Turn to page 25.

9    A.  Yes.

10   Q.  Okay.  And he scored well on the MacCAT as well?

11   A.  He did at the time that we gave it to him, yes.

12   Q.  31 out of 32, essentially?

13   A.  Yes.

14   Q.  Okay.  And that tool is also designed to assess, one,

15   whether he understands the proceedings and, two, whether he

16   has the ability to assist counsel?

17   A.  Correct.

18   Q.  And so the results of that tool also support your opinion

19   today?

20   A.  Yes.

21   Q.  And then I just wanted to clarify.  Your original report

22   from November 4th, 2015, you gave the opinion that he -- that

23   he did in fact understand the proceedings?

24   A.  Yes.

25   Q.  Okay.  And that opinion is unchanged today?

1  A.  For the most part, yes, that's true.

2  Q.  So the part that is different today pertains to the second

3  prong, his ability to assist counsel?

4  A.  Right, that's correct.

5  Q.  And the other thing I wanted to clarify for the Court was

6  you mentioned today the Schizotypal Personality Disorder?

7  A.  Yes.

8  Q.  My understanding from your November report was that you

9  saw traits of that disorder but you did not diagnose him as

10  meeting the criteria?

11  A.  Let me turn to that part.  One second, please.

12  Q.  Page 39.

13  A.  Yes, that's how I wrote it back then.

14  Q.  That he has traits consistent with?

15  A.  Yes.

16  Q.  But I did not see anything in the report saying at that

17  time you were diagnosing him as meeting the criteria.

18  A.  It's the same thing.  If you take a look at what the

19  criteria is according to the DSM-V, which is the manual that

20  they use to render these diagnoses, if you hit five or more of

21  these, then -- then you are -- then you qualify for that

22  diagnosis.  I just didn't specifically say "diagnosis of."  I

23  just said "consistent with."  But I'm saying the same thing.

24  Q.  Okay.  So, in your mind, your opinion hasn't changed with

25  respect to that disorder?

38

1   A.  The schizotypal --

2   Q.  Right.

3   A.  -- not to see any more of it.  But I'm more certain now.

4   Q.  Well, I just want to make sure we clarified that.

5   A.  Yes.

6   Q.  The way the report was originally written, it looked like

7   there was only one diagnosis of a mental disorder.

8   A.  I'm sorry for that.  Maybe I should have been more -- more

9   definite than that.  I apologize.

10  Q.  Okay.  You also mentioned concerns about expressions of

11  suicidal ideation?

12  A.  Yes.

13  Q.  At least in earlier meetings with Mr. Cornell, didn't he

14  state on a number of occasions that that was against his

15  religion?

16  A.  He did.

17  Q.  And he would say he was feeling like that, but he would

18  never go through with that?

19  A.  There were times when he said that.

20  Q.  Okay.  In terms of what he expressed to you this past

21  weekend --

22  A.  Yes.

23  Q.  -- was his expression conditioned on "If I get a certain

24  sentence, then this is how I'll feel"?  Or was it related to

25  the outcome of the case?

39

1    A.  No, it was not.

2    Q.  Okay.  It was just sort of based on where he is right now?

3    A.  Yes.  I can explain that to you, if you'd like me to.

4    Q.  I was just going over you took notes from that.  And my

5    understanding from the notes was that it was expressed as "If

6    I get a certain result, I'm not sure -- I'm not sure if I can

7    do that many years"?

8    A.  Yes, and he has said that --

9    Q.  Okay.

10   A.  -- on a few occasions that he would kill himself or he

11   would be driven to kill himself, I guess would be a better

12   word, and oftentimes he would say, "But," you know, "I don't

13   want to do that," or "I would never do that to my parents" --

14   Q.  And in your --

15   A.  -- "to my brother."

16   Q.  I'm sorry.

17   A.  Go ahead.

18   Q.  In your experience with younger defendants, have you heard

19   other prisoners express that concern that, "Look, if it's this

20   many years, I'm not sure I can do that"?

21   A.  Yes.

22   Q.  That's somewhat common or at least not unusual?

23   A.  It's not unusual.

24          MR. MANGAN:  No further questions, Your Honor.

25          THE COURT:  Redirect?

40

1          MR. PINALES:  Just a few.

2                        REDIRECT EXAMINATION

3    BY MR. PINALES:

4    Q.  I think that the prosecutor asked you a question how many

5    times have you seen Chris since the writing of your report and

6    you said you think it was four including yesterday?

7    A.  I believe so.

8    Q.  And that on some of those occasions did you see Chris at

9    my suggestion and Candace Crouse's suggestion?

