1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 1:15-CR-012 |
| | . | |
| Plaintiff, | . | |
| | . | |
| - v - | . | Cincinnati, Ohio |
| | . | Monday, December 5, 2016 |
| CHRISTOPHER LEE CORNELL, | . | 9:00 A.M. Hearing |
| | . | |
| Defendant. | . | **Sentencing Hearing** |

............................

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | UNITED STATES ATTORNEY'S OFFICE |
| | BY:  Timothy S. Mangan, Esq. (AUSA) |
| | 221 East Fourth Street |
| | Suite 400 |
| | Cincinnati, Ohio  45202 |
| | |
| | UNITED STATES DEPARTMENT OF JUSTICE |
| | BY:  Michael J. Dittoe, Esq. |
| | National Security Division |
| | 950 Pennsylvania Avenue NW, Suite 1539 |
| | Washington, D.C.  20530 |
| | |
| For the Defendant: | PINALES, STACHLER, YOUNG, BURRELL & CROUSE: |
| | BY:  Martin S. Pinales, Esq. |
| | and  Candace C. Crouse, Esq. |
| | 455 Delta Avenue, Suite 105 |
| | Cincinnati, Ohio  45226 |
| | |
| Also Present: | Laura Jensen (Probation Department) |
| | John Cornell (father) |
| | Angela Carmen (mother) |
| | John Cornell II (brother) |
| | Defendant's Aunt Debbie |
| | Ladies and Gentlemen of the Press |
| | |
| Law Clerk: | Rachel Payne, Esq. |
| | |
| Courtroom Clerk: | Mary C. Brown |
| | |
| Court Reporter: | Mary Ann Ranz |

2

1              MONDAY, DECEMBER 5, 2016

2              P R O C E E D I N G S      (9:01 A.M.)

3         THE CLERK:  Please be seated.

4      Case Number CR-1-15-12:  *United States of America versus*

5  *Christopher Cornell*.

6      Will Mr. Cornell and his attorneys please approach the

7  lectern?

8         THE COURT:  Good morning.

9         MR. PINALES:  Good morning, Your Honor.

10         MS. CROUSE:  Good morning.

11         THE COURT:  My notes do not reflect any objections to

12  the Presentence Report from either the government or the

13  defense.

14      Is that correct, Mr. Mangan?

15         MR. MANGAN:  That's correct, Your Honor.

16         MR. PINALES:  That is correct, Your Honor.  We both

17  met with Probation, we ironed out any objections that we had

18  had, and the final report is the agreed final report.

19         THE COURT:  Okay.  So then, for the record, can we

20  just review the Guideline calculations?  And I recognize there

21  is a plea agreement in this case and there is a cap on the

22  potential sentence in this case by agreement, so I certainly

23  have that in mind.

24      But there are three counts to which Mr. Cornell has pled

25  guilty.  Count 1 is Attempted Murder of Government Officials

3

1  and Employees.  The statutory penalty for that offense is not

2  more than 20 years in prison, up to Life term of supervised

3  release, up to a $250,000 fine, a 100-dollar mandatory special

4  assessment, and it is a Class C felony.

5      Count 3 is Possession of a Firearm in Furtherance of an

6  Attempted Crime of Violence.  It carries a mandatory minimum

7  sentence of five years to Life imprisonment and is to be

8  served consecutive to all other counts.

9      The statutory provision is up to five years of supervised

10 release, up to a $250,000 fine, and a 100-dollar mandatory

11 special assessment, and that is a Class A felony.

12     Count 4 is Attempted Material Support to a Foreign

13 Terrorist Organization.  The statutory penalties are

14 imprisonment for not more than 15 years, a period of

15 supervised release up to Life in length, up to a $250,000

16 fine, and there is a 100-dollar mandatory special assessment,

17 and this is a Class C felony.

18     The Guideline calculation for Mr. Cornell pursuant to the

19 2015 version of the Guidelines, we find that Counts 1 and 4

20 cannot be combined because they do not involve the same harm

21 or victims.

22     Count 3 cannot be grouped because its sentence must be

23 served consecutive to all other sentences.

24     For Count 1, the base offense level is 33.  There's a

25 victim adjustment of plus six.  There is an additional

4

enhancement of 12 levels because the offense was intended to
promote terrorism, and there's a two-level enhancement for
obstruction of justice, for a raw total of 53 levels.

Count 4 has a base offense level of 26. There is a
two-level increase for the specific offense characteristic of
provision of firearms.

There's a two-level adjustment related to victim status
and that a foreign terrorist organization crime is involved,
for a total adjusted offense level of 42.

As described in the Presentence Report, there is no
multi-count adjustment, and that's at paragraphs 60 through
65.

There's a two-level reduction for acceptance of
responsibility, a one-level reduction for a timely plea, for a
further adjustment in the offense level down to 50. However,
as described in paragraph 68 through 69, the maximum Guideline
offense level is 43.

Count 3 is a separate consideration in the Guidelines, and
the Guideline is the minimum term required by statute, and
that is five years.

Mr. Cornell's criminal history score is zero, which would
normally place him in Category I, but because this is a
federal crime of terrorism, his criminal history category is
automatically boosted to Category VI, the top of the criminal
history category regime.

5

1     Counts 1 and 4 would carry up to 420 months of

2  incarceration.  However, since the statutory maximum sentences

3  are less than the maximum Guideline sentence, that's what it

4  would be.  And then Count 3, as I said before, is a minimum

5  five years consecutive imprisonment.

6     Counts 1 and 4 carry supervised release up to Life in

7  term.  Count 3, up to five years of supervised release which

8  would run currently with Counts 1 and 4, and that would be a

9  minimum of two years of supervised release.

10     Mr. Cornell is not eligible for probation on any of the

11  counts.

12     The fine range is 2500 to $250,000.

13     And there's a 100-dollar mandatory special assessment on

14  each count, for a total amount of $300.

15     Have I have misspoken anywhere along the line, Mr. Mangan,

16  Mr. Dittoe?

17      MR. MANGAN:  Your Honor, only with respect to the

18  fine.  I believe you said 2500.  I think it's 25,000 to

19  250,000, but, otherwise, no, Your Honor.

20      THE COURT:  Thank you.

21    Mr. Pinales, Ms. Crouse?

22      MR. PINALES:  No, Your Honor.

23      THE COURT:  Okay.  I'll add a zero and then we'll all

24  be on the same page then.  Thank you.

25     All right.  Then, I have considerable input from counsel

6

1   on both sides, and I've read all of your memoranda and I've

2   read the submissions from the defense that arrived on Friday.

3        So in the ordinary course of business, Ms. Crouse,

4   Mr. Pinales, what would you like to present or say regarding a

5   fair and appropriate sentence?

6             MR. PINALES:  I had --

7             THE COURT:  I had not specifically adopted, approved

8   the plea agreement, but I think you can assume that to be the

9   case.

10            MR. PINALES:  Thank you, Your Honor.

11       I have a great deal to say.  But in order to set up the

12  process of our procedure today, there is an approximately

13  15-minute video that the government wanted to play when it was

14  their time.  We were going to use parts of that when I place

15  Dr. Bresler on the witness stand and ask him some specific

16  questions about those clips.

17       But we decided rather than, one, play it twice and, two,

18  be able to -- not being able to start and stop it in a

19  non-clumsy way, with the Court's permission and by agreement

20  of all the counsel that can be played right now, and then when

21  I place Dr. Bresler on the stand, I'll call his attention to

22  certain parts orally where we don't have to go back to that

23  tape.

24            THE COURT:  Fine.

25            MR. PINALES:  Thank you.

7

1          THE COURT:  I assume there's no objection?

2          MR. MANGAN:  There's no objection, Your Honor.

3     I don't know if you would like defense counsel and the

4     defendant to sit for this portion of it.  It's a 15-minute

5     video.  And I would note that we have a copy of it marked as

6     Government's Exhibit 1 which we'll submit with the Court, but

7     otherwise we're ready to play the video.

8          THE COURT:  Okay.  For your information, the court

9     reporter will not make a record of anything that you play by

10    way of tape or a video, so you will need to submit those as

11    exhibits in order to incorporate them in the record.

12         MR. PINALES:  We have no objection to the admission

13    of that video disc, Exhibit 1.

14         THE COURT:  Okay.  Very good.

15         MR. PINALES:  And, Your Honor, we have some cough

16    drops if the Court would like them.

17         THE COURT:  Well, so do I, but they're not right

18    here.

19     (To the Clerk) The top right drawer of my desk, Miss --

20         THE CLERK:  I usually have some.

21         THE COURT:  Thank you.

22         MS. CROUSE:  Judge, do you want these?

23         THE COURT:  I think I'm good.

24         MS. CROUSE:  Everybody's sick.

25         THE COURT:  I might revisit that offer.

8

1      Okay.  And if you'd like to be seated, yes.

2           MR. PINALES:  Thank you.

3           THE COURT:  Do we need to turn down the lights at

4  all?

5           MR. PINALES:  It's pretty bright.

6           MR. MANGAN:  If you're ready, Your Honor.

7           THE COURT:  Please.  Go ahead.

8      (At which time, Government's Exhibit No. 1, a videotape,

9  commenced playing at 9:13 A.M. and concluded at 9:27 A.M.)

10          THE COURT:  Mr. Pinales --

11          MR. PINALES:  Yes, Your Honor.

12          THE COURT:  -- Ms. Crouse?

13          MR. PINALES:  May I call Dr. Scott Bresler?

14          THE COURT:  Yes.

15          MR. PINALES:  Thank you.

16      And while he is approaching, Your Honor, at a previous

17  hearing in this court, when he was qualified as an expert, we

18  submitted a CV.  There is, since that is sometime back, a more

19  revised CV which has been marked exhibit for identification

20  purposes Number A, and I'd submit that with Dr. Bresler's

21  updated CV.

22          MR. DITTOE:  No objection, Your Honor.

23          THE COURT:  All right.

24          MR. PINALES:  Thank you.

25          THE CLERK:  Please raise your right hand.

1      (Duly sworn by the Clerk.)

2           THE CLERK:  Please be seated.

3                     SCOTT BRESLER, Ph.D.

4  a witness herein, having previously been sworn, testified as

5  follows:

6                     DIRECT EXAMINATION

7  BY MR. PINALES:

8  Q.  Good morning.  For the record, would you state your name,

9  please?

10 A.  Scott, S-C-O-T-T, Bresler, B- as in boy R-E-S as in Sam

11 L-E-R.

12 Q.  And for the purposes of the record -- and I don't want to

13 go through your CV because you've already been qualified --

14 just very, very briefly tell us what you do professionally and

15 your qualifications.

16 A.  I have a Ph.D. in psychology.  I'm the Clinical Director

17 of the Division of Forensic Psychiatry in the College of

18 Medicine, Department of Psychiatry and Behavioral

19 Neuroscience.

20     I do forensic evaluations both in the criminal and in the

21 civil arena, Your Honor.  In addition, I work at the formerly

22 known as University Hospital, University of Cincinnati Medical

23 Center, on the psychiatric units doing evaluations of

24 dangerousness for patients that come in on 72-hour holds, as

25 well as diagnostic workups for complicated cases and various

10

```
 1  types of risk assessment as well.

 2  Q.  Thank you, Doctor.

 3      We're here today for sentencing, and it is not the

 4  evaluation part, which you've already testified.

 5      And so you understand, the purpose of my questioning today

 6  is where did we get -- what brought us to this point in the

 7  life of Chris Cornell.  Okay?

 8  A.  Yes, sir.

 9  Q.  Would you give us the background of how you first started

10  and came in contact with a -- with Chris?

11  A.  I initially got involved in the case when the -- with

12  Public Defender Karen Savir, Your Honor.  Karen -- I've worked

13  for that office in other cases and Karen knew about -- knew

14  about my -- my skills and to be able to, in particular, to

15  work with and evaluate, interview, connect with -- with

16  various defendants, and she wanted me to come on board and to

17  do evaluations of -- of Chris, so she brought me on board.

18  Then, of course, she stepped off the case.  And then Marty

19  Pinales and Candace Crouse, also whom I've worked with in

20  high-profile cases in the past, requested that I stay on.  I

21  put in a number of hours.  They requested that I stay on and

22  continue to work with them, and so I did so.

23  Q.  And -- and by staying on, and in your previous association

24  with the Public Defender's Office, did you review discovery?

25  A.  Yes.
```

1  Q.  Now, when you testified the last time, my memory serves me

2  right that you had reviewed a lot of the discovery but had not

3  reviewed all of it.

4  A.  That's correct.

5  Q.  Since that time have you reviewed all of the discovery?

6  A.  I would say 90-something percent.  I didn't go through all

7  the tapes, but I've read the transcripts of all of the tapes

8  and then I went to certain sections that I felt were relevant,

9  and I reviewed those along with Dr. Christopher Marett.

10  Q.  And I was going to ask that.

11      Dr. Christopher Marett, would you tell us who he is and

12  his relationship with you in this case?

13  A.  He's a forensic psychiatrist who is working with me in

14  this case from -- from the very beginning.  He was in a

15  post-doctoral fellowship program which we have at the College

16  of Medicine and he has been by my side this whole time, gone

17  with me out to Terre Haute and Boone County on multiple

18  occasions, and we have spent countless hours reviewing

19  materials and even more countless hours doing research and

20  trying to understand the complexities of this case.

21  Q.  Is this case a complex case?

22  A.  I think it's a very complex case.

23  Q.  In what way?

24  A.  Because I think it's unusual.  First of all, I think that

25  Chris is an unusual young man and -- and I think it's

1  important to understand what makes him unusual.  And both from

2  a clinical perspective but even -- even from a security

3  perspective and legal perspective I think he's just -- he's an

4  odd bird.  He's different.

5  Q.  And we'll get to that in a moment.

6      Since the last time that you testified in this courtroom,

7  have you met and spent time with the family?

8  A.  I have.

9  Q.  And tell us what that involved.

10  A.  I brought the family back, so that would be -- family

11  would be John, who's the dad; Angel, mom; and John, Jr., the

12  older brother.  Also there's a -- there's a maternal aunt that

13  I met with as well.  Brought them in, interviewed them at

14  length for hours, and then I did some testing with just the

15  family -- actually IQ testing -- and I did that, Your Honor,

16  with father, mother and brother.

17  Q.  Well, let's -- as we're talking about that, let's now talk

18  about Chris's early childhood and family background.

19      You mentioned that John was his -- or is his father.  Can

20  you tell us how that relationship went?

21  A.  Well, John has struggled with addiction issues and

22  depression and anxiety as well as significant anger issues

23  throughout his life.  His dad went to prison on a couple of

24  stints for -- for stealing and for drugs, for doing drugs, and

25  then he came out and he worked for a while until he was

1    injured on the job.  It was -- he was a quick-tempered and

2    angry person by his own admission and at times would be --

3    would be overly punitive towards both the kids, but in

4    particular -- in particular Chris.  Chris was -- was a

5    different -- very different child than his older brother John,

6    and at times he was physically and emotionally very abusive of

7    Chris.

8        Angel also had her issues with anxiety and depression.

9    Runs in the family.  She's also very -- has very low

10   intelligence, Your Honor, and it's in my report, about -- you

11   know, below 99 percent of the average adult, although she --

12   she is sweet and kind and loving.  But -- but Chris clearly

13   posed a lot of challenges for her, certainly beyond her

14   ability to cope at times.  She tried to remain supportive,

15   tried to get him the help that he needed, but he was often

16   help-rejecting.

17       He was diagnosed with both depression and Oppositional

18   Defiant Disorder in his formative years, and there's a lot of

19   descriptions of him having other kinds of unusual behaviors:

20   Obsessive-compulsive behaviors; washing his hands till --

21   until they would bleed; changing his clothes; taking showers

22   multiple times in a day.  So, you know, problems --

23   problematic behavior.

24       And he also -- you know, Chris had a temper and he would

25   throw temper tantrums and was picked on by kids at school, and

14

1    that posed problems for the whole family.  They were aware of

2    them.

3    Q.  Well, first of all, let me just ask what time period in

4    Chris's life are we talking about?

5    A.  I'm talking about his -- his early formative years going

6    up to around middle school.  Things changed a bit middle

7    school.

8    Q.  And -- and during that period of time I believe you said

9    that Chris's father, John, was working?

10   A.  My understanding is yes.  I think he did deliveries and --

11   and drove a truck and was working.  At some point he got -- he

12   got injured; something, I believe, fell on him and he hurt

13   himself and had chronic pain issues and got off -- and went on

14   disability.  Angel, I think, has been on disability a while.

15   Q.  And disability because of the mental issue that you were

16   talking about?

17   A.  Mental and psychiatric.

18   Q.  And when Chris was in his formative years, as you put it,

19   was Angel the primary caregiver for Chris?  Was she the one

20   around?

21   A.  Mostly she was the one around.  I think that John -- if

22   problems occurred, John would mete out -- you know, would mete

23   out discipline, and to his own admission he was excessive in

24   that.

25       But not only -- not only Angel.  You know, Angel would

15

1    pass Chris off to his aunt, maternal aunt, and she would care

2    for him as well at certain points in time, as well as the rest

3    -- the rest of the family, but he was very much a loner.  He

4    wouldn't interact with other kids; wouldn't hop into the pool.

5    He would, you know -- he was very much spending time by

6    himself, kind of engaged in fantasy play.

7    Q.  When you say "fantasy play," what do you mean?

8    A.  He would have, like, various action figures and he would

9    play with them for hours on end.  Oftentimes, they would be

10   engaged in some kind of aggressive behavior, like wrestling or

11   fighting, that kind of thing.

12   Q.  And was this activity with others or by him --

13   A.  No, typically, you know, he showed from a very early stage

14   that he preferred to be alone.  They tried to get him in with

15   the other kids but he preferred to be alone.

16   Q.  You said action figures like wrestling.  Did wrestling

17   play a big part in Chris's life, or a part at least?

18   A.  Well, he always loved observing wrestling from a very

19   young age and he also read comic books and was into superhero

20   characters and things like that.  Later, he would become a

21   wrestler.  His dad, you know, said, Well, let's take this

22   interest and maybe this will be good for him, and he did

23   wrestle starting in late elementary to the middle school age

24   and he was actually pretty successful at that.

