AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

# UNITED STATES DISTRICT COURT

## FOR THE

SOUTHERN **DISTRICT OF** OHIO   MAR 24 2025 2: 24

FILED
RICHARD W. NAGEL
CLERK OF COURT

U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF OHIO-CINCINNATI

UNITED STATES OF AMERICA

Case No. 1:15 - CF-00012

(Write the number of your criminal case.)

v.

**MOTION FOR SENTENCE REDUCTION UNDER 18 U.S.C. § 3582(c)(1)(A) (Compassionate Release)**

CHRISTOPHER LEE CORNELL

Write your full name here.

*(Pro Se Inmate)*

---

### NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only* the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

## I. DOCUMENTS AND REQUEST TO SEAL

Does this motion include a request that any documents attached to this motion be filed under seal? (Documents filed under seal are not available to the public.)

☐ Yes ☑ No

## ATTACHMENTS

If you answered "Yes," please list below the documents you request be filed under seal:

_____

_____

CORNELL, CHRISTOPHER 72795061

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

Please list below any documents you are attaching to this motion. A proposed release plan is included as an attachment. You are encouraged, but not required, to complete the proposed release plan. Also, a cover page for the submission of medical records and additional medical information is included as an attachment to this motion, as well as a cover page for the submission of additional information (for example, information related to victim abuse under §1B1.13(b)(4)). Again, you are not required to provide medical records or this additional information. For each document you are attaching to this motion, state whether you request that it be filed under seal because it includes confidential information.

| Document | Attached? | Request to Seal? |
|---|---|---|
| Proposed Release Plan | ☑Yes ☐No | ☐Yes ☑No |
| Additional Medical Information | ☐Yes ☑No | ☐Yes ☑No |
| Additional Information (e.g., victim abuse-related information under §1B1.13(b)(4)) | ☐Yes ☑No | ☐Yes ☑No |

## II. REQUEST FOR APPOINTMENT OF COUNSEL

I request that an attorney be appointed to help me.

☐Yes ☐No

## III. SENTENCE INFORMATION

Date of Sentencing: _December 05, 2016_

Term of Imprisonment Imposed: _360 Months, 30 years_

Approximate Time Served to Date: _10 years, 43 days_

Projected Release Date: _12-06-2040_

Length of Term of Supervised Release: _Life_

Have you filed an appeal in your case?

☐Yes ☐No

Are you subject to an order of deportation or an ICE detainer?

☐Yes ☐No

CORNELL, CHRISTOPHER 72795061

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES[1]

Title 18 U.S.C. § 3582(c)(1)(A) allows you to file this motion (1) after you have fully exhausted all administrative rights to appeal a failure of the Federal Bureau of Prisons (BOP) to bring a motion on your behalf or (2) 30 days after the warden of your facility received your request that the warden make a motion on your behalf, whichever is earlier.

Please include copies of any written correspondence to and from the BOP related to your motion, including your written request to the warden and records of any denial from the BOP.

Have you personally submitted your request for compassionate release to the warden of the institution where you are incarcerated?

☑ Yes, I submitted a request for compassionate release to the warden on (date) 01-29-25.
☐ No, I did not submit a request for compassionate release to the warden.

If you answered "No," please explain why not.

_____

_____

Did the warden deny your request?

☑ Yes, the warden denied my request on (date)    02-07-25    .
☐ No, I did not submit a request for compassionate release to the warden.

## V. GROUNDS FOR RELEASE

This section includes specific citations to sections of the U.S. Sentencing Guidelines, specifically the policy statement at §1B1.13 (Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)), often referred to as "compassionate release."

Please use the checkboxes below to state the grounds for your request for compassionate release. Please select all grounds that apply to you. You may attach additional sheets if necessary to further describe the reasons supporting your motion. You also may attach any relevant exhibits. Exhibits may include medical records if your request is based on a medical condition, or a statement from a family member or sponsor.

---

[1] The requirements for filing this compassionate release motion with the court differ from the requirements for submitting a compassionate release request to the BOP. This form should be used only for a compassionate release motion made to the court. If you are submitting a compassionate release request to the BOP, please review and follow the BOP program statement.

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## A. Are you at least 70 years old?

☐ Yes ☑ No

If you answered "No," go to Section B below. You do not need to fill out Section A.

If you answered "Yes," you may be eligible for release under 18 U.S.C. § 3582(c)(1)(A)(ii) if you meet two additional criteria. *See* §1B1.13(a)(1)(B). Please answer the following questions so the court can determine if you are eligible for release under this section of the statute.

Have you served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense(s) for which you are currently imprisoned?

☐ Yes ☑ No

Has the Director of the BOP determined that you are not a danger to the safety of any other person or the community, as provided under 18 U.S.C. § 3142(g)?

☐ Yes ☑ No

## B. Do you believe there are other extraordinary and compelling reasons for your release?

☑ Yes ☐ No

If you answered "Yes," please check all boxes that apply so the court can determine whether you are eligible for release under 18 U.S.C. § 3582(c)(1)(A)(i). Section 3582(c)(1)(A) authorizes a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons" warrant a reduction and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

☐    I am suffering from a terminal illness. *See* §1B1.13(b)(1)(A).

☐    I am suffering from:

- a serious physical or medical condition;
- a serious functional or cognitive impairment; or
- deterioration in my physical or mental health because of the aging process

that substantially diminishes my ability to provide self-care within the environment of a correctional facility, and I am not expected to recover from this condition. *See* §1B1.13(b)(1)(B).

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

☐ I am suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which I am at risk of serious deterioration in health or death. *See* §1B1.13(b)(1)(C).

☐ There is an ongoing outbreak of infectious disease or ongoing public health emergency affecting, or at imminent risk of affecting, my correctional facility that, due to personal health risk factors and custodial status, has caused me an increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency, and such risk cannot be adequately mitigated in a timely manner. *See* §1B1.13(b)(1)(D).

☐ I am 65 years old or older; I am experiencing a serious deterioration in physical or mental health because of the aging process; and I have served at least 10 years or 75 percent of my term of imprisonment, whichever is less. *See* §1B1.13(b)(2).

☐ The caregiver of minor child/children or my child/children who is/are 18 years of age or older and incapable of self-care because of a mental or physical disability or mental condition has died or become incapacitated, and I am the only available caregiver for my child/children or adult disabled child/children. *See* §1B1.13(b)(3)(A).

☐ My spouse/registered partner, parent, immediate family member (child, spouse, registered partner, parent, grandchild, grandparent, or sibling), or someone whose relationship is similar to that of an immediate family member has become incapacitated, and I am the only available caregiver for them. *See* §1B1.13(b)(3)(B), (C), and (D).

☐ While serving this sentence, I was a victim of:

- sexual abuse involving a "sexual act," as defined in 18 U.S.C. § 2246(2); or
- physical abuse resulting in "serious bodily injury"

that was committed by or at the direction of a correctional officer, an employee, or contractor of the BOP or any other individual having custody or control over me. *See* §1B1.13(b)(4).

☐ There is another circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described above, are similar in gravity to the reasons described above. *See* §1B1.13(b)(5).

☑ I received an unusually long sentence, I have served at least 10 years of the term of imprisonment, and a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) would produce a gross disparity between the sentence

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

being served and the sentence likely to be imposed on the date I filed this motion, after full consideration of my individualized circumstances. *See* §1B1.13(b)(6).

Please explain below the basis for your request. If there is additional information that you would like the court to consider but which is confidential, you may include that information on a separate page; attach the page to this motion; and, in Section I above, request that that attachment be sealed.

See attachments

## VI. PREVIOUSLY FILED MOTIONS

Have you previously filed any motions for a reduction in sentence (compassionate release) under 18 U.S.C. § 3582(c)(1)(A) (in any court)?

☑ Yes ☐ No

If you answered "Yes," were any of your previous motions granted?

☐ Yes ☑ No

If you have previously filed any motions for a reduction in sentence (compassionate release) under 18 U.S.C. § 3582(c)(1)(A), what about your circumstances or the law has changed since your other motion(s) that you believe now makes you eligible? Please provide details below.

See attachments.

AO 250 (Rev. 09/24) Pro Se Motion for Compassionate Release

## VII. MOVANT'S DECLARATION AND SIGNATURE

For the reasons stated in this motion, I move the court for a reduction in sentence (compassionate release) under 18 U.S.C. § 3582(c)(1)(A). I declare under penalty of perjury that the facts stated in this motion are true and correct.

Feb. 28, 2025
Date

Christopher Lee Cornell
Printed Name

57795061
Federal Bureau of Prisons Register No.

FCI Cumberland
Federal Bureau of Prisons Facility

P.O. Box 1000
Institution's Address

Signature

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

ATTACHMENT 1

# UNITED STATES DISTRICT COURT
## FOR THE

SOUTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA

                                        Case No.  1:15 - cr-00012
                                        (Write the number of your criminal
                                        case.)

v.

CHRISTOPHER LEE CORNELL
Write your full name here.

### PROPOSED RELEASE PLAN
**In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)**

---

**NOTICE**

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only* the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

If you provide information in this document that you believe should not be publicly available, you may request permission from the court to file the document under seal. If the request is granted, the document will be placed in the electronic court files but will not be available to the public.

Do you request that this document be filed under seal?

☐ Yes ☑ No

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

## PROPOSED RELEASE PLAN

To the extent the following information is available to you, please include the information requested below. This information will help the U.S. Probation and Pretrial Services Office prepare for your release if your motion is granted.

### A. Housing and Employment

Provide the full address where you intend to reside if you are released from prison.

Apt. #415, 8214 W. Mill St., Cleves, Ohio 45002, United States

Provide the name and phone number of the property owner or renter of the address where you will reside if you are released from prison.

John Cornell & Angela Carmen
513-510-5377

Provide the names (if under the age of 18, please use only their initials), ages, and relationship to you of any other residents living at the above-listed address.

John Cornell jr., Brother

Do you know where you will work if you are released? If so, please provide the name and address of the employer and describe your job duties. If you do not have a specific employer, please describe the type of work you plan to do upon release.

I Plan to join my Brother John at Amazon, working Warehousing.

List any additional housing or employment resources available to you.

None.

### B. Medical Needs

Will you require ongoing medical care if you are released from prison?

☐ Yes  ☑ No

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

Will you have access to health insurance if released?

☑Yes ☐No

If yes, provide the name of your insurance company and the last four digits of the policy number.

____N|A____

If no, how do you plan to pay for your medical care?

_____

If no, are you willing to apply for government medical services (Medicaid/Medicare)?

☐Yes ☐No

Do you have copies of your medical records documenting the condition(s) for which you are seeking release?

☐Yes ☑No

If yes, please include them with your motion.

If no, where are the records located?

____N|A____

Are you prescribed medication in the facility where you are incarcerated?

☐Yes ☑No

If yes, list all prescribed medication, dosage, and frequency.

_____

Do you require durable medical equipment (e.g., wheelchair, walker, oxygen, prosthetic limbs, hospital bed)?

☐Yes ☑No

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 1

If yes, list equipment required.

_____

_____

Do you require assistance with self-care such as bathing, walking, toileting?

☐ Yes ☑ No

If yes, list the required assistance and how it will be provided.

_____

_____

Do you require assisted living?

☐ Yes ☑ No

If yes, provide the address of the anticipated home or facility and the source of funding to pay for it.

_____

_____

Are the people you are proposing to reside with aware of your medical needs?

☑ Yes ☐ No

Do you have other community support that can assist with your medical needs?

☐ Yes ☑ No

Provide their names, ages, and relationship to you. If the person is under the age of 18, please use only their initials.

_____

_____

Will you have transportation to and from your medical appointments?

☑ Yes ☐ No

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

---

## ATTACHMENT 1

Describe the method of transportation.

My Mother & Father both have transportation.

---

## SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

02/28/25
_____
Date

Christopher Lee Cornell
_____
Printed Name

72795061
_____
Federal Bureau of Prisons Register No.

FCI Cumberland
_____
Federal Bureau of Prisons Facility

Po Box 1000
_____
Institution's Address

_____
Signature

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 2

# UNITED STATES DISTRICT COURT
## FOR THE
<u>SOUTHERN</u> **DISTRICT OF** <u>OHIO</u>

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. <u>1:15- CR-00012</u><br>(Write the number of your criminal<br>case.) |

v.

<u>CHRISTOPHER LEE CORNELL</u>
Write your full name here.

## MEDICAL RECORDS AND ADDITIONAL MEDICAL INFORMATION
### In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)

---

### NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain a person's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number. A filing may include *only* the last four digits of a social security number, the year of a person's birth, a minor's initials, and the last four digits of a financial account number.

---

If you attach documents to this form that you believe should not be publicly available, you may request permission from the court to file those documents under seal. If the request is granted, the documents will be placed in the electronic court files but will not be available to the public.

Do you request that the attachments to this document be filed under seal?

☐ Yes ☑ No

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

ATTACHMENT 2

# MEDICAL RECORDS AND ADDITIONAL MEDICAL INFORMATION

To the extent that you have medical records or additional medical information that supports your
motion for compassionate release, please attach those records or that information to this document.

### SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

_02/28/25_
Date

_Christopher Lee Cornell_
Printed Name

_70793060l_
Federal Bureau of Prisons Register No.

_FCI Cumberland_
Federal Bureau of Prisons Facility

_P.O. Box 1000_
Institution's Address

Signature

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

## ATTACHMENT 3

# UNITED STATES DISTRICT COURT
## FOR THE
_SOUTHERN_ DISTRICT OF _OHIO_

UNITED STATES OF AMERICA

Case No. _1:15-cr-00012_
(Write the number of your criminal
case.)

v.

_CHRISTOPHER LEE CORNELL_
Write your full name here.

## COVER SHEET FOR ADDITIONAL INFORMATION
### In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)

---

### NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses
the privacy and security concerns resulting from public access to electronic court files. Under
this rule, papers filed with the court should *not* contain a person's full social security number or
full birth date, the full name of a person known to be a minor, or a complete financial account
number. A filing may include *only* the last four digits of a social security number, the year of a
person's birth, a minor's initials, and the last four digits of a financial account number.

---

If you attach documents to this form that you believe should not be publicly available, you may
request permission from the court to file those documents under seal. If the request is granted, the
documents will be placed in the electronic court files but will not be available to the public.

Do you request that the attachments to this document be filed under seal?

☐ Yes ☒ No

AO 250 (Rev. 09/2024) Pro Se Motion for Compassionate Release

ATTACHMENT 3

# ADDITIONAL INFORMATION

To the extent that you have additional information that supports your motion for compassionate release, please attach those records or that information to this document.

## SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

02/28/25
Date

_Signature_

Christopher Lee Cornell
Printed Name

72795061
Federal Bureau of Prisons Register No.

FCI Cumberland
Federal Bureau of Prisons Facility

P.O. Box 1000
Institution's Address



## INTRODUCTION

COMES NOW, the Defendant, Pro Se Inmate, Christopher Lee Cornell ("Cornell"), respectfully moves this Honorable Court to grant a sentence reduction based on the principles outlined in Amendment 814, his youthful offender status, the sentence disparity between similarly situated defendants, and his rehabilitation and self improvement during his incarceration. In support, the Petitioner submits the following arguments:

## INTRODUCTION

At the time of his offense, the Defendant was a 20-year-old young man whose judgment and decision-making were shaped by the underdevelopment of his adolescent brain. The Defendant was arrested at the age of 20 in connection with a terrorism-related offense under 18 U.S.C. 1114, 924(c), and 2339B. As outlined in this motion, the excessive 30 years in federal prison imposed upon him is disproportionate given the nature of his offense, his lack of prior criminal history, and the fact that the purported plot was under FBI control, with no imminent threat posed to any individuals. Given Cornell's rehabilitation efforts, the unique nature of his charges, his relatively young age and vulnerability at the time of the arrest, his demonstrated remorse, his commitment to reintegrate as a law-abiding citizen, and his strong support system upon release, Cornell demonstrates he is ready to safely re-enter society under adequate supervision.

## LEGAL BASIS FOR SENTENCE REDUCTION

Under 18 U.S.C. 3582(c)(1)(A), a court may reduce a term of imprisonment if extraordinary and compelling reasons exist and the reduction aligns with the factors set forth in 18 U.S.C. 3553(a). Cornell presents numerous factors demonstrating that extraordinary and compelling reasons exists to grant this motion.

Sentencing disparity is one such extraordinary and compelling reason, particularly when the imposed sentence deviates substantially from those given to similarly situated defendants across the federal judiciary.

The Sixth Circuit has emphasized that courts should seek uniformity and proportionality in sentencing, consistent with the policy goals of the Sentencing Reform Act of 1984. Moreover, the U.S. Supreme Court has recognized that addressing unwarranted disparities is central to achieving fairness and justice in sentencing. See Kimbrough v. United States, 552 U.S. 85, 101 (2007); Gall v. United States, 552 U.S. 38, 49-50 (2007).

### A. Application of Amendment 814 and Youthful Offender Status (Ground 1)

Amendment 814 to the United States Sentencing Guidelines provides for adjustments in cases where defendants, especially youthful offenders, demonstrate marked rehabilitative progress. Courts, under 18 U.S.C. 3582(c)(2), may reduce sentences if the defendant has shown evidence of rehabilitation and has a low risk of recidivism. As noted in United States v. Shaya, 714 F.3d 874, 877 (6th Cir. 2013), the Sixth Circuit has acknowledged that sentence reductions may be warranted when defendants demonstrate "significant positive changes" while incarcerated.

Given that the Defendant was only 20 years old at the time of arrest, a youthful offender designation is appropriate. Courts have long recognized that young adults may be susceptible to impulsive and poor decision-making but are capable of profound personal growth, as discussed in Graham v. Florida, 560 U.S. 48 (2010), which emphasized the potential for rehabilitation in younger offenders.

### B. Disparity in Sentencing and Non-Existent Imminent Threat (Ground 2)

Sentencing disparity occurs when the defendants with similar conduct and culpability receive different sentences without a legitimate justification, undermining the principle of equal justice under the law. Courts routinely analyze disparities to determine whether the sentences are consistent with the goals of deterrence, punishment, rehabilitation,

1

and fairness.

This Court should consider the disparity between the 30-year sentence imposed and those of other defendants in similar cases where no actual harm occurred, especially given the non-existent imminent threat to lawmakers. The U.S. Sentencing Commission's guidelines under U.S.S.G. 5K2.0 recognize that mitigating circumstances may justify a departure from standard sentencing ranges when the factual basis of the offense does not align with the charged conduct's severity. As the Sixth Circuit noted in United States v. Hayes, 958 F.3d 709 (6th Cir. 2020), the court must weight whether the imposed sentence aligns with Congressional intent and Sentencing Guidelines policy.

Here, the Defendant's 30-year sentence is disproportionate, considering his lack of criminal history, the FBI's control over the plot from its inception, and the absence of real danger to any lawmakers. The over-sentencing in this case violates the statutory goal of imposing sentences that are "sufficient, but not greater than necessary," under 18 U.S.C. 3553(a).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

On January 29, 2025, Cornell, an inmate at FCI Cumberland, submitted a formal request (i.e. BP-8) request to Warden Rokoski for compassionate release or a reduction in sentence. This request was based on two factors that constitute extraordinary and compelling reasons for relief: (1) the significant sentence disparity in his case, and (2) his status as a youthful offender under the criteria outline in Federal Bureau of Prisons Program Statement 5050.50.

However, on February 07, 2025, Warden Rokoski issues a denial of the requests, erroneously concluding that sentence disparity and youthful offender status do not meet the criteria for extraordinary and compelling reasons and Federal Bureau of Prisons Program Statement 5050.50. This denial was based on an incorrect interpretation of the policy, which explicitly recognizes both sentence reduction and youthful offender status can justify compassionate release under appropriate circumstances.

As will be demonstrated herein, Cornell satisfies the established criteria for extraordinary and compelling reasons warranting a reduction in sentence. The sentence reduction in his case presents a fundamental injustice that aligns with legal precedents acknowledging the need for relief when individuals are serving disproportionately harsh sentences compared to similarly situated defendant's. Additionally, his youthful offender status recognized under various legal frameworks as a mitigating factor further supports the appropriateness of compassionate release.

Accordingly, Cornell respectfully requests that this Court grant his motion for compassionate release and reduce his sentence to a term is just and appropriate given the circumstances outline herein.

FACTUAL BACKGROUND

Christopher Lee Cornell was indicted and convicted under three key statutes:

18 U.S.C. 1114: Relates to the Protection of Federal Officials and outlines penalties for assaulting, killing, or attempting to kill them.

18 U.S.C. 924(c): Pertains to the Use of Firearms in relation to Violent Crimes or Drug Trafficking offenses.

18 U.S.C. 2339(B): Addresses the provisions of Material Support to Terrorist Organizations.

In connection with these charges, Cornell, then only 20 years old, was sentenced to 30 years in federal prison.

Christopher Lee Cornell was placed under FBI investigation when he was just 17 years old. In United States v. Bingham, 653 F.3d 1112 (6th Cir. 2011), the court ruled that law enforcement agencies must follow constitutional guidelines and obtain proper authorization before engaging in surveillance activities.

The FBI had been monitoring him since 2011 but strategically initiated the investigation on September 11, 2014, to create a negative perception in the Court's eyes and a potential Jury.

Investigated by the FBI from 2011 to 2014 due to his religious beliefs as a Muslim and on-line activities related to foreign policy and government actions, he found himself targeted not for any criminal actions but for the expression of unconventional views. GovtDiscovery(Cornell)00421

Contrary to the misconceptions propagated by the Prosecution, Cornell vehemently denies any involvement in terrorism. His beliefs, albeit unconventional, were rooted in a broader critique of societal structures and power dynamics, particularly concerning foreign policy and government actions. The Sixth Circuit has reaffirmed that statements criticizing foreign policy or government actions fall under First Amendment protection, even if those statements are inflammatory. In United States v. Rahman, 189 F.3d 467 (6th Cir. 1999), the court ruled that inflammatory statements, such as those that could be seen as supporting terrorism or criminal actions, are protected unless the speech directly incites imminent illegal actions. General criticism or calls for political change are not grounds for prosecution.

The Defendant, Cornell, was targeted by the FBI's covert operations who used warrantless FISA Section 702 surveillance authorized without judicial oversight and a clear violation of 4th Amendment protections, who assumed a terrorist motive behind his social media activity. In FISA Court v. U.S., 485 F.3d 1 (FISA Court, 2007), the court held that surveillance under FISA on U.S. citizens requires a clear and compelling connection to national security threats. Using FISA against American citizens without meeting these stringent criteria is considered unconstitutional.

In January 2015, Cornell found himself thrust into a nightmare when he was arrested on terrorism charges, an accusation vehemently denied by the Defendant. Cornell stood firm in proclaiming his innocence, asserting that he was never a terrorist nor a sympathizer to any extremist cause. Rather, he adamantly insisted that his arrest was an egregious violation of his rights, driven by misconceptions and prejudices surrounding his religious beliefs and outspoken views on geopolitical issues.

Central to Cornell's argument is the assertion that Islam, his chosen faith, is inherently peaceful and does not advocate for extremism. He maintains that his deep religious convictions were misconstrued as indicators of radicalism, leading to his unwarranted scrutiny by law enforcement agencies. Moreover, he argues that his concerns regarding the impact of United States foreign policy on Muslim-majority regions, particularly the Middle East, were valid expressions of dissent rather than endorsement of violence.