10   A.  Yes.

11   Q.  And were they --

12       I believe you testified in your direct that sometimes you

13   saw him with us?

14   A.  I think on a couple of occasions I've seen you with --

15   I've seen him with you.

16   Q.  And on those occasions that were referred to by the

17   prosecutor since you -- making of the report, were they caused

18   by counsel's concern for the mental health of Chris Cornell?

19   A.  My being brought in to see him was because -- on at least

20   one if not two occasions -- was because you specifically asked

21   me to come see him because you had met with him and he was

22   crying incessantly and complaining that he can't take the

23   stress of this any longer; feeling very, very helpless,

24   hopeless, suicidal.

25   Q.  Other questions that Mr. Mangan asked you were he used the

1  word "traits."  And I think that's -- I had some problems that

2  -- the common, real-people use of the term "traits."

3      What are they as part of this schizotypal --

4  A.  Most diagnosticians or people that work with individuals

5  that suffer from various manifestations of psychopathology

6  typically separate out states which can ebb and flow, states

7  of emotion that can ebb and flow versus traits which are more

8  kind of pervasive behavioral patterns.  That's -- that's the

9  distinction that's made.

10  Q.  It's a term used in your profession?

11  A.  It is a term that's regularly used in the profession and

12  it's used very often to distinguish illnesses that have

13  symptoms that ebb and flow versus a characteristic style, if

14  you will, of how that person interacts with the world, sees

15  themself and others in their world, et cetera, et cetera.

16  Q.  And I believe you told the prosecutor that if a person

17  exhibits five or more of these traits, then that's what causes

18  the factor of the diagnosis?

19  A.  Right.  It's like a checklist.

20  Q.  And in that checklist there were actually nine; weren't

21  there?

22  A.  I didn't count them.

23  Q.  Okay.  The prosecutor referred to those tests that you

24  gave as "tools"?

25  A.  Yes.

Kessler - Redirect

42

1    Q.   They are that; are they not?  Just tools?

2    A.   They are tools.

3    Q.   And the buck stops with the professional?

4    A.   I'm not sure what you mean by "the buck stops."

5    Q.   I mean, you give your opinion based on tools, based on

6    perception, based on your education, based on your knowledge.

7    It's one factor; is it not?

8    A.   It's one factor.  I think that there's some of us in our

9    profession that felt, especially in light of the *Daubert*

10   decision, that we needed to have -- we needed to have tools

11   where we could have cut-off points, false liability, if you

12   will, consistency in the evaluation process, and that's why we

13   have those tools.

14        I --

15        And I've been teaching in this profession a long time,

16   meaning forensic psychologists and psychiatrists I have taught

17   around the country.

18        -- I feel that sometimes we may go a little too far and we

19   usurp the privilege of -- of the trier of fact, and that's why

20   I phrase it the way that I say it.  So it's not any disrespect

21   to the prosecutor; I'm not playing games.  I will describe it

22   at length, we can even talk numbers, but I don't put a lot of,

23   you know, a lot of emphasis necessarily on those numbers.

24             MR. PINALES:  Thank you, Your Honor.

25             THE COURT:  Mr. Mangan?

43

```
 1            MR. MANGAN:  Nothing further.

 2            THE COURT:  Thank you, Doctor.  You can step down.

 3            THE WITNESS:  Thank you, Judge.

 4            THE COURT:  Counsel, is there any reason for the

 5   doctor to remain available for recall?

 6            MR. PINALES:  No, Your Honor.

 7            MR. MANGAN:  No, Your Honor.

 8            THE COURT:  Okay.  Thank you, sir.  You may remain or

 9   depart, as you wish.

10            THE WITNESS:  Thank you.

11       (Witness excused.)

12                         -   -   -

13            TESTIMONY SCOTT BRESLER, Ph.D. CONCLUDED

14                         -   -   -

15

16

17

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

| DEFENSE WITNESS: | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| **SCOTT BRESLER, Ph.D.** | **2** | **25** | **40** |

<u>E X H I B I T S</u>

|  | <u>ID</u> | <u>ADMITTED</u> |
|---|---|---|
| **DEFENSE EXHIBIT A** Curriculum Vitae of Scott A. Bresler, Ph.D. [Under Seal] | 5 | 6 |
| **DEFENSE EXHIBIT B** Competency to Stand Trial Report [Under Seal] | 7 | 8 |

-  -  -

<u>C E R T I F I C A T E</u>

    I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Mary Ann Ranz
Official Court Reporter