25   Q.  And how did he -- how did he get along with the coaches,

```
 1   with the team, with the rest of the world?
 2   A.  It was difficult.  The other kids, I think, recognized
 3   that he was -- he was unusual, he was strange.  He would often
 4   refuse to shower with other kids, very -- I don't know if the
 5   word's embarrassed, I don't think he would agree with that,
 6   but uncomfortable in -- in disrobing and being in the shower
 7   with other kids.  And he doesn't have the sort of requisite
 8   set of social skills and kids would pick up on that and would
 9   tease him or take advantage of him at times.
10   Q.  I'm going to come back to that.  But the other member of
11   the family that you mentioned was his brother John, Jr.
12   A.  Uh-huh.
13   Q.  Did he have a relationship with his brother?
14   A.  He did.  He -- he looked up to him, he loved him, and I'm
15   saying this in the past because that's what we're talking
16   about.  I think he still very much loves his brother.  In
17   fact, his brother -- he would say his brother was his -- his
18   only friend, and his brother loved him and would look after
19   him, was worried about him.  And that relationship -- they
20   were close for a long time, and they'd fight like brothers
21   sometimes and get into trouble, run away from dad, and, you
22   know, he'd freak out and get upset with them, and so they
23   played, you know, played kind of games.  But that relationship
24   began to drift apart when they got -- when they moved into
25   their teenage years, especially when Chris moved into his
```

1    teenage years.

2    Q.  While we're on that subject, can we now start to talk

3    about the adolescent and teenage years.

4        Tell me first about Chris and his development in that

5    period of time.

6    A.  Well, it was difficult.

7    Q.  In what way?

8    A.  Teenagers usually -- I don't want to become overly

9    pedantic here, but teenagers are usually turning away from the

10   family and toward their peers and sort of experimenting with

11   who they are or what they want to be and developing their

12   values, whether it's in sports or religious organizations, or

13   what have you.  And Chris was really not successful at -- at

14   going forward in his development, what we call psychosocial

15   development.  He really wasn't successful in that arena at

16   all.

17       His brother, you know, was developing interest in girls

18   and had his own set of friends.  Chris became much more

19   suspicious of other kids, pulled away from them, isolated

20   himself more, spent more time on the Internet, and he had more

21   conflicts with family -- mom, dad -- and other kids.  There

22   were just -- there were conflicts; couldn't handle the

23   pressure to be a part of a team like in high school, and he

24   actually describes this quite eloquently.  I mean, very

25   uncomfortable with feeling a part of a team or feeling like,

1  you know, he's -- there're other kids that he has to have

2  these relationships with because they're on a team.  He

3  couldn't do that.  He couldn't bridge that gap.  He would stay

4  in his shell, and as time wore on he became more isolative.

5  Q.  And that shell, as I understand it, didn't consist of a

6  body of friends?

7  A.  No.  No.

8  Q.  What did he do in the shell?

9  A.  Drifted into cyberspace and would stay there for just

10  hours upon hours upon hours.  He would neglect his studies.

11  Sometimes he was truant, you know, wouldn't go to school or

12  he'd walk out of classes, wasn't really interested in learning

13  what the other kids were learning.  He wanted to learn what he

14  learned.  And he was lying.  Unfortunately, some of the stuff

15  he was learning was -- was stuff that I think led him to a

16  path of self-radicalization.

17  Q.  I want to get to the self-radicalization in a few moments,

18  but you mentioned he was drifting with grades and all.

19     How -- how did he -- how was he in school?

20  A.  He was never a particularly good student, but I don't

21  think that reflects -- really reflects his intelligence.  I

22  tested him, so -- I mean, he's average; he's average

23  intelligence.  And when he becomes fixated on certain topics,

24  he would -- it becomes an obsession and he just dives in and

25  he learns as much material as he can about that specific

19

1    topic.  It's almost -- I mean, it's -- we struggled at times

2    to determine whether this is some kind of autism or -- or

3    whether it's more like personality features, which is a common

4    struggle with that schizotypal personality which I talk about

5    later in my report.

6        So when he dives into something, he sort of dives into it

7    and he thinks he masters it.  He certainly spends a tremendous

8    amount of time doing that.

9    Q.  You mentioned that he was interested in comics and

10   superheroes.  Did he dive into that?

11   A.  Oh, yeah.  He would spend lots of time in the fantasy

12   world, as well as, you know, championship wrestling.  He was

13   enamored with them.

14   Q.  Well, were those wrestlers his superheroes?

15   A.  Some of them certainly were.

16   Q.  And did he dive into any other activities a hundred and

17   ten percent or so?

18   A.  Earlier, before he got into exploring in great detail a

19   lot of the religious -- a lot of, you know, religious,

20   theological stances and -- he was caught up more into what was

21   going on with the news, got into a lot of conspiracy -- the

22   conspiracy theories, like the Illuminati, was interested in

23   anarchy for a little bit of time, and was angry, you know, at

24   the government and sort of fancied himself an anarchist, and

25   developed some pretty good skills at rapping, thought he would

1  be a -- at one point thought he'd be a famous rap star and

2  actually expressed that to one of his non-halal professionals

3  that he was going to do that.  At Children's Hospital he said

4  that.

5      And then he got into vegetarianism.  He was very upset

6  about the way chickens were being treated and slaughtered by

7  companies like KFC.  And, you know, he weaved his way through

8  some -- some of the more, you know, some might term extreme

9  ideologies, and he worked his way into religion and then

10 eventually into -- into radical Islam.

11 Q.  Now, did he learn this on his own, all of these

12 activities, and radical Islam?

13 A.  He learned it on his own, but he was going to places on

14 the Internet where he could watch videos and listen to

15 lessons.  He did a lot of reading.  I mean, he really -- he

16 reads a tremendous amount.  So he was -- he was staying in his

17 room and -- and jumping, you know, into the cyberspace and

18 staying online and gathering information, and some of the

19 information resonated with him in -- in who he would like to

20 be.

21 Q.  And you said he would dive into these activities and you

22 mentioned religion.

23     Did he experiment with other religions and then --

24 A.  He looked at Judaism and he looked at Christianity, but it

25 did not -- you know, turning the other cheek was not -- was

21

1  not his idea of -- of a -- of a religion that he wanted to

2  practice.

3      He was attracted to Judaism for a period of time, in

4  particular the laws of Orthodox Judaism that regulates

5  behavior:  Sexual behavior, social behavior, dress, et cetera.

6  But -- but I think he was bothered by -- by Jews being

7  victimized so much over the years and wasn't comfortable with

8  that, and he saw himself as being kind of a victim many, many

9  times in his life and was looking, I think, to gravitate

10 towards something where he could feel more empowered.

11 Q.  And did he feel more empowered with Islam?

12 A.  Well, certainly with radical Islam he did.

13 Q.  Tell us about that.

14 A.  He -- he saw in Islam a way of regulating his life, so

15 there was all of these sort of legal ways of defining who you

16 are and how you behave towards others which he -- was very

17 attractive to him.

18     Obviously, the modesty, covering up the body and the

19 modesty issues was extremely attractive to him because he

20 struggled with those issues a lot.  Had a lot of problems in

21 talking with women, girls.  Socially very uncomfortable,

22 anxious.  So the whole idea of meeting someone, having an

23 arranged kind of marriage where you wouldn't necessarily have

24 to court someone, that was a very attractive idea to Chris.

25 He desperately wanted to have a family and be perceived as

22

1   normal.  All of that, I think, really appealed to him.

2       He also loves his father and his mother and --

3   particularly his father.  He very much loves his father.  And

4   I think he, and we've spent time talking about this, he

5   struggles to sort of take this image of his father, who at

6   times he has just loathed because of the abusive behavior

7   towards him, find a way to forgive his father and to love his

8   father, and I think he found that within certain teachings in

9   Islam which really resonated with him and in it allowed him to

10  organize his life, Islam did, while at the same time feel

11  righteously indignant about the way people in the West treat

12  people who are Muslim, from his perspective, and the way they

13  treated him, so they kind of meshed together.  So -- and I

14  thought that's what brought him to Islam, and he studied it

15  more and more.

16  Q.  Well, Islam is one of the great religions of this world

17  and it's a peaceful religion.  When you talk about his

18  attraction to Islam and radical Islam, tell me the difference.

19  I mean, how -- how has he been attracted to Islam and not the

20  peaceful part and attracted to the radical?  This is part of

21  his self-radicalization; is it not?

22  A.  Correct.

23  Q.  And how long did that take?

24  A.  I'm -- I'm thinking about a year and a half, maybe.

25  Something like that.  It's a process.  But I'm thinking it

23

1    start -- he would say a little bit earlier, but I think it

2    starts around age 17, I think is when it kicks off, and it's

3    in full swing by, you know, by 18 and a half for sure.  I

4    mean, he develops a whole new identity for himself.

5    Q.  And what was that identity?

6    A.  Well, he gave himself a name, and he would put on -- he

7    would wear his hair and wear clothing that he felt put him in

8    with -- with a radical Islamic community.

9        The name Raheel means a protected leader, and then --

10   protected by God, and then Ubaydah, the ending, is -- means

11   servant of God.  So, you know, a powerful and protected

12   leader, servant of God, that's what he -- that's what he named

13   himself.

14   Q.  So, as I understand it, he is in his room on the Internet,

15   reading, and watching videos; is that correct?

16   A.  Yes.

17   Q.  And that was his -- that's what he did for the

18   self-radicalization?

19   A.  Well, that -- that went on for -- for weeks to months.  I

20   mean, his family described him going in there and spending

21   days upon days upon days in there over weeks and months over

22   -- over a year.

23   Q.  And -- and this new identity, is that associated in any

24   way with that fantasy world that you described earlier?

25   A.  Well, I think it certainly could be.  I mean, I -- I

24

1  firmly believe that he felt that -- that he was Raheel.

2      Where it gets -- where it gets a little -- a little

3  strange is there were times where he felt he was always Raheel

4  and that Chris never existed, the life of Christopher Cornell

5  never existed.  I think -- I don't see that in a psychotic

6  sense.  And I remember the prosecutor asked me, you know, if

7  this is multiple personality.  It's not that.

8      I think -- I think what Chris meant by that is, that

9  taking on this new persona and this new name meant that he had

10 to give up Chris and the life of Chris.  And I think he

11 desperately wanted to give up the life of Chris because the

12 life of Chris is a very, very angry, depressed, anxious, you

13 know, kid.  And I think he -- and I think what he saw was that

14 he was now able to have a connection with God and that his

15 true self was -- was coming out, was emerging, and that true

16 self was -- was Raheel Mahrus Ubaydah.

17 Q.  And at this point, age -- Chris was arrested at age 20.

18 A.  20.

19 Q.  You say his radicalization began at age 17.  So over that

20 period of time and the hours that he's spending learning on

21 the computer from radical sources and all, did he reach out?

22 Was he -- was he just taking in or was he giving out some of

23 this radicalization?

24 A.  I think he -- well, there was a time where -- where he

25 decided that he needed to -- to reach out or to put out there

1  his ideas.  He felt like he discovered these ideas and they

2  excited him and he felt the need to kind of reach out and to

3  find others that have similar ideas.

4  Q.  And in reaching out with these ideas -- and you used the

5  term "his ideas" -- were they his ideas or were they the ideas

6  that he learned on the Internet that he was just giving back?

7  A.  I think both.  I think -- I think there were ideas on the

8  Internet, but I think he internalized those ideas and made

9  them a part of his identity.

10  Q.  And as part of that identity, this new identity and his

11  reaching out, did he have any responses?  Did he have any

12  connection with anyone?

13  A.  Not -- not that I know of.  Or if he did, they were not

14  the responses that he was necessarily looking for.

15      I know that he would -- he would go out and, you know, he

16  would go to a mosque or talk with people, and the kinds of

17  Islam that people were practicing in the community did not --

18  he was not comfortable with that.  He felt that it was -- that

19  it was a type of Islam that sort of compromised the values of

20  the religion and tried to appease Western society, which he

21  said he was not comfortable with, so he tried to reach out on

22  the Internet.  And he says that he spoke with certain

23  persons -- it's not clear to me whether that's true or not

24  true -- and he also contradicts himself.  There's a tape where

25  he's talking with the confidential informant -- excuse me --

26

1   and it's a segment of a tape where he wants to know whether or

2   not this plan that he's about to do, to go forward with,

3   whether it's been sanctioned by the powers that be.  You know,

4   Islamic State.  And so the confidential informant says, "Yes,

5   I heard back," and he says, "Ah, finally," you know, "because

6   I've been trying," you know, "for months and months and months

7   and not heard a word" -- right? -- to paraphrase.  "Not heard

8   a thing back."  "Now," you know, "we finally heard back.  I'm

9   so excited, I'm happy, now we can go forward with this -- with

10  this plan."

11      So I don't think there was a lot of responses from -- from

12  people.  I think a lot of this was really self-radicalization.

13  Q.  I want to make it perfectly clear.  You're not suggesting,

14  are you, that this plan, the plan that we are here in court on

15  today, this plan was not Chris's idea?

16  A.  No, I'm not saying that at all.  I think the tape clearly

17  shows that he -- that he concocted this idea and had thought

18  it over, and -- I'm not saying that at all.

19  Q.  Okay.  I want to make it perfectly clear that we're not

20  talking about any entrapment in any way.

21  A.  No, I don't think -- I don't think there's, you know,

22  entrapment in -- in that regard.

23  Q.  Okay.  Now -- and I'm going to come back to the words you

24  just used of "in that regard."

25      Ultimately, he is reaching out on the Internet.  And from

27

1    your review of the discovery, the informant reached to him;

2    correct?  They came in contact with each other?

3    A.  Yes.

4    Q.  And when they came in contact with each other, it began

5    first electronically, or tweeting or kicking, or whatever they

6    -- whatever the terms are; I'm a different generation -- but

7    it was an electronic relationship?

8    A.  Like through e-mails or chatrooms, or what have you.

9    Q.  And they spoke to each other that way; correct?

10   A.  Yes.

11   Q.  And you were able to review at least the portion that was

12   turned over in the discovery?

13   A.  Right.  There's some other -- they had had a number of

14   contacts, but I don't know if -- I don't know if we -- if

15   anybody has that -- that information.  There was contacts

16   before and then there were contacts that were taped once the

17   -- the confidential informant got involved.

18   Q.  And then there is a point when Chris and the informant met

19   each other; correct?

20   A.  Correct, uh-huh.

21   Q.  And those are on a video, lots of video, but one 15-minute

22   portion we've seen today?

23   A.  Yes.

24   Q.  Now, let's talk about Chris right now for a moment and his

25   interrelationship with the informant.

1      What did the informant mean to Chris, if you know?

2  A.  I'm assuming when you say "his relationship with," you're

3  talking about like this --

4  Q.  What did Chris feel about the informant?  And what -- let

5  me give --

6  A.  He came to trust him.  He came to deeply care for him;

7  called him his brother.  That's a common phrase, you know,

8  "akhi," "my" -- "my brother" in Arabic.  A common kind of

9  phrase.  But when he said it, you know, it was -- in some ways

10 this confidential informant was sort of taking the place of

11 John, the older brother, who was his only friend in the world,

12 but now he had somebody he could actually talk to about his

13 religious ideas and his zealotry, et cetera.

14 Q.  And what did that mean to Chris; I mean, to have a friend?

15 A.  I -- I think he was desperate to have a friend or have

16 someone acknowledge him not only as Raheel but as being

17 genuine and being a genuine brother who shared a similar

18 ideology.  I think he desperately wanted that.

19 Q.  Well, we've already said that this plan was Chris's?

20 A.  Correct.

21 Q.  And Chris told that plan to the informant?

22 A.  Correct.

23 Q.  And do you know from review of the discovery the informant

24 was older or younger or the same age, or what?

25 A.  I think he was older and -- I think he was older.  I think

1  he was dark skinned, North African, Moslem man.

2  Q.  Born Moslem or --

3  A.  I believe he was born Moslem.

4  Q.  Okay.

5  A.  And I think he was married and had children.

6  Q.  And in that relationship did the informant help Chris with

7  instructions on Islam?

8  A.  Gave him books, told him directions that he should go in

9  terms of understanding not only Islam but also radical Islam.

10  Q.  And that 15-minute snippet that we did here, I want to

11  remind you of certain pieces of it and then you can tell me

12  what that would mean to Chris in relation to why we're here

13  today.  Okay?

14      The tape begins, and through the first two minutes or so

15  Chris is doing all of the talking?

16  A.  (Nods head affirmatively.)

17  Q.  You saw that and heard that.  And you've seen that tape

18  before?

19  A.  Correct.

20  Q.  And you've seen it in a setting in a smaller room where

21  you could hear it a little better?

22  A.  Correct.

23  Q.  And during that first two minutes, all the way through two

24  minutes and nine seconds, the informant is saying, "Yeah,"

25  "Yeah," "Yeah."  Says it about four times.

1   A.  (Nods head affirmatively.)

2   Q.  What does that mean?

3   A.  I guess it means that he's attending or listening to, you

4   know, what Chris is saying.

5   Q.  And Chris is going through this plan and he says -- he's

6   talking about Washington, D.C., and at two minutes and

7   17 seconds it's -- the informant asked Chris, "Have you ever

8   been to Washington before?"  Do you recall that part?

9   A.  I do.

10   Q.  And Chris says, "No, I haven't, but I've Googled it."

11   A.  That's correct.

12   Q.  What does that mean?  I mean, tell me -- tell me about

13   that.

14   A.  You know, to me it just -- it just bespeaks the, you know,

15   naiveté that Chris has about, you know, how difficult this

16   kind of thing could be.  I think he's posturing.  I think he's

17   trying to impress the confidential informant and to show that,

18   you know, he's done his research and he knows a lot.

19   Q.  When you say "impress the confidential informant," is he

20   putting himself in a position of being a leader?

21   A.  Well, he certainly wants to be perceived as such, and --

22   and -- and also to hear back that the way that he's thinking

23   about this is correct.  And he -- actually at one point of the

24   tape the CI says something like, "I like the way you're

25   thinking."

31

1    Q.  I'm going to get to that.

2        And then at 8 minutes and 12 seconds into the tape the

3   phone rings, which I assume is the phone of the informant

4   since Chris didn't have a phone.

5        You remember the phone ringing?

6   A.  I do.

7   Q.  And it -- it appears that there is a very brief period

8   that the informant is on the phone with somebody and the

9   camera still remains on Chris.  And at a point he -- he's

10  talking to himself and saying, "Where -- where was I at?