Cornell's arrest, was not only unjust but also politically motivated. Certain lawmakers and media outlets sensationalized his case, inflating its significance beyond reasonable bounds. Despite subsequent admissions by the FBI that Cornell posed no credible threat, the damage had been done. Notably, he had no weapons, lacked the

3

means to carry out the plot, and had no actual contact with terrorist organizations.

The Prosecution alleged that Cornell had planned an attack on the United States Capital building during the State of the Union Address, intended to kill lawmakers. However, a close examination of the facts reveal several flaws in the case against him.

On January 14, 2015, Cornell attempted to purchase firearms but failed an ATF 4473 background check, which prevented the purchase. (See, Exhibit 1) Despite this failure, law enforcement authorities arrested and charged Cornell under 18 U.S.C. 1114 and 18 U.S.C. 924(c), suggesting that his involvement in the plot and attempts to acquire weapons were sufficient grounds for prosecution.

Cornell in this case is accused of devising a plot with an FBI informant, during which they discussed various scenarios and weapons. However, the Defendant's actions were limited to researching images on-line and engaging in conversations with the FBI informant about possible plans.

Merely planning and preparing, without substantive actions that demonstrates a clear intent and capability to execute a harmful act, do not meet the criteria for a charge under 18 U.S.C. 1114. Cornell's activities, which involved only discussions and on-line research, fell far short of the threshold required to substantiate such serious charge. Regarding 18 U.S.C. 1114, which criminalizes the killing or attempted killing of a federal office, the Sixth Circuit has held that mere planning and discussing a crime does not necessarily amount to a violation. For example, United States v. Riley, 497 F.3d 767 (6th Cir. 2007) involved a defendant accused of planning the murder of a federal officer. The court emphasized that preparing or discussing a crime, without overt acts towards its execution, does not satisfy the elements of an attempt.

Cornell's attempt to purchase firearms was thwarted by a failed background check. (See, Exhibit 1) This incident alone suggests that he was not in a position to carry out his alleged plot. The gun purchase was not completed, which is a critical element in charges related to firearms. (GovtDiscovery(Cornell)00805: Cornell: "They said, they said its going to be a delay. They said, um, it might take up to the twentieth, said its going to be delayed.") Federal law prohibits the sale of firearms to individuals who have failed background checks under 18 U.S.C. 922(g). In United States v. Carter, 617 F.3d 1237 (6th Cir. 2010), the Sixth Circuit held that it is illegal for a gun dealer to knowingly sell a firearm to someone who has failed a background check, and any subsequent crime involving the weapon may result in further prosecution under federal firearms law.

Following the failed gun purchase, Cornell expressed doubts about his plot to an FBI informant. He mentioned reconsidering his plans and abandoning the plot. (GovtDiscovery(Cornell)00812: Cornell: "We...we can switch up and go to a different place to, you know? We...we can do anything.") This change in intent undermines the Prosecution's claim that he was actively engaged in preparing for a violent act. The Sixth Circuit has also ruled that if a defendant backs out of a plot to commit murder before any actual attempt is made, they cannot be convicted of attempted murder. In United States v. Jackson, 345 F.3d 586 (6th Cir. 2003), the court ruled that mere conversation or the initiation of a criminal plot, without taking substantial steps toward the crime, does not lead to criminal liability for attempted murder. In cases where the defendant backs out before any illegal action occurs, there may be no criminal liability.

Even after eventually purchasing weapons, the processing of the ATF 4473 form was not completed in time. The purchase was scheduled for January 20, 2015, but the gun purchase and arrest of Cornell was much earlier (on January 14, 2015). (See, Exhibit 1)

Cornell was represented by Counsel; Martin Pinales, Candace Crouse and Eric Eckes, during the sentencing. These legal representatives were ineffective, specifically for failing to pursue dismissal of the charges 18 U.S.C. 1114 and 18 U.S.C. 924(c).

The Counsel did not adequately advise against taking a guilty plea deal, which Cornell now regrets accepting. A 30-year plea deal for a crime that involved no violence or tangible steps towards executing a violent act seems excessive. The plea deal could have been negotiated to better reflect the act threat posed by Cornell, especially considering the lack of real means to carry out the plot.

By choosing to plead guilty rather than contesting the charges, they neglected to challenge the Prosecution's assertion that Cornell had taken a substantial towards committing a violent crime.

4

The argument that Cornell did not meet the criteria for a substantial step towards committing the offense under 18 U.S.C. 1114 could have been a strong defense. The plot, as described, was speculative and lacked the necessary elements to support a conviction. The unrealistic nature of the plot given the tight security during the State of the Union address, the Defendant's lack of transportation, funds, or weapons further weakens the argument for a severe sentence. Cornell's inability to acquire weapons legally and the illegal acquisition through a gun store, coupled with a bad background check, could have been used to argue that Cornell was not a serious threat.

Cornell's Counsel not adequately informing or persuading Cornell about the potential defenses or the likelihood of a more favorable outcome at trial, is a crucial failure. United States v. Cronic, 466 U.S. 648 (1984)

The Defendant's counsel, ostensibly assigned to protect him, instead bolstered the FBI's narrative. His court-appointed attorneys consistently aligned with the government's assertions, failing to question the FBI's questionable tactics or to challenge the government's selective interpretation of events.

Given Cornell's innocence of the charges due to the lack of a substantial step and the unrealistic nature of the plot, the Counsel's decision to accept a plea deal could be seen as a serious misjudgment.

Instead of vigorously advocating for their client, his Counsel inexplicably chose to throw him at the mercy of the Court, neglecting to present compelling arguments or evidence that could mitigate the severity of the sentence.

On December 06, 2016, Christopher Lee Cornell was convicted of three Counts; 18 U.S.C. 1114; 18 U.S.C. 924(c); and 18 U.S.C. 2339(B), and was sentenced to 30-years in federal prison by Judge Sandra S. Beckwith.

ARGUMENT

1. Charges and Plea Deal

The Defendant, Christopher Lee Cornell, was accused of plotting to attack the U.S. Capital building in Washington, D.C., with firearms and explosives. Cornell was arrested on January 14, 2015, at the age of 20, and charged with conspiracy and material support for terrorist activities.

The Defendant plead guilty and was sentenced to 360-months (30-years) on December 05, 2016 for three offenses:

18 U.S.C. 1114 Attempted Murder of Government Officials and Employees

18 U.S.C. 924(c) Possession of a Firearm in Furtherance of a Crime of Violence

18 U.S.C. 2339(B) Attempted Material Support to a Foreign Terrorist Organization

The Defendant was also charged with 18 U.S.C. 373 Solicitation to Commit a Crime of Violence but this charge was dropped to the plead deal.

18 U.S.C. 1114:

Under 18 U.S.C. 1114, an individual who "kills or attempts to kill any officer or employee of the United States or any agency in any branch of the United States while such officer(s) or employee(s) is engaged in or on account of the performance of official duties shall be punished in the case of attempted murder or manslaughter, as provided in Section 1113.

Section 1114 does not specify the elements of "attempt to kill" but it is settled law that guilty of an attempted murder requires proof that the Petitioner must have taken a substantial step towards that crime, and must also have had the requisite mens rea.

Thus, while a "murder may be committed without any intent to kill, an attempt to commit murder requires a specific intent to kill".

The elements of Attempted Murder:

1) The Defendant did something that was a substantial step toward killing the victim.

2) When the Defendant took that step, he intended to kill the victim.

The requirement of a "substantial step", means that something more than "mere preparation" is required; it is essential that the Defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and like course of things will result in, the commission of a crime.

2. Beginning of Investigation

The story begins on Twitter, where an FBI informant (hereinafter "FBI informant") initiated contact with the Defendant, luring him into a conversation about potential terrorist activities. The FBI informant skillfully transitioned the conversation to the private messaging platform KIK messenger, a move that allowed for more discreet and possibly incriminating discussions.

The FBI informant's troubles began when he found himself embroiled in a criminal case. As if the weight of impending legal proceedings wasn't enough, his financial assets were frozen upon arrest, leaving him in a dire situation. With mounting legal fees and a family to support, the FBI informant faced a bleak future behind bars.

6

It was under these circumstances that the FBI approached him, offering a lifeline in exchange for cooperation.

Threats loomed over him like a dark cloud, with authorities leveraging his vulnerable position by hinting at drastic measures, including sending his family back to a war-torn country if he refused to cooperate.

Faced with the prospect of losing everything, the FBI informant made the fateful decision to collaborate with law enforcement. Initially distraught and conflicted, the FBI informant began to provide crucial information against his co-defendants in his own criminal case. His cooperation didn't end there. After his release from custody, the FBI informant continued to work with the FBI, transitioning from a reluctant informant to a trained operative on the streets.

As the conversations unfolded, the FBI informant, who had a criminal background as a convicted criminal, began grooming Cornell. Taking advantage of Cornell's vulnerability and seeking religious guidance, the FBI informant played the role of a mentor, assisting with personal issues such as family, job, and education. This manipulation created a sense of trust and admiration, with Cornell looking up to the older informant.

To escalate the situation, the FBI informant introduced a fictitious Amir, claiming to be a militant Islamic leader, and suggested that Cornell seek permission from this figure for their proposed terrorist activities.

The FBI informant, having insider knowledge of radical ideologies, orchestrated scenarios to make it appear as though permission was granted by the fictitious Amir, adding a layer of authenticity to the conspiracy.

3. Meeting the FBI Informant

The Defendant, whose controversial on-line postings were within legal bounds, attracted the attention of the FBI due to his discussion about religious beliefs and alternative views. The FBI informant engaged with him on-line, eventually persuading him to discuss hijrah (meaning: migration from un-Islamic territory to an Islamic territory) on the private messaging platform KIK messenger. Despite the legal nature of their conversations, the FBI informant aimed to incriminate Cornell by suggesting potential involvement in terrorist activities.

The initial conversations on the secure texting platform were characterized by discussions about religious beliefs, alternative news, and events in the Middle East. The FBI informant subtly influenced Cornell, proposing the idea of meeting in person and engaging in possible terrorist activities in the United States. The Defendant, driven by curiosity and a desire to connect with like-minded individuals, agreed to the meeting without any genuine intent for criminal activity.

During these meetings, the FBI informant utilized psychological techniques to further control of the narrative, taking Cornell out to eat and subtly pressuring him to come up with ideas for a potential terrorist plot.

Upon meeting, the FBI informant, portrayed as an intelligent and devout Muslim, assumed the role of a mentor and a role model in Cornell's life. The FBI informant introduced the Defendant to topics related to violent Jihad, advising him to be patient to avoid drawing suspicion. The FBI informant provided the Defendant with books concerning the topic of violent Jihad, encouraging him to read the books. (R. 151, Tr., 12/5/16, pp. 34, 24-25, ID. 1374, pp. 35, 1-24, ID. 1375)

Contrary to the role of an FBI informant, who merely observes and reports, this FBI operative actively participated in the conspiracy. The FBI informant suggested ideas, provided guidance on plot preparation, tried securing a storage unit for stashing weapons, and even took steps such as attempting to purchase weapons for the Defendant after his failed gun purchase on January 14, 2015. (GovtDiscovery(Cornell)00806: FBI Informant: "So look up exactly what I need (UI) so I don't go in there and start, like giving them...") While not trying to push blame or take away from what Cornell did what we are trying to look at here is how this young man, Cornell, wasn't simply this monster who wanted to wreak death and destruction upon America. Although he did make some bad choices in his early life and harbored some harmful beliefs and ideas, he really had a big heart and really did care about people. Cornell never truly hated America or its freedoms. He was born in this country and loved this country as much as us all. Though a bit misguided, he was overwhelmed and upset by the current climate at the time of his arrest and was taken advantage of by his surfing on the internet and coming into contact with ISIS. He really wanted to make a difference but had no idea how to go about it. He found solace sharing his thoughts on the internet, though those thoughts at times were not always helpful or productive. The difference he wanted to make got lost in his anger and depression and the loneliness he felt growing into adulthood without much friends or a social life. He was corrupted

by going down the path of ISIS, which he admits and regrets. Importantly, what we need to understand here is once he met the informant Cornell was enabled and given opportunities he otherwise would have never had if not for it.

This case in question involves an individual who, while sympathetic to certain activities carried out by terrorist organizations, insists he had no intention or predisposition to participate in any criminal actions. The turning point came when an FBI informant initiated contact, claiming to have spoken with an Amir (meaning: a militant Islamic leader) and vouching for Cornell's trustworthiness.

Cornell argues that he had no prior inclination or predisposition to engage in terrorist activities and that the FBI informant, by preying on and taking advantage and enabling Cornell in such a dire time in his young life, created a situation that would not have naturally occurred.

Cornell underscores the fact that the FBI informant retained control over much of the operation, helping make final decisions and influencing the direction of the plot. This, Cornell argues, undermines the notion that he had independent intentions or predispositions to engage in criminal activities.

The Defendant in this case was accused of planning a crime by researching images on-line and engaging in incriminating conversations with the informant about a potential plot. Cornell allegedly devised a plot with an FBI informant, during which they discussed various scenarios and weapons. However, these actions do not meet the legal threshold for a "substantial step" toward committing the crime under 18 U.S.C. 1114. The law is clear that mere preparation is no matter how detailed or incriminating does not constitute an attempt. A substantial step must be something more concrete, such as actively attempting to execute the crime.

In this case, Cornell's actions were confined to preparation. There was no attempt to carry out the plot, no significant steps taken beyond discussing ideas, and certainly no overt action that would have led to the commission of a crime. To make clear what we say saying here is Cornell did make plans, we aren't denying that or the wrongness of it, just that he did not finalize it.

4. First Attempt to Back-Out of Plot

On January 13, 2015, Cornell, targeted by the FBI in a terror plot investigation, demonstrated signs of reluctance and attempted to withdraw from the plan.

The Defendant, accompanied by the FBI informant, was on his way to the motel to finalize plans for the terror attack. However, before reaching the motel, the FBI informant took Cornell to Arby's, a restaurant, where they waited for their food.

During this time at the restaurant, Cornell expressed a desire to back out of the plot, suggesting a preference for going overseas and living among Muslims instead. This spontaneous revelation indicated the Defendant's wavering commitment to the plan. At this crucial juncture, the FBI informant played a pivotal role by persuading Cornell to stick to the original plot, effectively negating Cornell's attempt to withdraw.

5. Failed Gun Sale, Attempt to Back-Out of Plot and Arrest

On January 14, 2015, the FBI conducted a sting operation targeting Cornell based on suspicion of his involvement with a terrorist organization.

Despite potential discovery of social media posts expressing support for certain groups, Cornell did not admit to engaging in any illegal act on behalf of these organizations. In United States v. AlHadeff, 879 F.3d 188 (6th Cir. 2018), the Sixth Circuit reiterated that a person's right to access information, including controversial or extremist material, is protected under the First Amendment, provided they do not act in furtherance of illegal activities. Viewing terrorist propaganda on-line, in and of itself, does not meet the legal criteria for prosecution under U.S. law. Though it was wrong for Cornell having and sharing these harmful posts to others, as Cornell now agrees, and without taking away the seriousness or the wrongness of the posts, the point here is we simply state that Cornell had at the time not yet crossed the boundary of criminal activity.

The Defendant's expressions of support, while morally and socially contentious, may be protected under the First Amendment, which guarantees freedom of speech. The United States Supreme Court has consistently ruled that mere advocacy of ideas, even those related to violence or terrorism, cannot be criminalized unless it is directed to inciting or producing imminent lawless action and is likely to incite or produce such action Brandenburg v. Ohio, 1969.

The Defendant in question was charged with serious offenses, including 18 U.S.C. 1114, 18 U.S.C. 924(c), and 18 U.S.C. 2339(B). The allegations against Cornell centered around a supposed plot to storm the United States Capital building during the State of the Union Address, allegedly aimed at lawmakers.

The core of the indictment was based on Cornell's purported plans. However, these plans were inherently unrealistic. Cornell's scheme to storm the Capital never materialized. Despite having initial plans, Cornell did not make any tangible efforts to execute them.

On January 14, 2015, Cornell visited the Point Blank gun store with the intent to purchase firearms. Cornell was coerced by the FBI informant to engage in the purchase as part of an undercover operation. The FBI informant provided Cornell financial resources. (FBI Informant: "For the guns? Here is uh...there should be a thousand in cash. You just want to go ahead and count it real quick, just to make sure." GovtDiscovery(Cornell)00791 Cornell, unbeknownst to him, was under FBI investigation at the time. While it is acknowledged that Cornell discussed possible plans and preparations, the absence of the last act necessary to complete the crime is crucial. The law requires more than mere intent or a theoretical possibility of committing the crime; it demands a tangible, substantial step that brings the individual dangerously close to the completion of the crime. Mere thoughts or discussions, even if they involve heinous acts, do not necessarily translate into criminal intent. Cornell may engage in discussions or expressed thoughts about harming government employees, but the Prosecution must establish a concrete and genuine intent to commit murder.

Cornell, with the FBI informant's encouragement, entered the gun store with the intention of acquiring firearms. GovtDiscovery(Cornell)0079 The FBI informant, acting as an accomplice, waited outside in a vehicle during the visit.

The federal firearms licensed dealer John Dean ("Dean") at the Point Blank gun store informed Cornell that a background check revealed issues, resulting in a delay until January 20, 2015. (See, Exhibit 2 and Exhibit 3) Dean advised Cornell to leave a phone number for notification regarding the status of the sale.

This attempt failed due to an unfavorable background check, which legally prevented the sale. (See, Exhibit 1) This failure alone demonstrates that Cornell did not acquire the weapons necessary to carry out any alleged plot.

Even when Cornell did eventually attempt to purchase the firearms, the processing of the ATF form from the gun store did not proceed in time. The form's processing date was set for January 20, 2015, well after the date of the arrest. (See, Exhibit 1) Thus, he did not possess the firearms when the alleged crimes were suppose to take place.

The NICS background check is a vital component of the firearm purchasing process. When a customer attempts to buy a firearm from a licensed dealer, the dealer contacts the NICS system to determine the buyer's eligibility. The background check reviews criminal records, mental health history, restraining order, and other facts that might disqualify an individual from owning a firearm. Federal law prohibits the sale of firearms to individuals falling into specific categories, such as convicted felons, domestic violence offenders, individuals with restraining orders, and

those adjudicated as mentally ill.

According to federal law, licensed dealers are prohibited from completing a sale until they receive a definite response from the NICS system. This waiting period ensures that individuals who might be prohibited from owning firearms do not obtain them prematurely.

Selling a firearm to a person prohibited from owning one is a serious violation of federal law. United States v. Carter, 617 F.3d 1237 (6th Cir. 2010) The penalties for such violation can be severe and may include fines, loss of federal firearms license, and even imprisonment. Licensed dealers must exercise due diligence and adhere to the waiting period, regardless of any pressure from buyers or other parties.

The background check, a standard procedure in such transactions, revealed information that disqualified Cornell from obtaining firearms. This barrier represents a tangible impediment to the execution of the intended crimes, emphasizing that Cornell was unable to progress beyond the preliminary stage.

The inability to purchase firearms due to a failed background check meant that Cornell did not possess the necessary tools to carry out the intended act of violence against government officials. Without access to firearms, the level of threat posed by Cornell is significantly reduced, challenging the assertion that there was a firm and undeniable intent to commit murder.

It is crucial to delve into the motivations behind Cornell's actions. While intent is a crucial factor in any criminal case, the absence of a successful weapon acquisition suggests a gap between intent and capability. The failed background check can be viewed as a potential deterrent that hindered Cornell from translating intent into action.

Cornell returned to the car with the FBI informant, signaling a withdraw from the terrorism plot. (GovtDiscovery (Cornell)00812) During this interaction, Cornell explicitly expressed a change of heart by suggesting an alternative course of action. This verbalization of a shift in intent is a key factor in establishing that Cornell no longer pursued the original plan to commit murder but rather sought an alternative path. Cornell's statements to the FBI informant, indicating a willingness to explore alternative options, underscores a moment in reevaluation. By expressing a change of idea and proposing an alternative plan, Cornell demonstrated a clear attempt to withdraw from the original conspiracy to commit murder of government employees. This action is indicative of a lack of commitment to the initial criminal intent, further supporting the argument that Cornell did not complete the substantial step required for an attempted murder charge.

The Defendant's attempt to back out of the plot after the failed gun purchase aligns with the legal principle of voluntary abandonment. Voluntary abandonment occurs when an individual, with the intent to commit a crime, voluntarily and completely renounces the criminal purpose. In this case, Cornell's change of heart outside the gun store, coupled with the failed attempt to acquire weapons, could be interpreted as voluntary abandonment of the criminal plot.

However, the FBI informant suggested reconsideration, offering to purchase the firearms himself, and provided a phone number from his own device. GovtDiscovery(Cornell)00812    GovtDiscovery(Cornell)00807

Armed with the phone number, Cornell re-entered the Point Blank gun store to provide the phone number for notification regarding the status of the sale.

Dean stalled Cornell for a period of time as he attempted to exit the store before suddenly approving the firearms purchase. This delay and change of stance from Dean suggest a possible orchestrated effort to incriminate Cornell.

Under pressure from the FBI, Dean was compelled to proceed with the sale. Despite the glaring red flags surrounding Cornell's eligibility to possess firearms.

Dean misrepresented the situation to Cornell, leading him to believe he was legally allowed to purchase the guns. Cornell felt pressured by Dean, arguing he acted under duress.

As Cornell exited the gun store with the two M-15 Aramalite Rifles, and Dean accompanying Cornell with a box of ammunition, Cornell was immediately arrested outside the Point Blank Gun Range & Shop parking lot by Joint Terrorism Task Force agents.

6. Young Age and Vulnerability Due to Youth

At the time of his arrest, Cornell was a 20-year-old navigating the challenged of young adulthood. The impact of his age and vulnerability cannot be overstated. Studies show that young adults are particularly susceptible to external influence and manipulation. The evidence in this case suggests that Cornell's actions may have been more reflective of this vulnerability than of a legitimate intent to harm.

Cornell's interactions with the FBI informant appear to have escalated his interest in extremist rhetoric, yet it is well-documented that he was neither a mastermind nor an instigator. The informant in Cornell's case was a significant factor in his eventual arrest. Initially, Cornell was not involved in any significant terrorist activity. He was nothing more than a big talker on the internet. He was surveilled and approached by an informant who encouraged him to take concrete steps toward carrying out an attack. Cornell felt like he had a trusted friend. He felt important around the informant and the informant made a point to remind Cornell of that. The informant would often tell Cornell how he liked what he had to say, something Cornell did not have with others. Indeed, experts within the FBI concluded that Cornell posed minimal threat to public safety. While Cornell is not pushing blame on the FBI or its informant, as Cornell did make ill comments and shared harmful beliefs and ideas, as he agrees, we are stating that the relationship between himself and the informant helped add fuel to an already burning fire. Cornell admits here that his plans were wrong and his support for ISIS likewise was wrong. What we are stating here is only how the FBI didn't try helping Cornell or push into the right direction, but furthered enabled those harmful beliefs and ideas.