11  Where am I at?"

12       Do you recall that from the tape?

13  A.  Yes, I do.

14  Q.  Tell me what that means, if anything, to you.

15  A.  You know, he was on a roll, you know, on a soapbox, and,

16  you know, giving his, you know, his talk to the confidential

17  informant, and I think the phone, you know, rattled him and he

18  lost his concentration.  So --

19       And he talks to himself sometimes.  He has very odd

20  mannerisms.  I mean, you could see it.  He smiles, he laughs

21  at times that aren't appropriate.  And I think he was trying

22  to find where he was, where to pick up when the CI got off the

23  phone, and he does it with self-talk and he does it through

24  sort of gathering of his thoughts.  I think that's what

25  happened.

1  Q.  And you say he laughs at times that seem to be

2  inappropriate.  Have you seen that in -- in other people

3  before?

4  A.  I have.

5  Q.  And what does that mean?

6  A.  He's just very socially anxious and he has unusual affect.

7  I mean, it's a part of this whole schizotypal personality

8  presentation.  I mean, you know, what he -- what he exhibits

9  on his face or his affect may not necessarily be connected

10  with -- with information that he's conveying verbally.

11  Q.  Okay.  So you're talking to me now.

12  A.  I'm trying to talk to the Judge and --

13  Q.  No, I just want to simplify it so that I can understand

14  what you just said.

15  A.  Okay.

16  Q.  So when he laughs --

17  A.  Uh-huh.

18  Q.  When I laugh, it's at something that's humorous.

19      Does he laugh?  Or is it a nervous -- I mean --

20  A.  It's -- it's -- sometimes it's a nervous laugh.  I say

21  oftentimes it's a nervous laugh.  Sometimes he thinks things

22  are funny that most people would not see as funny.

23  Q.  Uh-huh.

24  A.  So it depends on, you know, on the context.  But -- but,

25  yes, I mean, he has unusual affect.  And he's not looking at

1  -- at this confidential informant.  You know, it's sort of

2  like, you know, a rambling monologue where he'll look over

3  periodically.  But, you know, he's -- and he doesn't look at

4  people when he talks.  I mean, that's very unusual for him to

5  look at you.

6  Q.  Have you noticed that when you talk to him?

7  A.  Oh, sure.

8  Q.  What does it mean?

9  A.  Again, it's just a part of this highly socially anxious,

10  you know -- he has unusual interpersonal mannerisms and he had

11  them as a child and they've become much more acute, much more

12  prominent as he's become an adult.

13  Q.  Is that related to his lack of being able to interact with

14  other people?

15  A.  Very much so.

16  Q.  Now, at 10 minutes and 43 seconds the CI says, "I'm ready

17  to go."  The informant says, "I'm ready to go."  What does

18  that mean to you?

19  A.  Just what it says.  I think the CI was ready to give him

20  the nod and say he's ready to go and let's get this going.  I

21  think that's what Chris took it as Okay, let's get this going.

22  Q.  And 11 minutes and 41 seconds and 11 minutes and 56

23  seconds, as you alluded to earlier, the informant says, "I

24  love how you think.  You're good at this.  I like that."

25      Do you remember that?

1    A.   I do.

2    Q.   What does that mean to Chris?

3    A.   Oh, that means everything to Chris.

4    Q.   Tell me about that.

5    A.   I mean, to hear -- he was wanting to hear that for a long,

6    long time from someone that he respects and feels is a

7    legitimate, you know, representative of -- of Islamic State,

8    and it means everything to him.  I mean, he's almost giddy

9    when he hears that.

10   Q.   And how does that play into his relationship now with the

11   informant?

12   A.   Well, I think he -- he is very attracted to the informant

13   and -- and feels supported and -- and loved by him, and it's

14   very meaningful for him.

15   Q.   Chris feels loved by the informant?

16   A.   I think he feels that the informant had genuine concern

17   for him and love -- love for him.  I mean, he gave him advice

18   about how he should interact with his family and be forgiving

19   towards his family, which -- which Chris was desperately

20   looking for.  And, yeah, I think they had a -- from Chris's

21   perspective certainly -- they had a very deep and important

22   relationship for him.

23   Q.   And -- and as part of that relationship and the teachings

24   that the informant did with Chris, you said he gave him books?

25   A.   He did.

35

```
 1   Q.  And these books were on the -- on the teachings of the
 2   Prophet Mohammed?
 3   A.  Some.
 4   Q.  On how to act in today's world?
 5   A.  Some.
 6   Q.  And are you -- you said that Chris looked up to the --
 7   A.  Oh, yeah.  He -- he pored over these books.  He studied
 8   them.  He would even -- I would come in and he would -- I
 9   would ask him to, you know, teach me things he had learned and
10   that he found important, and he would do that, and he did a
11   really good job actually.
12   Q.  And have you had an opportunity to see this (indicating)
13   book?
14   A.  I've seen the book, but I've not read that book.
15   Q.  Do you know --
16       Have you been told that this book is one of the books that
17   was given to him by the informant?
18   A.  That's what I understand.
19   Q.  We'll get to some of that.
20           MR. DITTOE:  Objection, Your Honor.  Identification
21   of the title of the book.
22           MR. PINALES:  If I could pronounce it, I would.  It
23   is S-A-H-I-H, first word; second word el; third word
24   B-U-K-H-A-R-I.
25           MR. DITTOE:  Thank you.
```

BRASLER - DIRECT

36

1   Q.  So Chris and the informant met, talked, hours of tape --

2   A.  (Nods head affirmatively.)

3   Q.  -- had a plan, Chris's plan.  And that plan was to go to

4   Washington; was it not?

5   A.  Yes.

6   Q.  On the State of the Union Day?

7   A.  (Nods head affirmatively.)  Well, actually to get there

8   before to do some reconnaissance and then eventually to get to

9   the Capitol and State of the Union, yes.

10  Q.  And that's in January?

11  A.  Correct.

12  Q.  And Chris was going to go in January with the informant to

13  the Capitol and get up into the gallery and shoot up the

14  president and officials?

15  A.  I'm not sure about getting up to the gallery.  What we

16  talked about was more of really what he was hoping to do to

17  try to get in.  But, yeah, at some point to -- to shoot the

18  president or shoot members of Congress, or whomever.

19  Q.  And then he was going to walk away?

20  A.  Or run away.

21  Q.  And run away.  Hide in the woods?

22  A.  (Nods head affirmatively.)

23  Q.  And we heard on the tape that was played to have enough

24  food so they wouldn't have to go to a grocery?

25  A.  Right.

37

1    Q.  And then through other tapes that you've listened to, part

2    of this plan was to do an Islamic State of two people:  He and

3    the informant; correct?

4    A.  Yeah.  Chris had expressed a desire to start an Islamic

5    State here in America and they were gonna -- he was going to

6    do that with himself and the informant.

7    Q.  And even the informant said, "Just the two of us?" and

8    Chris said, "Yes"?

9    A.  Well, Chris said, "I know it's going to be difficult," but

10   yeah.  Yes, he said --

11   Q.  Okay.  Now, Chris gets arrested?

12   A.  (Nods head affirmatively.)

13   Q.  And there is --

14       He gets arrested at a gun store; correct?

15   A.  Yes.

16   Q.  And he got to the gun store when the informant drove him

17   there and the informant waited in the car; is that correct?

18   A.  Yes.

19   Q.  And the informant is in the car after Chris comes out of

20   the gun store when he is arrested?

21   A.  Yes.

22   Q.  And then they go to the -- they go to the police station,

23   or the FBI headquarters, or wherever it is, it's a small room,

24   and that session was videotaped?

25   A.  (Nods head affirmatively.)

```
 1   Q.  You have to orally --

 2   A.  Yes.

 3   Q.  Okay.  And when --

 4   A.  I didn't hear that as a question.  Yes.

 5   Q.  And when it is a videotape --

 6       I'm lapsing into cross-examination, I'm sorry.

 7       -- when it is videotaped, there's a concern that he has

 8   for the informant; is that correct?

 9   A.  Sure.

10   Q.  Tell us about that.

11   A.  Well, I -- I think he was concerned about the welfare of

12   this friend that he had made and who he had planned to do this

13   with and he was expressing that concern to the -- to the --

14   all persons from the bureau that were talking to him.

15   Q.  He still cared for the informant?

16   A.  Yes.

17   Q.  Like a brother?

18   A.  Like a brother.

19   Q.  And at that time, in that room, he was still radicalized?

20   A.  Oh, very much so.

21   Q.  And at that time, in that room, while he was still

22   radicalized, he denied to the officers everything; correct?

23   A.  Correct.

24   Q.  Then he ultimately goes to a county jail?  Familiar

25   with --
```

1   A.  (Nods head affirmatively.)

2   Q.  Let's call it his post-arrest activities, for want of a

3   better word.

4      And the first thing he does while he's there is contacts a

5   TV station?

6   A.  (Nods head affirmatively.)

7   Q.  Can you give us any insight?  Did you talk to him about

8   that?

9   A.  I did.

10   Q.  Tell us about that.  How did it happen and why did it

11   happen and what can you share with us about that?

12   A.  I think he was still very much in the mode of wanting to

13   be perceived by others as being important and powerful and

14   being a representative from Islamic State and felt that now

15   that he's incarcerated he wouldn't be able to carry through on

16   the plans that he had come up with, but that he could call

17   others -- he could call others to step forward and to wreak

18   havoc in the United States.

19   Q.  Now, before he called the station from the jail, from the

20   county jail, did he have any relationships with any other

21   people inside the jail?

22   A.  I think he tried to have relationships with people in the

23   jail.

24   Q.  And he had the ability of and they had the ability of

25   watching the newscasts?

40

1  A.  Yes.

2  Q.  And as a result of watching the newscasts did anyone, for

3  want of a better word, taunt him?

4  A.  I think he was taunted by a number of people.  But, yeah,

5  there were -- there were people that were targeting him.

6  Q.  And he gave this interview?

7  A.  Uh-huh.

8  Q.  He also tried to mail out letters called "A Message to

9  America"?

10  A.  (Nods head affirmatively.)

11  Q.  And those letters you've read; have you not?

12  A.  I have.

13  Q.  And that was basically the same as the TV interview?

14  A.  Yes.

15  Q.  And then when he is doing that, after his arrest --

16      I want to just do it like a mental timeline.

17      -- is he still radicalized?

18  A.  Yes.

19  Q.  And then did you notice -- let's break it down into before

20  he went to Chicago.

21      Did you notice any wavering, any softening of his

22  radicalization before he went to Chicago?

23  A.  Yes.

24  Q.  And he went to Chicago for a mental examination?

25  A.  He did.

41

1   Q.  He goes to Chicago.  He's starting an internal

2   de-radicalization; correct?

3   A.  I don't know if I would label it that, but I think the

4   questioning -- he began to question, and I'm not so sure it

5   was so much questioning himself as it was the methods of ISIS

6   or ISIL.

7   Q.  The radical Islam?

8   A.  Correct.

9   Q.  And he goes to Chicago, and as I understand it he was in

10  some isolation?

11  A.  He was in isolation, but they -- he would -- they would

12  take him out periodically and he would exercise and be able to

13  associate with other people that were in some of those iso

14  cells.

15  Q.  Two other people specifically?

16  A.  Well, yes, two other people specifically.

17  Q.  One of those other people as he's going through this --

18      I don't -- I don't know what else to call it.

19      -- "questioning period" was a man named Daoud?

20  A.  Adel Daoud.

21  Q.  Adel Daoud.

22      Do you know who Adel Daoud is?

23          THE WITNESS:  Your Honor, I may have a conflict of

24  interest here.  Can I express this to you off --

25          THE COURT:  I think the attorneys need to hear it.

1    But at sidebar?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  Okay.

4    SIDEBAR CONFERENCE:

5                **THIS PORTION IS INTENTIONALLY BLANK**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **THIS PORTION IS INTENTIONALLY BLANK**

2

3

4

5

6

7

8

9

10

11

12

13

14   CONCLUSION OF SIDEBAR CONFERENCE

15   BY MR. PINALES:

16   Q.  Now it's in the public record.  So can you tell us who

17   Adel Daoud is?

18   A.  Adel Daoud is a Moslem young man from the Chicago area who

19   was very radicalized, although he grew up as a Moslem and he

20   had planned to bomb, with a car bomb, a bar in the Chicago --

21   in the city of Chicago, and the FBI -- FBI had a sting

22   operation in which they were able to set him up and have that

23   happen, and then he was arrested, and then subsequent to his

24   arrest he was -- he had gotten in some other trouble as well.

25   Q.  So Chris is sent to Chicago for an evaluation and he's in

44

1   isolation but permitted to have periods of time with

2   Mr. Daoud?

3   A.  I think he had long periods with Mr. Daoud.

4   Q.  And this is at the time that Chris was inwardly

5   questioning his radicalization?

6   A.  I would say it's at the time where he was questioning his

7   radicalization and how that had impacted his behavior and the

8   lives of his loved ones, his family.

9   Q.  So until Chicago, there is starting to be some movement on

10  his part --

11  A.  Yeah.

12  Q.  -- of his mindset?

13  A.  I think he was questioning himself.

14  Q.  Okay.  And then he has the -- he's given the

15  opportunity --

16      (Microphone mouthpiece falls.)

17          MR. PINALES:  Excuse me, Your Honor.  I don't want to

18  break the Court's --

19  Q.  -- he's given the opportunity to converse with Mr. Daoud?

20  A.  Yes.

21  Q.  And did you talk to Chris about their interactions?

22  A.  Yes, at length.

23  Q.  As a result of that interaction, tell us about the mindset

24  of Chris now that he's had an opportunity of being placed with

25  Mr. Daoud.

45

1   A.  I -- I think that -- that --

2       Well, first of all, you know, they -- they found points

3   where they agreed and shared similar interests, so they talked

4   a lot about conspiracy theories like the Illuminati, and they

5   also spoke about, you know, radical Islam and what needs to

6   happen here in America, and those kinds of things.

7   Q.  As a result of talking to Mr. Daoud, did Chris have a

8   mindset as to his future?

9   A.  I'm not sure I would say as a result of it.

10  Q.  All right.

11  A.  I think that he began to -- began to feel more angry again

12  towards -- towards the court system, towards America.  But I

13  think -- I think part of that was probably due to

14  conversations that he had with Adel Daoud, but I know that

15  part of it was also due to the conditions there which I'm

16  familiar with, the conditions in which he was being -- in

17  which he was being housed in incarceration.

18  Q.  Well, tell us.

19  A.  These are -- these are bad conditions.  These are -- these

20  are really -- this is -- this is a tough facility in Chicago

21  with really hardened -- hardened criminals and a lot of angry

22  people and it's -- these are not nice places.

23  Q.  So as a result -- well, I'm going to get to that.

24      There was another person that he had, even though he was

25  in isolation, some contact with?

```
 1  A.  Yes.

 2  Q.  And that played a significant part with him as well; did

 3  it not?

 4  A.  It did.

 5  Q.  What was that?

 6  A.  It was another -- it was another guy that was in, I think,

 7  the cell next to or even I think actually was housed with --

 8  with Adel Daoud, and I think the man killed himself.

 9  Q.  In the jail?

10  A.  In the jail.  In the -- he killed himself in the jail.

11  Q.  Chris was aware of all that?

12  A.  Oh, Chris was very aware of it.  He was there when it

13  happened.

14  Q.  And did that affect Chris?

15  A.  Sure, it affected him.

16  Q.  And so there was that examination in Chicago.  And

17  ultimately Chris came back to the county jail?

18  A.  Yes.

19  Q.  And when he came back to the county jail, was he

20  rebolstered to radicalization by his --

21  A.  Well, he was certainly --

22  Q.  -- experiences?

23  A.  He was certainly depressed, angry.  You know, the emotions

24  that kind of fueled that radicalization process were -- were

25  stoked, to say the least.
```

1  Q.  And then there were other activities that Chris did, other

2  shenanigans that Chris did, while at the county jail?

3  A.  Right.

4  Q.  And that was following his return after the Chicago

5  experience?

6  A.  Yes.

7  Q.  And that consisted of getting on the Internet and talking

8  about his informant?

9  A.  Yes.

10  Q.  It was about posting the same message again, "Message to

11  America"?

12  A.  Yes.

13  Q.  Now, all while this is going on, the government filed for

14  what is called a SAMs protection order.

15     Are you familiar with that?

16  A.  I am.

17  Q.  And Chris is now in the county jail still, previous to

18  going to Terre Haute, and he is -- he's in isolation?

19  A.  Yes.

20  Q.  During that period of time did he, looking at a scale,

21  start a de-mental escalation, a de-radicalization period?  Did

22  he start to question again some of his activities?

23  A.  At times.  It took a while.  At times he did.

24  Q.  And when you say "it took a while," what do you mean?

25  A.  Well, it means when he got back there he was a mess.  I

1    mean, we went out there.  I was worried about him killing

2    himself.  I expressed that.  I mean, he was a mess and -- and

3    it was really beginning to impact him, you know, how all of

4    this was -- was very destructive to the people that he loved

5    the most:  His father, his mom, his brother.  You know, he was

6    a mess.  But he -- so he would go through periods where he was

7    angry and other times when he wasn't, and sometimes that would

8    be, you know, kicked off, if you will, by events that occurred

9    there; things that people said to him, or that he claims;

10   correctional officers, you know, taunting him, or what have

11   you.  But, yeah, I think he began to step back and say, you

12   know, What's this mess I've got myself into?

13   Q.  And when he's questioning What's this mess I got myself

14   into?, was he questioning his being and his religion and his

15   radicalization?

16   A.  At times.

17   Q.  And do you know whether there was a time that he met

18   somebody else at the county jail?

19   A.  Well, he would talk with people.

20   Q.  And I want to direct your attention very specifically.

21   Did he have an opportunity while in the county jail to meet a

22   woman?

23   A.  He did.

24   Q.  Tell us about that.

25   A.  I think there was a woman that was being housed in a cell

49

1  that was across from his cell, and I think that they were able

2  to see each other through the window and they were able to

3  communicate, and he became enamored with this woman and felt

4  like they had made emotionally intimate connections and -- and

5  -- and he fell in love with her.

6  Q.  Love can do a lot of things to a lot of people, but what

7  did it do to Chris?

8  A.  I think he -- he wanted to -- he had fancied that they --

9  that he would get out and they would get married and they

10  would have children together, and he wrote her letters saying

11  I love you, cautioned her not to -- not, you know, to talk to

12  other men, that kind of stuff.