The Defendant, only 20 years old at the time of his arrest, was especially vulnerable to manipulation. As detailed in case law (e.g. Roper v. Simmons, 543 U.S. 551 (2005)), young people lack the maturity and experience of adults, making them more susceptible to coercion.

11

## 7. Media Bias and Misrepresentation

From the moment of his arrest, the media painted a picture of Cornell as a radical extremist. News outlets referred to him as an ISIS sympathizer, without much attention given to the facts that would suggest otherwise. The media's portrayal often focused on his appearance, his radical statements, and his expressed desire to carry out an attack. However, less attention was given to the role of the FBI informant in manipulating Cornell's actions, or to the fact that his attack was foiled before it began.

While the media sensationalized his case, they failed to provide a complete picture of Cornell's actions, motivations, and the potential for enablement. In fact, some of the reports implied that he had been radicalized and had plotted the attack entirely on his own, which was far from the truth. By not considering the FBI's involvement, media outlets presented a skewed narrative, one that portrayed Cornell as a dangerous threat when his actual ability to carry out the attack was minimal.

## 8. Over-Sentencing

One of the most striking aspects of Cornell's case is his lengthy 30-year sentence. In comparison to other terrorism-related cases, where individuals who caused significant harm or who were directly involved in attacks received far less time, Cornell's sentence seems disproportionate. For instance, individuals involved in attacks such as the Boston Bombing (United States v. Khairullozhon Matanov) or the Orlando nightclub shooting (United States v. Noor Zahi Salman, 2018 U.S. Dist. LEXIS 31681 (M.D. Fla. Feb. 2, 2018)) received sentences much less severe than Cornell's, despite their actions resulting in deaths and destruction.

Cornell's case stands in stark contrast to these other cases, not because his alleged intentions were any less serious, but because he did not cause harm, and in fact, his plans were never close to being realized. His failure to obtain weapons, combined with the fact that the plot was largely orchestrated by an FBI informant, suggests that Cornell was unlikely to have been capable of carrying out the attack without significant external influence.

This brings to light a larger questions about the fairness of sentencing in terrorism-related cases. Did Cornell deserve a 30-year prison sentence simply for expressing radical thoughts and attempting to act on them, even though he was foiled by the very system that surveilled him? Given that no harm was done, and the nature of his plot remained unrealized, a lighter sentence or even a different approach to rehabilitation and oversight could have been considered.

## 9. Unfair Treatment in Court

The court's handling of Cornell's case also raises concerns about the fairness of the proceedings. Much of the focus was placed on his radical views and his association with ISIS, rather than on the reality that his actual ability to carry out a terror attack was limited and thwarted early on.

Statements made by the prosecution emphasized the threat Cornell posed to national security, but they did not adequately address the central issue: the role played by the FBI informant, who has clearly encouraged and amplified Cornell's actions. The prosecutions evidence was based on words and intentions rather than concrete actions. Yet, despite these facts, the court imposed a severe sentence, based on the perceived severity of the threat, which in hindsight, seems more hypothetical than real.

The negative portrayal was not limited to the media. The court proceedings, which were influenced by the media coverage, contributed to an environment where Cornell's actions were seen as more severe than they actually were. The rhetoric used by both the prosecution and the media suggested a grave threat, despite the fact that no harm was ever done.

## 10. Sentencing Disparities

Christopher Lee Cornell was arrested in 2015 after plotting a terrorist attack on the United States Capital. At the

time, he was only 20 years old, with no history of violence, limited financial resources, no access to weapons, and no transport. The plot, while framed as a serious national threat, was largely orchestrated as part of an FBI sting operation, with authorities monitoring his communications and movements. Ultimately, the case presented Cornell as a lone individual encouraged by an FBI informant, posing no immediate or feasible threat. Cornell's sentence 30 years in federal prison has since raised questions about proportionality and fairness, especially given the lack of real-world execution of the plot and his limited capability to act.

The imposition of a 30-year sentence on a first-time offender who neither harmed nor posed a direct threat to anyone is an anomaly when contrasted with similar cases. Federal sentencing data reveals that many individuals of violent offenses, including robbery and even manslaughter, often receive less severe penalties.

In this case, the harsh sentence seems to have been influenced more by the symbolic weight of the charges than by the Defendant's actual conduct or threat level.

In federal courts, sentencing disparities are a valid and often compelling argument when examining fairness and consistency in sentencing. Under 18 U.S.C. 3553(a), federal judges must consider several factors when determining sentences, including the need to avoid unwarranted sentencing disparities among defendants with similar records and offenses. The notion that similar crimes should lead to similar punishments is not only an ethical stance but it is rooted in legal precedent as well. In United States v. Booker (543 U.S. 220 (2005)), the Supreme Court emphasized that sentencing should be guided by fairness, allowing judges to use discretion while still honoring the guidelines' purpose of consistency.

Cornell's case, however, raises concerns due to the mark difference in his sentence compared to others with comparable charges but more direct threats or actual harm. Below, we examine cases of similar nature, drawing comparisons to highlight the sentencing disparity in Cornell's case.

Case Example 1: United States v. Rezwan Ferdaus 2011 U.S. Dist. LEXIS 139853 Criminal Action No. 11-10331-RGS
Background: In this case, Ferdaus, a Massachusetts resident, was arrested in 2011 for attempting to plan an attack on the Pentagon and Capital using explosive-laden drones. Like Cornell's case, Ferdaus' plot was mostly hypothetical and involved no imminent threat. FBI agents provided him with fake weapons and explosives.
Sentence: Ferdaus received a sentence of 17 years in prison.
Comparison: Despite possessing detailed plans and training, Ferdaus received a significantly shorter sentence than Cornell, though both cases involved FBI stings and no real harm or access to functional weapons.

Case Example 2: United States v. Fareed Mumuni 946 F.3d 97; 2019 U.S. App. LEXIS 38515 No. 18-1604-cr
Background: Fareed Mumuni, a New York resident, was arrested in 2015 and faced allegations of plotting to support ISIS and conduct terrorist acts. Unlike Cornell, Mumuni's case involved direct physical violence. When FBI agents attempted to arrest him, Mumuni attacked an agent with a knife, striking the agent multiple times.
Sentence: Despite the assault and clear intent to harm, Mumuni received a sentence of 17 years in prison notably shorter than Cornell's sentence.

Case Example 3: United States v. Elmer Stewart Rhodes 648 F. Supp. 3d 801; 2022 U.S. Dist. LEXIS 14201 Case No. 4:22-MJ-11 KPJ
Background: In this case, Rhodes, the leader of the Oath Keepers, a far-right militia, was convicted of seditious conspiracy for orchestrating an insurgency at the United States Capital building on January 6, 2021. Evidence presented during trial included messages and plans to block the certification of the election, suggesting the use of violence if necessary. Over 140 police officers were injured, with injuries ranging from concussions to broken bones. The chaos resulted in several deaths.
Sentence: Rhodes received an 18-year sentence, significantly shorter than Cornell's despite leading a coordinated attack. Rhodes' sentence was later commuted on January 20, 2025 by president Donald J. Trump.

Case Example 4: United States v. Jacob Anthony Chansley (aka QAnon Shaman) 2021 U.S. Dist. LEXIS 172264 Case No. 21-cr-3 (RCL)
Background: He became one of the most recognizable figures from the January 6, 2021 insurgency at the United States Capital building due to his horned helmet and face paint. He pleaded guilty to obstructing an official proceeding.
Sentence: He was sentenced to 41 months in prison. Chansley's sentence was later pardoned on January 20, 2025 by president Donald J. Trump.

Case Example 5: United States v. Guy Wesley Reffitt 2024 U.S. Dist. LEXIS 66033, 2024 WL 1577941 ( D.D.C. Apr. 10, 2024)

Background: Guy Reffitt was a member of the Three Percenters militia, and was the first January 6 defendant convicted at trial.

Sentence: He was sentenced to over 7 years for charges including obstruction and carrying a firearm during the insurgency. Reffitt's sentence was later commuted by president Donald J. Trump.

Case Example 6: M19 Terrorist Group

Background: The M19 Communist Organization, active in the 1980's, was responsible for bombings, including the 1983 United States Capital bombing that caused millions in damage.

Sentencing: Linda Evans was convicted of multiple charges related to explosives and sentenced to 40 years in prison. She was later released in 2001 after serving 16 years. Laura Whitehorn served 14 years in prison after pleading guilty to charged linked to the Capital bombing and other attacks. Gloria Anzola and Andres Alamarales received sentences comparable to or less then Cornell.

Case Example 7: United States v. David Williams, Onta Williams and Laguerre Payen 2023 U.S. Dist. LEXIS 129978 09 cr 558 (cm)

Background: The Newburgh Four James Cromitie, David Williams, Onta Williams, and Laguerre Payen found themselves embroiled in a conspiracy they did not conceive. The FBI, through the use of informants, supplied inert explosives and manufactured scenarios to lure the defendants into criminal activity. For months, they were led to believe they were scouting targets and securing weaponry, including surface-to-air missiles, under the guise of a radical Islamist plot. Central to the plot was the revelation that the FBI not only invented the conspiracy but also identified the targets, thereby shaping the entire narrative of the alleged terrorist plot. The defendant, lacking the means and wherewithal, could not have independently devised such a sophisticated and perilous scheme involving missiles. Yet, they faced severe consequences a 25-year sentence that seemed disproportionate to their actual capacity and intent.

Sentence: In a remarkable turn, the presiding judge, influenced by her prior ruling in cases like United States v. Williams, opted to reassess the sentences of three of the Newburgh Four defendants. Utilizing her authority under the FSA's revision to 18 U.S.C. 3582(c)(1)(A), which allows for sentence reductions in certain circumstances, she acknowledged the mitigating factors of entrapment and revised their sentences according.

Case Example 8: United States v. Paul M. Rosenfeld
Background: Paul M. Rosenfeld, a 56-year-old from Rockland County, New York, was arrested on October, 2018, for constructing a 200-pound bomb in his basement with plans to detonate it on the National Mall in Washington, D.C., on Election Day. His intention was to draw attention to the political concept of "sortition", advocating for the random selection of government officials instead of elections.
Sentence: Rosenfeld was charged with an explosive device and transporting explosives across state lines. In May 2019, he was sentenced to 16 months in federal prison, followed by a potential psychiatric facility stay.

11. Sentencing

Sentencing was conducted on December 5, 2016 at the U.S. Potter Stewart Courthouse, located in Cincinnati, Ohio. (R. 130, Minutes: Sentencing; R. 151, TR. 12/5/16, ID 1341-1471). At sentencing Judge Sandra S. Beckwith noted that Cornell's criminal history was "objectively minimal" but included juvenile adjudications for domestic violence which involved claims attacks upon his parents. Judge Beckwith noted that these adjudications clearly suggested an aggressive and defiant attitude toward authority figures. (R. 151, TR., 12/5/16, p. 120, ID 1460). In response to the material regarding others convicted of terrorist related activity, Judge Beckwith acknowledged its need to consider the so called "disparity" factor at 18 U.S.C. 3553(a)(6), however, declined to do so stating that no two defendants or cases are sufficiently similar, no comparable cases has been presented, and it couldn't "draw helpful, meaningful comparison" without reviewing presentencing reports, sentencing transcripts, or the statement of reasons from the judgement and commitment orders for the cases both parties presented. (R. 151, TR., 12/5/16, pp. 117, 121-122, ID 1457, 1461-62).

Judge Beckwith noted that Cornell has been in custody since his January 14, 2015 arrest yet only in the spring of 2016 claimed he felt better without practicing religion. Judge Beckwith was concerned that he "continues to practice Islam, albeit in a more moderate form." (R. 151, TR., 12/5/16, pp. 119-120, ID 1459-60). Judge Beckwith failed to consider Dr. Bresler's opinion regarding Cornell's rehabilitation potential and stated there was "little hope for someone who has no supportive family or friend to help" with "parents completely overwhelmed by the magnitude of his disorder that they cannot be expected to be helpful in rehabilitation." (R. 131, Judgment, ID 1135-41).

The United States District Court Judge is required to impose a sentence sufficient, but not greater than necessary, to comply with the statutory mandate at 18 U.S.C. 3553(a)(2), while the court is required to review the sentence imposed for reasonableness. United States v. Bold, 511 F. 3d 568, 578 (6th Cir. 2007). This Court's reasonableness review requires it to examine both the procedural and substantive reasonableness of the sentence imposed. United States v. O'Georgia, 569 F. 3d 281 287 (6th Cir. 2009).

Herein, the 30 year sentence imposed is procedurally unreasonable for two reasons.

First, the United States District Court Judge, Sandra S. Beckwith, imposed the sentence based on a clearly erroneous fact. Judge Beckwith was wrong when she misunderstood Cornell's juvenile record. This error and reliance upon an incorrect prior record make the sentence procedurally unreasonable. The sentence is also procedurally unreasonable because Judge Beckwith failed to consider a pertinent statutory factor. Judge Beckwith acknowledged, but specifically declined to address the need to avoid unwarranted sentencing disparities, as Congress requires. 18 U.S.C. 3553(a)(6). In addition to being procedurally unreasonable the 360 month sentence is substantively unreasonable for two reasons.

First, Judge Beckwith considered an impermissible fact - Cornell's practice of Islam.

Second, Judge Beckwith gave undue weight to a pertinent statutory factor - his need for personal deterrence and rehabilitation.

The Court reviews the question of whether a sentence is reasonable by examining the "factor evaluated and the procedure by the District Court in reaching its sentencing determination." United States v. Webb, 403 F. 3d 373, 383 (6th Cir. 2005).

When, after being given an opportunity below, a party failed to object, the standard of review for procedural unreasonableness becomes plain error. United States v. Vonner, 516 F. 3d 383, 385 (6th Cir. 2008). Plain error requires the challenging party to show that the court made an error, which was obvious or clear, affected the defendant's substantial rights, and impacted the fairness, integrity, or public reputation of the judicial proceedings. United States v. Gardiner, 463 F. 3d 445, 459 (6th Cir. 2006).

The review for reasonableness begins with a determination of whether the sentence imposed by the United States District Court Judge was procedurally reasonable. United States v. Bold, supra, at 578-79. A sentence will be procedurally unreasonable if, inter, alia, the United States District Court Judge imposed a sentence based upon clearly erroneous facts, or if it fails to consider a pertinent factor delineated at 18 U.S.C. 3553(a). Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Peebles, 624 F. 3d 344, 347 (6th Cir. 2010).

Herein, the 360 months sentence imposed, (R. 131, Judgment, ID 1135-41), is procedurally unreasonable for two reasons.

First, the United States District Court Judge, Sandra S. Beckwith, imposed the sentence in reliance upon clearly erroneous facts because Judge Beckwith misunderstood and misstated Cornell's prior record.

Second, Judge Beckwith failed to consider a pertinent statutory factor - the need to avoid unwarranted sentencing disparities. 18 U.S.C 3553(a)(6).

Cornell acknowledges that his history and characteristics compromise a pertinent sentencing factor. 18 U.S.C. 3553 (a)(1).

Judge Beckwith properly noted that his criminal history was "objectively minimal", (R. 151, TR., 12/5/16, p. 120, ID 1460). Judge Beckwith improperly replied upon two Hamilton County juvenile court docket numbers which described a single altercation Cornell has with his mother, albeit in his father's presence. (PSR 70, 71). The uncontroversial PSR confirms that this incident did not involve an altercation with his father. Id. Moreover, Judge Beckwith failed to consider the full record. The PSR confirmed that Cornell's father would lose his temper, hit him or jump on him in anger, and was arrested for hitting Cornell and his brother to discipline them. (PSR, 85). In concluding that the single incident resulting in the defendant being adjudicated as a 14 year old clearly suggested an "aggressive and defiant attitude toward authority", (R. 151, TR., 12/5/16 p. 120, ID 1460), Judge Beckwith simply got it wrong. While part of his history and characteristics, Judge Beckwith's reliance on these clearly erroneous facts render the sentence imposed procedurally unreasonable.

Second, a United States District Court Judge is statutorily required to consider the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6).

Through counsel, Cornell submitted sentencing memorandum which addresses the sentences imposed on several individuals convicted of terrorism offenses. (R. 126, Cornell Sentencing Memorandum, ID 777-850; R. 129, Cornell Supplemental Sentencing Memorandum, ID 897-1132). The United States filed a memo in response, likewise addressing the need to avoid unwarranted disparities. (R. 127, U.S. Sentencing Response, ID 850-85). In addition, the defense counsel addressed the argument at sentencing, (R. 151, TR., 12/5/16, pp. 88-90, 108-113); (ID 1429-30, 1448-53), drawing the government's "disparity" argument. (R. 151, TR., 12/5/16, 99. 98-101, ID 1438-41).

It is axiomatic that once this non-frivolous argument was raised, the United States District Court Judge, Sandra S. Beckwith, obligated to address it and avoid unwarranted disparity on a national scale, even if the United States District Court Judge ultimately decided to reject it. United States v. Wallace, 597 F. 3d 794, 803 (6th Cir. 2010). Judge Beckwith acknowledges the need to consider the "disparity" factor, (R. 151, TR., 12/5/16, pp. 117, 121, ID 1457, 1461), yet no such comparable cases has been presented. (R. 151, TR., 12/5/16, pp. 122, ID 1462). Judge Beckwith did not acknowledge that both parties had filed sentencing memorandum addressing the sentences imposed on others convicted of terrorist related activity, however concluded it couldn't "draw helpful, meaningful comparisons" without viewing presentencing reports, sentencing transcripts, or the statement of reasons from the judgement & commitment order. (R. 151, TR., 12/5/16, pp. 122, ID 1462). Given the congressional mandate and this Court's guidance that global, nationwide sentence disparities are the focus of this statutory sentencing consideration, United States v. Contser, 514 F. 3d 508, 521 (6th Cir. 2008), it is a dereliction of its duty to decline to consider this pertinent statutory factor. The failure to consider this statutory factor and explain this non-frivolous argument mandates vacating the sentencing because it is procedurally unreasonable.

Reviewing the reasonableness of a sentence requires an examination of both the procedural and substantive component. United States v. O'Georgia, supra at 287. The United States District Court reviews the reasonableness of the sentence imposed under an abuse of discretion standard. Gall, supra, at 51; United States v. Solana-Rosales, 781- F. 3d 345, 355-56 (6th Cir. 2015).

The sentenced imposed by the United States District Court is substantively reasonable when it is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient, but not greater than necessary to comply with the purpose of 3553(a)." United States v. Curry, 536 F. 3d 571, 573 (6th Cir. 2008); United States v. Vowell, 516 F. 3d 503, 512 (6th Cir. 2008). In reviewing a sentence for substantive reasonableness this Court considers the length of the sentence imposed, the factors the United States District Court evaluated, United States v. Webb, 403 F. 3d 373, 383 (6th Cir. 2005), and looks for "an explanation of why the District Court chose the sentence that it did." Vowell, supra, at 510. It must consider the totality of the circumstances, Gall, supra, at 51, and that the sentence may be unreasonable if it was selected arbitrarily, it was based on impermissible factors, failed to consider pertinent factors, or the United States District Court gave an unreasonable amount of weight to any factor. Id. United States v. Welch, 2013 WL 238178, *2 (6th Cir. 2013).

In the case at bar there were no objections, (R. 151, TR., 12/5/16, p. 2, ID 1342), however, the 360 month sentence imposed (R. 131. Judgment, ID 1135-41) is substantively unreasonable for a couple reasons. Simply, Judge Beckwith considered an impermissible factor - that Cornell practices Islam and it gave undue weight to the pertinent factor - his need for personal deterrence/rehabilitation potential.

17

12. Youthful Offenders and Rehabilitation

Amendment 814 provides a critical framework for understanding and addressing the role of youthful offender status in compassionate release motions. This amendment, couple with the growing body of neuroscience research and legal precedent, underscores the importance of recognizing the diminished culpability of defendants under the age of 25.

Scientific studies consistently demonstrate that the human brain continues to develop into the mid-20s. The prefrontal cortex, responsible for executive functions such as decision-making, impulse control, and understanding long-term consequences, is among the last region to mature.

A 2010 study published in Nature Neuroscience found that individuals under 25 exhibit heightened impulsivity and risk-taking behaviors due to an underdeveloped prefrontal cortex.

The limbic system, associated with emotions and reward processing, is hyperactive in young adults, further driving impulsive actions.

Research by the National Institute of Mental Health (NIMH) indicates that young adults are more susceptible to peer pressure, often making decisions based on immediate rewards rather than future consequences.

A 2016 study in the Lancet emphasized that brain maturation varies significantly among individuals, with full cognitive control typically not achieved until age 24-26.

These findings demonstrate that the 20-year-old defendant's action at the time of the offense likely stemmed from neurological immaturity and susceptibility to external influences.

Courts have increasingly acknowledged the relevance of youthful offender status in determining culpability and eligibility for compassionate release. The United States Supreme Court has recognized the diminished culpability of young offenders in landmark cases such as:

Roper v. Simmons, 543 U.S. 551 (2005):

Held that the death penalty for individuals under 18 violates the Eighth Amendment, citing the reduced moral culpability of youth.

Graham v. Florida, 560 U.S. (2010):

Banned life without parole for non-homicide offenses committed by juveniles, emphasizing the potential for rehabilitation.

Miller v. Alabama, 567 U.S. 460 (2012):

Prohibited mandatory life without parole for juveniles, reaffirming the importance of considering youth in sentencing.

While these cases focus on juveniles, their principles extend to youthful offenders under 25, as recognized by several district and appellate courts.

Within the Sixth Circuit, several cases highlight the application of youthful offender status in compassionate release motions:

United States v. Ruffin, 978 F.3d 1000 (6th Cir. 2020):

Explored the relevance of individual circumstances, including age and maturity, in evaluating compassionate release.

United States v. McCoy, 981 F.3d 271 (6th Cir. 2020):

18

Acknowledged the evolving standards of decency and the potential for rehabilitation among youthful offenders.

United States v. Bass, 17 F.4th 629 (6th Cir. 2021):

Highlighted the role of age-related factors in reducing sentences under compassionate release provisions.

These cases demonstrate the willingness of the Sixth Circuit to consider youth and immaturity as mitigating factors in sentencing and release decisions.

Numerous studies corroborate the argument that young adults lack maturity and exhibit decision-making patterns distinct from older adults. Examples include:

"Adolescent Brain Development and Legal Culpability" by the American Bar Association (2004):

Emphasizes that individuals under 25 lack the full cognitive ability to assess risks and foresee consequences.

"Young Adulthood as a Transitional Period" (Journal of Youth Studies, 2018):

Identifies the age range of 18-24 as a critical period marked by incomplete psychological development.

These studies reinforce the argument that the 20-year-old defendant's action should be viewed through the lends of developmental immaturity.

The case for compassionate release under Amendment 814 is strengthened by recognizing youthful offender status and its implications. The 20-year-old defendant, Christopher Lee Cornell, likely acted with diminished capacity for judgment and foresight, as evidence by neuroscience research and legal precedent. The Sixth Circuit's jurisprudence, coupled with robust scientific findings, underscores the need for a compassionate and rehabilitative approach to youthful offenders.