13  Q.  And have you been privy to those letters?  Were you able

14  to read those?

15  A.  Yes.

16  Q.  And those were letters that were written by him to her

17  from the county jail that he -- that were seized by the

18  government, copied, given to me, and then I gave them to you?

19  A.  Yes.

20  Q.  And then ultimately sent on their way?

21  A.  Yes.

22  Q.  Okay.  Then he goes -- "he" Chris -- to Terre Haute, and I

23  want to talk about that period.

24      When he gets to Terre Haute, there is now in place

25  something called a SAMs order which is an isolation-type

50

1   thing.  Tell us about Chris's life in Terre Haute.

2   A.  Well, he, you know -- once that order goes into place,

3   he's -- they really restrict his ability to be able to, you

4   know, talk to other people.  Everything has to be approved by

5   the, you know, by the federal government -- who he talks to,

6   when, how it has to be -- very much established in advanced

7   because the feds had concerns, and rightly so, that he would,

8   you know, find some way again to, you know, send out this --

9   this call for jihad.  So that's why they did it.

10  Q.  And when he went to Terre Haute, he was being housed in a

11  -- in part of Terre Haute's facility; was he not?

12  A.  Yes.

13  Q.  Do you know where?

14  A.  He was in isolation in a high-security cell.

15  Q.  High-security cell?

16  A.  On a high-security pod.

17  Q.  On the death row portion?

18  A.  (Nods head affirmatively.)  I did not know that it was --

19  Chris never told me it was death row, but I found out after

20  the fact, yes.

21  Q.  Okay.  And in that isolation, it was true isolation; was

22  it not?

23  A.  Oh, yes.

24  Q.  It was isolation without communication to the outside

25  world except a few guards?

51

```
 1   A.  Yeah.  Counselor -- there were a couple of counselors,

 2   but, yeah, it was very much isolation.

 3   Q.  You and Dr. Marett --

 4   A.  We went a couple times.

 5   Q.  -- Ms. Crouse and I?

 6   A.  Yes.

 7   Q.  And he is in a cell 24/7; correct?

 8   A.  Yes.

 9   Q.  Without a radio?

10   A.  (Nods head affirmatively.)

11   Q.  Without a television?

12   A.  (Nods head affirmatively.)

13   Q.  Without even visits from his parents?

14   A.  (Nods head affirmatively.)

15   Q.  And he is writing very detailed letters; is he not?

16   A.  Yes.

17   Q.  And he's writing them to his father, his mother, his

18   brother?

19   A.  (Nods head affirmatively.)

20   Q.  And these are almost like a diary of his thinking; is it

21   not?

22   A.  It is.

23   Q.  Let's talk about his thinking and what is going on with

24   Chris in that almost total isolation.

25   A.  Excuse me.  Well, he -- he is becoming increasingly
```

52

1  despondent, very anxious at times, having panic attacks,

2  questioning, you know, the reason for him to go on living,

3  questioning this whole identity of Raheel, whether he wants to

4  remain in that identity or revert back to something else.

5  He's sort of deconstructing, if you will, or beginning to sort

6  of deconstruct, you know, the -- this whole process of what

7  led him into the mess he's in now.

8  Q.  Okay.  If -- if we term "the mess that he was in" what led

9  him in, the radicalization was what started it; correct?

10  A.  Yes.

11  Q.  We went through periods of an ebb and a flow with that

12  radicalization?

13  A.  (Nods head affirmatively.)

14  Q.  Then he goes to Terre Haute.  And is it ebbing or flowing?

15  What's happening to that belief?

16  A.  Well, I think he was moving in the direction where he

17  was -- you know, he wanted to completely get rid of this

18  identity of Raheel and revert back to Chris, you know, and

19  essentially say what he did was foolhardy and that he deeply

20  regrets it.

21  Q.  You've talked to lots of people in your practice?

22  A.  I have.

23  Q.  Do you believe that his remorse was sincere?

24  A.  Judging sincerity is -- is not a very -- is not a very

25  easy thing to do.  I think that he felt -- I'd rather not

53

1   answer that.  I mean, I don't know if he was sincere or not

2   sincere.  He certainly was desperate, depressed, anxious,

3   fearful of the consequences, so there's almost like a gallows

4   remorse here, if you will.  Was at one point willing to, you

5   know -- I think he shaved every -- his beard, and I think he

6   was eating non-halal foods for a while, so -- I mean, he was

7   in significant turmoil.

8   Q.  Was he --

9       Obviously in turmoil because of his position, but did he

10  have in that period an opportunity of looking inward to his

11  plan on death to America?

12  A.  I think it went well beyond that --

13  Q.  Tell us.

14  A.  -- Mr. Pinales.

15      I -- I -- in my conversations with him and in Dr. Marett's

16  conversations with him, he was questioning this whole

17  identification with radical Islam or -- and Islam, for that

18  matter, almost as though he was, you know, sort of angry with

19  -- with God, with Allah, and, you know -- and I think that --

20  it went much past that.  I think he looked at this whole plan

21  to go to Washington and all of that as being a foolish plan,

22  you know, that was -- that was concocted by a desperate young

23  man who was looking for significance and to be noticed by

24  others and that's the way he would talk about it, and to feel

25  powerful in a world that up to this point he felt utterly

1    powerless and abused.

2    Q.   During all of these periods of Chris's incarceration, do

3    you know whether his family has stood by him?

4    A.   Oh, they've very much -- they very much stood by him.

5    Q.   And has he fortified his relationship with his family --

6    A.   Yes.

7    Q.   -- internally?

8    A.   Yes.  The relationship has deepened.  And I do feel that

9    he -- I mean, certainly appears to feel extremely remorseful,

10   and he will cry profusely at times as to how his actions have

11   brought ridicule and shame to Dad, Mom and brother.

12            MR. PINALES:  Can I have just a moment, Your Honor?

13            THE COURT:  Yes.

14       (Defense Counsel confer privately.)

15   BY MR PINALES:

16   Q.   Dr. Bresler, as I said when we first started, we are here

17   today before the sentencing of Chris for the purposes of

18   understanding Chris, what made him and makes him tick, pardon

19   me for simplifying it, and for his mental state along the way

20   and particularly now.

21       And I know it's not within the realm of your science to

22   talk about length of sentences.  The government is going to

23   stand here and they're going to ask Judge Beckwith for a

24   30-year sentence.  Chris is 22 years of age.  A 30-year

25   sentence is longer than he's ever been even on this earth.

1    Can you address a 30-year sentence in relation to Chris's

2  mental psyche, to his -- that's the wrong word -- to be his --

3  to what will happen to Chris with a 30-year sentence in a

4  prison system?

5         MR. DITTOE:  Objection, Your Honor.  This goes beyond

6  the scope of what was contained in Dr. Bresler's report.

7  There was nothing mentioned about this specific issue in

8  Dr. Bresler's report, so the government would object on that

9  basis.  We haven't had a chance to address the issue with

10  other psychologists.  It goes beyond the scope of the report.

11         MR. PINALES:  Your Honor, I think it's a natural flow

12  from that report.  We're now moved into the punishment phase

13  and I'm only talking about the psychology of a prison

14  sentence.

15         THE COURT:  Well, perhaps you could rephrase the

16  question.

17         MR. PINALES:  Okay.

18    (Defense Counsel confer privately.)

19  Q.  You've studied Chris?

20  A.  Yes.

21  Q.  And you've talked about Chris's mental adjustment or

22  non-adjustments throughout his 22 years now of life?

23  A.  Yes, as well as his adjustment to incarceration.

24  Q.  And we've talked about --

25    And you filed a report with the court; did you not?

 1   A.  I did.

 2   Q.  And in that report, on page 23, do you not say, "I am very

 3   concerned, however, that a long sentence requiring that Chris

 4   remain in prison for the majority of his adult years could

 5   create a foreboding sense of hopelessness in this young man,

 6   making him vulnerable" and et cetera, et cetera?

 7   A.  I wrote that.

 8   Q.  So you have addressed the issue of where Chris is now and

 9   where he is going?

10   A.  I have.

11   Q.  And I don't mean physically where he is going.  I'm

12   talking about mentally where he may go as a result of

13   physically being someplace.

14   A.  I have.

15   Q.  And you use the term "long sentence."  As I said, the

16   government is going to be asking this Court for a 30-year

17   sentence.  Can you address the effects of that type of

18   sentence on Chris where he is now?

19   A.  So there's -- there's a few ways to do this.  First of

20   all, I want -- I want to take issue with something that you

21   said earlier and that is I have done many, many presentence

22   investigation reports in state systems and federal systems

23   over the years, so it is something that I've done extensively

24   in my -- in my work over the years.

25   Q.  In fact, you were with the Massachusetts Prison System;

1  were you not?

2  A.  I was.

3  Q.  Okay.

4  A.  And would evaluate exactly those types of issues, people

5  that had maladjustment to incarceration and that kind of

6  thing.  So I worry about Chris.

7  Q.  Why?

8  A.  Well, because for a number of reasons.  I -- first of all,

9  you know, I think he has biological vulnerability to becoming

10  depressed and anxious.  He's been depressed before at times

11  earlier in his life and I can see him, you know, having a

12  difficulty adjusting.

13      He's also very sensitive.  He's different.  And the other

14  inmates will clearly recognize that he is different very --

15  very quickly.  And there's --

16      Even within the walls of a prison, maybe especially within

17  the walls of a prison, there's a lot of xenophobia, and if

18  you're different, you know, it's like Kosinski's *The Painted*

19  *Bird*:  You're gonna be targeted -- right? -- and I worry about

20  that and how he will react to that.

21      If he's true to form, I think he will isolate himself even

22  more, or do things purposefully in order to isolate himself,

23  and that worries me greatly because --

24  Q.  Why?  Why does that worry you?

25  A.  Because it allows him to stew in his thoughts, and

1  sometimes his thoughts are -- are fragmented and very dark and

2  there won't be people that will disconfirm that unless he

3  allows them in, and he doesn't trust many people.

4      There was one counselor I think in Terre Haute that he

5  said he felt some trust in.

6      I would love for him to get involved with an Imam.  I

7  would very much love for him to get on some medications, but I

8  don't think he's going to do it because he's fearful of being

9  stigmatized.  But he might.  He might over time.  And 30 years

10 is a long time in the life of -- I mean, it's a long time in

11 -- in the prison system.  It can -- it can easily break the

12 strongest of men, and he is nowhere near the strongest of men.

13     It's going to depend on where he goes and the types of

14 correctional officers that he engages with.  I've met

15 wonderful correctional officers over the years who have deep

16 concern and do their job and do it brilliantly -- brilliantly

17 and passionately.  I've also met others who aren't that way.

18 So where he's housed and who he's with, that's -- so 30 years

19 is a long, long time.

20     He can't even conceive of 30 years.  I mean, he's what, 22

21 now?  So this is -- you know, 30 years is beyond a life

22 sentence for him.  And he questions his ability to be able to

23 -- to handle that.  He's terrified at the prospect that he

24 will not get out of prison, or that when he gets out of

25 prison, there'll be nobody there for him -- Dad will be dead,

59

```
 1   Mom will be dead, brother will be, you know, very much a
 2   middle-aged person.  Nobody's there for him, he's totally
 3   alone, and that's a very scary prospect for him because that's
 4   his whole world.  Those people, those three people really are
 5   his whole world.  So I worry about that.
 6       And I'm not -- you know, I can understand -- you know, I
 7   work with law enforcement; I give lectures with the FBI and
 8   trainings with the FBI.  I can understand that they want to
 9   have somebody like this removed from society.  I got it.  I
10   understand that very well.  But my question is, and I don't
11   have an answer to this --
12       And I think it is really going to be up to you, Judge
13   Beckwith, and I don't envy your position.
14       -- how much is too much?  How much is too much?  And at
15   what point do we exceed a -- a time here where -- where this
16   will crush the life and soul out of this -- out of this young
17   man?  That's a very difficult decision to make and I worry
18   about it, but I'm not passing judgment on -- on the
19   government's position and -- you know, I just want to express
20   my concerns.
21       This is a vulnerable person.  He's been a vulnerable
22   person for a long, long time, and he'll remain a vulnerable
23   person.  And vulnerable people in prison, bad things can
24   happen, and he's seen that firsthand when he was in Chicago
25   and saw a guy hang it up.
```

60

1  Q.  When you say "a vulnerable person," is he vulnerable to --

2       For want of a better word, pardon me of my clumsiness in

3  expressing this.

4       -- get in with the wrong crowd?

5  A.  It could be.  He could get caught up in the wrong crowd.

6  Q.  So what would that do?

7  A.  He could be further radicalized if he gets caught up in

8  the wrong crowd.  I mean, you know, he -- he craves attention

9  and friendship.  And, you know, the wrong crowd, yeah,

10 absolutely he can get in with the wrong group of people.  I

11 hope he doesn't.  I hope -- I hope he is smart enough to stay

12 away from those people.  But like the Nazi guy that, you know,

13 he had the interactions with and was assaultive towards him

14 and -- you know, he can get taken in.  He's not -- his

15 interpersonal relationship skills are very deficient and that

16 sets him up for problems.

17 Q.  Well, we haven't even talked about the Nazi guy.  You want

18 to tell the Court about him?

19 A.  There was a white supremacist that quote/unquote

20 "befriended" him and then -- then decided that he was going to

21 abuse Chris and be assaultive, and he was.  Chris didn't see

22 it coming.

23 Q.  And he was assaulted by that person?

24 A.  Yes.

25 Q.  And is that likely to happen in a long incarceration

61

1  period?

2          MR. DITTOE:  Judge, this is really getting in the

3  area of speculation here as to what could happen or what might

4  happen inside a prison, so the government would object.

5          MR. PINALES:  I agree.  Let me -- let me word it a

6  little differently.

7  Q.  Without saying a sentence --

8  A.  Without what?

9  Q.  Without giving the Court a sentence --

10      'Cause that's not within your purview with Chris.

11      -- with Chris's mental state, with the need for

12  punishment, is ten years enough?

13          MR. DITTOE:  Objection, Your Honor.  It calls for the

14  ultimate conclusion, and the ultimate conclusion is the

15  province of the Court, not the province of the psychologist.

16  So objection.  Irrelevant.

17          THE COURT:  Sustained.

18          MR. PINALES:  I'm asking about his mental state with

19  a ten-year sentence, Your Honor.

20          MR. DITTOE:  Same objection, Your Honor.

21          THE COURT:  Sustained.

22          MR. PINALES:  One moment.

23      (Defense Counsel confer privately.)

24          MR. PINALES:  Nothing further.  Thank you.

25          THE COURT:  Okay.  We have been at this for nearly

 1  two hours, and it seems as a humane thing to do that we might

 2  take a 15-minute break.  So about ten after 11 we'll resume.

 3          THE CLERK:  All rise.          (10:55 A.M.)

 4                          *   *   *

 5  BEFORE THE COURT:                      (11:10 A.M.)

 6          THE COURT:  Mr. Dittoe, when you're ready.

 7          MR. DITTOE:  Thank you, Your Honor.

 8                      CROSS-EXAMINATION

 9  BY MR. DITTOE:

10  Q.  Good morning, Dr. Bresler.

11  A.  Good morning, sir.

12  Q.  I just want to go over some very -- very few points.

13      During your direct examination, you talked a lot about

14  sort of the background and characteristics of the defendant

15  when he was in school.  And it would be correct to say that he

16  had a temper, he was angry all during the course of his

17  school.  That would be correct; right?

18  A.  I'm not saying all during the course, but certainly there

19  were periods of time that was the case.

20  Q.  As a result of that temper and that anger he received

21  various sorts of psychological treatments; isn't that correct?

22  A.  There were attempts made at that, yes.

23  Q.  And during the course of the treatment the psychologist

24  noted that he had anger issues; is that correct?

25  A.  Yes.

1   Q.  And sometimes his family members described him as going

2   berserk if he would get something that he wouldn't want, like

3   losing a wrestling match or something like that; is that

4   correct, sir?

5   A.  Yes.

6   Q.  All right.  Now, continuing on, you said that it's no

7   question that Mr. Cornell was self-radicalized; is that

8   correct?

9   A.  Yes.

10  Q.  He became self-radicalized when he was about 17 to 18 and

11  a half, and 18 and a half you said he was fully

12  self-radicalized; is that so?

13  A.  I think so, yeah.

14  Q.  And that was, of course, well before he met the informant;

15  is that correct?

16  A.  That is before he met the informant.

17  Q.  And you said he explored during the process of

18  self-radicalization -- you said he explored different

19  religions and different beliefs, and I believe you said that

20  the turn-the-cheek option was not his idea; is that correct?

21  A.  I don't think it appealed to him, no.

22  Q.  And you said he fully internalized the idea of radical

23  Islam; correct?

24  A.  Oh, yes.

25  Q.  And you were familiar with Twitter and what Twitter does;

64

1   is that right, sir?

2   A.  Yes.

3   Q.  And he had a Twitter account; is that correct?

4   A.  He did.

5   Q.  And he reached out to others using his Twitter account;

6   correct?

7   A.  Yes.

8   Q.  And he had followers on Twitter; isn't that correct, sir?

9   A.  He did.

10  Q.  Followers other that the informant; is that right?

11  A.  Yes.

12  Q.  Now, during the course of your discussions with -- with

13  Mr. Cornell, the defendant, he talked about -- he used the

14  word "coconut Muslim" when referring to the Imam at the local

15  mosque; is that correct?

16  A.  Yes, he did.

17  Q.  What did he mean by that, sir?

18  A.  He meant a person who is a Moslem but is moderate and that

19  who he believes, in a pejorative kind of way, who are not

20  practicing Islam according to the way he felt the religion

21  needed -- needed to be practiced.

22  Q.  Now, you talked during the course of his incarceration,

23  when you went to Terre Haute, when he was sort of isolated at

24  Terre Haute, he actually started to get better, isn't that

25  right, in terms of his radical beliefs?  He started to

PRESLER - CROSS

65

1  question them when he was at Terre Haute; is that right?

2  A.  I'm not sure I'd call it "get better," but I would think

3  that -- but I think he did -- started to question the whole

4  process, yes.

5  Q.  And so the de-radicalization actually started when he was

6  at that -- became more intense, his questioning of his

7  beliefs, when he was in Terre Haute; is that right?