Amendment 814 to the U.S. Sentencing Guidelines provides for adjustments in cases where defendants, especially youthful offenders, demonstrate mark rehabilitative progress. Courts, under 18 U.S.C. 3582(c)(2), may reduce sentences if the defendant has shown evidence of rehabilitation and has a low risk of recidivism. As noted in United States v. Shaya, 714 F.3d 874, 877 (6th Cir. 2012), the Sixth Circuit has acknowledged that sentence reductions may be warranted when defendants demonstrate "significant positive change" while incarcerated.

Given that the Defendant was only 20 years old at the time of arrest, a youthful offender designation is appropriate. Courts have long recognized that young adults may be susceptible to impulsive and poor decision-making but are capable of profound personal growth, as discussed in Graham v. Florida, 560 U.S. 48 (2010), which emphasized the potential for rehabilitation in younger offenders.

The Sentencing Commission and various legal precedents recognize that youthful offenders often exhibit different behavioral patterns compared to old individuals. The development of the brain continues into a person's mid-20s, influencing behavioral and decision-making. Cornell's age at the time of the offenses should be considered in light of his developmental stage, which was characterized by impulsivity and susceptibility to external influences, including peer pressure. Research indicates that adolescents are particularly vulnerable to external influences, which can significantly impact their decision-making processes.

Cornell's rough upbringing led him to seek mentor figure roles and guidance from older individuals, which further influenced his susceptibility to external pressures. Research indicates that adolescents are particularly vulnerable to peer influence, and in Cornell's case, the absence of positive role models made him more likely to seek acceptance and guidance from those who may not have had his best interests at heart. This combination of seeking validation and the inherent impulsivity of youth played a significant role in his action during his formative years.

The November 1, 2024, amendment to the United States Sentencing Guidelines includes provisions that emphasize the consideration of youthful offenses. Specifically, it highlights that courts should account for the developmental differences in individuals who committed offenses before reach full maturity. These include factors such as impulsivity, vulnerability to peer pressure, and incomplete brain development, all of which can significantly affect decision-making and culpability. The amendment further supports incorporating these considerations into sentencing and compassionate

release evaluations, aiming to reflect the higher potential for rehabilitation among youthful offenders.

This policy shift aligns with broader research acknowledging that youth are distinct in their capacity for change and growth, and it encourages courts to weigh these factors accordingly when determining sentences or reevaluating cases for potential release. Recent case law illustrates the impact of youthful age even in violent cases. For example, in United States v. Griggs, No. 2:08-cr-00920-TLN (E.D. Cal. 2020), the court granted compassionate release considering the progress made in rehabilitating himself during incarceration and recognizing the defendant's youth at the time of the crime.

Cornell's risk of reoffending is notably Low, a critical factor in consideration for compassionate release. (See, Exhibit 5) For the past 9 years, the Defendant has remained free from major disciplinary actions, highlighting his ability to adhere to rules and maintain good behavior. While minor incidents may have occurred earlier in his incarceration, these are not unusual for individuals adjusting to the challenges of prison life. What is significant is their sustained record of good behavior and their focus on self-betterment, which reduce the likelihood of recidivism. Studies have shown that individuals who have demonstrated significant rehabilitative progress, especially those with a history of youthful offenses, often exhibit reduced recidivism rates. This is support by case law such as United States v. McCoy, 981 F.3d 271 (4th Cir. 2020), where the court acknowledged that a defendant's low recidivism risk, coupled with strong rehabilitation efforts, warranted compassionate release.

At the time of his offense, Cornell was only 20 years old, a period of life marked by naivety and susceptibility to poor judgment. Now 30, he has had a decade to reflect, mature, and develop a deeper understanding of his past actions and their impact. During this time, he has renounced the radical ideologies that contributed to his crime.

The 2024 amendment to the sentencing guidelines reinforces this understanding by directing courts to weigh the transformative potential of youthful offenses more heavily. The amendment underscores those individuals who committed offenses as adolescents, like Cornell, pose significantly reduced risks to public safety due to their demonstrated growth and rehabilitation.

Recognizing the transformative potential of rehabilitation underscores the importance of supporting individuals like Cornell. Studies show that when inmates engage in educational programs and interventions, their likelihood of reoffending decreases significantly. Thus, releasing individuals who show low risk and substantial progress not only serves their reintegration into society but also enhances public safety, as they are less likely to revert to criminal behavior. In Cornell's case, his demonstrated commitment to person change reinforces the argument for his compassionate release and highlights the efficacy of rehabilitation as a means of reducing crime rates.

According to the Sentencing Commission, "A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Various risk factors, such as environmental influences, adverse childhood experiences, substance abuse, limited educational opportunities, and familial relationships, can significantly impact a youthful individual's development into their mid-20s and contribute to involvement in the criminal justice system. Furthermore youthful individual's tend to exhibit greater impulsivity, risk-taking behavior, and susceptibility to external influences as their brain continue to develop into young adulthood, rendering them more amenable to rehabilitation. The age-crime curve, a consistent finding in criminology, illustrates a decrease in criminal behavior with age, suggesting that age-appropriate interventions and protective factors may facilitate desistance from crime. Consequently, in appropriate cases, the court may explore alternative forms of punishment besides imprisonment to fulfill the sentencing objectives.

The Commission has underscored that ongoing brain development until the mid-20s, on average, may contribute to impulsive actions and reward-seeking behavior, albeit the precise age impact varies individually. Additionally, research has established a correlation between age and rearrest rates, with younger individuals experiencing higher rates of rearrest and quicker recidivism after release compared to older individuals".

In Cornell's case, the Court did not address this factor, nor did it consider how his youthful age at the time of the offenses should impact the evaluation of his rehabilitative efforts and current readiness for reintegration into society. His progress aligns with evidence-based practices that support the reintegration of rehabilitative individuals into society, thereby enhancing public safety and reducing the likelihood of reoffending. Acknowledging the impact of youthful offenses, susceptibility to peer pressure, and the search for guidance and validation due to a challenging upbringing is vital for a fair assessment of Cornell's compassionate release request.

Rehabilitation

Before his incarceration, Cornell admits and agrees he harbored harmful ideologies rooted in radicalized beliefs. However, during his time in prison, he has deliberately distanced himself from these ideologies, embracing tolerance, understanding, and peace. Cornell has since condemned and denounced ISIS and other terrorist groups who harbor harmful ideologies rooted in radicalized beliefs. He has also abandoned his previous harmful ideologies rooted in radicalized beliefs.

In the 10 years of his incarceration, Cornell has demonstrated remarkable personal growth and resilience. He has sought psychological support, engaged in self-improvement, and committed himself to a future as a law-abiding and contributing member of society. Cornell admits that he has learned a great lesson from his experience while in prison. His previous words and actions that lead him to where he is today were neither correct nor helpful to either him or others around him. Cornell admits that he has no desire to be involved with or return to those same harmful ideologies he once harbored. Cornell has acquired the necessary skills that demonstrate his self-control and ability to reach out to others for help. Through prison programming Cornell has come to a better understanding of what is right and wrong. And, as he admits, his previous thoughts and behaviors were in fact wrong.

Cornell has become more appreciative of the freedoms and rights given to him by being an American and living in the United States. Cornell understands that America, though having its issues at times, is indeed a beautiful and free country that allows opportunities for all people - to live a life in the pursuit of happiness. Cornell acknowledges and regrets many mistakes he made before and after his arrest that disallowed him that pursuit. Cornell admits and agrees that his actions before and after his arrest were neither correct nor proper. He deeply regrets the choices he made that found him in the current situation. Cornell acknowledges how badly this criminal case impacted his loved ones and community, and is deeply regretful of it. He regrets the humiliation and troubles brought about those involved; his family, his friends, his community, and the American people in totality. Cornell apologizes to all those affected by this criminal case, including the court members who had to be involved with this matter. Cornell further apologizes and regrets the statements made in a Fox19 interview following his arrest, an act influenced by severe depression, long-term isolation, and undue pressure from an FBI informant housed in a cell adjacent to Cornell at the Boone County jail, located in Kentucky. (R. 15, Tr., 12/5/16, pp. 60, 12-24, ID. 1400) Cornell is very regretful of the insults and threats made against America and its leadership during the Fox19 interview. He acknowledes those insults and threats as being harmful and incorrect and he has no desire to act upon any of it.

Cornell was a very fragile and unstable man at the time of his arrest, and some would say lost, but today through much rehabilitative efforts he has become a strong and stable man and ready to reenter society. Through many years of struggle he found his way to a path of balance, involving peace and tolerance. Cornell acknowledges the opportunities America provides to its people, and he too himself hopes to share in it. Cornell recognizes America as a great country full of amazing opportunities, especially under its current leadership. If given the opportunity for freedom Cornell can guarantee the court that he would not pursue the same radicalized path that lead him to where he is today. He understands that extremism and terrorist beliefs are incorrect and inhumane. He understands that terrorist propaganda is harmful and non-productive. After seeing the inside of prison and spending many years in cells he understands well that it is not the way.

2 1

Cornell has so much supportive people in his life that can and will contribute to his life outside of prison. With his supervised conditions it will be difficult, if not impossible, for Cornell to even consider breaking a single law. And with Cornell already experiencing the tough life of being in prison he is sure to never find himself in such a place again. Cornell cares about his freedoms, his life, his future, his family and oppurtunies awaiting him and hopes to leave from prison to lead a successful life. He hopes to leave from prison to take care of his elderly parents and spend time with his family in productive ways, building and bonding with them. Cornell admits that prison is an environment and place that is not good or healthy. Prison allows excellent chance for rehabilitation efforts, we agree, but Cornell has learned a great lesson from his time in prison and will avoid every decision that could send him back to it. Prison deprives men of so many freedoms and opportunities and it makes one ponder. Cornell has come to appreciate those freedoms and opportunities America provides for its people and the lenient laws and rules it expects them to follow. Cornell understands that many other countries don't have it as good as us Americans do and he will appreciate the chance to live freely and happily.

Moreover, his consistent conduct over the past 10 years, devoid of any actions or statements aligning with his former harmful beliefs and ideology, further demonstrates his transformation. Cornell has since abandoned those harmful beliefs and ideologies carried by terrorists and other radicalized groups and individuals and has become more peaceful and tolerant towards other backgrounds and faiths. Cornell has left off from his previous path of support for hatred and violence and anti-Semitism. The absence of similar behavior to his pre-trial conduct solidifies the argument that he is no longer a danger to society.

Over the past decade, Cornell has taken extraordinary steps to rehabilitate himself and prepare for life outside prison. He completed numerous education and vocational programs, including ServSafe Food Handler Training certification, CDL Drivers License training, Business Math, and Carpentry Math, equipping himself with practical skills for employment. Participation in programs such as Suicide Watch Companion, Drug Education, Anger Management, Interfaith Dialogue, International Open University, Motivational Coaching, Healthy Lifestyle Wellness, and the CORE FBOP program underscores his efforts to address personal growth, emotional regulation, and community engagement. Cornell has been working as a unit orderly and is a reliable and trusted worker. He has plans to seek proper employment, housing, transport and education upon leaving prison. (See, Exhibits 5, 6, 7, 8, 9, 10, 11, 12)

Compassionate release would allow Cornell to build a life anchored in redemption and purpose. He has plans to establish a family, become a role model, and contribute positively to his community. With the support of his family, a committed partner, and employable skills, he is well-positioned to succeed in his post-incarceration life.

CONCLUSION

For the foregoing reasons, the Defendant, Christopher Lee Cornell, respectfully requests that this Court reduce his sentence, considering the sentencing disparity and his youthful offender status, his lack of prior criminal history, and his demonstrated rehabilitation. The Defendant has proven his capacity for change and poses Low threat to society, warranting a sentence reduction consistent with the sentencing disparity and Amendment 814 and in line with the goals of the Sentencing Reform Act.

Respectfully Submitted,

Sign: _____

Christopher Lee Cornell
#72795-061
Federal Correctional Institution
P.O. Box 1000
Cumberland, Maryland 21501-1000

Date: Feb. 28, 2025

Exhibit 1

Exhibit 2

on a list of disqualified persons due to the open terror investigation.[4] However, the bottom line is that the gun store employee initially refused to sell Chris the firearms until after the background check came back clear. The gun store employee told Chris to give him a telephone number so he could reach him once the background check cleared. Chris went back to the car where the informant was waiting in order to figure out a telephone number to give to the gun store because he did not have a cell phone and did not want the gun store to call his parents' house. The informant helped him to create a Google number. When Chris went back into the store to provide the telephone number, he was informed that he could purchase the guns.

Finally, a close examination of the "Message to America" speech that the Government quotes in its Sentencing Memorandum was actually copied by Chris from other speeches that he found online. In his Feb. 15, 2016 letter, Chris wrote, "The speech was copied from other speeches with a couple words added in and switched around." (Ex. A., Feb. 15, 2016 Cornell Letter)(Ex. E, Message to America Sources). Through all the online posting, the phone call to the news, and the statements made to the informant, nothing that came from Chris was an original idea. Rather all of his hate speech was copied from radical Islamic propaganda that he found very easily on the internet.

Chris created a character, with a different name, in a fantasy where this character was somebody in the world. But the character Chris created was not original—the script for this character was already written by the propaganda work of radical Islamists. Generally speaking, when someone plagiarizes their words and ideas, the words and ideas, no matter

---

[4] When defense counsel first spoke with the employee, he was not sure if the background check came back as a delay or a denial. The employee checked his notes and upon a follow-up conversation with counsel confirmed that the background check originally came back as a denial.

16

Exhibit 3

consequences. Ultimately, he took a "substantial step" when purchasing firearms. However, as will be discussed below, this "substantial step" is much farther removed from the actual crime than many terrorism plots that receive the kind of prison time the Government is requesting in this case. This "substantial step" is the purchase of firearms in Cincinnati, Ohio on January 14, 2015, with a plan to drive to Washington, D.C., scope out the capital, and then carry out the planned attack 6 days later.

Thus, while Chris deserves attempt liability, it also true that the nature of his inchoate offense involved a plan that was less fully developed than a typical attempt offense. After all, for attempt liability, a defendant's conduct "must be more than remote preparation." *United States v. Mandujano*, 499 F.2d 370, 377 (5th Cir. 1974). To be clear, counsel is not suggesting Chris' actions do not qualify as a "substantial step." However, for sentencing purposes and consideration of the nature of his offense, it is relevant that Chris' acts were far closer to "remote preparation" than, for instance, a defendant who pushes the detonator on a fake bomb.

Counsel respectfully submits that actions that result in actual harm deserve greater punishment. Similarly, substantial steps and plans that involve a feasible and soon-to-occur present danger of actual harm deserve greater punishment than an unrealistic plan that involves 6 days of additional forthcoming development.

It is important to note that the defense spoke to the gun shop employee who sold Chris the firearms. He informed the defense that Chris initially failed the background check and he could not sell him the gun that day. He also informed the defense that the FBI did something to make him pass the background check. The Government disputes that the Chris failed the background check and that the check was simply delayed because he was

TRULINCS 72795061 - CORNELL, CHRISTOPHER - Unit: CUM-D-A

--------------------------------------------------------------------------------------------

FROM: 72795061
TO:
SUBJECT: LETTER TO JUDGE
DATE: 01/29/2025 12:15:48 PM

Exhibit 4

Christopher Lee Cornell
#72795-061
Federal Correctional Institution
P.O. Box 1000
Cumberland, M.D. 21051-1000

Dear Judge,

I am writing you today, of my own free will, in hopes to find forgiveness, understanding and leniency from you and your Honorable Court in the following matter:

10 years ago I was arrested and convicted of a terrorism offense. I was sentenced to 30 years in federal prison for that offense. 10 years ago I was a lost and troubled young man, with no real direction or role models in my life. I like many sought direction and role models from people like ISIS or those who associated with them. I like those many others found myself on the internet watching and taking in the propaganda of terrorists. I thought at that time I found meaning and purpose. I thought I found a way to fix my situation and solve what problems I faced in my life. Instead of choosing the gang life or drugs, I chose another form of extremism, radicalization. But like any of those extremist I found a way out. Today I condemn and reject ISIS and any thoughts, beliefs and/or ideologies associated with ISIS and extremism. Before my arrest I was going through severe depression, isolation and lacked any real direction. I spent much of my time absorbing radical propaganda online. It would eventually lead me to meeting the older man I took as one of those role models, the informant in this criminal case, who I thought could be an ally and friend to help with these new thoughts and beliefs I found. As I admit, being with him I did feel important and felt a bit pressured at times, I did feel trapped in the conspiracy, but I don't want to put complete blame on him. I do take full responsibility for what occurred by my words and actions. I should have never found myself on the internet looking at that stuff nor seeking out people like him to interact with. Yes, he contacted me first, but it is no excuse as I didn't need to interact with him nor anybody else as I did. And so I take that responsibility and admit it being wrong.

Judge, 10 years ago I was a hot head. Angry and full of hate. I made irrationally decisions at times and didn't care about the outcome of my actions or who would be affected by it. I needed help. And unfortunately, but thankfully enough it was in prison I found help. 10 years ago I said and done a lot of bad things. Things that still haunt me to this day. I wouldn't say I was a bad man back then, but I certainly was misguided. Today I live with much regret and sorrow for the things that I said and done in my past and the people affected by it; be it my family, my friends, my community, the American public at large and the judicial system. I brought not only trouble to myself, but to those as well. And with that said, I am regretful and truly sorry for what occurred. 10 years ago I found myself face first on the ground being arrested with firearms. I was quickly transported to a jail cell and that's where the story began. In the beginning of my arrest it was troubling. I was already suffering from issues. With the arrest it made it much more and I made it my excuse. I caused a lot of trouble, sending my legal team and family into a crisis of their own. I found myself in and out of court for the terrible things I said and done. I insulted and threatened many of our government. I conducted interviews that I terrible regret doing for what trouble I brought to those involved. I brought much humiliation not only to myself and my loved ones, but our beautiful country as a whole. I didn't know the beauty of this country or the freedoms and rights it provided us at that time. I didn't know the values America had. It took 10 years to find that.

Judge, I really do love my country and its lenient laws and freedoms it brings us. I have learned so much over the years and had the opportunity to be around and live with so many amazing people of all walks of life; be it Black or White, Christian or Jew. I had the opportunity to build and bond with so many people. I had the opportunity to take care of them as a suicide watch companion and give them better guidance, acting as a role model. I had built many long-term friendships with those people. Before my arrest I lacked that ability, to get along and accept others of different faiths and backgrounds. And after my arrest I would've never thought of it happen, I was as it seemed determined. But today that is much different from what the court knew then. I am no longer that same lost and unstable man I once was. I found myself changing into who I am today. The man I wish the world would've known then. Today I cherish my life and the lives of others. I appreciate my American values. I appreciate the freedoms and rights we are given as American citizens. I understand America to be the land of opportunities and second

TRULINCS 72795061 - CORNELL, CHRISTOPHER - Unit: CUM-D-A

--------------------------------------------------------------------------------------------------------

chances, and that is what I am looking for with you. I hope to be able to contribute what skills and talents I learned while in prison to the world. I would like to get out of prison to help my elderly parents, to help my community, and help those who fell victim to radicalization like I did. If given the opportunity I would be happy to speak with youngsters that fell victim to the same propaganda and lies of ISIS I fell for and turn them from that path of destruction and provide them better guidance, as a role model - the role model I wish I had been at that time I was arrested.

If given the opportunity I guarantee I would never find myself in another court room or prison cell again. I plan to stay busy and productive when I get out of prison, pursuing education and employment, and building a family of my own - being a role model for what family I will have. I will stay away from those who are involved with radicalization, as I done since being in prison. I have learned many skills and talents while in prison and know what it takes to succeed. I have completely left off from what radicalization I was on 10 years ago and will pursue a better path. I know what mistakes I made before and will avoid them. I will avoid any and all terrorist propaganda and those associated with that ideology. I understand that hate and violence is never the answer and is wrong. And I understand it will not be tolerated in our country nor its communities. I hope to contribute to keeping violence away from our wonderful communities by participating in any available programs that will allow me to. Judge, I will do what it takes to prove to you and society I am not a danger or a threat.

I can prove myself if given a second chance, and won't let you or anybody else down. My old ways are gone. 10 years is a long time and enough time to figure things out. I was young when this all happened. I've grown up and matured. I no longer carry those same beliefs or ideas I once had and understand the consequences of them. I know the repercussions for the actions I once took and if taken again, and can confirm that prison is not a place any of us wants to go. Judge, I am a living example that rehabilitation is real, and if given the chance recidivism will not occur. I never want to come back to prison and will not. I will do whatever it takes to make sure it doesn't happen - with the help of my family and a strong community connection. If given relief and allowed to leave any time soon I would do whatever is asked of me by my probation officer and avoid violation of my supervision. That should be no issue for somebody like myself. By giving me relief and allowing me out sooner than what I was given would not jeopardize the safety of others or take away from the example that was expected to be made out of me, and I can assure that. Judge, many things must be considered, especially rehabilitation. With all due respect I can assure you I am very much rehabilitated and prepared for life outside of prison. 10 years for a man who was only 20 years old at the time of arrest is long enough to understand that. I missed out on a lot during those years, many opportunities. And I hope not to miss out any more. I can get out of here and if given the chance I can get out of here today and be that person that the court wants me to be of my 30 year sentence. All I need is a second chance, an opportunity, what our beautiful nation offers us all. And that is what I am respectfully asking for from you.

I respectfully ask that you please thoughtfully consider my words and allow some kind of relief.

Thank you very much for your time and consideration.

w/ great respect,

C. Cornell

Exhibit 5



# Certificate of Achievement

This certificate is awarded to

CHRISTOPHE CORNELL

Congratulations! You have completed

## ServSafe® Food Handler Training

| Instructor | T.CATALA | Date | 6/25/2024 |
|---|---|---|---|
| Organization | BOP | Location | FCI CUMBERLAND |

**National Restaurant Association**
175 W. Jackson Blvd, Ste. 1500
Chicago, IL 60604-2814
800.765.2122 in Chicago area
312.715.1010 Restaurant.erg I
ServSafe.com

©2014 National Restaurant Association Educational Foundation (NRAEF). All rights reserved. ServSafe® and the ServSafe logo are trademarks of the NRAEF, and National Restaurant Association® and the arc design are trademarks of the National Restaurant Association.
14I11701
1411

Exhibit 9

# Certificate of Completion

Presented to

Christopher Cornell #72795-061

For successfully completing the

Drug Abuse Education Course

The Drug Abuse Education Course is a minimum of 12 hours. This specific course consisted of 12 hours. The goal of this program is to help the offender to make an accurate evaluation of the consequences of his/her alcohol/drug use and consider the need for treatment.