8  A.  I think it began before that, but I think it intensified,

9  you know, when he was literally feeling the consequences of

10  the -- of the isolation.

11  Q.  Now, on direct examination defense counsel asked if

12  Mr. Cornell's remorse was sincere and I believe you responded

13  you couldn't answer that, and then I believe you said he had

14  something -- something in the nature of gallows remorse; is

15  that correct, sir?

16  A.  Yes.

17          MR. DITTOE:  No further questions, Your Honor.

18          THE COURT:  I have two questions.

19  Doctor, in the course of your examining Mr. Cornell and

20  developing your report, were you aware Mr. Cornell's father

21  was involved with Mr. Cornell in attempting to identify,

22  locate, expose and actually have killed the confidential

23  informant?

24          THE WITNESS:  I am aware that the father was

25  assisting him in trying to get out information which might

66

1    lead to the exposure of the confidential informant.  I'm aware

2    of everything that you said, Your Honor, up to the very last

3    point.  I'm not aware that he was planning to have him killed,

4    although Chris was very forthcoming with me.  He was saying,

5    you know, at that time he was so angry at being deceived by

6    this -- by this brother, by this confidential informant, that

7    he was hoping that something bad would happen to him.

8             THE COURT:  Okay.  And I think you've already

9    answered this.  You were aware of Mr. Cornell's attempts to

10   send his so-called "Message to America," calling for other

11   similar-minded people to attack non-believers.

12       Is that a fair paraphrase of what he had in mind?

13            THE WITNESS:  Yes, Your Honor.

14            THE COURT:  Okay.  Those are my only questions.

15       And, Mr. Dittoe, if you have follow-up, I'll let you do

16   that.

17            MR. DITTOE:  No, Your Honor.

18            THE COURT:  Okay.  Thank you.  Mr. Pinales?

19            MR. PINALES:  Yes.

20                      REDIRECT EXAMINATION

21   BY MR. PINALES:

22   Q.  I have a few follow-ups on Mr. Dittoe's questions and a

23   couple on the Court's, briefly.

24       Mr. Dittoe asked you about the term "coconuts" and what it

25   meant.

1   A.  Yes.

2   Q.  In reviewing everything you know about this, there were

3   other references to coconuts, were there not, by Chris?

4   A.  Yes.

5   Q.  As a matter of fact, when he and the confidential

6   informant are discussing things, Chris says, "I've been trying

7   to get a go-ahead and I haven't heard back from the coconuts."

8       Do you recall that?

9   A.  I don't specifically remember.  I remember him saying that

10  "I've been trying to hear back and I've heard nothing," but I

11  don't remember specifically about him using the word

12  "coconuts" at the time, but he did it use it at other times.

13  It's not his word, though.  It's not something he invented, I

14  mean.

15  Q.  Right.  Right.

16      And that was when the informant said, "Well, I heard back

17  from an emir and we have the go-ahead."  You remember that --

18  A.  Yes.

19  Q.  -- they were discussing?

20      He was -- he was lamenting -- "he," Chris -- was lamenting

21  that he was trying to reach people and get a go-ahead and

22  hadn't heard back from anybody; correct?

23          MR. DITTOE:  Objection, Your Honor.  This is really

24  beyond the scope of cross.  I referred to what a "coconut

25  Muslim" meant with respect to the Imam here, and now counsel

68

1   is going into an issue that I did not go into on cross which

2   related to the interaction with the informant in this

3   instance.  So it's beyond the scope of cross.

4           MR. PINALES:  Your Honor, I believe I had questioned

5   him about whether or not the term "coconut" was used in that

6   phraseology.

7           MR. DITTOE:  And he said he didn't recall, I believe.

8   The psychologist, the witness, said he did not recall.

9           THE COURT:  Okay.  Sustained.

10  BY MR. PINALES:

11  Q.  You used the term, in response to one of Mr. Dittoe's

12  questions, about gallows remorse.  What is that?

13  A.  It's -- what I meant by that was that -- is that when

14  somebody's facing the -- and experiencing the dire

15  consequences of their behavior -- right? -- in this case, the

16  -- the -- the incarcerated environment he was being placed in

17  and amongst people that he was being placed, I think he became

18  very fearful and -- and he had this

19  Oh-my-God-what-have-I-done? response.

20  Q.  So was that remorse real?

21          MR. DITTOE:  Objection, Your Honor.  Same as the word

22  "sincere."  The witness said he couldn't answer.

23          MR. PINALES:  It was brought up by Mr. Dittoe, Your

24  Honor.

25          THE COURT:  Well, that's a rather generic term, or

69

1  question.  If you want to try to zero it in on Mr. Cornell --

2  although, I'm not sure Dr. Bresler can answer that question.

3          THE WITNESS:  I can't, Your Honor.

4          MR. PINALES:  Then that ends my questioning.  Thank

5  you.

6          THE COURT:  Anything further of Dr. Bresler?

7          MR. DITTOE:  No, Your Honor.

8          THE COURT:  Anything?

9          MR. PINALES:  No, Your Honor.  Thank you.

10          THE COURT:  And he may be excused?

11          MR. PINALES:  He may, but he may stay if he wishes.

12          THE COURT:  You're perfectly welcome to stay, but you

13  are also free to go --

14          THE WITNESS:  Thanks, Your Honor.

15          THE COURT:  -- if you wish.

16          THE WITNESS:  Appreciate it.

17      (Witness excused.)

18          MR. PINALES:  Your Honor, at this time I'd like to

19  ask that the family be able to address the Court from the

20  podium.

21          THE COURT:  Okay.  Mr. Mangan, you were on your feet,

22  which I assume is an indication you have something to say.

23          MR. MANGAN:  No, Your Honor.  I think before we get

24  to the argument from the -- from the attorneys, we do want to

25  have a brief sidebar.  But we can certainly do that then.

70

1          MR. PINALES:  We can do it now or then.  We're guests

2   in your home, Your Honor.  We'll do it when you tell us.

3          MR. MANGAN:  We can do it now and then go straight

4   through.

5          THE COURT:  All right.

6          MR. PINALES:  Okay.

7          MR. MANGAN:  Shouldn't take long.

8   <u>SIDEBAR CONFERENCE</u>:

9                **THIS PORTION IS INTENTIONALLY BLANK**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**THIS PAGE IS INTENTIONALLY BLANK**



**THIS PAGE IS INTENTIONALLY BLANK**

THIS PAGE IS INTENTIONALLY BLANK

**THIS PAGE IS INTENTIONALLY BLANK**

75

**THIS PAGE IS INTENTIONALLY BLANK**

CONCLUSION OF SIDEBAR CONFERENCE

MR. PINALES:  With the Court's permission, I would ask John Cornell to come forward to the podium.

THE COURT:  Okay.

MR. PINALES:  For the purposes of the record, I'm calling John Cornell, who is the father of Christopher Cornell, and he has written something down that he intends to read because he's not used to public speaking, Your Honor.

THE COURT:  That's fine.

MR. JOHN CORNELL:  Hopefully, I can read this, Your Honor.  I'm having problems with my eye.  I have third nerve palsy and I'm seeing double and sideways.

First, I want to start out with -- I just wanted to say, Your Honor, I'm Christopher's father.  And I'm not sure if you remember me or not, but I was in your courtroom on one of those step charges many years ago, and I know you're a tough judge, but I also know that you're a smart judge.  You wanted to give me a second chance, but my record was too bad and you couldn't [crying].  I just hope you can find it in your heart, Your Honor, to give Christopher a second chance [crying].

You know, I wasn't always the best father.  I was always so critical of Christopher in everything he tried to do and

76

1   everything he tried to accomplish.

2       You know, I got clean and sober when Chris and John were

3   still babies.  I've been clean for over 20 years, Your Honor,

4   but it took me out of the home.  I couldn't do it on my own.

5   I got sober in AA.  And I got it worked and -- with meetings.

6   And just because I got sober, it didn't help the anger issues.

7   That was something I never addressed and probably should have

8   years ago.

9       I just know that Christopher's -- he's such -- he has so

10  much potential.  And I know if he's given a second chance, he

11  could still do some great things in his life.

12      I love him so much, Your Honor, that I just can't imagine

13  him not being a part of my life.

14      This has been hard on our whole family.  You know, we get

15  to visit him -- well, we visit every opportunity that we get.

16  And we've had to travel to Terre Haute and we don't even have

17  a car, you know, suitable to make the trip.  And we put a fund

18  together amongst our family to where we chip in so we can rent

19  a car.  And I talked to Christopher extensively on his visits

20  and I could see a big, big change in Chris, and our

21  relationship has gotten so much stronger.  You know, we're

22  able to talk now where we never could talk before [crying],

23  and I see a big change in Christopher.

24      And I can't even read this, my eyes are so bad.  I just

25  wanted to say please, Your Honor, don't throw him away for the

77

1   rest of his life.  He's just a kid [crying] and he has so much

2   potential.  Please, Your Honor, I'm begging you with all my

3   heart.

4       That's about all I can say.

5           MR. PINALES:  Thank you.  Angel?

6       I'd like to introduce Chris's mother, Angel.

7           MS. ANGELA CARMEN:  Your Honor, I am Christopher's

8   mom, Angela.  I know him better than anyone.  He's always been

9   a mommy's boy.  We did everything together.

10      I remember one time when we went for ice cream and he

11  asked me if he could hold his own money and pay for his own

12  ice cream -- and I did.  The next thing I knew, he asked me to

13  pull the car over, and I did, and he gave his money to a

14  homeless man on the corner.  I asked him why he did it.  He

15  said he needed it more than us.

16      There was lots of time when Christopher showed lots of --

17  showed acts of kindness.  I remember another time when he

18  filled his backpack with bottled water and went out on his

19  bike and passed it out to homeless people.  When he came home,

20  his hands were freezing.  I found out later that he gave his

21  gloves to a homeless man that didn't have any.

22      Christopher has a heart of gold, and I pray you give him a

23  second chance.  He's just a kid.  I love him so much and I

24  will always love him.

25      Thank you.

78

1    MR. PINALES:  As the Court heard from Dr. Bresler and

2 has read in the Presentence Report, I would like to introduce

3 John, his brother, who was, as everybody has referred to, his

4 best friend.

5    MR. JOHN CORNELL II:  Your Honor, my name is John.  I

6 am Christopher's older brother and also his best friend.

7    No one knows him as well as I do.  My brother would never

8 hurt anyone or anything.  He has one of the biggest hearts

9 that I've ever seen in a person.

10    I've seen him help so many people in need -- such as

11 homeless people -- with food or even the clothes off his back.

12    Everyone deserves a second chance.  Just because someone

13 is lost and loses their way doesn't mean they're lost forever.

14 Everyone needs help.

15    I love my brother and I don't know what I would do without

16 him in my life.

17    That's it.  Thank you.

18    MR. PINALES:  And, finally, he'd like to call on Aunt

19 Debbie.

20    MS. CORNELL:  Your Honor, I'm Christopher's aunt.

21    I've given this a lot of thought what I wanted to say here

22 today, and I guess where I'd like to start is Chris really is

23 a good person.

24    My memories of Chris are a shy, quiet, compassionate,

25 sensitive young man who struggled to have conversation with

1   his own family.  He'd come to my house for family gatherings.

2   He would sit at the end of my couch and he would talk to my

3   dog and play with my dog.  He didn't participate in any of the

4   family activities.

5       I told his father that I thought his behavior was odd, and

6   Chris overheard me and he stopped coming around, which wasn't

7   my intentions.  Chris was a kid that was socially inept.  He

8   was incapable.  He struggled with his own identity.  All he

9   wanted was to fit in, but he didn't know how.

10      I know he said a lot of stupid things, Your Honor, but I

11  know in my heart he could never have hurt anybody.

12      I've prayed so hard for you to find compassion and

13  understanding for my nephew.  I've prayed to God to keep him

14  safe.  I'm so afraid for him.  I pray that he can find his

15  inner strength and our family can and we can get through this.

16      And I promise you, Your Honor -- I know you don't know me,

17  but I'm a good person and I love Christopher.  I promise I'll

18  be there for him.  I'll be a positive influence on his life.

19      And you'll have my continued love and support.

20          MR. PINALES:  Thank you, Your Honor.  We have nothing

21  more to present.

22      I would ask now that Ms. Crouse address the Court.

23          THE COURT:  Is this by way of wrap-up argument?

24          MR. PINALES:  Yes, Your Honor.

25          THE COURT:  Does the government have any witnesses

80

1   that they would like to call?

2           MR. MANGAN:  No, Your Honor.

3           THE COURT:  All right.

4           MR. PINALES:  Thank you.

5           THE COURT:  Then, Ms. Crouse?

6           MS. CROUSE:  Thank you, Your Honor.

7       Your Honor, Marty and I have represented Chris for the

8   last approximately year and a half.  And, obviously, we

9   haven't been on the case as long as you have, but it has been

10  quite a journey for us in watching the transformation of Chris

11  throughout this time.

12      This is a very difficult case and it's a very, very unique

13  case, and a lot of what Dr. Bresler testified.

14      What we can take away -- and Dr. Bresler was on this case

15  longer than Marty and I were too.  He's had almost two years

16  of interviews with Mr. Cornell.  And the biggest question that

17  I think everyone has on their mind is how did this happen?

18  How did this happen to one of us, one of our children?

19      He is an American kid who was born and raised in

20  Cincinnati.  You know, he grew up in a non-religious family

21  and now has -- has become a devout Muslim and was,

22  unfortunately, self-radicalized.

23      And I think what you can -- what you can take from

24  Dr. Bresler's intense interviews and study of Chris is this

25  doesn't happen to just any kid.  It has to be the right kid.

81

1    And, unfortunately, with what we have with Christopher

2    Cornell, it was kind of the perfect storm, in a sense.

3        We have a lower middle-class kid who had an unstable

4    childhood, which included some mental and physical abuse.  We

5    have a person with a certain degree of mental issues and

6    particularly the Schizotypal Personality Disorder that

7    Dr. Bresler diagnosed him with and also this

8    Obsessive-Compulsive Disorder.

9        So we have somebody that had an inability to interact

10   socially with his peers and who isolated himself and who felt

11   very depressed and very alone.  And when you have all of this,

12   it's a slow build.  It is the perfect person where this --

13   this stuff that's on the Internet really can resonate --

14   resonate with somebody.

15       And as Dr. Bresler told you, this radicalization, this

16   self-radicalization, did not happen overnight.  You know,

17   Chris started out -- he was looking for something to bring

18   meaning to his life.  He was searching for answers and he

19   looked at a lot of different things.  He got lost in these

20   conspiracy theories on the Internet.  He had his anarchy

21   phase, his vegetarian phase, his -- anything where he could

22   just throw himself into and just get lost into it, and that's

23   -- that's where he was and so his life was there.  I mean, he

24   had his brother, but as Dr. Bresler told you, his brother was

25   growing up normally, was able to interact with his peers.  He

82

1   started dating; he had a group of friends. And Chris didn't

2   like hanging out with those people, so he withdrew.

3        And so, unfortunately, this propaganda that we hear of

4   over and over again that is readily available on the Internet

5   was there waiting for him. And so he was self-radicalized,

6   and we will admit that and that's what Dr. Bresler testified

7   to.

8        I think that when we talk about the informant, you know,

9   we -- we certainly aren't arguing an entrapment theory here.

10  But I do think that in a review of the cases that I've seen

11  like this with FBI sting operations, when courts look to

12  sentence somebody, the informant's role is an important one

13  and it's something that courts look at and that's why we

14  raised it and brought it to your attention, because I think

15  when you have somebody like Chris who befriended this person,

16  in his mind this was somebody that he looked up to. This was

17  an older person. This was a born Muslim. This was somebody

18  who educated him. And we gave you excerpts from the video.

19  This is actually -- the excerpts we gave you, Your Honor, are

20  transcripts that were provided to us by the government, so

21  these are the government's transcripts of interactions between

22  Chris and the informant. And there's hours of conversations.

23  I mean, we just gave you a snippet of it. And they talk about

24  girls, they talk about his job, they talk about his family and

25  how they were making fun of him practicing his religion and

83

1   what does he do about that.  And the informant was giving him

2   advice and the informant was giving him books and the

3   informant was helping him with his religion, asking him "Do

4   you have questions about Islam?  Can I educate you?"  So this

5   was a big piece.

6       And I know, obviously, from the Court's questions about

7   what Chris did as far as exposing who he believed to be the

8   informant --

9       And let's remember:  We don't know if this is the person.

10      -- but who he believed to be the informant.  Yes, he did

11  expose him on the Internet because he was -- he was hurt and

12  he was angry.  And he has expressed numerous times how much he

13  regrets that.

14      It was a fixation.  As Dr. Bresler testified, he would

15  fixate on things.  And there was a sense of betrayal there

16  because this was really his only friend besides his brother

17  that he's had.

18      So I do believe that this informant, while certainly

19  didn't put these ideas in Chris's head, he certainly added

20  fuel to the fire, and that's what we wrote in the Sentencing

21  Memorandum.  And I think it's something that the Court should

22  take into consideration in looking at that as a mitigating

23  piece of this.

24      Chris completely accepts responsibility for his actions.

25  He didn't for the longest time.  But the reason why we shared

1    with you these very private letters that he sent his family is

2    because we wanted to show you that this is not simply

3    something that he wrote to the Court at the request of his

4    lawyers.  This is stuff he wrote to his family, because really

5    it's what kept him sane while he was in solitary and it was

6    the only thing that he had to think about.  I mean, he was

7    separated from everything.

8        When he got to Terre Haute, he was in real solitary

9    confinement.  He had no books initially.  No radio initially.

10   No television.  So these letters were kind of like a diary for

11   him.  And the government intercepted them and we would get

12   copies after they did, and then they would send them on to the

13   family.  But these were really not meant to be public.  They

14   were not meant for anybody but his mother, father and brother.

15   And we only gave you a few of them.  There's many, many more.

16   I mean, some of them are as mundane as when he finally did get

17   a radio, he would spend pages just talking about different rap

18   and hip hop music that he liked that came on the radio.

19       When he finally got a TV -- this was months later -- he

20   would talk about TV shows that the family would like to watch

21   together and he would be watching a TV show that they liked to

22   watch together.