12/7/2023

Date

Drug Abuse Treatment Specialist

FCI CUMBERLAND, Cumberland, MD

# Certificate of Achievement

Congratulations to

## CHRISTOPHER CORNELL



HEALTHY LIFESTYLE

For Successful Completion of

Healthy Lifestyle Wellness Class at F.C.I. Cumberland

January 2025



T. Shoemaker / Sports Specialist

Exhibit 8

# CERTIFICATE OF COMPLETION

This is to certify that

## Cornell, Christopher

(72795-061)

successfully completed

### Anger Management

at the

Federal Correctional Institution: Cumberland, Maryland

10/16/2024

Dr. Stoner – Staff Psychologist

```
   CUMEN  606.00 *        MALE CUSTODY CLASSIFICATION FORM      *        01-22-2025
PAGE 001 OF 001                                                          13:40:12
                            (A) IDENTIFYING DATA
REG NO..: 72795-061            FORM DATE: 12-03-2024            ORG: CUM
NAME....: CORNELL, CHRISTOPHER
                                     MGTV: NONE
PUB SFTY: GRT SVRTY,THRT GOVT,SENT LGTH  MVED:
                             (B) BASE SCORING
DETAINER: (0) NONE              SEVERITY.......: (7) GREATEST
MOS REL.: 192                   CRIM HIST SCORE: (00) 0 POINTS
ESCAPES.: (0) NONE              VIOLENCE.......: (5) < 5 YRS MINOR
VOL SURR: (0) N/A               AGE CATEGORY...: (4) 25 THROUGH 35
EDUC LEV: (0) VERFD HS DEGREE/GED  DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
                            (C) CUSTODY SCORING
TIME SERVED.....: (4) 26-75%     PROG PARTICIPAT: (2) GOOD
LIVING SKILLS...: (1) AVERAGE    TYPE DISCIP RPT: (3A) 1 MOD
FREQ DISCIP RPT.: (2) 1          FAMILY/COMMUN..: (4) GOOD


                     --- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE   SEC TOTAL   SCORED LEV MGMT SEC LEVEL   CUSTODY  CONSIDER
+16  +16    0          +16       MEDIUM        N/A              IN      SAME


G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

Exhibit 9

```
   CUMB9         *          INMATE EDUCATION DATA          *      01-22-2025
PAGE 001 OF 001 *                TRANSCRIPT                *      19:16:44

REGISTER NO: 72795-061      NAME..: CORNELL                    FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: CUM-CUMBERLAND FCI

-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
CUM  ESL HAS   ENGLISH PROFICIENT        05-10-2016 1442 CURRENT
CUM  GED HAS   COMPLETED GED OR HS DIPLOMA 02-22-2017 0917 CURRENT


--------------------------- EDUCATION COURSES ---------------------------
SUB-FACL   DESCRIPTION                   START DATE  STOP DATE EVNT AC LV  HRS
CUM        HEALTHY LIFESTYLE             01-06-2025 CURRENT
CUM        SPANISH I                     12-13-2024 CURRENT
CUM        MRSA IN AN ATHLETIC FACILITY  12-27-2024 01-17-2025  P  C  P    1
CUM        BUSINESS MATH                 09-23-2024 11-06-2024  P  C  P    8
CUM        CARPENTRY MATH                08-29-2024 10-15-2024  P  C  P   16
CUM        US PRESIDENTS ACE CLASS       07-23-2024 09-04-2024  P  C  P   16
CUM        INTRO. COM. DRIVERS LICENSE   07-23-2024 09-03-2024  P  C  P    8
CUM        CHERNOBYL ACE CLASS           06-17-2024 07-16-2024  P  C  P   12
CUM        S-SERVSAVE FOOD HAND CERT     06-20-2024 06-25-2024  P  C  P    5
CUM        AFRICAN AMERICAN HISTORY      03-27-2024 04-30-2024  P  C  F    8
CUM        LIFE COACHING/PERSONAL MOTIVAT 01-31-2024 03-14-2024 P  C  P    8
CUM        ACCOUNTING                    12-11-2023 01-23-2024  P  C  P    8
CUM        INTRODUCTION TO ART/PAINTING  07-10-2022 11-11-2022  P  C  P   10
FAI        SHU ATHLETES & EFFICIENT HEART 02-23-2022 03-11-2022 P  C  P   10
FAI        SHU CHOLESTERAL               01-27-2022 02-24-2022  P  C  P   10
FAI        SHU THE SKELETAL SYSTEM       12-10-2021 01-14-2022  P  C  P   10
FAI        SHU STRETCHING                11-03-2021 11-11-2021  P  C  P   10
FAI        SHU CARDIOVASCULAR DISEASE    10-20-2021 11-05-2021  P  C  P   10
FAI        SHU SOFTBALL CHAPTER 5        09-25-2021 10-09-2021  P  C  P   10
FAI        SHU SOFTBALL CHAPTER 4        09-05-2021 10-02-2021  P  C  P   10
FAI        SHU SOFTBALL CHAPTER 3        09-05-2021 09-05-2021  P  C  P   10
FAI        SHU SELF-STUDY CALISTHENICS   06-18-2020 06-18-2020  P  C  P    2
```

Exhibit 10

```
G0000          TRANSACTION SUCCESSFULLY COMPLETED
```

**Individualized Needs Plan - Program Review   (Inmate Copy)**   SEQUENCE: 01978521
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: CORNELL, CHRISTOPHER  72795-061                 Team Date: 12-04-2024

| | |
|---|---|
| Facility: | CUM CUMBERLAND FCI |
| Name: | CORNELL, CHRISTOPHER |
| Register No.: | 72795-061 |
| Age: | 30 |
| Date of Birth: | 03-31-1994 |

| | |
|---|---|
| Proj. Rel. Date: | 12-06-2040 |
| Proj. Rel. Mthd: | GOOD CONDUCT TIME |
| DNA Status: | FAI04867 / 02-22-2017 |

Exhibit 11

## Detainers
| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

## Inmate Photo ID Status
No photo ID - Expiration: null

## Current Work Assignments
| Facl | Assignment | Description | Start |
|---|---|---|---|
| CUM | F D1 ORD | FCI D1 ORDERLY | 05-09-2024 |

## Current Education Information
| Facl | Assignment | Description | Start |
|---|---|---|---|
| CUM | ESL HAS | ENGLISH PROFICIENT | 05-10-2016 |
| CUM | GED HAS | COMPLETED GED OR HS DIPLOMA | 02-22-2017 |

## Education Courses
| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| CUM | C | BUSINESS MATH | 09-23-2024 | 11-06-2024 |
| CUM | C | CARPENTRY MATH | 08-29-2024 | 10-15-2024 |
| CUM | C | US PRESIDENTS ACE CLASS | 07-23-2024 | 09-04-2024 |
| CUM | C | INTRO. COM. DRIVERS LICENSE | 07-23-2024 | 09-03-2024 |
| CUM | C | CHERNOBYL ACE CLASS | 06-17-2024 | 07-16-2024 |
| CUM | C | S-SERVSAVE FOOD HAND CERT | 06-20-2024 | 06-25-2024 |
| CUM | C | AFRICAN AMERICAN HISTORY | 03-27-2024 | 04-30-2024 |
| CUM | C | LIFE COACHING/PERSONAL MOTIVAT | 01-31-2024 | 03-14-2024 |
| CUM | C | ACCOUNTING | 12-11-2023 | 01-23-2024 |
| CUM | C | INTRODUCTION TO ART/PAINTING | 07-10-2022 | 11-11-2022 |
| FAI | C | SHU ATHLETES & EFFICIENT HEART | 02-23-2022 | 03-11-2022 |
| FAI | C | SHU CHOLESTERAL | 01-27-2022 | 02-24-2022 |
| FAI | C | SHU THE SKELETAL SYSTEM | 12-10-2021 | 01-14-2022 |
| FAI | C | SHU STRETCHING | 11-03-2021 | 11-11-2021 |
| FAI | C | SHU CARDIOVASCULAR DISEASE | 10-20-2021 | 11-05-2021 |
| FAI | C | SHU SOFTBALL CHAPTER 5 | 09-25-2021 | 10-09-2021 |
| FAI | C | SHU SOFTBALL CHAPTER 4 | 09-05-2021 | 10-02-2021 |
| FAI | C | SHU SOFTBALL CHAPTER 3 | 09-05-2021 | 09-05-2021 |
| FAI | C | SHU SELF-STUDY CALISTHENICS | 06-18-2020 | 06-18-2020 |

## Discipline History (Last 6 months)
| Hearing Date | Prohibited Acts |
|---|---|

** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS **

## Current Care Assignments
| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 03-28-2022 |
| CARE1-MH | CARE1-MENTAL HEALTH | 05-03-2017 |

## Current Medical Duty Status Assignments
| Assignment | Description | Start |
|---|---|---|
| C19-T NEG | COVID-19 TEST-RESULTS NEGATIVE | 03-30-2022 |
| NO PAPER | NO PAPER MEDICAL RECORD | 02-21-2017 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 02-23-2017 |
| YES F/S | CLEARED FOR FOOD SERVICE | 02-23-2017 |

**Individualized Needs Plan - Program Review    (Inmate Copy)**    SEQUENCE: 01978521
Dept. of Justice / Federal Bureau of Prisons                                  Team Date: 12-04-2024
Plan is for inmate: CORNELL, CHRISTOPHER 72795-061

## Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP UNQUAL | RESIDENT DRUG TRMT UNQUALIFIED | 11-06-2023 |
| ED COMP | DRUG EDUCATION COMPLETE | 12-07-2023 |
| NR WAIT | NRES DRUG TMT WAITING | 10-10-2023 |

## FRP Payment Plan

Most Recent Payment Plan

**FRP Assignment:**    **COMPLT**    **FINANC RESP-COMPLETED**        **Start: 09-09-2017**

Inmate Decision:    **AGREED**    **$50.00**        Frequency: **MONTHLY**
Payments past 6 months:    **$0.00**        Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $300.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

## FRP Deposits

Trust Fund Deposits - Past 6 months:    $1,851.88        Payments commensurate ?   Y

New Payment Plan:    ** No data **

## Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| AWARD | EBRR INCENTIVE AWARD | 08-15-2023 |
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 11-26-2019 |
| INELIG AUT | FTC-INELIGIBLE OFF CODE - AUTO | 12-17-2019 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 12-03-2024 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 12-03-2024 |
| N-COGNTV N | NEED - COGNITIONS NO | 12-03-2024 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-29-2021 |
| N-EDUC N | NEED - EDUCATION NO | 12-03-2024 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 12-03-2024 |
| N-FM/PAR Y | NEED - FAMILY/PARENTING YES | 12-03-2024 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 12-03-2024 |
| N-MEDICL N | NEED - MEDICAL NO | 12-03-2024 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 12-03-2024 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 12-03-2024 |
| N-TRAUMA N | NEED - TRAUMA NO | 12-03-2024 |
| N-WORK N | NEED - WORK NO | 12-03-2024 |
| R-MED | MEDIUM RISK RECIDIVISM LEVEL | 12-03-2024 |

## Progress since last review

Completed Business Math, Carpentry Math, US Presidents
Works D1 Unit Orderly

## Next Program Review Goals

Complete OSHA10, Criminal Thinking, Victim Impact Group and Cognitive Thinking by next TEAM...

## Long Term Goals

Complete Work Keys Drywall, Thresholds, Anger Management, and Braille by 3/2026

## RRC/HC Placement

## Comments

GCT 11/22/2040

**Individualized Needs Plan - Program Review   (Inmate Copy)**   SEQUENCE: 01978521
Dept. of Justice / Federal Bureau of Prisons                    Team Date: 12-04-2024
Plan is for inmate: CORNELL, CHRISTOPHER  72795-061

Name:  CORNELL, CHRISTOPHER          DNA Status:   FAI04867 / 02-22-2017
Register No.:  72795-061
Age:  30
Date of Birth:  03-31-1994

Inmate   (CORNELL, CHRISTOPHER. Register No.: 72795-061)

_____

Date

_____          _____
Unit Manager / Chairperson                Case Manager

_____          _____
Date                                      Date

## FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:72795-061, Last Name:CORNELL

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 72795-061 | Risk Level Inmate....: R-MED |
| Inmate Name |   General Level......: R-LW (20) |
|   Last.........: CORNELL |   Violent Level......: R-MED (27) |
|   First........: CHRISTOPHER | Security Level Inmate: MEDIUM |
|   Middle.......: | Security Level Facl..: MEDIUM |
|   Suffix.......: | Responsible Facility.: CUM |
| Gender.........: MALE | Start Incarceration..: 12/05/2016 |

### PATTERN Worksheet Summary

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 30 | 21 | 12 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | TRUE | 5 | 7 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 5 | 5 | 10 |
| Education Score | HighSchoolDegreeOrGED | -2 | -2 |
| Drug Program Status | NoNeed | -6 | -3 |
| All Incident Reports (120 Months) | 15 | 3 | 3 |
| Serious Incident Reports (120 Months) | 5 | 3 | 3 |
| Time Since Last Incident Report | 8 | 1 | 1 |
| Time Since Last Serious Incident Report | 32 | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 8 | -9 | -3 |
| Work Programs | 1 | -1 | -1 |
| | Total | 20 | 27 |

### PATTERN Worksheet Details

Item: Programs Completed, Value: 8

General Score: -9, Violent Score: -3

Risk Item Data

| Category | - Assignment | - Start | - Stop |
|---|---|---|---|
| DRG | ED COMP | 12/07/2023 10:09 | |
| EDC | ACCOUNTING | 12/11/2023 12:30 | 12/11/2023 12:30 |
| EDC | LIFE COACH | 01/31/2024 10:42 | 01/31/2024 10:42 |
| EDC | CHERNOBYL | 06/17/2024 13:27 | 06/17/2024 13:27 |
| EDC | CDL INTRO | 07/23/2024 12:11 | 07/23/2024 12:11 |
| EDC | PRESIDENTS | 07/23/2024 18:26 | 07/23/2024 18:26 |
| EDC | CARP MATH | 08/29/2024 13:55 | 08/29/2024 13:55 |
| EDC | BUS MATH | 09/23/2024 12:30 | 09/23/2024 12:30 |

Item: Work Programs, Value: 1

General Score: -1, Violent Score: -1

Risk Item Data

| Category | - Assignment | - Start | - Stop |
|---|---|---|---|
| EDC | SERVSAFE | 06/20/2024 08:03 | 06/20/2024 08:03 |

Exhibit 12

```
CUMJF  540*23 *            SENTENCE MONITORING          *      04-24-2024
PAGE 001         *         COMPUTATION DATA             *      07:26:38
                           AS OF 04-24-2024


REGNO..: 72795-061 NAME: CORNELL, CHRISTOPHER


FBI NO..........: 982867CH0          DATE OF BIRTH: 03-31-1994  AGE:  30
ARS1............: CUM/A-DES
UNIT............: 1 GP                QUARTERS.....: Z03-210UDS
DETAINERS.......: NO                  NOTIFICATIONS: NO

FSA ELIGIBILITY STATUS IS: INELIGIBLE

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.

HOME DETENTION ELIGIBILITY DATE....: 06-06-2040

THE INMATE IS PROJECTED FOR RELEASE: 12-06-2040 VIA GCT REL


--------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------
COURT OF JURISDICTION..........: OHIO, SOUTHERN DISTRICT
DOCKET NUMBER..................: 1:15-CR-12
JUDGE..........................: BECKWITH
DATE SENTENCED/PROBATION IMPOSED: 12-05-2016
DATE COMMITTED.................: 02-21-2017
HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED..............: NO


                 FELONY ASSESS  MISDMNR ASSESS  FINES       COSTS
NON-COMMITTED.: $300.00        $00.00         $00.00       $00.00

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $00.00

--------------------CURRENT OBLIGATION NO: 010 ------------------------
OFFENSE CODE....:  161     18:1114 HOMICIDE, US OFFCL      FSA INELIGIBLE
OFF/CHG: 18:114 ATTEMPTED MURDER OF GOVERNMENT EMPLOYESS AND OFFICIALS,
         CT.1

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
  TERM OF SUPERVISION............: LIFE
  DATE OF OFFENSE................: 01-14-2015



G0002       MORE PAGES TO FOLLOW . . .
```

Exhibit 13

```
CUMJF  540*23 *              SENTENCE MONITORING            *      04-24-2024
PAGE 002           *         COMPUTATION DATA               *      07:26:38
                             AS OF 04-24-2024
```

REGNO..: 72795-061 NAME: CORNELL, CHRISTOPHER


```
-----------------------CURRENT OBLIGATION NO: 020 -------------------------
OFFENSE CODE....:  890     18:2331-2339 TERRORISM            FSA INELIGIBLE
OFF/CHG: 18:2339B MATERIAL SUPPORT TO DESIGNATED FOREIGN TERRORIST
        ORGANIZATION, CT.4

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:    180 MONTHS
 TERM OF SUPERVISION.:..........: LIFE
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CC/CS (60 MOS CS)
 DATE OF OFFENSE...............: 01-14-2015

-----------------------CURRENT OBLIGATION NO: 030 -------------------------
OFFENSE CODE....:  130     18:924(C) FIREARMS LAWS          FSA INELIGIBLE
OFF/CHG: 18:924(C) POSSESSION OF A FIREARM IN FUTHERANCE OF A CRIME OF
        VIOLENCE, CT. 3

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:     60 MONTHS
 TERM OF SUPERVISION............: LIFE
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: C/S TO 020 & 010
 DATE OF OFFENSE...............: 01-14-2015

-----------------------CURRENT COMPUTATION NO: 010 ------------------------
```

COMPUTATION 010 WAS LAST UPDATED ON 04-23-2024 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 02-15-2017 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020, 010 030


G0002      MORE PAGES TO FOLLOW . . .

Case: 1:15-cr-00012-TSB-MRM Doc #: 253 Filed: 03/24/25 Page: 56 of 86 PAGEID #: 2217

```
CUMJF  540*23 *              SENTENCE MONITORING           *      04-24-2024
PAGE 003 OF 003 *            COMPUTATION DATA              *      07:26:38
                             AS OF 04-24-2024
```

REGNO..: 72795-061 NAME: CORNELL, CHRISTOPHER


DATE COMPUTATION BEGAN..........: 12-05-2016
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............:    360 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:     30 YEARS
AGGREGATED TERM OF SUPERVISION..: LIFE
EARLIEST DATE OF OFFENSE........: 01-14-2015

JAIL CREDIT.....................:    FROM DATE      THRU DATE
                                     01-14-2015     12-04-2016

TOTAL PRIOR CREDIT TIME.........: 691
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 1498
TOTAL GCT EARNED................: 378
STATUTORY RELEASE DATE PROJECTED: 12-06-2040
ELDERLY OFFENDER TWO THIRDS DATE: 01-14-2035
EXPIRATION FULL TERM DATE.......: 01-12-2045
TIME SERVED.....................:     9 YEARS      3 MONTHS     11 DAYS
PERCENTAGE OF FULL TERM SERVED..:  30.9
PERCENT OF STATUTORY TERM SERVED:  35.8

PROJECTED SATISFACTION DATE.....: 12-06-2040
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 2-14-17 180M TERM (60 TO RUN CS), TOTAL AGG TERM =360 MOS
                6-28-18 DGCT27D.F/JTP;4-22-20:GCT UPD PER FSA.MLH;
                6-12-20 DGCT F/ADB; 2-25-22 DGCT 27D. F/SNA; 3-10-22 DGCT 27D.
                F/SNA; 3-28-22 DGCT 27D. F/SNA; 04-23-24 UPDT GCT E/EXS




G0000        TRANSACTION SUCCESSFULLY COMPLETED

```
CUMJF  542*22  *                SENTENCE MONITORING          *      04-24-2024
PAGE 001        *                 GOOD TIME DATA              *      07:27:01
                                 AS OF  04-24-2024


REGNO...: 72795-061    NAME: CORNELL, CHRISTOPHER
ARS 1...: CUM A-DES                                    PLRA
COMPUTATION NUMBER..: 010                       PRT   ACT DT:
LAST UPDATED: DATE.: 04-23-2024         FACL..: DSC     CALC: AUTOMATIC
UNIT.................: 1 GP             QUARTERS...........: Z03-210UDS
DATE COMP BEGINS....: 12-05-2016        COMP STATUS.........: COMPLETE
TOTAL JAIL CREDIT...: 691               TOTAL INOP TIME.....: 0
CURRENT REL DT......: 12-31-2043 THU    EXPIRES FULL TERM DT: 01-12-2045
PROJ SATISFACT DT...: 12-06-2040 THU    PROJ SATISF METHOD..: GCT REL
ACTUAL SATISFACT DT.:                   ACTUAL SATISF METHOD:
DAYS REMAINING......:                   FINAL PUBLC LAW DAYS:
GED PART STATUS.....:                   DEPORT ORDER DATED..:


-------------------------GOOD CONDUCT TIME AMOUNTS-------------------------
```

| START DATE | STOP DATE | MAX DIS | POSSIBLE TO FFT | ACTUAL TOTALS DIS | FFT | VESTED AMOUNT | VESTED DATE |
|---|---|---|---|---|---|---|---|
| 01-14-2015 | 01-13-2016 | 54 | 54 | | | | |
| 01-14-2016 | 01-13-2017 | 54 | 108 | | | | |
| 01-14-2017 | 01-13-2018 | 54 | 162 | | | | |
| 01-14-2018 | 01-13-2019 | 54 | 189 | 27 | | | |
| 01-14-2019 | 01-13-2020 | 54 | 243 | | | | |
| 01-14-2020 | 01-13-2021 | 54 | 270 | 27 | | | |
| 01-14-2021 | 01-13-2022 | 54 | 324 | | | | |
| 01-14-2022 | 01-13-2023 | 54 | 324 | 81 | | | |
| 01-14-2023 | 01-13-2024 | 54 | 378 | | | | |
| 01-14-2024 | 01-13-2025 | 54 | | 14 | | | |
| 01-14-2025 | 01-13-2026 | 54 | | | | | |
| 01-14-2026 | 01-13-2027 | 54 | | | | | |
| 01-14-2027 | 01-13-2028 | 54 | | | | | |
| 01-14-2028 | 01-13-2029 | 54 | | | | | |
| 01-14-2029 | 01-13-2030 | 54 | | | | | |
| 01-14-2030 | 01-13-2031 | 54 | | | | | |
| 01-14-2031 | 01-13-2032 | 54 | | | | | |
| 01-14-2032 | 01-13-2033 | 54 | | | | | |
| 01-14-2033 | 01-13-2034 | 54 | | | | | |
| 01-14-2034 | 01-13-2035 | 54 | | | | | |
| 01-14-2035 | 01-13-2036 | 54 | | | | | |
| 01-14-2036 | 01-13-2037 | 54 | | | | | |
| 01-14-2037 | 01-13-2038 | 54 | | | | | |
| 01-14-2038 | 01-13-2039 | 54 | | | | | |
| 01-14-2039 | 01-13-2040 | 54 | | | | | |
| 01-14-2040 | 01-13-2041 | 54 | | | | | |
| 01-14-2041 | 01-13-2042 | 54 | | | | | |
| 01-14-2042 | 01-13-2043 | 54 | | | | | |
| 01-14-2043 | 01-13-2044 | 54 | | | | | |
| 01-14-2044 | 01-12-2045 | 54 | | | | | |

```
     TOTAL EARNED AMOUNT......................................:      378


G0002        MORE PAGES TO FOLLOW . . .
```

Case: 1:15-cr-00012-TSB-MRM Doc #: 253 Filed: 03/24/25 Page: 58 of 86 PAGEID #: 2219

```
 CUMJF  542*22 *              SENTENCE MONITORING       *       04-24-2024
PAGE 002 OF 002 *               GOOD TIME DATA          *       07:27:01
                              AS OF   04-24-2024


REGNO...: 72795-061    NAME: CORNELL, CHRISTOPHER
ARS 1...: CUM A-DES                                 PLRA
COMPUTATION NUMBER..: 010                       PRT   ACT DT:
LAST UPDATED:  DATE.: 04-23-2024          FACL..: DSC    CALC: AUTOMATIC

     TOTAL EARNED AND PROJECTED AMOUNT...........................:    1498
```

```
G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

Z
210 UNDS

210

BP-A0148
DEC 23

U.S. DEPARTMENT OF JUSTICE

INMATE REQUEST TO BUREAU EMPLOYEE

FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Employee) | DATE: |
|---|---|
| Warden BOKOSKY | Jan. 1/29/25 Wed. |
| FROM: | REGISTER NO.: |
| Christopher Lee Cornell | 72795-061 |
| WORK ASSIGNMENT: | UNIT: |
| D-1 orderly | D-1 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

I, Christopher Lee Cornell, am requesting for Compassionate release under 3582 (c) (1) (A), pursuant to Amendment 814, youthful offender Status, and sentencing disparity, including Rehabilitation. (See attachments for the Brief) for Compassionate release

Thanks very much in advance.