23       He would talk about food that he ate from the commissary,

24   or lunch.  I mean, these were in between all of the -- the

25   expressions of remorse.  I mean, these were very lengthy

1   letters, just a day-in-the-life as he was working his way

2   through.  And he tried to be very positive for his family, and

3   there were a lot of letters saying, "Oh," you know, "the

4   food's good," and "I'm doing fine," and then as you saw, and

5   what we attached to the sentencing memo, there were days where

6   he was not doing fine.  And Marty and I have lived this with

7   him for the last year and a half, and, Judge, it has been a

8   rough go.  There has been -- we've been scared he was going to

9   kill himself on several occasions.  We've had to call

10  Dr. Bresler and asked him to go see him.

11      There were times where we -- he couldn't even work with

12  us, didn't even want to talk about the case, couldn't bring

13  himself to even deal with this he was so despondent.

14      And what I noticed, though, as -- as he was working his

15  way through these issues --

16      And you remember when he shaved his head and he shaved his

17  beard and he turned his back on Islam for a period of time.

18  That was part of his process of pulling himself away from this

19  -- these radical ideas.  And I think part of it, too, there

20  was a relief by me and Marty on the sense of Okay, great, you

21  know, you're -- you're not practicing anymore.  Let's -- let's

22  throw that over here.

23      The problem is, what happened with that is he got very,

24  very, very depressed.  And there came a point where

25  Dr. Bresler actually suggested to him, "You know, maybe you

1  actually need some religion in your life." I mean, a lot of

2  people do.

3     And so he did start working back Islam into his life, but

4  focusing on a peaceful Islam. When that happened, along with

5  all these other months of -- of the letters that you saw of --

6  of reflection and remorse, apology, not only to his family,

7  there were -- he apologized to the informant in those letters,

8  he apologized to the Muslim community in those letters. He's

9  realizing the impact of what he did and it's not going to be

10  an overnight thing, just like his self-radicalization wasn't.

11  But once he worked that religion back in -- and then we

12  started in plea negotiations. And it was amazing that once he

13  decided to plead and accept responsibility, I saw a huge

14  change in him. It was almost like this relief came over him,

15  you know, that there was going -- that he finally's "Look,

16  okay. You know what? I've accepted this and I'm going to get

17  punished and I need to figure out how am I going to live my

18  life now, because my life has forever changed. I know that.

19  I know I'm going to be spending a long time in prison. So how

20  am I going to do this?"

21     And what I saw out of him -- and Marty -- we came back

22  from one of our visits to Terre Haute and said this is the

23  first time we saw him hopeful for his future, like thinking

24  that -- he's talking to us about what kind of skills he could

25  learn while he's in there, what kind of education. You know,

1  he always wanted to be a nurse.  Obviously, that's never going

2  to happen.  But, you know, how can he, when he gets out, get a

3  job and be productive and not just be a leech on society?

4  What can he do?

5      And then there's also that fear of, you know, will his

6  family still be there.  And I have to say, Judge, these people

7  -- what dedication.  You know, his father, with all the faults

8  that he may have, I'll tell you one thing about his dad:  He

9  loves his son.  And he probably had some really bad judgment

10 there when they were talking about the informant, but I think

11 it was out of hurt and out of anger and I don't think that

12 there was any intention there.  I just think that it was -- it

13 was a man who loves his son.

14     And they don't even have a car to take them to Terre

15 Haute.  Their car doesn't go that far.  They had to rent a car

16 every single week.  And a lot of letters that you saw, and we

17 explained in the memoranda, were before he would get visits.

18 When he was there, he was in isolation, he had no phone calls,

19 he had no visits.  And once the visits started getting

20 regular --

21     And Terre Haute was actually great to us, I have to say.

22 They arranged so the family could come every single Friday,

23 and they went every single Friday.  They rented a car and they

24 drove three hours and they visited him for the time that they

25 could and then they drove back all in one day, every week.

88

1   They are committed.

2       And I think that when you're thinking about a sentence,

3   you've got to think about when somebody gets out and what --

4   what kind of support they're going to have.  We know he's

5   going to be on lifetime supervised release.  He's going to be

6   watched and under the thumb of the government for the rest of

7   his life.  But when he gets out, he needs to have that family

8   there to support him.  And I know they're going to be there if

9   they can.  But 30 years from now, I don't know if his dad's

10  going to be there, and so we need to keep that into

11  consideration.

12      But he does have hope for the future.  And I know that he

13  wants to be a productive person even while he's in there, and

14  he has told us this, and I'm telling you he did not have that

15  hope for the longest time.  And so we are hoping that whatever

16  sentence you hand down doesn't shatter that hope, that it

17  gives him hope that he can still get through this.  There are

18  no de-radicalization programs in prison, and we talked to

19  Dr. Bresler about, you know, what -- what's going to be there

20  for him while he's in there?

21      There are some psychological counseling available that

22  he'll have to avail himself of.  And while he doesn't have a

23  lot of trust for people, I think you saw even in some of the

24  letters that we shared with you there were times when he

25  requested the assistance of the psych nurse or the psych

1   doctor at the prison. So he is starting to reach out for the

2   help that he needs, and I'm hoping that he continues to do

3   that while he's in there. And then, of course, his

4   religion -- hopefully, he'll find a religious leader in there

5   that will help him through and show him the way.

6       We did cite other cases, Your Honor, and I'm not going to

7   get into them in real detail because I got into them in detail

8   in -- in my filings with the Court.

9       There is no other case like this. Every case is

10   different. Every case has different circumstances. But the

11   one thing that really jumped out to us when we were analyzing

12   the cases that -- for the 30 years -- are cases where somebody

13   actually detonated or tried to detonate a bomb. Those are the

14   cases typically that would get 30 years, or where somebody

15   goes to trial and doesn't show remorse. So I didn't see one

16   case that the government provided where somebody gets that

17   length of time for what we're talking about here.

18       So we're simply asking you to consider less than 30, way

19   less than 30 years in Chris's case, because he is fixable. He

20   is one of our kids. He's a U.S. citizen. He's one of us.

21   And, unfortunately, he turned to the Internet and he -- he --

22   that propaganda, which has worked on, you know, people

23   throughout the country, worked on him.

24       But I think you can see through this period that he is

25   fixable. He has taken the time to self-reflect, and we don't

1    need to throw him away for 30 years.  So we're simply asking

2    the Court to consider a much lesser sentence than that.

3        Thank you.

4            THE COURT:  Thank you.

5            MR. PINALES:  As I said earlier, Chris wanted to

6    address the Court.  Would the Court like it now or as part of

7    his allocution?  Or --

8            THE COURT:  As you wish.

9            MR. PINALES:  I think it makes sense --

10           THE COURT:  As long as he has the opportunity to

11   speak.

12           MR. PINALES:  Yes.

13       Chris, do you want to come forward?

14           THE DEFENDANT:  Yes.

15           MR. PINALES:  And I'll share with the Court that he

16   is -- he has a cold, he's not feeling well, but he did write

17   down some thoughts that he wanted to address the Court.

18       (The defendant and Mr. Pinales confer privately.)

19           THE DEFENDANT:  I'd like to begin by giving my

20   sincere apologies to all those who've been affected with my

21   words and actions over the period this all began.

22       I'm sorry for scaring everyone and the things I put you

23   all through.  I'm sorry for us all being -- for us all being

24   down here today instead of us being home with our loved ones.

25       I'm sorry to my family, my friends, the Muslim community,

1   and all the American people.  The way that I was acting was,

2   as I said before, was illogical and unreasonable.  I should

3   have never said or done the things I did and I was wrong.

4   Since then I have learned from it all and made an honest

5   change within myself.  I'm no longer that person I was when I

6   first stood in this courtroom.  I was a young and angry and

7   confused kid with no real idea what I was doing or the

8   consequences that carry with it.

9       Since my incarceration, I've done a lot of thinking,

10  especially during the last nine months as I spent my time at

11  Terre Haute prison on the death -- on the death row unit in

12  complete isolation.

13      I was not able to see nor speak to a single person.  I

14  wasn't allowed to do anything.  There are so many

15  restrictions.

16      Being alone in silence, I looked inward and I was able to

17  find myself and where I went wrong.

18      Since the time of my arrest, I've learned a lot.  I've

19  been called the worst of names.  I've been assaulted by both

20  inmate and staff.  I've been mocked for my faith and put in a

21  state of complete hopelessness and depression.

22      For a time I began to feel like the troubles I began to

23  encounter were too much for me to bear -- the humiliation, the

24  depression, the ill treatment, the loneliness and the

25  hopelessness -- and it made me want to just give up.

92

1    Sometimes I just sit in my cell in tears, not eating,
2  contemplating suicide.

3    There've been times where I couldn't sleep as well.
4  Although I did contemplate suicide, I never acted upon it,
5  knowing it was not the solution.  It was wrong, so I never
6  attempted it.  I, instead, kept a firm grip onto my faith and
7  faced it head-on.  It's been a very difficult -- it's been
8  very difficult, but I survived.

9    During my time incarcerated, I was constantly attacked for
10  my faith as a Muslim, both physical and moral.  At times I
11  felt like leaving -- leaving my faith because of this but know
12  I shouldn't, and it was the one thing that kept me going.  If
13  I were to do so, I know that I'll feel even more hopeless and
14  depressed, likely even take my own life.  Instead, I kept the
15  faith, held my head up high and -- was struggling too many
16  obstacles that crossed my path.  It was my faith that kept me
17  alive up until this time today.

18    With my religion, I have meaning and purpose and
19  understanding and hope.  My religion teaches me to do good and
20  live righteous and how to do so.

21    I hope not my being -- coming here today as a Muslim or
22  upon me having a beard, that doesn't have you see me for who
23  me -- see for me or the change I actually made [verbatim].
24  It's not your appearance but your actions that make and show
25  you what you are.  Just 'cause I'm a Muslim and I have a beard

1   doesn't make me a terrorist, or anyone else.

2       I have morals and care for all life.  I do not believe in

3   killing people or anything else -- anything else the

4   prosecution or anyone else might claim.  I believe that all

5   life was made sacred.  And for a person to take even a single

6   life, even by killing all of humanity -- excuse me -- I do not

7   encourage people -- I do not encourage or promote violence or

8   hate, but rather only peace.

9       Our religion of Islam is not one of violence or hate but

10  is of peace, and I myself am a peaceful Muslim.  Not only am I

11  a peaceful Muslim, but I'm a good and caring human being who

12  would do anything for any person no matter their status,

13  beliefs or race [crying].

14      I'm not a bad person.  I made bad decisions.  I'm only a

15  human being at the end of the day.  I will make mistakes and

16  will sin from time to time.  That's only because I'm a human

17  being.  And as a human being, I'm not perfect nor is anybody

18  else in here.  We can only be the best we can -- we can only

19  be the best we can be in this life.

20      We all will -- we all have and will say and do things we

21  don't mean to others and later regret those things, but we

22  forgive -- we will forgive one another, learn from our

23  mistakes and move forward, and that's what I hope we can do --

24  do here today.

25      I hope to get out of here still a young man with a life

94

1 left to live.  I've not really got a chance to live yet.  I

2 was 20 years old at the time of my arrest.  I'm now 22.  I do

3 care about my life and want to make something out of myself.

4 I want to be out of here one day with my family as a free and

5 a happy person again.

6     Mrs. Beckwith, I ask that you please allow me a second

7 chance at life.  I promise to you and everyone else that I'll

8 never go back to the way I was living before nor find myself

9 back in this courtroom.  I will take up a trade and come out

10 as a productive citizen within society.

11     I'm not a threat or danger to the country or community and

12 can and will prove this to you.  I will get involved in

13 community service and activities, things that will help make

14 our community safer and clean again.

15     Miss Beckwith, I understood when I came here today that I

16 must be punished for my actions, and I won't disagree with

17 that.  What I ask you is that you take all that I've said

18 today here into consideration, and the fact that I've shown

19 both you and your courtroom the proper respect -- respect

20 since the beginning of this all.

21     If I was the terrible person the prosecutor, the media,

22 and everyone else makes me out to be -- and I've been the

23 complete opposite here in the courtroom today -- I would have

24 come in here with words of hate and causing a disturbance, but

25 I didn't.  That is because I'm truly a different person than I

95

1   was and what everyone makes me out to be.

2       I would like to mention the fact that never has the

3   prosecutor or any others demonized me have ever visited me and

4   seen me in tears as I sat in my jail cell, so what they say

5   about me and who I am has no credibility.

6       I understand that I've done many awful things while

7   incarcerated. But let me also mention that it's been over ten

8   months since I've been in any serious trouble.

9       The things I said today, I didn't say simply to get a

10  lesser sentence, as the prosecutor might claim. Though I do

11  want a lesser sentence, I don't feel the way I do because I

12  was caught, but I feel the way I do because I learned my

13  lesson and I have changed.

14      All of what I said today to you is the complete honest

15  truth. Everything I said I did mean.

16      Miss Beckwith, I can offer so much to this world and do

17  great things if just given the opportunity, a second chance.

18  So, please, as you begin to make your final decision now,

19  forever change a life and a family, make it one that is

20  reasonable, and be as lenient as you can be.

21      Please listen to what has been said on both sides of the

22  courtroom and see me for what I've shown to you and not what

23  the prosecutor nor anyone has made me out to be.

24      I would like to conclude by saying thank you for this

25  opportunity today to be in your courtroom to speak. I do

96

1  appreciate it, and now I'll leave the rest to you, Miss

2  Beckwith, as I have done what I needed -- what was needed of

3  me.

4          THE COURT:  Thank you.

5          MR. PINALES:  Thank you, Your Honor.

6          THE COURT:  You can resume your seat.

7      Mr. Pinales, do you have anything else you'd like to add

8  before the government makes its closing remarks?

9          MR. PINALES:  No, Your Honor.  Thank you.

10          THE COURT:  Okay.  Mr. Mangan?

11          MR. MANGAN:  Your Honor, I know you have a tremendous

12  amount of material before you in this case, and with the

13  proceedings today, you probably know more about this defendant

14  than you know about many of the defendants that get to come

15  before you for sentencing, and so I don't want to belabor all

16  the details and all the information that -- that you're well

17  aware of.

18      I do want to note you've got factors to go through.

19  That's kind of the root analysis that the Court needs to go

20  through and it always starts with the Sentencing Guidelines,

21  as you went through them already.  The fact of the matter is,

22  the numbers that come out in that analysis are pretty stark.

23  Even if you didn't count Count 3 or some of these other things

24  or the obstruction, you would end up in the Guidelines that

25  say Life.  And it's only the statutory maximums that lead to a

97

1    lower guideline range, which is 40 years.  So the plea

2    agreement that's been put before the Court with the cap of

3    30 years is already contemplated, a downward variance of ten

4    years to the sentence that the government is recommending.

5    The 30-year sentence would have Mr. Cornell come out of prison

6    sometime in his mid 40's, and so if the Court were to accept

7    the plea agreement, it comes down to whether he could get out

8    at that age or some age lower than that.

9        But when you look at the Guidelines, I realize that we're

10   talking about something lower than the Guideline sentences.

11   But what's clear from the factors in there is that a terrorism

12   case is different.  That's made clear in numerous parts of the

13   Guidelines.  It's treated differently for very important

14   reasons:  They're unique cases.  They're uniquely offensive to

15   the government and to the country.  That's why they're treated

16   this way.

17       We also know the target matters.  If someone is going to

18   go after government employees or government buildings, that's

19   different.

20       If there's a threat to a victim -- or, excuse me, a

21   witness, that matters in the Guidelines because it matters to

22   our system.

23       Those are all things that are factored in and why he's

24   facing such a stiff sentence.  And the use of a gun matters as

25   well.

98

1    So as you look at all of it, we're starting with the point

2    in the Guidelines that is ten years above where the plea

3    agreement is.

4    So the plea agreement is there and the recommendation is

5    there at a lower level of 30 years in part because we are

6    trying to factor in all of these other considerations and to

7    look at the landscape of other cases that are out there.

8    I'm not going to go through all the cases because I know

9    they have been set forth for the Court.

10   The one thing that I think the Court can notice is that,

11   one, when there's a violent attack being plotted in a

12   terrorism case, that's given a higher sentence typically.

13   When there is a plotted attack against a government

14   installation, such as the *Khalifi* case which was against the

15   Capitol or *Nafis* or *Martinez*, those tend to get higher

16   sentences.  Those three cases came out in 30 years, 30 years,

17   and 25 years.

18   Obviously, the *Khalifi* case is the closest the Court can

19   come to a comparable because that was an attempt to blow up a

20   bomb at the U.S. Capitol.

21   But to cut through all the fog, the fact is what we know

22   is there are significant sentences for those types of cases.

23   But as the defense acknowledges, there is no case like this.

24   There really is no case quite like this.  And, frankly, the

25   factors that make it different are aggravating, not

1   mitigating.

2       It's different because he chose to do this on a particular

3   event. It wasn't simply "I want to attack a government

4   installation." He wanted to attack the U.S. Capitol because

5   he wanted to attack the members of Congress and he wanted to

6   attack people in the government, and he eventually settled on

7   a plan to attack the State of the Union, the only annual

8   address to the country, because he wanted to have that

9   significance.

10      And you've heard in the case -- or in the video how to him

11  9-11 didn't do much because it didn't impact the government.

12  He wanted to attack the government. That's what was

13  significant to him. So the timing and the placement and the

14  targets were specific to that goal. So this is different.

15      The fact that he threatened a witness is different. We

16  don't see that in these other cases.

17      I know they want to make a distinction between those that

18  press a trigger on a pipe bomb versus his plot. I don't think

19  they've -- that's a distinction without a difference.

20      In fact, what we're dealing with there is the defendant

21  himself chooses the plot. They choose what kind of attack

22  they want to do. He originally started with pipe bombs and

23  guns. He eventually settled on doing the guns. He picked the

24  gun store. It was down the street from where he lived. He

25  picked out the type of guns online, everything. It was his

100

1   idea to do it as a firearm attack.  And I don't think it makes

2   a whole lot of difference for us to get into a debate about

3   which is the more lethal means of conducting a violent attack.

4   The fact is, he was trying to do the exact same thing as those

5   that were trying to do with a bomb.  He just was going to do

6   it with semiautomatic weapons.  For them to bring a

7   plausibility argument is missing the point.

8       Look, we're dealing with very, very unique times.  The

9   fact is, it doesn't matter sort of what the plan was going to

10  turn out to be at the end of the day.  When they bought those

11  guns -- look, by the end of that night, they would have been

12  in Washington, D.C. with two semiautomatic rifles and 600

13  rounds of ammunition and a person who is as committed as you

14  will see to commit an act of violence.  Where it would have

15  gone from there, who would have ended up dead, who knows?