Christopher Lee Cornell
Prisoner #72795061

(Do not write below this line)

DISPOSITION:

SEE Attached.

| Employee Signature | Date |
|---|---|
| | 2/10/2025 |

Record Copy - File; Copy - Inmate

PDF                              Prescribed by P5511

RESPONSE TO INMATE REQUEST TO STAFF MEMBER

CORNELL, Christopher
Reg No: 72795-061
Unit D1 - D03-226L

This is in response to your request dated January 29, 2025,
wherein you are requesting to be considered for Compassionate
Release/Reduction in Sentence (RIS) based on "extraordinary and
compelling" circumstances, due to the sentencing disparity in
your case and 814 youthful offender status.

The First Step Act of 2018 went into effect on December 21,
2018. The First Step Act provides, in relevant part, "the court,
upon motion of the Director of the Bureau of Prisons (BOP), or
upon motion of the defendant after the defendant has fully
exhausted all administrative rights to appeal a failure by the
BOP to bring a motion on the defendant's behalf or the lapse of
30 days from the receipt of such a request by the warden of the
defendant's facility, whichever is earlier, may reduce the term
of imprisonment."

When the First Step Act of 2018 went into effect, the BOP
updated Program Statement (PS) 5050.50, Compassionate
Release/Reduction in Sentence to reflect these changes.  The
First Step Act language does not require the BOP to submit a
motion on an inmate's behalf. Rather, the BOP considers several
factors in evaluating RIS requests to determine whether an
inmate should be recommended. The BOP sets forth criteria for
situations it deems meets the "extraordinary and compelling"
standard in PS 5050.50. The criterion for requests is split-up
by medical and non-medical. The medical requests that are
considered to meet the "extraordinary and compelling" criteria,
include: terminal medical condition and debilitated medical
condition. The non-medical requests that are considered to meet
the "extraordinary and compelling" criteria, include: "new law"
elderly inmates; elderly inmates with medical conditions; other
elderly inmates; death or incapacitation of the family member
caregiver; and incapacitation of a spouse or registered partner.

**Page 1 of 2**

Page 2
CORNELL, Christopher
Reg. No.: 72795-061

After reviewing your request and the Compassionate
Release/Reduction in Sentence, Program Statement, length of
sentence/disparities in sentence is not part of the criteria
that is outlined in PS 5050.50. Additionally, sentencing
disparities and the 814 youthful offender status are not
addressed with the compassionate release/reduction in sentence
process.

As such, the reasons listed for your request, do not meet the
"extraordinary and compelling" criteria set forth in PS 5050.50.

Accordingly, your request for a Compassionate Release/Reduction
in Sentence is not appropriate. If you are dissatisfied with
this response, you may appeal using the Administrative Remedy
process at the institution level within (20) calendar days of
receipt of this response.

_2/7/25_
Date

_____
E. Rokosky, Warden

INTRODUCTION

COMES NOW, the Defendant, Pro Se Inmate, Christopher Lee Cornell ("Cornell"), respectfully moves this Honorable Court to grant a sentence reduction based on the principles outlined in Amendment 814, his youthful offender status, the sentence disparity between similarly situated defendants, and his rehabilitation and self improvement during his incarceration. In support, the Petitioner submits the following arguments:

INTRODUCTION

At the time of his offense, the Defendant was a 20-year-old young man whose judgment and decision-making were shaped by the underdevelopment of his adolescent brain. The Defendant was arrested at the age of 20 in connection with a terrorism-related offense under 18 U.S.C. 1114, 924(c), and 2339B. As outlined in this motion, the excessive 30 years in federal prison imposed upon him is disproportionate given the nature of his offense, his lack of prior criminal history, and the fact that the purported plot was under FBI control, with no imminent threat posed to any individuals. Given Cornell's rehabilitation efforts, the unique nature of his charges, his relatively young age and vulnerability at the time of the arrest, his demonstrated remorse, his commitment to reintegrate as a law-abiding citizen, and his strong support system upon release, Cornell demonstrates he is ready to safely re-enter society under adequate supervision.

LEGAL BASIS FOR SENTENCE REDUCTION

Under 18 U.S.C. 3582(c)(1)(A), a court may reduce a term of imprisonment if extraordinary and compelling reasons exist and the reduction aligns with the factors set forth in 18 U.S.C. 3553(a). Cornell presents numerous factors demonstrating that extraordinary and compelling reasons exists to grant this motion.

Sentencing disparity is one such extraordinary and compelling reason, particularly when the imposed sentence deviates substantially from those given to similarly situated defendants across the federal judiciary.

The Sixth Circuit has emphasized that courts should seek uniformity and proportionality in sentencing, consistent with the policy goals of the Sentencing Reform Act of 1984. Moreover, the U.S. Supreme Court has recognized that addressing unwarranted disparities is central to achieving fairness and justice in sentencing. See Kimbrough v. United States, 552 U.S. 85, 101 (2007); Gall v. United States, 552 U.S. 38, 49-50 (2007).

A. Application of Amendment 814 and Youthful Offender Status (Ground 1)

Amendment 814 to the United States Sentencing Guidelines provides for adjustments in cases where defendants, especially youthful offenders, demonstrate marked rehabilitative progress. Courts, under 18 U.S.C. 3582(c)(2), may reduce sentences if the defendant has shown evidence of rehabilitation and has a low risk of recidivism. As noted in United States v. Shaya, 714 F.3d 874, 877 (6th Cir. 2013), the Sixth Circuit has acknowledged that sentence reductions may be warranted when defendants demonstrate "significant positive changes" while incarcerated.

Given that the Defendant was only 20 years old at the time of arrest, a youthful offender designation is appropriate. Courts have long recognized that young adults may be susceptible to impulsive and poor decision-making but are capable of profound personal growth, as discussed in Graham v. Florida, 560 U.S. 48 (2010), which emphasized the potential for rehabilitation in younger offenders.

B. Disparity in Sentencing and Non-Existent Imminent Threat (Ground 2)

Sentencing disparity occurs when the defendants with similar conduct and culpability receive different sentences without a legitimate justification, undermining the principle of equal justice under the law. Courts routinely analyze disparities to determine whether the sentences are consistent with the goals of deterrence, punishment, rehabilitation,

1

and fairness.

This Court should consider the disparity between the 30-year sentence imposed and those of other defendants in similar cases where no actual harm occurred, especially given the non-existent imminent threat to lawmakers. The U.S. Sentencing Commission's guidelines under U.S.S.G. 5K2.0 recognize that mitigating circumstances may justify a departure from standard sentencing ranges when the factual basis of the offense does not align with the charged conduct's severity. As the Sixth Circuit noted in United States v. Hayes, 958 F.3d 709 (6th Cir. 2020), the court must weight whether the imposed sentence aligns with Congressional intent and Sentencing Guidelines policy.

Here, the Defendant's 30-year sentence is disproportionate, considering his lack of criminal history, the FBI's control over the plot from its inception, and the absence of real danger to any lawmakers. The over-sentencing in this case violates the statutory goal of imposing sentences that are "sufficient, but not greater than necessary," under 18 U.S.C. 3553(a).

## FACTUAL BACKGROUND

Christopher Lee Cornell was indicted and convicted under three key statutes:

18 U.S.C. 1114: Relates to the Protection of Federal Officials and outlines penalties for assaulting, killing, or attempting to kill them.

18 U.S.C. 924(c): Pertains to the Use of Firearms in relation to Violent Crimes or Drug Trafficking offenses.

18 U.S.C. 2339(B): Addresses the provisions of Material Support to Terrorist Organizations.

In connection with these charges, Cornell, then only 20 years old, was sentenced to 30 years in federal prison.

Christopher Lee Cornell was placed under FBI investigation when he was just 17 years old. In United States v. Bingham, 653 F.3d 1112 (6th Cir. 2011), the court ruled that law enforcement agencies must follow constitutional guidelines and obtain proper authorization before engaging in surveillance activities.

The FBI had been monitoring him since 2011 but strategically initiated the investigation on September 11, 2014, to create a negative perception in the Court's eyes and a potential Jury.

Investigated by the FBI from 2011 to 2014 due to his religious beliefs as a Muslim and on-line activities related to foreign policy and government actions, he found himself targeted not for any criminal actions but for the expression of unconventional views. GovtDiscovery(Cornell)00421

Contrary to the misconceptions propagated by the Prosecution, Cornell vehemently denies any involvement in terrorism. His beliefs, albeit unconventional, were rooted in a broader critique of societal structures and power dynamics, particularly concerning foreign policy and government actions. The Sixth Circuit has reaffirmed that statements criticizing foreign policy or government actions fall under First Amendment protection, even if those statements are inflammatory. In United States v. Rahman, 189 F.3d 467 (6th Cir. 1999), the court ruled that inflammatory statements, such as those that could be seen as supporting terrorism or criminal actions, are protected unless the speech directly incites imminent illegal actions. General criticism or calls for political change are not grounds for prosecution.

The Defendant, Cornell, was targeted by the FBI's covert operations who used warrantless FISA Section 702 surveillance authorized without judicial oversight and a clear violation of 4th Amendment protections, who assumed a terrorist motive behind his social media activity. In FISA Court v. U.S., 485 F.3d 1 (FISA Court, 2007), the court held that surveillance under FISA on U.S. citizens requires a clear and compelling connection to national security threats. Using FISA against American citizens without meeting these stringent criteria is considered unconstitutional.

In January 2015, Cornell found himself thrust into a nightmare when he was arrested on terrorism charges, an accusation vehemently denied by the Defendant. Cornell stood firm in proclaiming his innocence, asserting that he was never a terrorist nor a sympathizer to any extremist cause. Rather, he adamantly insisted that his arrest was an egregious violation of his rights, driven by misconceptions and prejudices surrounding his religious beliefs and outspoken views on geopolitical issues.

Central to Cornell's argument is the assertion that Islam, his chosen faith, is inherently peaceful and does not advocate for extremism. He maintains that his deep religious convictions were misconstrued as indicators of radicalism, leading to his unwarranted scrutiny by law enforcement agencies. Moreover, he argues that his concerns regarding the impact of United States foreign policy on Muslim-majority regions, particularly the Middle East, were valid expressions of dissent rather than endorsement of violence.

Cornell's arrest, was not only unjust but also politically motivated. Certain lawmakers and media outlets sensationalized his case, inflating its significance beyond reasonable bounds. Despite subsequent admissions by the FBI that Cornell posed no credible threat, the damage had been done. Notably, he had no weapons, lacked the

3

means to carry out the plot, and had no actual contact with terrorist organizations.

The Prosecution alleged that Cornell had planned an attack on the United States Capital building during the State of the Union Address, intended to kill lawmakers. However, a close examination of the facts reveal several flaws in the case against him.

On January 14, 2015, Cornell attempted to purchase firearms but failed an ATF 4473 background check, which prevented the purchase. (See, Exhibit 1) Despite this failure, law enforcement authorities arrested and charged Cornell under 18 U.S.C. 1114 and 18 U.S.C. 924(c), suggesting that his involvement in the plot and attempts to acquire weapons were sufficient grounds for prosecution.

Cornell in this case is accused of devising a plot with an FBI informant, during which they discussed various scenarios and weapons. However, the Defendant's actions were limited to researching images on-line and engaging in conversations with the FBI informant about possible plans.

Merely planning and preparing, without substantive actions that demonstrates a clear intent and capability to execute a harmful act, do not meet the criteria for a charge under 18 U.S.C. 1114. Cornell's activities, which involved only discussions and on-line research, fell far short of the threshold required to substantiate such serious charge. Regarding 18 U.S.C. 1114, which criminalizes the killing or attempted killing of a federal office, the Sixth Circuit has held that mere planning and discussing a crime does not necessarily amount to a violation. For example, United States v. Riley, 497 F.3d 767 (6th Cir. 2007) involved a defendant accused of planning the murder of a federal officer. The court emphasized that preparing or discussing a crime, without overt acts towards its execution, does not satisfy the elements of an attempt.

Cornell's attempt to purchase firearms was thwarted by a failed background check. (See, Exhibit 1) This incident alone suggests that he was not in a position to carry out his alleged plot. The gun purchase was not completed, which is a critical element in charges related to firearms. (GovtDiscovery(Cornell)00805: Cornell: "They said, they said its going to be a delay. They said, um, it might take up to the twentieth, said its going to be delayed.") Federal law prohibits the sale of firearms to individuals who have failed background checks under 18 U.S.C. 922(g). In United States v. Carter, 617 F.3d 1237 (6th Cir. 2010), the Sixth Circuit held that it is illegal for a gun dealer to knowingly sell a firearm to someone who has failed a background check, and any subsequent crime involving the weapon may result in further prosecution under federal firearms law.

Following the failed gun purchase, Cornell expressed doubts about his plot to an FBI informant. He mentioned reconsidering his plans and abandoning the plot. (GovtDiscovery(Cornell)00812: Cornell: "We...we can switch up and go to a different place to, you know? We...we can do anything.") This change in intent undermines the Prosecution's claim that he was actively engaged in preparing for a violent act. The Sixth Circuit has also ruled that if a defendant backs out of a plot to commit murder before any actual attempt is made, they cannot be convicted of attempted murder. In United States v. Jackson, 345 F.3d 586 (6th Cir. 2003), the court ruled that mere conversation or the initiation of a criminal plot, without taking substantial steps toward the crime, does not lead to criminal liability for attempted murder. In cases where the defendant backs out before any illegal action occurs, there may be no criminal liability.

Even after eventually purchasing weapons, the processing of the ATF 4473 form was not completed in time. The purchase was scheduled for January 20, 2015, but the gun purchase and arrest of Cornell was much earlier (on January 14, 2015). (See, Exhibit 1)

Cornell was represented by Counsel; Martin Pinales, Candace Crouse and Eric Eckes, during the sentencing. These legal representatives were ineffective, specifically for failing to pursue dismissal of the charges 18 U.S.C. 1114 and 18 U.S.C. 924(c).

The Counsel did not adequately advise against taking a guilty plea deal, which Cornell now regrets accepting. A 30-year plea deal for a crime that involved no violence or tangible steps towards executing a violent act seems excessive. The plea deal could have been negotiated to better reflect the act threat posed by Cornell, especially considering the lack of real means to carry out the plot.

By choosing to plead guilty rather than contesting the charges, they neglected to challenge the Prosecution's assertion that Cornell had taken a substantial towards committing a violent crime.

The argument that Cornell did not meet the criteria for a substantial step towards committing the offense under 18 U.S.C. 1114 could have been a strong defense. The plot, as described, was speculative and lacked the necessary elements to support a conviction. The unrealistic nature of the plot given the tight security during the State of the Union address, the Defendant's lack of transportation, funds, or weapons further weakens the argument for a severe sentence. Cornell's inability to acquire weapons legally and the illegal acquisition through a gun store, coupled with a bad background check, could have been used to argue that Cornell was not a serious threat.

Cornell's Counsel not adequately informing or persuading Cornell about the potential defenses or the likelihood of a more favorable outcome at trial, is a crucial failure. United States v. Cronic, 466 U.S. 648 (1984)

The Defendant's counsel, ostensibly assigned to protect him, instead bolstered the FBI's narrative. His court-appointed attorneys consistently aligned with the government's assertions, failing to question the FBI's questionable tactics or to challenge the government's selective interpretation of events.

Given Cornell's innocence of the charges due to the lack of a substantial step and the unrealistic nature of the plot, the Counsel's decision to accept a plea deal could be seen as a serious misjudgment.

Instead of vigorously advocating for their client, his Counsel inexplicably chose to throw him at the mercy of the Court, neglecting to present compelling arguments or evidence that could mitigate the severity of the sentence.

On December 06, 2016, Christopher Lee Cornell was convicted of three Counts; 18 U.S.C. 1114; 18 U.S.C. 924(c); and 18 U.S.C. 2339(B), and was sentenced to 30-years in federal prison by Judge Sandra S. Beckwith.

ARGUMENT

1. Charges and Plea Deal

The Defendant, Christopher Lee Cornell, was accused of plotting to attack the U.S. Capital building in Washington, D.C., with firearms and explosives. Cornell was arrested on January 14, 2015, at the age of 20, and charged with conspiracy and material support for terrorist activities.

The Defendant plead guilty and was sentenced to 360-months (30-years) on December 05, 2016 for three offenses:

18 U.S.C. 1114 Attempted Murder of Government Officials and Employees

18 U.S.C. 924(c) Possession of a Firearm in Furtherance of a Crime of Violence

18 U.S.C. 2339(B) Attempted Material Support to a Foreign Terrorist Organization

The Defendant was also charged with 18 U.S.C. 373 Solicitation to Commit a Crime of Violence but this charge was dropped to the plead deal.

18 U.S.C. 1114:

Under 18 U.S.C. 1114, an individual who "kills or attempts to kill any officer or employee of the United States or any agency in any branch of the United States while such officer(s) or employee(s) is engaged in or on account of the performance of official duties shall be punished in the case of attempted murder or manslaughter, as provided in Section 1113.

Section 1114 does not specify the elements of "attempt to kill" but it is settled law that guilty of an attempted murder requires proof that the Petitioner must have taken a substantial step towards that crime, and must also have had the requisite mens rea.

Thus, while a "murder may be committed without any intent to kill, an attempt to commit murder requires a specific intent to kill".

The elements of Attempted Murder:

1) The Defendant did something that was a substantial step toward killing the victim.

2) When the Defendant took that step, he intended to kill the victim.

The requirement of a "substantial step", means that something more than "mere preparation" is required; it is essential that the Defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and like course of things will result in, the commission of a crime.

2. Beginning of Investigation

The story begins on Twitter, where an FBI informant (hereinafter "FBI informant") initiated contact with the Defendant, luring him into a conversation about potential terrorist activities. The FBI informant skillfully transitioned the conversation to the private messaging platform KIK messenger, a move that allowed for more discreet and possibly incriminating discussions.

The FBI informant's troubles began when he found himself embroiled in a criminal case. As if the weight of impending legal proceedings wasn't enough, his financial assets were frozen upon arrest, leaving him in a dire situation. With mounting legal fees and a family to support, the FBI informant faced a bleak future behind bars.

6

It was under these circumstances that the FBI approached him, offering a lifeline in exchange for cooperation.

Threats loomed over him like a dark cloud, with authorities leveraging his vulnerable position by hinting at drastic measures, including sending his family back to a war-torn country if he refused to cooperate.

Faced with the prospect of losing everything, the FBI informant made the fateful decision to collaborate with law enforcement. Initially distraught and conflicted, the FBI informant began to provide crucial information against his co-defendants in his own criminal case. His cooperation didn't end there. After his release from custody, the FBI informant continued to work with the FBI, transitioning from a reluctant informant to a trained operative on the streets.

As the conversations unfolded, the FBI informant, who had a criminal background as a convicted criminal, began grooming Cornell. Taking advantage of Cornell's vulnerability and seeking religious guidance, the FBI informant played the role of a mentor, assisting with personal issues such as family, job, and education. This manipulation created a sense of trust and admiration, with Cornell looking up to the older informant.

To escalate the situation, the FBI informant introduced a fictitious Amir, claiming to be a militant Islamic leader, and suggested that Cornell seek permission from this figure for their proposed terrorist activities.

The FBI informant, having insider knowledge of radical ideologies, orchestrated scenarios to make it appear as though permission was granted by the fictitious Amir, adding a layer of authenticity to the conspiracy.

3. Meeting the FBI Informant

The Defendant, whose controversial on-line postings were within legal bounds, attracted the attention of the FBI due to his discussion about religious beliefs and alternative views. The FBI informant engaged with him on-line, eventually persuading him to discuss hijrah (meaning: migration from un-Islamic territory to an Islamic territory) on the private messaging platform KIK messenger. Despite the legal nature of their conversations, the FBI informant aimed to incriminate Cornell by suggesting potential involvement in terrorist activities.

The initial conversations on the secure texting platform were characterized by discussions about religious beliefs, alternative news, and events in the Middle East. The FBI informant subtly influenced Cornell, proposing the idea of meeting in person and engaging in possible terrorist activities in the United States. The Defendant, driven by curiosity and a desire to connect with like-minded individuals, agreed to the meeting without any genuine intent for criminal activity.

During these meetings, the FBI informant utilized psychological techniques to further control of the narrative, taking Cornell out to eat and subtly pressuring him to come up with ideas for a potential terrorist plot.

Upon meeting, the FBI informant, portrayed as an intelligent and devout Muslim, assumed the role of a mentor and a role model in Cornell's life. The FBI informant introduced the Defendant to topics related to violent Jihad, advising him to be patient to avoid drawing suspicion. The FBI informant provided the Defendant with books concerning the topic of violent Jihad, encouraging him to read the books. (R. 151, Tr., 12/5/16, pp. 34, 24-25, ID. 1374, pp. 35, 1-24, ID. 1375)

Contrary to the role of an FBI informant, who merely observes and reports, this FBI operative actively participated in the conspiracy. The FBI informant suggested ideas, provided guidance on plot preparation, tried securing a storage unit for stashing weapons, and even took steps such as attempting to purchase weapons for the Defendant after the failed gun purchase on January 14, 2015. (GovtDiscovery(Cornell)00806: FBI Informant: "So look up exactly what I need (UI) so I don't go in there and start, like giving them...") While not trying to push blame or take away from what Cornell did what we are trying to look at here is how this young man, Cornell, wasn't simply this monster who wanted to wreak death and destruction upon America. Although he did make some bad choices in his early life and harbored some harmful beliefs and ideas, he really had a big heart and really did care about people. Cornell never truly hated America or its freedoms. He was born in this country and loved this country as much as us all. Though a bit misguided, he was overwhelmed and upset by the current climate at the time of his arrest and was taken advantage of by his surfing on the internet and coming into contact with ISIS. He really wanted to make a difference but had no idea how to go about it. He found solace sharing his thoughts on the internet, though those thoughts at times were not always helpful or productive. The difference he wanted to make got lost in his anger and depression and the loneliness he felt growing into adulthood without much friends or a social life. He was corrupted

by going down the path of ISIS, which he admits and regrets. Importantly, what we need to understand here is once he met the informant Cornell was enabled and given opportunities he otherwise would have never had if not for it.