16  Fortunately, we won't have to find out.  But the fact is, what

17  we're dealing with here is it's not about this being

18  farfetched as the defense claims.

19      Look, people have attacked the Capitol before.  In the

20  '50s, four people got into the Capitol and shot it up.  They

21  got sentences in the 75 years' range.  No one was killed, but

22  the fact is that has happened.

23      In '94, an individual, who was mentally disturbed,

24  attacked the Capitol, killed two Capitol guards -- or two

25  Capitol police officers.

1    Then you have in the last year or so an individual who was

2  inspired by ISIL, took a firearm, killed a guard at a monument

3  and then went and attacked the Canadian Parliament and got

4  into the lobby and shot -- shot at numerous people before he

5  himself was killed.  And that was an attack that the defendant

6  himself celebrated and was very happy that it happened and was

7  trying to learn from it and talked at length with the

8  informant about what they should do differently, how they can

9  do it better than that person.

10    But to say this is farfetched misses the point.  It's

11  2016.  We are seeing attacks that we've never conceived of

12  before.  We don't have to go outside our district to know that

13  lesson.

14    So even a -- even a rash plan with less than lethal means

15  can injure or even kill people.  The fact is, we have an

16  individual here who was fully on board with doing something

17  like this.  It was just a matter of when.  It really was just

18  a matter of when and where.

19    With respect to the threat to the informant, or to the

20  witness, I think in another type of case that would get a much

21  larger share of the attention.  I think in this case it

22  somewhat gets overwhelmed by the nature of the offense itself.

23  But the fact is, we are talking about protecting the integrity

24  of our system in terms of using witnesses, in terms of having

25  trials that maintain the order -- the order of our criminal

1    justice system.

2        And I know they want to blame it a little bit on the

3    individual he met at Chicago, but the fact is the Court knows

4    from the record he started hunting down the true identity of

5    this informant long before that and went to great lengths to

6    do so.  And it doesn't matter if he named the right person.

7    That's terrible.  If he named the wrong person, that's

8    terrible -- right? -- because we're putting out a threat to an

9    innocent party in that respect.  It doesn't matter.  That's

10   not what you're supposed to do.  And, frankly, in the

11   Guidelines, the threat -- the obstruction of justice sort of

12   gets lost in the math.  But the fact is it is significant.  It

13   is different.  It's an aggravating factor.  And this is not --

14       Look, this is a year after he was arrested.  So you're

15   talking about somebody who showed, to the extent they think he

16   had changed at that point, he clearly hadn't and we were still

17   dealing with somebody who was lashing out and acting in a very

18   threatening, violent, impulsive manner even a year after the

19   arrest.  So whatever impact the arrest might have had in other

20   cases, it did not sober him in the least.

21       One of the other -- you know, I'll talk a little bit and

22   touch on the characteristics briefly with respect to the

23   nature of the offense.  But the fact is, they do point to the

24   informant.  While not blaming him, they're trying to say,

25   "Well, he found a kindred soul and that emboldened him."  Part

1    of the reason we wanted to play this, that selection, was that

2    we have hours of recordings between the defendant and the

3    informant, and I know the Court has read some of the summaries

4    of that.  But that was a pretty good sample.  Mr. Cornell is

5    doing all the talking, he is bursting with ideas, and the

6    informant is simply there to take it all in.  Obviously, we

7    noted in there that we couldn't risk him acting alone or

8    finding a different person to act with him.  So, really, all

9    -- all the informant is tasked with is saying, "Okay.  I'm

10   with you.  What is it you want to do?"  And that's -- we find

11   out there's a lot he wants to do, and there's a lot he has

12   already been doing and planning and organizing and getting his

13   thoughts together.

14       They even summarized how -- the fact that the informant

15   tried to calm him down in a number of instances, tried to slow

16   him down, tried to temper his anger towards his co-workers,

17   towards his family.  But at the end of the day, I think the

18   defense summarized it pretty well:  The house was already

19   burning.  And that's a very accurate description of what we're

20   dealing with.  He had already been way down the path in terms

21   of being radicalized and having violent plans.

22       I know they mentioned something about his "Message to

23   America" being copied from other -- you know, speeches from

24   Anwar Al-Awlaki and some others.  The fact is, that's pretty

25   common with individuals who have committed these types of

104

1    terrorist attacks, including the individual who did the

2    *Charlie Hebdo* attack.  They used the same speeches.  They

3    cribbed from the same types of propaganda.  And even that

4    speech, the *Charlie Hebdo* speech, was one that Mr. Cornell

5    had.  So that's not uncommon.  That doesn't mean that he

6    wasn't going to do what he planned to do.

7        And this kind of goes back to his present state.  I know

8    Mr. Cornell has talked about where he is right now and his

9    feeling of remorse and regret, and I hope those are sincere

10   and I hope he is heading in that direction, you know, for all

11   the time to come.  Do we know that's going to be the case?

12   It's really hard to say that.  I think even Dr. Bresler would

13   admit that this has been a very unpredictable individual to

14   deal with.

15       We know he was radicalized outside of prison.  And

16   according to what they describe today, he was further

17   radicalized in prison.  So what's going to happen to him from

18   here, we really don't know.

19       What we know --

20       And so I don't want to say that I don't believe his

21   statements now regarding regret or remorse; however, there

22   were statements in Mr. Cornell's letter saying that "I never

23   was going to do this.  I really wasn't going to do it.  I

24   didn't plan to harm anybody."  That's just not true.  I think

25   everything that this Court has seen in the materials shows

1   that he was fully committed to this.  And at the time he was

2   arrested in January of 2015, he was a ticking time bomb, and

3   we're fortunate that no one was killed or injured.  But the

4   fact is, he has had all of the intent, all -- all the

5   materials to commit one of the more, you know, audacious and

6   terrible acts of terrorism that we've seen plotted, so it

7   needs to be treated that way.

8       The one thing I'll note in listening to Dr. Bresler was, I

9   know this Court has to look at the other factors -- you know,

10  promoting respect for the law, just punishment, protecting the

11  public, deterrence.  With the words that Dr. Bresler used,

12  there's really nothing comforting about his descriptions of

13  Mr. Cornell that gives the Court a whole lot of confidence

14  that where he is right now mentally is where he's going to be

15  in six months or 12 months, or anytime after that.

16      It's hard to be bullish on someone who has changed

17  direction so impulsively, so quickly, so many times in this

18  short period of time.

19      The words used:  Disturbed; an unusual young man; an odd

20  bird; having a temper; a loner who lacks social skills;

21  obsessed with topics; not interested in turning the other

22  cheek; angry; depressed; socially anxious; may adjust poorly;

23  easily influenced by others, including other inmates.

24      So I don't think it's -- I would say predicting the future

25  for him is very difficult and it's hard to be bullish about

106

1    how it's going to turn out.  I hope for the best, but we don't

2    know.  We simply don't know.

3        What we do know is the Court needs to consider these other

4    factors, such as promoting respect for the law, providing just

5    punishment, protecting the public, and deterring this type of

6    conduct.

7        I know the defense takes issue with the deterrence factor

8    saying that, you know, we don't know that that means anything.

9    I would submit to the Court that, and I'll leave it with this,

10   that this -- if there's any case where deterrence is critical,

11   it is this type of case, because we're dealing with a crime

12   where the defendant, first of all, is inspired by other

13   crimes, wants to commit a violent crime himself, and hopes,

14   hopes to inspire others to do the same thing.

15       This is the type of crime where they're trying to become

16   part of a domino effect, where they're trying to have a ripple

17   effect, and that's unique.  You don't have individuals going

18   out there committing fraud, hoping to inspire others to commit

19   fraud or doing a drug deal hoping to inspire others to become

20   drug dealers.  This is different.

21       Look at -- look at the situation we're in now.

22   Unfortunately, we know about all the terrible terrorist issues

23   we've had to deal with nationally the last couple of years.

24   But, unfortunately, we don't have to look beyond our district,

25   and that's a sad, sad reality for us.  But we've had

1    significant cases, like this defendant, who's been arrested

2    with heinous plots.  And we've also had two individuals who on

3    their own chose to go out and commit violent attacks -- first

4    the machete attack in February up in Columbus and then most

5    recently The Ohio State attack.  That is the reality, that is

6    the true context in which today's sentencing occurs.  We can't

7    say this is farfetched.  We can't say, "I wasn't going to do

8    it."  It is happening.  People are doing it and they are doing

9    it for the sole reason to create terror, to create fear, and

10   hope that others take up the cause.

11       At one point Chris Cornell wrote about, after he was

12   arrested, that when his gun fell, he wants others to pick it

13   up.  That is the problem with these types of cases; that is

14   why they're so scary and difficult and challenging.

15       So when the Court looks at all of these factors, we

16   believe that the sentence that's being recommended, which is a

17   downward variance from the Sentencing Guidelines, this

18   sentence that we're recommending of 30 years does promote

19   respect for the law, does provide just judgment, does protect

20   the public, and it will afford adequate deterrence.  So we ask

21   for a sentence of 30 years followed by lifetime supervision.

22       Thank you, Your Honor.

23           THE COURT:  Mr. Pinales, any response?  I'll give you

24   the opportunity --

25           MR. PINALES:  Thank you, Your Honor.

108

1       THE COURT:  -- for a last word or two.

2       MR. PINALES:  Thank you.

3   I'll try and be brief, but it will be "or two."

4   This Court has the task, which I don't envy, of coming up

5   with a just sentence.

6   "Just" -- many people can look at the word, the sentence,

7   through different eyes, and one person can see a just sentence

8   for 30 years, another might see a just sentence for much less

9   than that.

10   One thing we all agree on is this case is unlike a lot of

11   others.  But I think it's important for this Court to look at

12   all of the others, at all of the punishments around the

13   country and within this district to come up with that just

14   sentence.

15   We filed a Sentencing Memorandum that had a great many

16   comparables to which the government filed a response and

17   attached an exhibit, which I think has been most helpful for

18   the defense because this case may be unlike all others, but

19   many of those other cases are so much unlike ours for a number

20   of different reasons.

21   Dr. Bresler termed it that Chris had "magical thinking."

22   This whole plan was a magical plan, compared to other plans

23   where sentences have been given out.  In many of the cases

24   that the government cited to the Court --

25   And just now they refer to the *Khalifi* case with the

1  Capitol.  Mr. Khalifi had a bomb and left and pushed a button

2  which he thought was the detonator.  He was in Washington, and

3  pushed the button to blow up the Capitol.  Chris was in

4  Cincinnati.  He didn't push a button, but had a magical

5  thought of blowing up or shooting up the Capitol.

6      In other cases that were cited by the government with the

7  sentence that was shown by the government, the defendant used

8  a cellphone to push a button.  Whether it was underneath a

9  20-story building where the defendant thought that there was a

10 car bomb there and could push the button and did push the

11 button and nothing happened because it wasn't a real bomb but

12 he tried and it could have, Chris was in Cincinnati.

13     Whether it was going to a Christmas lighting ceremony with

14 a fake bomb and pushing a button so it would detonate, Chris

15 was in Cincinnati.

16     Now, I'm not negating that Chris needs to be punished.

17 We're here for that.  The question is how much?

18     The 30-year sentences that were cited, the 28-, 24-year

19 sentence that was cited by -- by the prosecution, the second

20 one on their exhibit, the person had a cellphone detonation

21 and the truck was parked, he walked away from the truck, he

22 pushed the button and it was a fake bomb.

23     A 28-year sentence was for a federal courthouse where the

24 accused had activated a timer and walked away from the federal

25 courthouse and nothing happened because it was not a real

110

1   bomb, but he activated in his mind that bomb.

2        Putting weapons under a bridge between Cleveland and Akron

3   that didn't go off but the weapons were placed there, that

4   wasn't a religious jihadi but it was a white supremacist.  But

5   it's still an act of terrorism.

6        When Mr. Mangan mentioned that we have to look even within

7   our own district, just a couple of weeks ago I went to the

8   sentencing of a young man named Munir.  I had the opportunity

9   of hearing the argument by defense counsel and hearing the

10  argument by the government.  Mr. Dittoe and Mr. Mangan were

11  the government, and it is their words that I want to talk

12  about.

13       The defense attorney raised the same issues that I'm

14  raising of looking at comparable sentences around the country

15  and looking at the activity itself.  And in that case,

16  Mr. Mangan said about that defendant in this courthouse two

17  weeks ago, "This is all his writings, all his thoughts; he was

18  not just retweeting."  But today he said it's okay -- very

19  wrong -- because Chris was taking the other ideas.

20       He talks about the activities of Chris today after his

21  arrest, and we can't say that that was right, but, in that

22  other case, Mr. Mangan used the words all -- "What he did has

23  already been factored into our plea agreement."

24       What was the things he had done?  Let's talk about that

25  and compare it to this one.  That defendant was in contact

1   with ISIL.  He was taking orders from ISIL, and he had been

2   given the orders to kidnap and kill a specific person who's

3   name was given to him by ISIL, behead him, and put that tape

4   on the Internet.  That person lived in Cincinnati, and Munir

5   was in Cincinnati.  That was a very specific, non-magical plan

6   of terror.

7        Chris's plan was to go to Washington -- and it's in all of

8   the discovery -- to be wearing his sandals in January, to walk

9   down with his kufi on, having a rifle, walking down on the

10  State of the Union Day, on the streets of Washington, and

11  somehow get into the Capitol.  This was his magical plan.

12       Munir, who was sentenced two weeks ago in this courthouse

13  to 20 years, had a plan that was a real plan, a doable plan

14  and one that could have been carried out but for the

15  intervention of the informant from that case.  That person

16  wrote a letter to court that was read by apparently the

17  defendant right at the moment of sentencing.  They took a

18  moment so that everybody could read it.  And in that letter,

19  the informant talked about the fear that he had for himself

20  and for his family.  And in that case Mr. Mangan said, "That's

21  a real victim that we have here."

22       The other cases were for a building, for a process, but

23  not a real victim like we have here, even if they did push a

24  button on a bridge or a building.  That was a case that

25  apparently the No. 3 man in ISIL was directing Munir, gave him

112

1    the target, told him to activate this plan, gave him the plan.

2    That same person who had his ear was the one who directed the

3    Garland, Texas activity.

4        In our case, we have the informant --

5        And we are not saying that the informant made Chris do

6    this, but we are saying the informant encouraged.  And at one

7    point Chris wanted to back out and the informant said, "I

8    drove 13 hours to get here.  I'm ready to go."

9        And as we heard, the informant in this case was not the

10   No. 3 man, but he fertilized the seed that was in Chris.  He

11   gave him books -- books that were trained to help him, to

12   teach him, books that I can't pronounce the name of, but it

13   reads, "The Call to Jihad, Fighting for Allah's Cause in the

14   Koran.  Praise be Allah who has ordained our jihad with the

15   heart, with the hand, with weapons, with the tongue and

16   speech."

17       This Court has to mete out a fair sentence.  And I'm not

18   negating what Chris did.  This Court has to give out a

19   sentence that is a deterrent, that gives an opportunity for

20   rehabilitation, and that is fair in relation to other

21   sentences like this.

22       And while there is no other sentence like this -- no other

23   case like this, there are comparables that we can look at.

24   And I submit to the Court 30 years is one-and-a-half times

25   Chris's life.  I submit to the Court that 30 years is a

113

1     detrimental sentence to Chris as a human being.

2        Do we throw him away because of his crime?  Do we crumble

3     him like a piece of paper and trash him?  I submit we do not.

4     I submit he is salvageable, and I believe a sentence between

5     10- and 20 years is a very fair, a very long sentence.  A

6     20-year sentence is how old he lived before he was arrested.

7        I don't envy this Court, this is a difficult case, but I

8     hope the Court will show some compassion.

9        Thank you.

10            THE COURT:  Anything further from the government?

11            MR. MANGAN:  No, Your Honor.

12            THE COURT:  Okay.  Well, everyone reasonably

13     comfortable, or do you need a break before I tell you what I'm

14     thinking?

15            MR. PINALES:  I'm thinking I'd like a break right

16     now, Your Honor.

17            THE COURT:  Okay.  Let's just take a 15-minute break.

18            MR. PINALES:  Fine.

19            THE COURT:  And when you come back, I'll share my

20     thoughts with you and state a tentative sentence and then give

21     everyone the opportunity to respond.

22            MR. PINALES:  Thank you.

23            THE CLERK:  All rise.          (12:39 P.M.)

24                      *  *  *

25     <u>BEFORE THE COURT</u>          (12:57 P.M.)

114

1          THE COURT:  Okay.  I will announce my thinking in

2     this matter and there will be a written record of my findings

3     and determinations, also called a Statement of Reasons, that

4     will be appended to the presentence report that will go to the

5     Bureau of Prisons and will be filed under seal in the Court's

6     docket.

7          After I give my reasoning, I will state a tentative

8     sentence, after which counsel will be invited to raise any

9     objections that they have not previously raised and argued

10     pursuant to the *Bostick* case.

11          Let me say at the outset that I will now formally accept

12     Mr. Cornell's guilty pleas to Counts 1, 3, and 4 of the

13     Superseding Indictment and the plea agreement pursuant to

14     which he entered those pleas.

15          Just for the record, that plea agreement calls for the

16     government to dismiss Count 2 in partial consideration of

17     Mr. Cornell's guilty pleas.

18          At the outset of the hearing today I reviewed the

19     Guideline sentencing ranges in this case.  And just to refresh

20     recollections, I would say that Counts 1 and 4 carry up to

21     420 months of imprisonment based upon an Adjusted Offense

22     Level of 43 and a criminal history category of VI.

23          Count 3 carries a minimum five-year consecutive prison

24     sentence.

25          The supervised release provisions are as follows:

1  Counts 1 and 4, up to Life terms.  Count 3 carries a term

2  of supervised release of two to five years, and that would run

3  concurrently with the terms of supervised release on Counts 1

4  and 4.

5  There were no objections to the Presentence Report filed

6  either by the government or the defense.  The parties,

7  however, have entered into a plea agreement pursuant to Rule

8  11(c)(1)(C) of the Federal Rules of Criminal Procedure.

9  And as I said, the Court accepts the plea agreement and

10  the agreed sentencing limitation.  The plea agreement calls

11  for a sentence of incarceration not to exceed 30 years total.