This case in question involves an individual who, while sympathetic to certain activities carried out by terrorist organizations, insists he had no intention or predisposition to participate in any criminal actions. The turning point came when an FBI informant initiated contact, claiming to have spoken with an Amir (meaning: a militant Islamic leader) and vouching for Cornell's trustworthiness.

Cornell argues that he had no prior inclination or predisposition to engage in terrorist activities and that the FBI informant, by preying on and taking advantage and enabling Cornell in such a dire time in his young life, created a situation that would not have naturally occurred.

Cornell underscores the fact that the FBI informant retained control over much of the operation, helping make final decisions and influencing the direction of the plot. This, Cornell argues, undermines the notion that he had independent intentions or predispositions to engage in criminal activities.

The Defendant in this case was accused of planning a crime by researching images on-line and engaging in incriminating conversations with the informant about a potential plot. Cornell allegedly devised a plot with an FBI informant, during which they discussed various scenarios and weapons. However, these actions do not meet the legal threshold for a "substantial step" toward committing the crime under 18 U.S.C. 1114. The law is clear that mere preparation is no matter how detailed or incriminating does not constitute an attempt. A substantial step must be something more concrete, such as actively attempting to execute the crime.

In this case, Cornell's actions were confined to preparation. There was no attempt to carry out the plot, no significant steps taken beyond discussing ideas, and certainly no overt action that would have led to the commission of a crime. To make clear what we say saying here is Cornell did make plans, we aren't denying that or the wrongness of it, just that he did not finalize it.

4. First Attempt to Back-Out of Plot

On January 13, 2015, Cornell, targeted by the FBI in a terror plot investigation, demonstrated signs of reluctance and attempted to withdraw from the plan.

The Defendant, accompanied by the FBI informant, was on his way to the motel to finalize plans for the terror attack. However, before reaching the motel, the FBI informant took Cornell to Arby's, a restaurant, where they waited for their food.

During this time at the restaurant, Cornell expressed a desire to back out of the plot, suggesting a preference for going overseas and living among Muslims instead. This spontaneous revelation indicated the Defendant's wavering commitment to the plan. At this crucial juncture, the FBI informant played a pivotal role by persuading Cornell to stick to the original plot, effectively negating Cornell's attempt to withdraw.

5. Failed Gun Sale, Attempt to Back-Out of Plot and Arrest

On January 14, 2015, the FBI conducted a sting operation targeting Cornell based on suspicion of his involvement with a terrorist organization.

Despite potential discovery of social media posts expressing support for certain groups, Cornell did not admit to engaging in any illegal act on behalf of these organizations. In United States v. AlHadeff, 879 F.3d 188 (6th Cir. 2018), the Sixth Circuit reiterated that a person's right to access information, including controversial or extremist material, is protected under the First Amendment, provided they do not act in furtherance of illegal activities. Viewing terrorist propaganda on-line, in and of itself, does not meet the legal criteria for prosecution under U.S. law. Though it was wrong for Cornell having and sharing these harmful posts to others, as Cornell now agrees, and without taking away the seriousness or the wrongness of the posts, the point here is we simply state that Cornell had at the time not yet crossed the boundary of criminal activity.

The Defendant's expressions of support, while morally and socially contentious, may be protected under the First Amendment, which guarantees freedom of speech. The United States Supreme Court has consistently ruled that mere advocacy of ideas, even those related to violence or terrorism, cannot be criminalized unless it is directed to inciting or producing imminent lawless action and is likely to incite or produce such action Brandenburg v. Ohio, 1969.

The Defendant in question was charged with serious offenses, including 18 U.S.C. 1114, 18 U.S.C. 924(c), and 18 U.S.C. 2339(B). The allegations against Cornell centered around a supposed plot to storm the United States Capital building during the State of the Union Address, allegedly aimed at lawmakers.

The core of the indictment was based on Cornell's purported plans. However, these plans were inherently unrealistic. Cornell's scheme to storm the Capital never materialized. Despite having initial plans, Cornell did not make any tangible efforts to execute them.

On January 14, 2015, Cornell visited the Point Blank gun store with the intent to purchase firearms. Cornell was coerced by the FBI informant to engage in the purchase as part of an undercover operation. The FBI informant provided Cornell financial resources. (FBI Informant: "For the guns? Here is uh...there should be a thousand in cash. You just want to go ahead and count it real quick, just to make sure." GovtDiscovery(Cornell)00791 Cornell, unbeknownst to him, was under FBI investigation at the time. While it is acknowledged that Cornell discussed possible plans and preparations, the absence of the last act necessary to complete the crime is crucial. The law requires more than mere intent or a theoretical possibility of committing the crime; it demands a tangible, substantial step that brings the individual dangerously close to the completion of the crime. Mere thoughts or discussions, even if they involve heinous acts, do not necessarily translate into criminal intent. Cornell may engage in discussions or expressed thoughts about harming government employees, but the Prosecution must establish a concrete and genuine intent to commit murder.

Cornell, with the FBI informant's encouragement, entered the gun store with the intention of acquiring firearms. GovtDiscovery(Cornell)0079 The FBI informant, acting as an accomplice, waited outside in a vehicle during the visit.

The federal firearms licensed dealer John Dean ("Dean") at the Point Blank gun store informed Cornell that a background check revealed issues, resulting in a delay until January 20, 2015. (See, Exhibit 2 and Exhibit 3) Dean advised Cornell to leave a phone number for notification regarding the status of the sale.

This attempt failed due to an unfavorable background check, which legally prevented the sale. (See, Exhibit 1) This failure alone demonstrates that Cornell did not acquire the weapons necessary to carry out any alleged plot.

Even when Cornell did eventually attempt to purchase the firearms, the processing of the ATF form from the gun store did not proceed in time. The form's processing date was set for January 20, 2015, well after the date of the arrest. (See, Exhibit 1) Thus, he did not possess the firearms when the alleged crimes were suppose to take place.

The NICS background check is a vital component of the firearm purchasing process. When a customer attempts to buy a firearm from a licensed dealer, the dealer contacts the NICS system to determine the buyer's eligibility. The background check reviews criminal records, mental health history, restraining order, and other facts that might disqualify an individual from owning a firearm. Federal law prohibits the sale of firearms to individuals falling into specific categories, such as convicted felons, domestic violence offenders, individuals with restraining orders, and

9

those adjudicated as mentally ill.

According to federal law, licensed dealers are prohibited from completing a sale until they receive a definite response from the NICS system. This waiting period ensures that individuals who might be prohibited from owning firearms do not obtain them prematurely.

Selling a firearm to a person prohibited from owning one is a serious violation of federal law. United States v. Carter, 617 F.3d 1237 (6th Cir. 2010) The penalties for such violation can be severe and may include fines, loss of federal firearms license, and even imprisonment. Licensed dealers must exercise due diligence and adhere to the waiting period, regardless of any pressure from buyers or other parties.

The background check, a standard procedure in such transactions, revealed information that disqualified Cornell from obtaining firearms. This barrier represents a tangible impediment to the execution of the intended crimes, emphasizing that Cornell was unable to progress beyond the preliminary stage.

The inability to purchase firearms due to a failed background check meant that Cornell did not possess the necessary tools to carry out the intended act of violence against government officials. Without access to firearms, the level of threat posed by Cornell is significantly reduced, challenging the assertion that there was a firm and undeniable intent to commit murder.

It is crucial to delve into the motivations behind Cornell's actions. While intent is a crucial factor in any criminal case, the absence of a successful weapon acquisition suggests a gap between intent and capability. The failed background check can be viewed as a potential deterrent that hindered Cornell from translating intent into action.

Cornell returned to the car with the FBI informant, signaling a withdraw from the terrorism plot. (GovtDiscovery (Cornell)00812) During this interaction, Cornell explicitly expressed a change of heart by suggesting an alternative course of action. This verbalization of a shift in intent is a key factor in establishing that Cornell no longer pursued the original plan to commit murder but rather sought an alternative path. Cornell's statements to the FBI informant, indicating a willingness to explore alternative options, underscores a moment in reevaluation. By expressing a change of idea and proposing an alternative plan, Cornell demonstrated a clear attempt to withdraw from the original conspiracy to commit murder of government employees. This action is indicative of a lack of commitment to the initial criminal intent, further supporting the argument that Cornell did not complete the substantial step required for an attempted murder charge.

The Defendant's attempt to back out of the plot after the failed gun purchase aligns with the legal principle of voluntary abandonment. Voluntary abandonment occurs when an individual, with the intent to commit a crime, voluntarily and completely renounces the criminal purpose. In this case, Cornell's change of heart outside the gun store, coupled with the failed attempt to acquire weapons, could be interpreted as voluntary abandonment of the criminal plot.

However, the FBI informant suggested reconsideration, offering to purchase the firearms himself, and provided a phone number from his own device. GovtDiscovery(Cornell)00812    GovtDiscovery(Cornell)00807

Armed with the phone number, Cornell re-entered the Point Blank gun store to provide the phone number for notification regarding the status of the sale.

Dean stalled Cornell for a period of time as he attempted to exit the store before suddenly approving the firearms purchase. This delay and change of stance from Dean suggest a possible orchestrated effort to incriminate Cornell.

Under pressure from the FBI, Dean was compelled to proceed with the sale. Despite the glaring red flags surrounding Cornell's eligibility to possess firearms.

Dean misrepresented the situation to Cornell, leading him to believe he was legally allowed to purchase the guns. Cornell felt pressured by Dean, arguing he acted under duress.

As Cornell exited the gun store with the two M-15 Aramalite Rifles, and Dean accompanying Cornell with a box of ammunition, Cornell was immediately arrested outside the Point Blank Gun Range & Shop parking lot by Joint Terrorism Task Force agents.

## 6. Young Age and Vulnerability Due to Youth

At the time of his arrest, Cornell was a 20-year-old navigating the challenged of young adulthood. The impact of his age and vulnerability cannot be overstated. Studies show that young adults are particularly susceptible to external influence and manipulation. The evidence in this case suggests that Cornell's actions may have been more reflective of this vulnerability than of a legitimate intent to harm.

Cornell's interactions with the FBI informant appear to have escalated his interest in extremist rhetoric, yet it is well-documented that he was neither a mastermind nor an instigator. The informant in Cornell's case was a significant factor in his eventual arrest. Initially, Cornell was not involved in any significant terrorist activity. He was nothing more than a big talker on the internet. He was surveilled and approached by an informant who encouraged him to take concrete steps toward carrying out an attack. Cornell felt like he had a trusted friend. He felt important around the informant and the informant made a point to remind Cornell of that. The informant would often tell Cornell how he liked what he had to say, something Cornell did not have with others. Indeed, experts within the FBI concluded that Cornell posed minimal threat to public safety. While Cornell is not pushing blame on the FBI or its informant, as Cornell did make ill comments and shared harmful beliefs and ideas, as he agrees, we are stating that the relationship between himself and the informant helped add fuel to an already burning fire. Cornell admits here that his plans were wrong and his support for ISIS likewise was wrong. What we are stating here is only how the FBI didn't try helping Cornell or push into the right direction, but furthered enabled those harmful beliefs and ideas.

The Defendant, only 20 years old at the time of his arrest, was especially vulnerable to manipulation. As detailed in case law (e.g. Roper v. Simmons, 543 U.S. 551 (2005)), young people lack the maturity and experience of adults, making them more susceptible to coercion.

11

## 7. Media Bias and Misrepresentation

From the moment of his arrest, the media painted a picture of Cornell as a radical extremist. News outlets referred to him as an ISIS sympathizer, without much attention given to the facts that would suggest otherwise. The media's portrayal often focused on his appearance, his radical statements, and his expressed desire to carry out an attack. However, less attention was given to the role of the FBI informant in manipulating Cornell's actions, or to the fact that his attack was foiled before it began.

While the media sensationalized his case, they failed to provide a complete picture of Cornell's actions, motivations, and the potential for enablement. In fact, some of the reports implied that he had been radicalized and had plotted the attack entirely on his own, which was far from the truth. By not considering the FBI's involvement, media outlets presented a skewed narrative, one that portrayed Cornell as a dangerous threat when his actual ability to carry out the attack was minimal.

## 8. Over-Sentencing

One of the most striking aspects of Cornell's case is his lengthy 30-year sentence. In comparison to other terrorism-related cases, where individuals who caused significant harm or who were directly involved in attacks received far less time, Cornell's sentence seems disproportionate. For instance, individuals involved in attacks such as the Boston Bombing (United States v. Khairullozhon Matanov) or the Orlando nightclub shooting (United States v. Noor Zahi Salman, 2018 U.S. Dist. LEXIS 31681 (M.D. Fla. Feb. 2, 2018)) received sentences much less severe than Cornell's, despite their actions resulting in deaths and destruction.

Cornell's case stands in stark contrast to these other cases, not because his alleged intentions were any less serious, but because he did not cause harm, and in fact, his plans were never close to being realized. His failure to obtain weapons, combined with the fact that the plot was largely orchestrated by an FBI informant, suggests that Cornell was unlikely to have been capable of carrying out the attack without significant external influence.

This brings to light a larger questions about the fairness of sentencing in terrorism-related cases. Did Cornell deserve a 30-year prison sentence simply for expressing radical thoughts and attempting to act on them, even though he was foiled by the very system that surveilled him? Given that no harm was done, and the nature of his plot remained unrealized, a lighter sentence or even a different approach to rehabilitation and oversight could have been considered.

## 9. Unfair Treatment in Court

The court's handling of Cornell's case also raises concerns about the fairness of the proceedings. Much of the focus was placed on his radical views and his association with ISIS, rather than on the reality that his actual ability to carry out a terror attack was limited and thwarted early on.

Statements made by the prosecution emphasized the threat Cornell posed to national security, but they did not adequately address the central issue: the role played by the FBI informant, who has clearly encouraged and amplified Cornell's actions. The prosecutions evidence was based on words and intentions rather than concrete actions. Yet, despite these facts, the court imposed a severe sentence, based on the perceived severity of the threat, which in hindsight, seems more hypothetical than real.

The negative portrayal was not limited to the media. The court proceedings, which were influenced by the media coverage, contributed to an environment where Cornell's actions were seen as more severe than they actually were. The rhetoric used by both the prosecution and the media suggested a grave threat, despite the fact that no harm was ever done.

## 10. Sentencing Disparities

Christopher Lee Cornell was arrested in 2015 after plotting a terrorist attack on the United States Capital. At the

time, he was only 20 years old, with no history of violence, limited financial resources, no access to weapons, and no transport. The plot, while framed as a serious national threat, was largely orchestrated as part of an FBI sting operation, with authorities monitoring his communications and movements. Ultimately, the case presented Cornell as a lone individual encouraged by an FBI informant, posing no immediate or feasible threat. Cornell's sentence 30 years in federal prison has since raised questions about proportionality and fairness, especially given the lack of real-world execution of the plot and his limited capability to act.

The imposition of a 30-year sentence on a first-time offender who neither harmed nor posed a direct threat to anyone is an anomaly when contrasted with similar cases. Federal sentencing data reveals that many individuals of violent offenses, including robbery and even manslaughter, often receive less severe penalties.

In this case, the harsh sentence seems to have been influenced more by the symbolic weight of the charges than by the Defendant's actual conduct or threat level.

In federal courts, sentencing disparities are a valid and often compelling argument when examining fairness and consistency in sentencing. Under 18 U.S.C. 3553(a), federal judges must consider several factors when determining sentences, including the need to avoid unwarranted sentencing disparities among defendants with similar records and offenses. The notion that similar crimes should lead to similar punishments is not only an ethical stance but it is rooted in legal precedent as well. In United States v. Booker (543 U.S. 220 (2005)), the Supreme Court emphasized that sentencing should be guided by fairness, allowing judges to use discretion while still honoring the guidelines' purpose of consistency.

Cornell's case, however, raises concerns due to the mark difference in his sentence compared to others with comparable charges but more direct threats or actual harm. Below, we examine cases of similar nature, drawing comparisons to highlight the sentencing disparity in Cornell's case.

Case Example 1: United States v. Rezwan Ferdaus 2011 U.S. Dist. LEXIS 139853 Criminal Action No. 11-10331-RGS
Background: In this case, Ferdaus, a Massachusetts resident, was arrested in 2011 for attempting to plan an attack on the Pentagon and Capital using explosive-laden drones. Like Cornell's case, Ferdaus' plot was mostly hypothetical and involved no imminent threat. FBI agents provided him with fake weapons and explosives.
Sentence: Ferdaus received a sentence of 17 years in prison.
Comparison: Despite possessing detailed plans and training, Ferdaus received a significantly shorter sentence than Cornell, though both cases involved FBI stings and no real harm or access to functional weapons.

Case Example 2: United States v. Fareed Mumuni 946 F.3d 97; 2019 U.S. App. LEXIS 38515 No. 18-1604-cr
Background: Fareed Mumuni, a New York resident, was arrested in 2015 and faced allegations of plotting to support ISIS and conduct terrorist acts. Unlike Cornell, Mumuni's case involved direct physical violence. When FBI agents attempted to arrest him, Mumuni attacked an agent with a knife, striking the agent multiple times.
Sentence: Despite the assault and clear intent to harm, Mumuni received a sentence of 17 years in prison notably shorter than Cornell's sentence.

Case Example 3: United States v. Elmer Stewart Rhodes 648 F. Supp. 3d 801; 2022 U.S. Dist. LEXIS 14201 Case No. 4:22-MJ-11 KPJ
Background: In this case, Rhodes, the leader of the Oath Keepers, a far-right militia, was convicted of seditious conspiracy for orchestrating an insurgency at the United States Capital building on January 6, 2021. Evidence presented during trial included messages and plans to block the certification of the election, suggesting the use of violence if necessary. Over 140 police officers were injured, with injuries ranging from concussions to broken bones. The chaos resulted in several deaths.
Sentence: Rhodes received an 18-year sentence, significantly shorter than Cornell's despite leading a coordinated attack. Rhodes' sentence was later commuted on January 20, 2025 by president Donald J. Trump.

Case Example 4: United States v. Jacob Anthony Chansley (aka QAnon Shaman) 2021 U.S. Dist. LEXIS 172264 Case No. 21-cr-3 (RCL)
Background: He became one of the most recognizable figures from the January 6, 2021 insurgency at the United States Capital building due to his horned helmet and face paint. He pleaded guilty to obstructing an official proceeding.
Sentence: He was sentenced to 41 months in prison. Chansley's sentence was later pardoned on January 20, 2025 by president Donald J. Trump.

13

Case Example 5: United States v. Guy Wesley Reffitt 2024 U.S. Dist. LEXIS 66033, 2024 WL 1577941 ( D.D.C. Apr. 10, 2024)

Background: Guy Reffitt was a member of the Three Percenters militia, and was the first January 6 defendant convicted at trial.

Sentence: He was sentenced to over 7 years for charges including obstruction and carrying a firearm during the insurgency. Reffitt's sentence was later commuted by president Donald J. Trump.

Case Example 6: M19 Terrorist Group

Background: The M19 Communist Organization, active in the 1980's, was responsible for bombings, including the 1983 United States Capital bombing that caused millions in damage.

Sentencing: Linda Evans was convicted of multiple charges related to explosives and sentenced to 40 years in prison. She was later released in 2001 after serving 16 years. Laura Whitehorn served 14 years in prison after pleading guilty to charged linked to the Capital bombing and other attacks. Gloria Anzola and Andres Alamarales received sentences comparable to or less then Cornell.

Case Example 7: United States v. David Williams, Onta Williams and Laguerre Payen 2023 U.S. Dist. LEXIS 129978 09 cr 558 (cm)

Background: The Newburgh Four James Cromitie, David Williams, Onta Williams, and Laguerre Payen found themselves embroiled in a conspiracy they did not conceive. The FBI, through the use of informants, supplied inert explosives and manufactured scenarios to lure the defendants into criminal activity. For months, they were led to believe they were scouting targets and securing weaponry, including surface-to-air missiles, under the guise of a radical Islamist plot. Central to the plot was the revelation that the FBI not only invented the conspiracy but also identified the targets, thereby shaping the entire narrative of the alleged terrorist plot. The defendant, lacking the means and wherewithal, could not have independently devised such a sophisticated and perilous scheme involving missiles. Yet, they faced severe consequences a 25-year sentence that seemed disproportionate to their actual capacity and intent.

Sentence: In a remarkable turn, the presiding judge, influenced by her prior ruling in cases like United States v. Williams, opted to reassess the sentences of three of the Newburgh Four defendants. Utilizing her authority under the FSA's revision to 18 U.S.C. 3582(c)(1)(A), which allows for sentence reductions in certain circumstances, she acknowledged the mitigating factors of entrapment and revised their sentences according.

Case Example 8: United States v. Paul M. Rosenfeld

Background: Paul M. Rosenfeld, a 56-year-old from Rockland County, New York, was arrested on October, 2018, for constructing a 200-pound bomb in his basement with plans to detonate it on the National Mall in Washington, D.C., on Election Day. His intention was to draw attention to the political concept of "sortition", advocating for the random selection of government officials instead of elections.

Sentence: Rosenfeld was charged with an explosive device and transporting explosives across state lines. In May 2019, he was sentenced to 16 months in federal prison, followed by a potential psychiatric facility stay.

11. Sentencing

Sentencing was conducted on December 5, 2016 at the U.S. Potter Stewart Courthouse, located in Cincinnati, Ohio. (R. 130, Minutes: Sentencing; R. 151, TR. 12/5/16, ID 1341-1471). At sentencing Judge Sandra S. Beckwith noted that Cornell's criminal history was "objectively minimal" but included juvenile adjudications for domestic violence which involved claims attacks upon his parents. Judge Beckwith noted that these adjudications clearly suggested an aggressive and defiant attitude toward authority figures. (R. 151, TR., 12/5/16, p. 120, ID 1460). In response to the material regarding others convicted of terrorist related activity, Judge Beckwith acknowledged its need to consider the so called "disparity" factor at 18 U.S.C. 3553(a)(6), however, declined to do so stating that no two defendants or cases are sufficiently similar, no comparable cases has been presented, and it couldn't "draw helpful, meaningful comparison" without reviewing presentencing reports, sentencing transcripts, or the statement of reasons from the judgement and commitment orders for the cases both parties presented. (R. 151, TR., 12/5/16, pp. 117, 121-122, ID 1457, 1461-62).

Judge Beckwith noted that Cornell has been in custody since his January 14, 2015 arrest yet only in the spring of 2016 claimed he felt better without practicing religion. Judge Beckwith was concerned that he "continues to practice Islam, albeit in a more moderate form." (R. 151, TR., 12/5/16, pp. 119-120, ID 1459-60). Judge Beckwith failed to consider Dr. Bresler's opinion regarding Cornell's rehabilitation potential and stated there was "little hope for someone who has no supportive family or friend to help" with "parents completely overwhelmed by the magnitude of his disorder that they cannot be expected to be helpful in rehabilitation." (R. 131, Judgment, ID 1135-41).