12  The Sentencing Guidelines do not control the determination

13  of a sentence in this case.

14  Subsequent to the Supreme Court decision in *United States*

15  *versus Booker*, the Court must consult the Guidelines and take

16  them into account when imposing a sentence.

17  In this case, however, as I said, the Court has accepted a

18  plea agreement, which to the Court seems fair and appropriate

19  under all of the circumstances, calling for a total sentence

20  of not more than 30 years' imprisonment pursuant to Federal

21  Rule of Criminal Procedure 11(c)(1)(C).  Accordingly, the

22  Court is required to impose a sentence within the limit

23  provided by the plea agreement.  And as Mr. Mangan has pointed

24  out, the limitation in the plea agreement frees Mr. Cornell

25  from what might have otherwise been a sentence ten years

116

1  longer than the 30 years' limitation in the plea agreement.

2      The Court has considered the Sentencing Memorandum of the

3  United States, Document No. 123 in the record of this case;

4  the presentence evaluation report of Dr. Scott Bresler,

5  Document 125; the Sentencing Memorandum of Mr. Cornell,

6  Document 126; and the memorandum of the United States in

7  response to Mr. Cornell's Sentencing Memorandum, which is

8  Document No. 127.  The defense has also filed information

9  regarding other arguably comparable cases in Document 129.

10     I have considered all matters brought before the Court

11  bearing on the factors set forth in Title 18, United States

12  Code, Section 3355(a).  Those factors include the following,

13  to the extent that they are pertinent in this case:

14  First:  The nature and circumstances of the offense and

15  the history and characteristics of the defendant;

16  Second:  The need for the sentence imposed:

17      (A) to reflect the seriousness of the offense, to

18      promote respect for the law, and to provide just

19      punishment for the offense;

20      (B) to afford adequate deterrence to criminal

21      conduct;

22      (C) to protect the public from further crimes of the

23      defendant; and

24      (D) to provide the defendant with needed educational

25      or vocational training, medical care, or other

1    correctional treatment in the most effective manner;

2    Third:  The kinds of sentences available;

3    Four:  The sentencing range established by the guidelines;

4    Five:  Any pertinent policy statement issued by the

5    Sentencing Commission that is in effect today;

6    Six:  The need to avoid unwarranted sentencing disparities

7    among defendants with similar records who have been found

8    guilty of similar conduct; and

9    Seven:  The need to provide restitution to any victims of

10   the offense, which is not applicable here.

11       In particular, the Court has considered the following:

12       The nature and circumstances of the offense, which are

13   horrific.  The defendant intended, and took active steps to

14   commit mass murder in the Congress of the United States in

15   conjunction with the President's annual State of the Union

16   Address.  Additionally, he hoped to assassinate the President

17   and at one point to attack the Israeli embassy.

18       Mr. Cornell was unconcerned about innocent civilians,

19   including children, who might be harmed in the course of his

20   rampage.  And I would just cite Document No. 123 at page 8 in

21   support of that.

22       He repeatedly expressed his admiration for the Islamic

23   State of Iraq and the Levant (ISIL) terrorists who slaughtered

24   innocent people in the *Charlie Hebdo* attack, the attack on the

25   Canadian Parliament, and the hatchet attack on New York City

118

1   police officers.  The defendant wrote, quote, "I feel honored

2   to be called a terrorist because it means that you strike

3   terror in the hearts of the Kufr."  "Kufr" meaning

4   non-believers, non-Islams.

5       Only the timely intervention of law enforcement arresting

6   Mr. Cornell immediately after purchasing two semiautomatic

7   rifles and approximately 600 rounds of ammunition prevented

8   the bloodshed intended by Mr. Cornell.  Even after Mr. Cornell

9   was arrested, he continued his attempts to rally others to

10  commit violence against Americans and American institutions by

11  giving a news interview glorifying himself and violence

12  against "the West."

13      With the help of his father, Mr. Cornell sought to

14  identify the confidential human source, also known as the CHS,

15  who he believed had betrayed him.  He published a profile of

16  the CHS on the Internet urging others to kill him and his

17  family.

18      Mr. Cornell and his father persisted in these efforts

19  despite warnings from law enforcement agencies that their

20  activities were being monitored.

21      Mr. Cornell took printed transcripts of his meetings with

22  the CHS from the government's discovery production in a

23  further effort to identify the CHS.  As a consequence of

24  Mr. Cornell's evasions of restrictions on the use of the jail

25  computer and right to use the U.S. mail, Mr. Cornell was

119

1   removed from the local jail where he was being held and

2   transferred to a federal facility where he could be more

3   closely monitored.

4       Mr. Cornell began his affiliation with ISIL -- or at least

5   the ISIL cause -- in 2014 and was arrested on January 14,

6   2015.  He's been held in custody ever since.  It was not until

7   February or April of this year that Mr. Cornell claimed in

8   letters to his family that he had shaved his head, where he

9   had previously had long, Islamic-styled locks, and was no

10  longer practicing any religion.  He claimed he now felt

11  better.  However, defendant has since indicated that he wishes

12  to continue to practice Islam, although he claims a more

13  moderate form of Islam.

14      Mr. Cornell's commitment to a law-abiding lifestyle and

15  renunciation of violence seems very late in coming.  Many of

16  the cases cited by the defendant involve defendants who

17  renounced violence immediately upon their arrest and in some

18  cases became government cooperators.

19      Mr. Cornell's break from Islamic radicalism seems, in the

20  Court's opinion, tentative at best.  The Court further notes

21  that Mr. Cornell does not seem to have expressed any genuine

22  remorse for his actions.  He says he is remorseful, but that

23  seems directed more towards the inconveniences visited upon

24  his family as a result of his behavior, his arrest, and his

25  incarceration, rather than the public at large, the Islamic

120

1    community at large.  It's very concerning to the Court, as I

2    said, the late claim of remorse.  Even Dr. Bresler, his

3    defense expert, calls his remorse gallows remorse -- remorse

4    when faced with the actual consequences of his actions.

5        Mr. Cornell's prior criminal history is objectively

6    minimal, but it is noteworthy that his two domestic violence

7    charges involve attacks upon his parents.  This clearly

8    suggests an aggressive and defiant attitude toward authority

9    figures.  Indeed, Dr. Bresler in his psychiatric evaluation

10   indicates that Mr. Cornell displayed Oppositional Defiant

11   Disorder behavior in grade school.  The balance of his life to

12   date reflects the symptoms of this impairment.  Ultimately,

13   Dr. Bresler concludes that the defendant suffers from

14   Schizotypal Personalty Disorder -- that's in Document 125 at

15   pages 22 to 23.  Mr. Cornell engages in, quote, "magical

16   thinking" and has a, quote, "propensity to distort reality,

17   possibly to psychotic proportions."  That's in the same

18   document at page 20.

19       It seems clear that when not actively assisting their son

20   in his blood-thirsty plans, such as doing harm and violence to

21   the confidential informant, his parents are completely

22   overwhelmed by the magnitude of his disorder.  They cannot be

23   expected to be helpful in their son's rehabilitation.

24   Dr. Bresler believes, quote, "There is no reason to believe

25   that Chris cannot or will not make positive changes while

1    residing in prison" -- again in his report at page 24.

2    The Court, however, sees little hope for someone who has been

3    so wholly out of control for nearly two decades and has no

4    supportive family or friends to help in his rehabilitation.

5        While his family members profess love for him, it's

6    obvious by the circumstances that we face today that none of

7    them has been able to help him in the past or would be

8    equipped to help him in the future.

9        Mr. Cornell's offenses are extremely serious and the

10   nature of these offenses demands a significant sentence to

11   promote respect for the law and to provide just punishment.

12   Adequate deterrence to further criminal conduct by this

13   defendant and other like-minded individuals can only be

14   accomplished by a significant sentence.  Closely related to

15   deterrence, per se, is protection of the public from further

16   crimes of Mr. Cornell.  It may be possible that Mr. Cornell

17   would benefit from behavioral or psychiatric treatment within

18   the federal correctional system, as it appears that

19   Mr. Cornell presently needs to be in a controlled environment

20   in order to focus on a treatment regimen.

21       The kinds of sentences available and the Guideline ranges

22   have been discussed previously in these remarks.

23       The need to avoid unwarranted sentencing disparities among

24   defendants with similar records who have been found guilty of

25   similar conduct is acknowledged by the Court.  Yet the Court

122

1   notes that no two defendants or cases are sufficiently alike

2   to require identifiable sentences and none have been presented

3   to the Court.

4       The Court notes the cases of other defendants found guilty

5   of terrorist-related activities cited in the defendant's

6   sentencing memorandum and in the government's memorandum in

7   response to defendant's sentencing memorandum for comparison

8   purposes.  However, without the benefit or access to these

9   defendants' presentence reports, transcripts of their

10  sentencing hearings, or statements of reasons from their

11  judgment and commitment orders, the Court finds it difficult

12  to draw helpful, meaningful comparisons.

13      The Court is concerned about Mr. Cornell's facility with

14  computers, as reflected by his shutdown of the entire computer

15  system at his grade school when he was only in the fourth

16  grade, along with his refusal to reactivate the school

17  computer system until forced to by his parents.

18      Mr. Cornell circumvented the restrictions on the county

19  jail computer to gain access to the Internet and disseminated

20  his violent beliefs.  He called for others to commit crimes of

21  violence against the West and the person, the CHS, who he

22  believed had betrayed him.  Mr. Cornell has the ability to

23  reach beyond his jail cell to inflame others against American

24  citizens.  He's able to manipulate other inmates to assist him

25  in mailing out his, quote, "Message to America," close quotes,

123

1   call to violence.  He managed to communicate with someone in

2   another state to execute an attack on the United States

3   Government and the CHS, despite the attempts of jail personnel

4   to confine his virulent messages.

5       Although Mr. Cornell is relatively young and has recently

6   expressed remorse for his actions and has technically accepted

7   responsibility and entered timely pleas, the Court believes

8   that he remains dangerous and susceptible to falling prey to

9   jihadists or other extremist propaganda.

10      The Court reminds all concerned that this is a sentencing

11  hearing, not an intervention convened for the purpose of

12  helping Mr. Cornell in regaining a balanced outlook on life.

13  And while this is an individual human tragedy in terms of

14  Mr. Cornell and his family, it could have been much, much

15  worse.

16      So with all of this in mind, the Court concludes that a

17  total sentence of 30 years' imprisonment followed by a

18  lifetime of supervised release will best serve to fulfill the

19  need to impose a sentence that is sufficient but not greater

20  than necessary to achieve the goals of sentencing.  And I

21  would conclude as follows:

22      That Mr. Cornell should serve 240 months' imprisonment on

23  Count 1, 180 months imprisonment on Count 4 with 120 months of

24  that sentence to run concurrently with Count 1, and 60 months

25  to run consecutively to Count 1.

124

1     Count 3, 60 months to run consecutively to the combined

2    total of 300 months for Counts 1 and 4.

3     So then I'll state a tentative sentence and give both

4    sides the opportunity to raise objections not previously

5    raised pursuant to the *Bostick* case and any thoughts or

6    suggestions for amendment to the proposed sentence.

7     Mr. Cornell has pleaded guilty to Counts 1, 3 and 4 of the

8    Superseding Indictment.  Count 1 is Attempted Murder of

9    Government Employees and Officials, in violation of Title 18,

10   United States Code, Section 1114.

11     Count 2 -- Count 3, excuse me, is Possession of a Firearm

12   in Furtherance of a Crime of Violence, in violation of Title

13   18, United States Code, Section 924(c).

14     Count 4 is Material Support to a Designated Foreign

15   Terrorist Organization, in violation of Title 18, United

16   States Code, Section 2339B.

17     With regard to imprisonment, Mr. Cornell would be

18   sentenced to 240 months on Count 1, 240 months on Count 4 with

19   the first 120 months to be served concurrently with Count 1.

20     I'm sorry?

21        MR. MANGAN:  Your Honor, I think for Count 4 it's

22   180.

23        THE COURT:  I think I am mistaken.  I'm not a very

24   good copyist.

25     Here we go.  Thank you.  A hundred and eighty.

1    -- with the first 120 months to be served concurrently

2    with Count 1, and 60 months to be served consecutively to

3    Count 1, for a total of 300 months.

4        Count 3, 60 months consecutive to Counts 1 and 4, for a

5    total of 360 months.

6        I would impose a period of Life supervision on the

7    standard conditions of supervised release in the Southern

8    District of Ohio, and those would be set forth in detail in

9    the Sentencing Order.

10       Additionally, Mr. Cornell would be relieved of the

11   obligation for drug testing since he does not pose even a low

12   risk of future substance abuse.  That, of course, could be

13   revisited should the probation officer assigned to Mr. Cornell

14   sees reason to revisit it.

15       Mr. Cornell shall not possess a firearm, ammunition,

16   destructive device, or any other dangerous weapon.

17       He shall cooperate in the collection of DNA as directed by

18   his probation officer.

19       Mr. Cornell is prohibited from utilizing a computer during

20   the term of his supervised release with the exception of and

21   solely for legal research, outside employment, as a specific

22   class assignment in an accredited educational institution, or

23   to send or receive typed e-mail messages without attached

24   electronic files or images embedded in the body of a message

25   as approved in advance by his probation officer.

1      Mr. Cornell is required to install software to monitor

2    computer activities on any computer he is authorized to use,

3    at his expense.  The software may record any and all activity

4    on his computer, including the capturing of keystrokes,

5    application information, Internet use history, e-mail

6    correspondence and chat conversation.  The software will be

7    checked on a random basis.  Mr. Cornell shall have no

8    expectations of privacy regarding computer use or information

9    stored on the computer when monitoring software is installed.

10   And he should understand and agree that information gathered

11   by said software may be used against him in subsequent court

12   actions regarding his computer use and conditions of

13   supervision.

14      Mr. Cornell must warn other users of the existence of the

15   software program.

16      He is prohibited from attempting to remove, tamper with,

17   or alter or circumvent in any way the software program.

18      Mr. Cornell must comply with the rules set forth in the

19   Probation Department's Computer Monitoring Participation

20   Agreement.

21      Mr. Cornell's residence and employment must be

22   pre-approved by the probation officer.  Mr. Cornell shall not

23   loiter near police stations, military bases, state, federal or

24   local government agencies or buildings unless for emergency

25   services.  Any visits to any such places must be pre-approved

1  by his probation officer.

2      Because of his financial situation, I would not impose a

3  fine, but I am obliged to impose the $100 mandatory special

4  assessment for each count, for a total of $300.

5      If Mr. Cornell is unable to pay the $300 immediately, he

6  may begin paying toward that assessment total while he is

7  incarcerated in the Bureau of Prisons, and he shall pay at

8  least $25 per quarter towards the penalties if assigned a

9  non-UNICOR or Grade 5 UNICOR job, or at least 50 percent of

10  his monthly pay if assigned a UNICOR Grade 1-4 job.

11      Within 30 days of the commencement of his period of

12  supervised release Mr. Cornell shall begin paying any balance

13  remaining at the rate of $10 per month.  The Court will

14  reassess his ability to pay based upon the probation officer's

15  recommendation or Mr. Cornell's petition for review of his

16  ability to pay.

17      Mr. Cornell shall forfeit his interest in the following

18  property to the United States:

19      Two Armalite M 15, 5.56-millimeter semiautomatic rifle --

20  rifles -- Serial Nos. MS000788B and MS000974A and

21  approximately 600 rounds of ammunition purchased at the same

22  time as the other -- the two firearms.

23      Comments, suggestions, objections?  Mr. Mangan?

24          MR. MANGAN:  None from the government, Your Honor.

25          THE COURT:  Mr. Pinales?

128

1         MS. CROUSE:  No, Your Honor.

2         THE COURT:  Okay.  Then, I anticipate that this

3 judgment will be filed with the Clerk's Office today, December

4 the 5th.

5     And in accordance with Rule 4(b) of the Rules of Appellate

6 Procedure, Mr. Cornell must file any notice of appeal that he

7 wishes to file within 14 days of the filing of this judgment,

8 and that would mean his deadline for filing his notice of

9 appeal will be December the 19th, 2016.

10     I advise you, Mr. Cornell, that if you request, I will

11 direct the Clerk of the Court to prepare and file forthwith a

12 notice of appeal on your behalf.

13     Would you like a notice of appeal filed?

14         THE DEFENDANT:  No, ma'am.

15         THE COURT:  I'm going to rely on Mr. Pinales and

16 Ms. Crouse to protect your appellate rights.  But,

17 Mr. Cornell, it is your responsibility, if you decide to

18 appeal, to notify them in a timely fashion so that they can

19 take the appropriate steps.

20     Counselors, is there anything known to either side that

21 would prohibit the Court imposing the sentence as stated, for

22 the reasons that I stated at this time?

23         MR. MANGAN:  No, Your Honor.  Thank you.

24         THE COURT:  Mr. Pinales?

25         MR. PINALES:  No, Your Honor.

129

1          THE COURT:  Then I will impose the sentence as I

2     stated it, for the reasons that I've stated.

3        And I commend both sides for a case well prepared and

4     thoroughly.  I don't think that Mr. Cornell could have had

5     better defense counsel and I also think the government was

6     very well represented.  So with that we will be in recess.

7          THE CLERK:  All rise.             (1:29 P.M.)

8                          -   -   -

9                   PROCEEDINGS CONCLUDED

10                         -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

130

I N D E X

|  | ID | ADMITTED |
|---|---|---|
| Government's Exhibit 1 (videotape) | 7 | 7 |
| Defendant's A (updated CV of Dr. Bresler) | 8 | 8 |

| DEFENDANT'S WITNESS: | Direct | Cross | Redirect |
|---|---|---|---|
| **SCOTT BRESLER, Ph.D.** | 9 | 62 | 66 |

| STATEMENTS TO THE COURT: | Page |
|---|---|
| By JOHN CORNELL | 75 |
| By ANGELA CARMEN | 77 |
| By JOHN CORNELL II | 78 |
| By AUNT DEBBIE | 78 |
| By CANDACE CROUSE, ESQ. | 80 |
| By THE DEFENDANT | 90 |
| By TIMOTHY MANGAN, ESQ. | 96 |
| By MARTIN PINALES, ESQ. | 108 |

| SENTENCE OF THE COURT | 113 |
|---|---|

*   *   *

C E R T I F I C A T E

      I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


s/Mary Ann Ranz
Official Court Reporter