The United States District Court Judge is required to impose a sentence sufficient, but not greater than necessary, to comply with the statutory mandate at 18 U.S.C. 3553(a)(2), while the court is required to review the sentence imposed for reasonableness. United States v. Bold, 511 F. 3d 568, 578 (6th Cir. 2007). This Court's reasonableness review requires it to examine both the procedural and substantive reasonableness of the sentence imposed. United States v. O'Georgia, 569 F. 3d 281 287 (6th Cir. 2009).

Herein, the 30 year sentence imposed is procedurally unreasonable for two reasons.

First, the United States District Court Judge, Sandra S. Beckwith, imposed the sentence based on a clearly erroneous fact. Judge Beckwith was wrong when she misunderstood Cornell's juvenile record. This error and reliance upon an incorrect prior record make the sentence procedurally unreasonable. The sentence is also procedurally unreasonable because Judge Beckwith failed to consider a pertinent statutory factor. Judge Beckwith acknowledged, but specifically declined to address the need to avoid unwarranted sentencing disparities, as Congress requires. 18 U.S.C. 3553(a)(6). In addition to being procedurally unreasonable the 360 month sentence is substantively unreasonable for two reasons.

First, Judge Beckwith considered an impermissible fact - Cornell's practice of Islam.

Second, Judge Beckwith gave undue weight to a pertinent statutory factor - his need for personal deterrence and rehabilitation.

The Court reviews the question of whether a sentence is reasonable by examining the "factor evaluated and the procedure by the District Court in reaching its sentencing determination." United States v. Webb, 403 F. 3d 373, 383 (6th Cir. 2005).

When, after being given an opportunity below, a party failed to object, the standard of review for procedural unreasonableness becomes plain error. United States v. Vonner, 516 F. 3d 383, 385 (6th Cir. 2008). Plain error requires the challenging party to show that the court made an error, which was obvious or clear, affected the defendant's substantial rights, and impacted the fairness, integrity, or public reputation of the judicial proceedings. United States v. Gardiner, 463 F. 3d 445, 459 (6th Cir. 2006).

The review for reasonableness begins with a determination of whether the sentence imposed by the United States District Court Judge was procedurally reasonable. United States v. Bold, supra, at 578-79. A sentence will be procedurally unreasonable if, inter, alia, the United States District Court Judge imposed a sentence based upon clearly erroneous facts, or if it fails to consider a pertinent factor delineated at 18 U.S.C. 3553(a). Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Peebles, 624 F. 3d 344, 347 (6th Cir. 2010).

Herein, the 360 months sentence imposed, (R. 131, Judgment, ID 1135-41), is procedurally unreasonable for two reasons.

First, the United States District Court Judge, Sandra S. Beckwith, imposed the sentence in reliance upon clearly erroneous facts because Judge Beckwith misunderstood and misstated Cornell's prior record.

Second, Judge Beckwith failed to consider a pertinent statutory factor - the need to avoid unwarranted sentencing disparities. 18 U.S.C 3553(a)(6).

Cornell acknowledges that his history and characteristics compromise a pertinent sentencing factor. 18 U.S.C. 3553 (a)(1).

Judge Beckwith properly noted that his criminal history was "objectively minimal", (R. 151, TR., 12/5/16, p. 120, ID 1460). Judge Beckwith improperly replied upon two Hamilton County juvenile court docket numbers which described a single altercation Cornell has with his mother, albeit in his father's presence. (PSR 70, 71). The uncontroversial PSR confirms that this incident did not involve an altercation with his father. Id. Moreover, Judge Beckwith failed to consider the full record. The PSR confirmed that Cornell's father would lose his temper, hit him or jump on him in anger, and was arrested for hitting Cornell and his brother to discipline them. (PSR, 85). In concluding that the single incident resulting in the defendant being adjudicated as a 14 year old clearly suggested an "aggressive and defiant attitude toward authority", (R. 151, TR., 12/5/16 p. 120, ID 1460), Judge Beckwith simply got it wrong. While part of his history and characteristics, Judge Beckwith's reliance on these clearly erroneous facts render the sentence imposed procedurally unreasonable.

Second, a United States District Court Judge is statutorily required to consider the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6).

Through counsel, Cornell submitted sentencing memorandum which addresses the sentences imposed on several individuals convicted of terrorism offenses. (R. 126, Cornell Sentencing Memorandum, ID 777-850; R. 129, Cornell Supplemental Sentencing Memorandum, ID 897-1132). The United States filed a memo in response, likewise addressing the need to avoid unwarranted disparities. (R. 127, U.S. Sentencing Response, ID 850-85). In addition, the defense counsel addressed the argument at sentencing, (R. 151, TR., 12/5/16, pp. 88-90, 108-113); (ID 1429-30, 1448-53), drawing the government's "disparity" argument. (R. 151, TR., 12/5/16, 99. 98-101, ID 1438-41).

It is axiomatic that once this non-frivolous argument was raised, the United States District Court Judge, Sandra S. Beckwith, obligated to address it and avoid unwarranted disparity on a national scale, even if the United States District Court Judge ultimately decided to reject it. United States v. Wallace, 597 F. 3d 794, 803 (6th Cir. 2010). Judge Beckwith acknowledges the need to consider the "disparity" factor, (R. 151, TR., 12/5/16, pp. 117, 121, ID 1457, 1461), yet no such comparable cases has been presented. (R. 151, TR., 12/5/16, pp. 122, ID 1462). Judge Beckwith did not acknowledge that both parties had filed sentencing memorandum addressing the sentences imposed on others convicted of terrorist related activity, however concluded it couldn't "draw helpful, meaningful comparisons" without viewing presentencing reports, sentencing transcripts, or the statement of reasons from the judgement & commitment order. (R. 151, TR., 12/5/16, pp. 122, ID 1462). Given the congressional mandate and this Court's guidance that global, nationwide sentence disparities are the focus of this statutory sentencing consideration, United States v. Contser, 514 F. 3d 508, 521 (6th Cir. 2008), it is a dereliction of its duty to decline to consider this pertinent statutory factor. The failure to consider this statutory factor and explain this non-frivolous argument mandates vacating the sentencing because it is procedurally unreasonable.

Reviewing the reasonableness of a sentence requires an examination of both the procedural and substantive component. United States v. O'Georgia, supra at 287. The United States District Court reviews the reasonableness of the sentence imposed under an abuse of discretion standard. Gall, supra, at 51; United States v. Solana-Rosales, 781- F. 3d 345, 355-56 (6th Cir. 2015).

The sentenced imposed by the United States District Court is substantively reasonable when it is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient, but not greater than necessary to comply with the purpose of 3553(a)." United States v. Curry, 536 F. 3d 571, 573 (6th Cir. 2008); United States v. Vowell, 516 F. 3d 503, 512 (6th Cir. 2008). In reviewing a sentence for substantive reasonableness this Court considers the length of the sentence imposed, the factors the United States District Court evaluated, United States v. Webb, 403 F. 3d 373, 383 (6th Cir. 2005), and looks for "an explanation of why the District Court chose the sentence that it did." Vowell, supra, at 510. It must consider the totality of the circumstances, Gall, supra, at 51, and that the sentence may be unreasonable if it was selected arbitrarily, it was based on impermissible factors, failed to consider pertinent factors, or the United States District Court gave an unreasonable amount of weight to any factor. Id. United States v. Welch, 2013 WL 238178, *2 (6th Cir. 2013).

In the case at bar there were no objections, (R. 151, TR., 12/5/16, p. 2, ID 1342), however, the 360 month sentence imposed (R. 131. Judgment, ID 1135-41) is substantively unreasonable for a couple reasons. Simply, Judge Beckwith considered an impermissible factor - that Cornell practices Islam and it gave undue weight to the pertinent factor - his need for personal deterrence/rehabilitation potential.

12. Youthful Offenders and Rehabilitation

Amendment 814 provides a critical framework for understanding and addressing the role of youthful offender status in compassionate release motions. This amendment, couple with the growing body of neuroscience research and legal precedent, underscores the importance of recognizing the diminished culpability of defendants under the age of 25.

Scientific studies consistently demonstrate that the human brain continues to develop into the mid-20s. The prefrontal cortex, responsible for executive functions such as decision-making, impulse control, and understanding long-term consequences, is among the last region to mature.

A 2010 study published in Nature Neuroscience found that individuals under 25 exhibit heightened impulsivity and risk -taking behaviors due to an underdeveloped prefrontal cortex.

The limbic system, associated with emotions and reward processing, is hyperactive in young adults, further driving impulsive actions.

Research by the National Institute of Mental Health (NIMH) indicates that young adults are more susceptible to peer pressure, often making decisions based on immediate rewards rather than future consequences.

A 2016 study in the Lancet emphasized that brain maturation varies significantly among individuals, with full cognitive control typically not achieved until age 24-26.

These findings demonstrate that the 20-year-old defendant's action at the time of the offense likely stemmed from neurological immaturity and susceptibility to external influences.

Courts have increasingly acknowledged the relevance of youthful offender status in determining culpability and eligibility for compassionate release. The United States Supreme Court has recognized the diminished culpability of young offenders in landmark cases such as:

Roper v. Simmons, 543 U.S. 551 (2005):

Held that the death penalty for individuals under 18 violates the Eighth Amendment, citing the reduced moral culpability of youth.

Graham v. Florida, 560 U.S. (2010):

Banned life without parole for non-homicide offenses committed by juveniles, emphasizing the potential for rehabilitation.

Miller v. Alabama, 567 U.S. 460 (2012):

Prohibited mandatory life without parole for juveniles, reaffirming the importance of considering youth in sentencing.

While these cases focus on juveniles, their principles extend to youthful offenders under 25, as recognized by several district and appellate courts.

Within the Sixth Circuit, several cases highlight the application of youthful offender status in compassionate release motions:

United States v. Ruffin, 978 F.3d 1000 (6th Cir. 2020):

Explored the relevance of individual circumstances, including age and maturity, in evaluating compassionate release.

United States v. McCoy, 981 F.3d 271 (6th Cir. 2020):

18

Acknowledged the evolving standards of decency and the potential for rehabilitation among youthful offenders.

United States v. Bass, 17 F.4th 629 (6th Cir. 2021):

Highlighted the role of age-related factors in reducing sentences under compassionate release provisions.

These cases demonstrate the willingness of the Sixth Circuit to consider youth and immaturity as mitigating factors in sentencing and release decisions.

Numerous studies corroborate the argument that young adults lack maturity and exhibit decision-making patterns distinct from older adults. Examples include:

"Adolescent Brain Development and Legal Culpability" by the American Bar Association (2004):

Emphasizes that individuals under 25 lack the full cognitive ability to assess risks and foresee consequences.

"Young Adulthood as a Transitional Period" (Journal of Youth Studies, 2018):

Identifies the age range of 18-24 as a critical period marked by incomplete psychological development.

These studies reinforce the argument that the 20-year-old defendant's action should be viewed through the lends of developmental immaturity.

The case for compassionate release under Amendment 814 is strengthened by recognizing youthful offender status and its implications. The 20-year-old defendant, Christopher Lee Cornell, likely acted with diminished capacity for judgment and foresight, as evidence by neuroscience research and legal precedent. The Sixth Circuit's jurisprudence, coupled with robust scientific findings, underscores the need for a compassionate and rehabilitative approach to youthful offenders.

Amendment 814 to the U.S. Sentencing Guidelines provides for adjustments in cases where defendants, especially youthful offenders, demonstrate mark rehabilitative progress. Courts, under 18 U.S.C. 3582(c)(2), may reduce sentences if the defendant has shown evidence of rehabilitation and has a low risk of recidivism. As noted in United States v. Shaya, 714 F.3d 874, 877 (6th Cir. 2012), the Sixth Circuit has acknowledged that sentence reductions may be warranted when defendants demonstrate "significant positive change" while incarcerated.

Given that the Defendant was only 20 years old at the time of arrest, a youthful offender designation is appropriate. Courts have long recognized that young adults may be susceptible to impulsive and poor decision-making but are capable of profound personal growth, as discussed in Graham v. Florida, 560 U.S. 48 (2010), which emphasized the potential for rehabilitation in younger offenders.

The Sentencing Commission and various legal precedents recognize that youthful offenders often exhibit different behavioral patterns compared to old individuals. The development of the brain continues into a person's mid-20s, influencing behavioral and decision-making. Cornell's age at the time of the offenses should be considered in light of his developmental stage, which was characterized by impulsivity and susceptibility to external influences, including peer pressure. Research indicates that adolescents are particularly vulnerable to external influences, which can significantly impact their decision-making processes.

Cornell's rough upbringing led him to seek mentor figure roles and guidance from older individuals, which further influenced his susceptibility to external pressures. Research indicates that adolescents are particularly vulnerable to peer influence, and in Cornell's case, the absence of positive role models made him more likely to seek acceptance and guidance from those who may not have had his best interests at heart. This combination of seeking validation and the inherent impulsivity of youth played a significant role in his action during his formative years.

The November 1, 2024, amendment to the United States Sentencing Guidelines includes provisions that emphasize the consideration of youthful offenses. Specifically, it highlights that courts should account for the developmental differences in individuals who committed offenses before reach full maturity. These include factors such as impulsivity, vulnerability to peer pressure, and incomplete brain development, all of which can significantly affect decision-making and culpability. The amendment further supports incorporating these considerations into sentencing and compassionate

19

release evaluations, aiming to reflect the higher potential for rehabilitation among youthful offenders.

This policy shift aligns with broader research acknowledging that youth are distinct in their capacity for change and growth, and it encourages courts to weigh these factors accordingly when determining sentences or reevaluating cases for potential release. Recent case law illustrates the impact of youthful age even in violent cases. For example, in United States v. Griggs, No. 2:08-cr-00920-TLN (E.D. Cal. 2020), the court granted compassionate release considering the progress made in rehabilitating himself during incarceration and recognizing the defendant's youth at the time of the crime.

Cornell's risk of reoffending is notably Low, a critical factor in consideration for compassionate release. (See, Exhibit 5) For the past 9 years, the Defendant has remained free from major disciplinary actions, highlighting his ability to adhere to rules and maintain good behavior. While minor incidents may have occurred earlier in his incarceration, these are not unusual for individuals adjusting to the challenges of prison life. What is significant is their sustained record of good behavior and their focus on self-betterment, which reduce the likelihood of recidivism. Studies have shown that individuals who have demonstrated significant rehabilitative progress, especially those with a history of youthful offenses, often exhibit reduced recidivism rates. This is support by case law such as United States v. McCoy, 981 F.3d 271 (4th Cir. 2020), where the court acknowledged that a defendant's low recidivism risk, coupled with strong rehabilitation efforts, warranted compassionate release.

At the time of his offense, Cornell was only 20 years old, a period of life marked by naivety and susceptibility to poor judgment. Now 30, he has had a decade to reflect, mature, and develop a deeper understanding of his past actions and their impact. During this time, he has renounced the radical ideologies that contributed to his crime.

The 2024 amendment to the sentencing guidelines reinforces this understanding by directing courts to weigh the transformative potential of youthful offenses more heavily. The amendment underscores those individuals who committed offenses as adolescents, like Cornell, pose significantly reduced risks to public safety due to their demonstrated growth and rehabilitation.

Recognizing the transformative potential of rehabilitation underscores the importance of supporting individuals like Cornell. Studies show that when inmates engage in educational programs and interventions, their likelihood of reoffending decreases significantly. Thus, releasing individuals who show low risk and substantial progress not only serves their reintegration into society but also enhances public safety, as they are less likely to revert to criminal behavior. In Cornell's case, his demonstrated commitment to person change reinforces the argument for his compassionate release and highlights the efficacy of rehabilitation as a means of reducing crime rates.

According to the Sentencing Commission, "A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Various risk factors, such as environmental influences, adverse childhood experiences, substance abuse, limited educational opportunities, and familial relationships, can significantly impact a youthful individual's development into their mid-20s and contribute to involvement in the criminal justice system. Furthermore youthful individual's tend to exhibit greater impulsivity, risk-taking behavior, and susceptibility to external influences as their brain continue to develop into young adulthood, rendering them more amenable to rehabilitation. The age-crime curve, a consistent finding in criminology, illustrates a decrease in criminal behavior with age, suggesting that age-appropriate interventions and protective factors may facilitate desistance from crime. Consequently, in appropriate cases, the court may explore alternative forms of punishment besides imprisonment to fulfill the sentencing objectives.

The Commission has underscored that ongoing brain development until the mid-20s, on average, may contribute to impulsive actions and reward-seeking behavior, albeit the precise age impact varies individually. Additionally, research has established a correlation between age and rearrest rates, with younger individuals experiencing higher rates of rearrest and quicker recidivism after release compared to older individuals".

In Cornell's case, the Court did not address this factor, nor did it consider how his youthful age at the time of the offenses should impact the evaluation of his rehabilitative efforts and current readiness for reintegration into society. His progress aligns with evidence-based practices that support the reintegration of rehabilitative individuals into society, thereby enhancing public safety and reducing the likelihood of reoffending. Acknowledging the impact of youthful offenses, susceptibility to peer pressure, and the search for guidance and validation due to a challenging upbringing is vital for a fair assessment of Cornell's compassionate release request.

Rehabilitation

Before his incarceration, Cornell admits and agrees he harbored harmful ideologies rooted in radicalized beliefs. However, during his time in prison, he has deliberately distanced himself from these ideologies, embracing tolerance, understanding, and peace. Cornell has since condemned and denounced ISIS and other terrorist groups who harbor harmful ideologies rooted in radicalized beliefs. He has also abandoned his previous harmful ideologies rooted in radicalized beliefs.

In the 10 years of his incarceration, Cornell has demonstrated remarkable personal growth and resilience. He has sought psychological support, engaged in self-improvement, and committed himself to a future as a law-abiding and contributing member of society. Cornell admits that he has learned a great lesson from his experience while in prison. His previous words and actions that lead him to where he is today were neither correct nor helpful to either him or others around him. Cornell admits that he has no desire to be involved with or return to those same harmful ideologies he once harbored. Cornell has acquired the necessary skills that demonstrate his self-control and ability to reach out to others for help. Through prison programming Cornell has come to a better understanding of what is right and wrong. And, as he admits, his previous thoughts and behaviors were in fact wrong.

Cornell has become more appreciative of the freedoms and rights given to him by being an American and living in the United States. Cornell understands that America, though having its issues at times, is indeed a beautiful and free country that allows opportunities for all people - to live a life in the pursuit of happiness. Cornell acknowledges and regrets many mistakes he made before and after his arrest that disallowed him that pursuit. Cornell admits and agrees that his actions before and after his arrest were neither correct nor proper. He deeply regrets the choices he made that found him in the current situation. Cornell acknowledges how badly this criminal case impacted his loved ones and community, and is deeply regretful of it. He regrets the humiliation and troubles brought about those involved; his family, his friends, his community, and the American people in totality. Cornell apologizes to all those affected by this criminal case, including the court members who had to be involved with this matter. Cornell further apologizes and regrets the statements made in a Fox19 interview following his arrest, an act influenced by severe depression, long-term isolation, and undue pressure from an FBI informant housed in a cell adjacent to Cornell at the Boone County jail, located in Kentucky. (R. 15, Tr., 12/5/16, pp. 60, 12-24, ID. 1400) Cornell is very regretful of the insults and threats made against America and its leadership during the Fox19 interview. He acknowledes those insults and threats as being harmful and incorrect and he has no desire to act upon any of it.

Cornell was a very fragile and unstable man at the time of his arrest, and some would say lost, but today through much rehabilitative efforts he has become a strong and stable man and ready to reenter society. Through many years of struggle he found his way to a path of balance, involving peace and tolerance. Cornell acknowledges the opportunities America provides to its people, and he too himself hopes to share in it. Cornell recognizes America as a great country full of amazing opportunities, especially under its current leadership. If given the opportunity for freedom Cornell can guarantee the court that he would not pursue the same radicalized path that lead him to where he is today. He understands that extremism and terrorist beliefs are incorrect and inhumane. He understands that terrorist propaganda is harmful and non-productive. After seeing the inside of prison and spending many years in cells he understands well that it is not the way.

Cornell has so much supportive people in his life that can and will contribute to his life outside of prison. With his supervised conditions it will be difficult, if not impossible, for Cornell to even consider breaking a single law. And with Cornell already experiencing the tough life of being in prison he is sure to never find himself in such a place again. Cornell cares about his freedoms, his life, his future, his family and oppurtunies awaiting him and hopes to leave from prison to lead a successful life. He hopes to leave from prison to take care of his elderly parents and spend time with his family in productive ways, building and bonding with them. Cornell admits that prison is an environment and place that is not good or healthy. Prison allows excellent chance for rehabilitation efforts, we agree, but Cornell has learned a great lesson from his time in prison and will avoid every decision that could send him back to it. Prison deprives men of so many freedoms and opportunities and it makes one ponder. Cornell has come to appreciate those freedoms and opportunities America provides for its people and the lenient laws and rules it expects them to follow. Cornell understands that many other countries don't have it as good as us Americans do and he will appreciate the chance to live freely and happily.

Moreover, his consistent conduct over the past 10 years, devoid of any actions or statements aligning with his former harmful beliefs and ideology, further demonstrates his transformation. Cornell has since abandoned those harmful beliefs and ideologies carried by terrorists and other radicalized groups and individuals and has become more peaceful and tolerant towards other backgrounds and faiths. Cornell has left off from his previous path of support for hatred and violence and anti-Semitism. The absence of similar behavior to his pre-trial conduct solidifies the argument that he is no longer a danger to society.

Over the past decade, Cornell has taken extraordinary steps to rehabilitate himself and prepare for life outside prison. He completed numerous education and vocational programs, including ServSafe Food Handler Training certification, CDL Drivers License training, Business Math, and Carpentry Math, equipping himself with practical skills for employment. Participation in programs such as Suicide Watch Companion, Drug Education, Anger Management, Interfaith Dialogue, International Open University, Motivational Coaching, Healthy Lifestyle Wellness, and the CORE FBOP program underscores his efforts to address personal growth, emotional regulation, and community engagement. Cornell has been working as a unit orderly and is a reliable and trusted worker. He has plans to seek proper employment, housing, transport and education upon leaving prison. (See, Exhibits 5, 6, 7, 8, 9, 10, 11, 12)

Compassionate release would allow Cornell to build a life anchored in redemption and purpose. He has plans to establish a family, become a role model, and contribute positively to his community. With the support of his family, a committed partner, and employable skills, he is well-positioned to succeed in his post-incarceration life.

CONCLUSION

For the foregoing reasons, the Defendant, Christopher Lee Cornell, respectfully requests that this Court reduce his sentence, considering the sentencing disparity and his youthful offender status, his lack of prior criminal history, and his demonstrated rehabilitation. The Defendant has proven his capacity for change and poses Low threat to society, warranting a sentence reduction consistent with the sentencing disparity and Amendment 814 and in line with the goals of the Sentencing Reform Act.

Respectfully Submitted,

Sign: _____

Christopher Lee Cornell
#72795-061
Federal Correctional Institution
P.O. Box 1000
Cumberland, Maryland 21501-1000

Date:



Federal Correctional Institution
P.O. Box 1000
Cumberland, MD 21501-1000

Cincinnati, Ohio
SAT 22 MAR 202

legal
Mail

72795-061
Us District Court
Clerk      Room #103
100 E 5TH ST
Cincinnati, OH 45202
United States



C. Cornell — 061

Mailed:
02/28/25
Friday